# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                          Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a          In Proceedings Under
M-Den, Inc., d/b/a The M Den                     Chapter 11

                                                 Hon.  Thomas J. Tucker

                       Debtor.

_____/

## DECLARATION OF SCOTT HIRTH
## IN SUPPORT OF DEBTOR'S PETITION AND FIRST DAY MOTIONS

In support of Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den's ("Debtor") Chapter 11 Petition and its First Day Motions (defined below), I, Scott Hirth, declare as follows:

1.      The Debtor filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on August 16, 2024 (the "Petition Date").

2.      I am the Debtor's president, and I am in charge of purchasing, marketing and business development and I oversee the finance department.  I received my Master of Business Administration from the University of Michigan.

3. I own 25.03% of the Debtor's outstanding membership interest. The remaining interests are owned by Julie Corrin (25.03%) and Steve Horning (25.03%) and SSJ Return Holdings, Inc[1]. (24.91%).

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtor's personnel and professionals, my knowledge and review of relevant documents including the Debtor's books and records, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. Contemporaneously with the filing of this Declaration, the Debtor filed its *First Day Motion for Interim and Final Orders (I) Authorizing the Debtor To Use Cash Collateral; (II) Providing Adequate Protection To the Pre-Petition Lenders; and (III) Scheduling a Final Hearing* (the "Cash Collateral Motion"), *First Day Motion for Order Authorizing Payment of Prepetition Wages, Salaries and Employee Benefits* (the "Payroll Motion" and together with the Cash Collateral Motion, Payroll Motion, the "First Day Motions").

---

[1] SSJ Return Holdings, Inc. is in turn owned by me (33.33%), Julie Corrin (33.33%), and Steve Horning (33.33%).

6.     The Debtor has requested certain relief in the First Day Motions in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of the estate.

7.     I believe the relief sought in each of the First Day Motions is (i) necessary for the Debtor to make a successful transition to chapter 11 with minimal interruption or disruption to its business, and (ii) constitutes a key factor in maximizing and preserving the value of the Debtor's estate.

8.     I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of this Chapter 11 case and in support of the Debtor's voluntary petition and First Day Motions.

## BACKGROUND

9.     Debtor has been operating the largest retail operation of the University of Michigan (the "University") branded clothing and other merchandise for almost fifty (50) years.

10.    For the last thirty (30) years[2], the Debtor has been the official merchandise retailer of the University of Michigan Athletics, including a link to Debtor's website on the University of Michigan Athletics' website., pursuant to a

---

[2] This thirty-year stretch was interrupted in 2009 when the Debtor's status as the University's official merchandise retailer was terminated for one year and then reinstated.

July 1, 2009 licensing agreement and amendments (collectively the "<u>Licensing Agreement</u>").

11.   The University purported to terminate the Debtor's right under the Licensing Agreement (including its right to be the University's official merchandise retailer, as well as the Debtor's right to use the "M Den" name and URL) effective May 13, 2024.

12.   The Debtor and the University subsequently entered into a Forbearance Agreement (retroactively effective to May 13) pursuant to which the Debtor was authorized to continue to use the "M Den" name and URL and continued as the official merchandise retailer.

13.   The Forbearance Agreement was terminated by the University effective June 11, 2024, but the University allowed the Debtor to continue operating as if the Forbearance Agreement remained in effect in order to minimize disruption while the University looked for a new official merchandise retailer and the Debtor pursued a going concern sale.

14.   This continued until August 15, 2024, when the University demanded in writing that the Debtor cease and desist from further use of the "M Den" name and URL.

15.   Until very recently, Debtor operated from five separate retail locations and sold merchandise through the MDEN.com website.

16.     Debtor's largest store by far is located on State Street in Ann Arbor (the "Flagship Store").  The Debtor has also operated from stores located (i) on Main Street in Ann Arbor, (ii) in the Briarwood Mall in Ann Arbor (iii) in the Twelve Oaks Mall in Novi, and (iv) on Columbia Street in Detroit.

17.     The Debtor ceased operating its Twelve Oaks Mall location on August 16, 2024, and ceased operating at Briarwood Mall and Columbia Street in Detroit on August 19, 2024.  The Debtor is in the process of moving its assets out of these three locations.

18.     As a result, Debtor currently has two brick-and-mortar locations: (i) the Flagship Store, and (ii) the Main Street store.  In addition, Debtor sells merchandise from a tent located at the corner of Stadium and Main Streets in Ann Arbor (directly across the street from Michigan Stadium) on game days, graduation days and other special events.

19.     Previously, the Debtor sold merchandise on game days inside of Michigan Stadium and the University's retail locations at various other sports venues, but it does not anticipate doing so going forward.

## CAUSES OF BANKRUPTCY FILING

20.     A long chain of events contributed to Debtor's financial distress and ultimately its bankruptcy filing.  Following decades of success, and expansion of Debtor's operations completed in 2019, Debtor was faced with the severe challenges

which the COVID-19 pandemic brought to the retail sector, particularly on a suddenly empty college campus, and particularly to a company sitting on depleted cash reserves.

21.     In 2019, Debtor funded three large capital improvements from its operating capital and cash reserves.  The Debtor spent nearly a million dollars updating and implementing a new ERP software system.  At the same time, the Debtor funded roughly $600,000 to build out its Detroit and Main Street[3] locations, with both locations opening/reopening for business in November of 2019.  The Debtor self-funded these improvements, leaving it with lower-than-normal cash reserves going into 2020 when it hit head-on the unanticipated and unprecedented COVID-19 global pandemic that immediately followed.

22.     Starting in March of 2020, virtually all of Debtor's customers were removed from Ann Arbor for an entire year.  The University of Michigan's football and basketball games and other athletic events were played without fans present.  Students moved home, and students and faculty attended classes, graduation and other ceremonies remotely.

---

[3] The Main Street location was closed in June of 2018 as the landlord demolished the building and re-built it as a six story multi-use complex.  Upon completion of the building construction, the Debtor completed the build out of its unit, all funded by cash reserves.

23.     With its customer base stuck at home, the Debtor's retail sales took a nosedive and the Debtor shifted to selling the majority of its product online.  In 2020 over sixty percent (60%) of Debtor's sales were online which was more than double the percentage of online sales in 2019.  Unfortunately for the Debtor, its online sales generated a much lower profit margin than its retail sales.[4]

24.     In addition, the pandemic created significant uncertainty in necessary inventory levels and unpredictability in the supply chain.  Leading up to the fall of 2020, it was not clear when students would be returning to campus or whether fans would be able to attend games during the 2020 football and basketball seasons.  The Debtor was forced to decide whether to purchase its fall inventory and prepare for a possible return of the students and fans, or risk being left flat footed without proper inventory if the flood gates opened.

25.     As the University's official retail merchandise partner, the Debtor determined it was necessary to purchase its fall inventory in order to be prepared for the return of students and fans.  The Debtor purchased roughly $6,000,000 in inventory, but the COVID regulations did not lift. Classes remained remote, and college football and basketball games were played without fans, leaving Debtor with

---

[4] In addition to shipping costs, the royalty Debtor owed to the University for online sales was significantly higher than the royalty owed to the University for brick-and-mortar sales.

millions of dollars in inventory and vendor obligations to repay without its more profitable retail operations.

26. With traditional financing being generally unavailable, the Debtor began seeking alternative financing to cover its cash shortages and began taking out high interest loans which further deteriorated its financial condition.

27. In addition to the shift to online sales, the Debtor's profit model underwent another significant shift in July of 2021 when the NCAA approved a policy allowing student athletes to monetize their name, image and likeness ("NIL Policy"). The Debtor was quick to respond to the NIL Policy and worked with the University to launch a first of its kind name and number program for the 2021 football season. The Debtor's agility in implementing the program was celebrated, but its implementation was not without cost. The increased cost associated with payment of the student athletes further depleted Debtor's profit margin.

28. Despite all of the adversity, the Debtor's profit showed slight improvement in 2021. Students were returning to campus and sporting events and graduations were once again celebrated at in-person events. The Debtor was making strides at paying back its high interest secondary market loans.

29. Unfortunately, in fall and winter of 2022 when the supply chain issues caused by the pandemic came home to roost, the Debtor was not strong enough to withstand this final blow.

30.     Throughout 2020 and 2021, Debtor's vendors struggled to complete orders on timelines available prior to COVID and required Debtor to order inventory a year or more in advance of shipment.  Debtor met the demands, and submitted inventory orders a year or more in advance.

31.     It backfired.  During a two-week period in December 2022, Debtor received over five million dollars ($5,000,000) in pre-ordered inventory.  Much of the inventory was delivered later than expected, after the 2022 football season, in a glut difficult to even process, let alone sell.  The vendors went largely unpaid and some initiated lawsuits and obtained judgments which the Debtor could not pay.

32.     The Debtor started 2023 in the red and was ultimately not able to recover.  Debtor's sales sky-rocketed at the end of 2023 when University of Michigan's football team won the National Championship, but the royalties due to the University on championship merchandise were even higher and Debtor's profit margin was slim.  At the end of the day, the National Championship victory and the increase in sales was not sufficient to provide the Debtor with a financial recovery.

33.     The pandemic, the high interest unconventional financing, the deluge of inventory, lower profit margins attributable to online sales, the NIL Policy, and Championship royalites ultimately contributed to the Debtor's bankruptcy filing and the end of its nearly fifty years of success as the official merchandise retailer to the University of Michigan.

**NATURE OF DEBT**

**I.   DIRECT LIABILITIES TO BANK OF ANN ARBOR**

34.   The Debtor and its related entities have maintained loan relationships with Bank of Ann Arbor for many years. The loan relationships which exist as of the Petition Date are described below.

35.   The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated October 5, 2023, in the face amount of $2,150,000 ("Loan 100184"). The Debtor believes the current balance on Loan 100184 is approximately $2,255,675.50. This loan matured prior to the Petition Date and is due in full.

36.   The following individuals and entities have guaranteed repayment of Loan 100184: (i) Barbara Hirth, (ii) Barbara A. Hirth Trust u/a/d/ August 15, 1996, (iii) David Hirth, (iv) David F. Hirth Trust u/a/d August 15, 1996, as amended, (v) Scott Hirth, (vi) Julie Corrin, (vii) Steve Horning, (viii) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (ix) Scott David Hirth Trust Dated October 14, 2002, and (x) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

37.   The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated July 29, 2022, in the face amount of

$292,061.99 ("Loan 201529").  The Debtor believes the current balance on Loan 201529 is approximately $103,184.41.

38.     Debtor executed a Commercial Security Agreement dated July 5, 2020, granting Bank of Ann Arbor a security interest and all asset lien on Debtor's assets, including its Cash Collateral, to secure all amounts owed by Debtor to Bank of Ann Arbor.  Bank of Ann Arbor perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on May 6, 1999, file number D514533, which has been continued from time to time.

39.     The following individuals and entities have guaranteed repayment of Loan 100184: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (v) Scott David Hirth Trust Dated October 14, 2002, and (vi) The David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

**II.     GUARANTEED OBLIGATIONS TO BANK OF ANN ARBOR**

**a.  M-DEN PROPERTIES, LLC**

40.     The Debtor executed a Commercial Guaranty dated July 27, 2017 (the "Heritage Properties Guaranty"), guarantying repayment of all amounts owed by M-Den Properties, LLC ("Heritage Properties") to Bank of Ann Arbor.

41.      Heritage Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 29, 2022, in the face amount of $658,554.57 ("Loan

401828"). The Debtor believes the current balance on Loan 401828 is approximately $606,290.36.

42. The Scott David Hirth Trust Dated October 14, 2002, and I guaranteed repayment of Loan 401828.

43. Heritage Properties is also indebted to Bank of Ann Arbor pursuant to a Promissory Note dated June 25, 2022, in the face amount of $283,599.54 ("Loan 400994"). The Debtor believes the current balance on Loan 400994 is approximately $179,530.36.

44. The obligations of Heritage Properties to Bank of Ann Arbor are also secured by a mortgage and assignment of rents on real property located at 5000 Carpenter Rd. in Ypsilanti, Michigan (the "Warehouse").

45. The Warehouse is owned by Heritage Properties and is leased to Debtor.

46. The following individuals and entities have guaranteed repayment of Loan 400994: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (v) Scott David Hirth Trust Dated October 14, 2002, and (vi) The David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### b. STADIUM PROPERTIES

47.     The Debtor executed a Commercial Guaranty dated June 27, 2017 ("Stadium Properties Guaranty"), guarantying repayment of all amounts owed by M Den Stadium Properties, LLC ("Stadium Properties") to Bank of Ann Arbor.

48.     Stadium Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated March 23, 2024, in the face amount of $870,335 ("Loan 401827").  The Debtor believes the current balance on Loan 401827 is approximately $861,082.35.

49.     Loan 401827 is also secured by a mortgage and assignment of rents on real property located at 1336 South Main and 210 West Stadium Blvd. in Ann Arbor.

50.     The following individuals and entities have guaranteed repayment of Loan 401827: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### c. STATE STREET PROPERTIES

51.     The Debtor executed a Commercial Guaranty dated June 27, 2017 ("State Street Guaranty"), guarantying repayment of all amounts owed by M Den State Street Properties, LLC ("State Street Properties") to Bank of Ann Arbor.

52.     State Street Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 27, 2022, in the face amount of $2,256,976.20 ("Loan 401636").   The Debtor believes the current balance on Loan 401636 is approximately $2,057,684.10.

53.     Loan 401636 is also secured by a mortgage and assignment of rents on real property located at 307-309 State Street in Ann Arbor, Michigan.

54.     The following individuals and entities have guaranteed repayment of Loan 401636: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### III.     DIRECT LIABILITY TO NEWTEK BANK

55.     Debtor is indebted to Newtek Bank pursuant to U.S. Small Business Administration Note dated December 10, 2020 in the face amount of $4,600,000 ("Newtek Note").   The Debtor believes the current balance on the Newtek Note is approximately $4,835,106.04.

56.     The Newtek Note is secured by an all asset lien on Debtor's assets, including its Cash Collateral, pursuant to a Commercial Security Agreement dated December 10, 2020.    Newtek perfected its lien by the filing of a UCC Financing

Statement with the State of Michigan on November 13, 2020, file number 20201113000487-3.

57.    The following individuals and entities have guaranteed repayment of the Newtek Note: (i) Rennae Whitt; (ii) Elizabeth Horning, (iii) Steven Horning, (iv) M Den State Street Properties, LLC, (v) Scott David Hirth, (vi) July Carol Corrin, (vii) M Den Stadium Properties, LLC, (viii) M-Den Properties, LLC, and (ix) David Corrin.

## IV.    DIRECT LIABILITY TO TVT

58.    Debtor is indebted to TVT 2.0, LLC ("TVT") pursuant to Business Loan and Security Agreement dated March 23, 2023 in the face amount of $2,500,000 ("TVT Agreement").   The Debtor believes the current balance on the TVT Note is approximately $1,003,941.

59.    The TVT Note is secured by an all asset lien on Debtor's assets, including its Cash Collateral, pursuant to the TVT Agreement.   The Debtor believes that TVT has perfected its lien by the filing of a UCC Financing Statement with the State of Michigan, however, it has been unable to identify the filing.

## V.    FORMER LIEN CREDITORS

60.    In addition, the Debtor previously borrowed funds from various creditors who filed UCC Financing statements against the Debtor's assets, including Cash Collateral.   These creditors are identified on the attached Exhibit A.   The

Debtor believes that all amounts owed to these creditors have been repaid and as a result none of these creditors have an interest in the Debtor's Cash Collateral. However, these creditors have not filed termination statements terminating their filed Financing Statements so the Debtor is notifying them of its proposed use of Cash Collateral.

61.     I am informed that no other party-in-interest has an interest in the Debtor's Cash Collateral.

62.     Nothing in this Declaration may be construed as an admission by the Debtor as to any liability or the amount of any indebtedness, or as an admission by the Debtor with respect to the validity, extent, priority, and/or enforceability of any lien against any of the Debtor's assets.

### REQUEST FOR USE OF CASH COLLATERAL

63.     As of the Petition Date, Debtor, without admission, Debtor believes that its cash collateral, as defined in 11 U.S.C. §363, (the "Cash Collateral") consisted of the following collateral:

     a.    Cash of approximately $1,159.03;
     b.    Accounts Receivable of approximately $161,488.53[5];
     c.    Inventory valued at approximately $8,102,417.00 (cost basis).

---

[5] The vast majority of Debtor's accounts receivable are owed to it by the University and are likely subject to set-off against the University's claim of approximately $8,855,882.

64.    Debtor requires the use of Cash Collateral to make such payments as are necessary for the continuation of its business as shown in the budget attached to the Cash Collateral Motion as Exhibit C (the "Budget"). The projected revenue and expenses in the Budget are based upon historical financial data.

65.    The Budget projects Debtor's anticipated revenue and expenses and demonstrates the amount of funds the Debtor anticipates needing to spend on its operations over a thirteen-week period.

66.    I am confident that Debtor's post-petition operations will be profitable as further set forth in the Budget.

67.    From the Petition Date through September 15, 2024, Debtor projects that it will need to spend approximately $936,489 to avoid immediate and irreparable harm as set forth in the Budget.

68.    Without the ability to make the payments as set forth in the Budget, (i) the Debtor will suffer irreparable harm, (ii) it will be unable to fund operations necessary to sell collateral (iii) its employees will abandon it because the Debtor will be unable to pay for their services, and (iv) the Debtor will be forced to cease operating.

69.    The majority of the Debtor's value arises from its on-going operations and its ability to continue operating as a going concern out of its Flagship Store. If the Debtor ceases operating and is forced into liquidation, its value will be

substantially reduced.

70.     Accordingly, authorizing Debtor to use Cash Collateral as set forth in the Budget is in the best interests of all creditors and parties-in-interest.

## PAYROLL MOTION

71.     Contemporaneously with the filing of this Declaration, the Debtor has filed its *First Day Motion for Order Authorizing Payment of Prepetition Employee Obligations* (the "Payroll Motion").

72.     On the Petition Date, the Debtor had approximately 151 employees ("Employees").   Thirty-five (35) of the Employees are paid a salary and the remainder are paid hourly.

73.     Prior to the Petition Date, and in the ordinary course of business, Debtor typically paid obligations relating to Employee wages ("Wages") on a bi-weekly basis, with Wages being paid every two weeks on Friday for the period ending five days earlier.

74.     The Debtor provides Employees with the opportunity to participate in a 401K program and matches up to two percent (2%) of each employee's contribution.

75.     The Debtor provides its Employees with access to health insurance coverage and a Health Savings Account ("HSA").   The Debtor pays the health

insurance premiums for all employees. In addition, the Debtor funds each Employees' HSA with an amount sufficient to pay their annual deductible.

76. The Debtor also offers dental and vision insurance to its Employees but does not pay any of the premium.

77. The benefits described in paragraphs 74, 75 and 76 are collectively referred to as the "Employee Benefits").

78. As of the Petition Date, the following Employees are "insiders" as the term is defined in the Bankruptcy Code (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) Hunter Hirth, and (v) Robyn Horning. The compensation paid to each is set forth below:

- I receive an annual salary of $160,000, Employee Benefits and a cell phone. My job responsibilities and educational background are set forth above.

- Julie Corrin receives an annual salary of $160,000, Employee Benefits and a cell phone. Ms. Corrin is in charge of retail operations and oversees all store managers, runs the operations at Michigan Stadium on game days and manages game day inventory. Ms. Corrin has a Bachelor degree from Michigan State University.

- Steve Horning receives an annual salary of $160,000, Employee Benefits and a cell phone. Mr. Horning is responsible for the warehouse operations and restocking inventory at retail locations. Mr. Horning is also responsible for managing facility operations such as internet, phone service, UPS, copiers, etc. Mr. Horning has his Bachelor degree from Central Michigan University.

- Hunter Hirth is my daughter. She receives an annual salary of $60,000 and Employee Benefits. Ms. Hirth is the Debtor's marketing manager and social media coordinator.

- Robyn Horning is Steve Horning's cousin. She is paid an annual salary of $70,000 and she runs the shipping line for distribution center.

79.     Wages and Employee Benefits will be collectively referred to as the "Employee Obligations".

80.     The Debtor is required by law to withhold from its Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").

81.     The Debtor is also required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (together with the Withholding Taxes, the "Payroll Taxes").

82.     The laws of the State of Michigan require Debtor to fund certain amounts necessary to maintain workers' compensation policies and programs to provide the relevant Employees with coverage for claims arising from or related to their employment ("Workers' Compensation Expenses" and together with the Payroll Taxes, the "Regulated Payroll Obligations").

83.     The Debtor processes its payroll with PayChex.

84.     The Debtor is required to fund its next payroll on August 29, 2024, for payment to Employees on August 30, 2024.  This payroll will total approximately $144,000.00 and will cover Employee Obligations and Regulated Payroll Obligations incurred from August 12, 2024 to August 25, 2024.

85.     Approximately $61,700.00 of this amount will be compensation to Employees for prepetition services ("Prepetition Wages").

86.     No Employee will receive more than $15,150 in Prepetition Wages if this payroll is paid.

87.     In addition to the payment of the Prepetition Wages, some or all of the additional Employee Obligations and Regulated Payroll Obligations will relate to prepetition services.

88.     The vast majority of the value of the Debtor's business arises from its ongoing operations.  The Employees are instrumental in allowing the Debtor to continue operating as a going concern.

89.     If the Debtor is unable to pay Employee Obligations when due, some of the Employees may suffer extreme personal hardship and be unable to pay their daily living expenses.

90.     Furthermore, any delay or failure to pay Employee Obligations would irreparably impair the Employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtor's relationship with its Employees at a time

when the Employees' support is critical to the success of the Debtor's reorganization. The Debtor acknowledges that many of the Employees will be terminated on or shortly after the Petition Date because of anticipated store closures. However, there are many Employees that the Debtor needs to continue its operations and the confidence and morale of these continuing Employees will be damaged if the Debtor terminates other Employees and does not pay them their final wages.

91. The Debtor simply cannot risk the substantial damage to the value of its business that would inevitably result from the loss of Employees or decline in the Employees' morale.

92. Declarant says nothing further.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/ s / Scott Hirth

Dated: August 19, 2024