In re:                                           Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a          In Proceedings Under
M-Den, Inc., d/b/a The M Den                      Chapter 11

                                                 Hon.  Thomas J. Tucker

                          Debtor.

_____/

### DEBTOR'S FIRST DAY MOTION FOR ORDER AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS

Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc., d/b/a The M Den

("Debtor"), by and through its proposed attorneys, Schafer and Weiner, PLLC, for its

*First Day Motion for Order Authorizing Payment of Prepetition Employee*

*Obligations* ("Motion"), states:

#### JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§

157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).

3.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 363(b), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code")[1] and Rule 6003 of the Federal Rules of Bankruptcy Procedure ("FRBP").

## REQUESTED HEARING DATE

5.     Contemporaneously with its filing of this Motion, the Debtor filed its *First Day Motion for Interim and Final Orders (I) Authorizing the Debtor To Use Cash Collateral; (II) Providing Adequate Protection To the Pre-Petition Lenders; and (III) Scheduling a Final Hearing* ("Cash Collateral Motion" and together with this Motion the "First Day Motions").  The Debtor requested that the Court schedule a hearing on the First Day Motions on or before August 23, 2024.

## BACKGROUND

6.     On August 16, 2024 (the "Petition Date"), the Debtor filed its Voluntary Petition for relief (the "Chapter 11 Case") Chapter 11 of Title 11 of the United States Code.

7.     The Debtor continues to operate its business and manage its financial affairs and properties as a debtor-in-possession pursuant to §§ 1107(a) and 1108.  No official committee of creditors holding unsecured claims or other committees have been formed under § 1102.

---

[1] Unless otherwise noted to the contrary, all section references herein are references to sections of the Bankruptcy Code.

8. Scott Hirth ("Hirth") is the President and has been selected as the Debtor's responsible person in this bankruptcy case.

9. The *Declaration of Scott Hirth in Support of Debtor's Chapter 11 Petition and First Day Motions* ("Hirth Declaration") describes Debtor's background and the circumstances leading to its bankruptcy filing. *See* Hirth Declaration at DN 15.

## THE DEBTOR'S BUSINESS

## BACKGROUND

10. Debtor has been operating the largest retail operation of the University of Michigan (the "University") branded clothing and other merchandise for almost fifty (50) years. *See* DN 15 at ¶ 9.

11. For the last thirty (30) years[1], the Debtor has been the official merchandise retailer of the University of Michigan Athletics, including a link to Debtor's website on the University of Michigan Athletics' website, pursuant to a July 1, 2009 licensing agreement and amendments (collectively the "Licensing Agreement"). *See* DN 15 at ¶ 10.

12. The University purported to terminate the Debtor's right under the Licensing Agreement (including its right to be the University's official merchandise

---

[1] This thirty-year stretch was interrupted in 2009 when the Debtor's status as the University's official merchandise retailer was terminated for one year and then reinstated.

retailer, as well as the Debtor's right to use the "M Den" name and URL) effective May 13, 2024. *See* DN 15 at ¶ 11.

13.     The Debtor and the University subsequently entered into a Forbearance Agreement (retroactively effective to May 13) pursuant to which the Debtor was authorized to continue to use the "M Den" name and URL and continued as the official merchandise retailer. *See* DN 15 at ¶ 12.

14.     The Forbearance Agreement was terminated by the University effective June 11, 2024, but the University allowed the Debtor to continue operating as if the Forbearance Agreement remained in effect in order to minimize disruption while the University looked for a new official merchandise retailer and the Debtor pursued a going concern sale. *See* DN 15 at ¶ 13.

15.     This continued until August 15, 2024, when the University demanded in writing that the Debtor cease and desist from further use of the "M Den" name and URL. *See* DN 15 at ¶ 14.

16.     Until very recently, Debtor operated from five separate retail locations and sold merchandise through the MDEN.com website. *See* DN 15 at ¶ 15.

17.     Debtor's largest store by far is located on State Street in Ann Arbor (the "Flagship Store").  The Debtor has also operated from stores located (i) on Main Street in Ann Arbor, (i) in the Briarwood Mall in Ann Arbor (iii) in the Twelve Oaks Mall in Novi, and (iv) on Columbia Street in Detroit. *See* DN 15 at ¶ 16.

18.     The Debtor ceased operating its Twelve Oaks Mall location on August 16, 2024 and ceased operating at Briarwood Mall and Columbia Street in Detroit on August 19, 2024.  The Debtor is in the process of moving its assets out of these three locations.  *See* DN 15 at ¶ 17.

19.     As a result, Debtor currently has two brick and mortar locations: (i) the Flagship Store, and (ii) the Main Street store.  In addition, Debtor sells merchandise from a tent located at the corner of Stadium and Main Streets in Ann Arbor (directly across the street from Michigan Stadium) on game days, graduation days and other special events.  *See* DN 15 at ¶ 18.

20.     Previously, the Debtor sold merchandise on game days inside of Michigan Stadium and the University's retail locations at various other sports venues, but it does not anticipate doing so going forward. *See* DN 15 at ¶ 19.

### CAUSES OF BANKRUPTCY FILING

21.     A long chain of events contributed to Debtor's financial distress and ultimately its bankruptcy filing.  Following decades of success, and expansion of Debtor's operations completed in 2019, Debtor was faced with the severe challenges which the COVID-19 pandemic brought to the retail sector, particularly on a suddenly empty college campus, and particularly to a company sitting on depleted cash reserves.  *See* DN 15 at ¶ 20.

22.    In 2019, Debtor funded three large capital improvements from its operating capital and cash reserves.   The Debtor spent nearly a million dollars updating and implementing a new ERP software system.   At the same time, the Debtor funded roughly $600,000 to build out its Detroit and Main Street[1] locations, with both locations opening/reopening for business in November of 2019.   The Debtor self-funded these improvements, leaving it with lower-than-normal cash reserves going into 2020, hitting head-on into the unanticipated and unprecedented COVID-19 global pandemic that immediately followed.   *See* DN 15 at ¶ 21.

23.    Starting in March of 2020, virtually all of Debtor's customers were removed from Ann Arbor for an entire year.   The University of Michigan's football and basketball games and other athletic events were played without fans present. Students moved home, and students and faculty attended classes, graduation and other ceremonies remotely.   *See* DN  15 at ¶ 22.

24.    With its customer base stuck at home, the Debtor's retail sales took a nosedive and the Debtor shifted to selling the majority of its product online.  In 2020 over sixty percent (60%) of Debtor's sales were online which was more than double

---

[1] The Main Street location was closed in June of 2018 as the landlord demolished the building and re-built it as a six story multi-use complex.  Upon completion of the building construction, the Debtor completed the build out of its unit, all funded by cash reserves.

the percentage of online sales in 2019. Unfortunately for the Debtor, its online sales generated a much lower profit margin than its retail sales.[1]  *See* DN 15 at ¶ 23.

27.    In addition, the pandemic created significant uncertainty in necessary inventory levels and unpredictability in the supply chain.  Leading up to the fall of 2020, it was not clear when students would be returning to campus or whether fans would be able to attend games during the 2020 football and basketball seasons.  The Debtor was forced to decide whether to purchase its fall inventory and prepare for a possible return of the students and fans, or risk being left flat footed without proper inventory if the flood gates opened.  *See* DN 15 at ¶ 24.

26.    As the University's official retail merchandise partner, the Debtor determined it was necessary to purchase its fall inventory in order to be prepared for the return of students and fans.  The Debtor purchased roughly $6,000,000 in inventory, but the COVID regulations did not lift. Classes remained remote, and college football and basketball games were played without fans, leaving Debtor with millions of dollars in inventory and vendor obligations to repay without its more profitable retail operations.  *See* DN 15 at ¶ 25.

27.    With traditional financing being generally unavailable, the Debtor began seeking alternative financing to cover its cash shortages and began taking out

---

[1] In addition to shipping costs, the royalty Debtor owed to the University's for online sales was significantly higher than the royalty owed to the University for brick-and-mortar sales.

high interest loans) which further deteriorated its financial condition. *See* DN 15 at ¶ 26.

28.     In addition to the shift to online sales, the Debtor's profit model underwent another significant shift in July of 2021 when the NCAA approved a policy allowing student athletes to monetize their name, image and likeness ("NIL Policy"). The Debtor was quick to respond to the NIL Policy and worked with the University to launch a first of its kind name and number program for the 2021 football season. The Debtor's agility in implementing the program was celebrated, but its implementation was not without cost. The increased cost associated with payment of the student athletes further depleted Debtor's profit margin. *See* DN 15 at ¶ 27.

29.     Despite all of the adversity, the Debtor's profit showed slight improvement in 2021. Students were returning to campus and sporting events and graduations were once again celebrated at in-person events. The Debtor was making strides at paying back its high interest secondary market loans. *See* DN 15 at ¶ 28.

30.     Unfortunately, in fall and winter of 2022 when the supply chain issues caused by the pandemic came home to roost, the Debtor was not strong enough to withstand this final blow. *See* DN 15 at ¶ 29.

31.     Throughout 2020 and 2021, the Debtor's vendors struggled to complete orders on timelines available prior to Covid and required Debtor to order inventory a

year or more in advance of shipment. Debtor met the demands, and submitted inventory orders a year or more in advance. *See* DN 15 at ¶ 30.

32.   It backfired. During a two-weeks period in December 2022, Debtor received over five million dollars ($5,000,000) in pre-ordered inventory. Much of the inventory was delivered later than expected, after the 2022 football season, in a glut difficult to even process, let alone sell. The vendors went largely unpaid and some initiated lawsuits and obtained judgments which the Debtor could not pay. *See* DN 15 at ¶ 31.

33.   The Debtor started 2023 in the red and was ultimately not able to recover. Debtor's sales sky-rocketed at the end of 2023 when University of Michigan's football team won the National Championship, but the royalties due to the University on championship merchandise was even higher and Debtor's profit margin was slim. At the end of the day, the National Championship victory and the increase in sales was not sufficient to provide the Debtor with a financial recovery. *See* DN 15 at ¶ 32.

34.   The pandemic, the high interest unconventional financing, the deluge of inventory, lower profit margins attributable to online sales, the NIL Policy, and Championship royalites ultimately contributed to the Debtor's bankruptcy filing and the end of its nearly fifty years of success as the official merchandise retailer to the University of Michigan. *See* DN 15 at ¶ 33.

## DEBTOR'S PAYROLL

34.     On the Petition Date, the Debtor had approximately 151 employees ("Employees"). Thirty-five (35) of the Employees are paid a salary and the remainder are paid hourly. *See* DN 15 at ¶ 72.

35.     Prior to the Petition Date, and in the ordinary course of business, Debtor typically paid obligations relating to Employee wages ("Wages") on a bi-weekly basis, with Wages being paid every two weeks on Friday for the period ending five days earlier. *See* DN 15 at ¶ 73.

36.     The Debtor provides Employees with the opportunity to participate in a 401K program and matches up to two percent (2%) of each employee's contribution. *See* DN 15 at ¶ 74.

37.     The Debtor provides its Employees with access to health insurance coverage and a Health Savings Account ("HSA"). The Debtor pays the health insurance premiums for all employees. In addition, the Debtor funds each Employees' HSA with an amount sufficient to pay their annual deductible. *See* DN 15 at ¶ 75.

38.     The Debtor also offers dental and vision insurance to its Employees but does not pay any of the premium. *See* DN 15 at ¶ 76.

39.     The benefits described in paragraphs 36, 37 and 38 are collectively referred to as the "Employee Benefits"). *See* DN 15 at ¶ 77.

40.     As of the Petition Date, the following Employees are "insiders" as the term is defined in the Bankruptcy Code (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) Hunter Hirth, and (v) Robyn Horning.  The compensation paid to each is set forth below:

- Scott Hirth receives an annual salary of $160,000, Employee Benefits and a cell phone.  Mr. Hirth is in charge of purchasing, marketing and business development and he oversees the finance department.  Mr. Hirth received his Master of Business Administration from the University of Michigan.

- Julie Corrin receives an annual salary of $160,000, Employee Benefits and a cell phone.  Ms. Corrin is in charge of retail operations and oversees all store managers, runs the operations at Michigan Stadium on game days and manages game day inventory. Ms. Corrin has a Bachelor degree from Michigan State University.

- Steve Horning receives an annual salary of $160,000, Employee Benefits and a cell phone.  Mr. Horning is responsible for the warehouse operations and restocking inventory at retail locations. Mr. Horning is also responsible for managing facility operations such as internet, phone service, UPS, copiers, etc.  Mr. Horning has his Bachelor degree from Central Michigan University.

- Hunter Hirth is Scott Hirth's daughter.  She receives an annual salary of $60,000 and Employee Benefits.  Ms. Hirth is the Debtor's marketing manager and social media coordinator.

- Robyn Horning is Steve Horning's cousin.  She is paid an annual salary of $70,000 and she runs the shipping line for distribution center.

*See* DN 15 at ¶ 78.

34.   Wages and Employee Benefits will be collectively referred to as the "Employee Obligations".  *See* DN 15 at ¶ 79.

35.   The Debtor is required by law to withhold from its Employees' Wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  *See* DN 15 at ¶ 80.

36.   The Debtor is also required to make matching payments from its own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (together with the Withholding Taxes, the "Payroll Taxes").  *See* DN 15 at ¶ 81.

37.   The laws of the State of Michigan require Debtor to fund certain amounts necessary to maintain workers' compensation policies and programs to provide the relevant Employees with coverage for claims arising from or related to their employment ("Workers' Compensation Expenses" and together with the Payroll Taxes, the "Regulated Payroll Obligations").  *See* DN 15 at ¶ 82.

38.   The Debtor processes its payroll with PayChex.  *See* DN 15 at ¶ 83.

39.     The Debtor is required to fund its next payroll on August 29, 2024, for payment to Employees on August 30, 2024. This payroll will total approximately $144,000.00 and will cover Employee Obligations and Regulated Payroll Obligations incurred from August 12, 2024 to August 25, 2024. *See* DN 15 at ¶ 84.

40.     Approximately $61,700.00 of this amount will be compensation to Employees for prepetition services ("Prepetition Wages"). *See* DN 15 at ¶ 85.

41.     No Employee will receive more than $15,150 in Prepetition Wages if this payroll is paid. *See* DN 15 at ¶ 86.

42.     In addition to the payment of the Prepetition Wages, some or all of the additional Employee Obligations and Regulated Payroll Obligations will relate to prepetition services. *See* DN 15 at ¶ 87.

43.     The vast majority of the value of the Debtor's business arises from its ongoing operations. The Employees are instrumental in allowing the Debtor to continue operating as a going concern. *See* DN 15 at ¶ 88.

44.     If the Debtor is unable to pay Employee Obligations when due, some of the Employees may suffer extreme personal hardship and be unable to pay their daily living expenses. *See* DN 15 at ¶ 89.

45.     Furthermore, any delay or failure to pay Employee Obligations would irreparably impair the Employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtor's relationship with its Employees at a time

when the Employees' support is critical to the success of the Debtor's reorganization. The Debtor acknowledges that many of the Employees may be terminated on or shortly after the Petition Date because of anticipated store closures. However, there are many Employees that the Debtor needs to continue its operations and the confidence and morale of these continuing Employees will be damaged if the Debtor terminates other Employees and does not pay them their final wages. *See* DN 15 at ¶ 90.

46.     The Debtor simply cannot risk the substantial damage to the value of its business that would inevitably result from the loss of Employees or decline in the Employees' morale. *See* DN 15 at ¶ 91.

## RELIEF REQUESTED

47.     Pursuant to sections 105(a), 363(b), and 507(a), the Debtor respectfully requests that the Court enter an order, substantially in the form attached as **Exhibit A,** (a) authorizing the Debtor, in its sole discretion, to pay and honor the Employee Obligations (as defined below); (b) directing the Debtor's prepetition banks and the financial institutions to receive, process, honor, and pay all checks and electronic payments related to the Employee Obligations; and (c) permitting the Debtor to change or discontinue and implement new Employee Obligations in its sole discretion and without further approval of the Court.

## BASIS FOR RELIEF

48.     Under section 507(a)(4)(A), each Employee is entitled to a priority claim of up to $15,150 for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date. Also, section 507(a)(5) provides up to $15,150 of priority status for Employees' claims for contributions to certain employee-benefit plans, less amounts paid under section 507(a)(4).

49.     Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1), and section 105(a) provides, *inter alia*, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this Title."

50.     Furthermore, courts have authorized payment of prepetition wages and benefits to employees under sections 363(b) and 105(a), and the "necessity of payment" doctrine. *See* e.g., <u>In re Gulf Air Inc.</u>, 112 B.R. 152, 153 (Bankr. W.D. La 1989) (the Court authorized payment of all salaries and wages, per diem expenses, life and health insurance premiums and workers compensation premiums for company's 550 employees and dependents recognizing that the maintenance of the Debtor's work force was "indispensable" to its reorganization efforts). <u>In re Michigan State Railway Company, Inc.</u>, 87 B.R. 921 (Bankr. E.D. Mich. 1988)

(Although dealing with a railroad reorganization, a necessity of payment rule was recognized when it was demonstrated that the payment of the prepetition claim was necessary to maintain business of the Debtor). *See also* In re Goodrich Quality Theatres, 616 B.R. 514, 517 (Bankr. W.D. Mich. 2020) (discussing the legal basis for the necessity of payment doctrine and noting that "[t]he need to make payroll in order to avoid immediate an irreparable harm is practically self-evident." 616 B.R. at 521); In re UNR Industries, Inc., 143 B.R. 506, 519 (Bankr. N.D. Ill. 1992) (Employee payments authorized since the "necessity doctrine may be used to permit a Debtor to pay the prepetition claims of . . . employees whose continued cooperation is essential to the Debtor's successful reorganization.").

51. Courts in this district have routinely granted similar relief. *See, e.g.,* In re Select Distributors, LLC, Case No. 21-45689-tjt [DN 30, Filed July 12, 2021]; In re Cadillac Nursing Home, Inc. d/b/a St. Francis Nursing Center, Case No. 16-41554 (TJT) [DN 23, filed February 12, 2016]; Telesource Services, LLC, Case No. 15-45364 (TJT) [DN 28, filed April 8, 2015]; In re Shanta Corp. d/b/a St. Anne's Convalescent Center, Case No. 15-44578 (TJT) [DN 36, filed March 30, 2015]; In re Associated Community Services, Inc., Case No. 14-44095 (PJS) [DN 20, filed March 18, 2014]; In re Acme Acres, LLC, Case No. 13-45044 (PJS) [DN 25, filed March 20, 2013]; In re Shanta Corp. d/b/a St. Anne's Convalescent Center, et al., Case No. 12-43956 (TJT) [DN 31, filed February 27, 2012].

52.     The Debtor believes that most, if not all, of the Employee Obligations relating to the prepetition period constitute priority claims under sections 507(a)(4) and/or (a)(5).   As priority claims, the Debtor's estate must pay the Employee Obligations in full before satisfying any of the Debtor's general unsecured obligations.   Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and it will not prejudice the rights of general unsecured creditors or other parties-in-interest.

53.     Any delay or failure to pay Employee Obligations would irreparably impair the Employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtor's relationship with its Employees at a time when the Employees' support is critical to the success of the Debtor's reorganization.   The Debtor acknowledges that many of the Employees may be terminated in connection with or shortly after the Petition Date with the closer of several of Debtor's retail locations.   However, there are many Employees that the Debtor needs to continue its operations and the confidence and morale of these continuing Employees will be damaged if other Employees who are losing their jobs are not paid.   The Debtor simply cannot risk the substantial damage to the value of its business that would inevitably result from the loss of Employees or decline in the Employees' morale. *See* Dk. No. 11 at ¶ 62.

54.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the filing of the petition if the relief is necessary to avoid immediate and irreparable harm. Absent an order granting the relief requested in this Motion, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable some of the Employees to meet their own personal financial obligations. Without the requested relief, the stability of the Debtor will be irreparably undermined because otherwise loyal Employees will seek employment alternatives. The Debtor will suffer imminent and irreparable harm if the relief requested is not granted. Accordingly, the Debtor submits that the requirements of Bankruptcy Rule 6003 are met and the relief sought herein should be granted immediately.

55.     With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors of the Debtor's estate, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) in respect of such obligations.

56.     Accordingly, by this Motion, the Debtor also seeks authority pursuant to sections 507(a), 363(b), 105(a) and the necessity of payment doctrine to pay Regulated Payroll Obligations and, in the Debtor's sole discretion, the Employee Obligations and as they become due and owing, and to continue, uninterrupted, its

practices, programs and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Petition Date.

57. Any delay in paying the Employee Obligations will be detrimental to the Debtor, its Employees, its creditors, and the estate. Accordingly, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting this motion, whether imposed by Bankruptcy Rule 6004(g) or otherwise.

### DEBTOR'S BANKS SHOULD BE AUTHORIZED TO HONOR AND PAY CHECKS ISSUED AND MAKE OTHER TRANSFERS TO PAY THE EMPLOYEE OBLIGATIONS

58. The Debtor further requests that the Court authorize the Debtor's banks to receive, process, honor, and pay all prepetition and post-petition checks issued or to be issued, and electronic fund transfers requested or to be requested, by the Debtor to pay the Employee Obligations and Regulated Payroll Obligations. The Debtor also seeks authority to issue new post-petition checks or affect new electronic fund transfers to pay the Employee Obligations and Regulated Payroll Obligations and to replace, where needed, any prepetition checks or electronic fund transfer requests.

59. As a result of the commencement of the Debtor's case, and in the absence of an order of the Court providing otherwise, the Banks may dishonor or reject the Debtor's checks, wire transfers, and direct deposit transfers relating to the Employee Obligations and Regulated Payroll Obligations.

60.     Accordingly, for the reasons stated herein, Debtor seeks entry of an order approving the payment of the Employee Obligations and Regulated Payroll Obligations.

61.     Additionally, the Debtor requests that this Court relieve it from the obligation to identify each individual Employee as a creditor in this case.  The Debtor believes that identifying each individual Employee as a creditor will result in needless expenses and administrative burden to the bankruptcy estate.  Furthermore, no Employee will be prejudiced if the Employees are not individually identified as creditors in this case because the Employees will be paid and will no longer have prepetition claims.

## NOTICE

62.     The Debtor will (a) immediately provide notice of the hearing on this Motion to: (i) the United States Trustee for the Eastern District of Michigan, (ii) Bank of Ann Arbor, (iii) Newtek, (iv) TVT, (v) the entities listed on Exhibit B to the Cash Collateral Motion or their agent, (vi) the Debtor's 20 largest unsecured creditors, and (v) all other parties who were required to be served under Fed. R. Bank. P. 4001(d), and (b) give such notice by any one of the following methods which is available: (i) ECF service; (ii) personal service; (iii) overnight mail; (iv) facsimile, or (v) e-mail.   In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

<u>**NO PRIOR REQUEST**</u>

63.     No previous motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form attached as Exhibit A, (i) authorizing Debtor, in its sole discretion, to pay and honor the Employee Obligations and Regulated Payroll Obligations; (ii) directing Debtor's banks and other financial institutions to receive, process, honor, and pay all checks and electronic payments related to the Employee Obligations and Regulated Payroll Obligations; and (iii) permitting the Debtor to change or discontinue and implement new Employee Obligations in its sole discretion and without further approval of the Court.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Kim Hillary
KIM HILLARY (P67534)
HOWARD BORIN (P51959)
Proposed Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
Dated:  August 19, 2024                    khillary@schaferandweiner.com

**Exhibit A**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 24-47922-tjt |
| Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc., d/b/a The M Den | In Proceedings Under Chapter 11 |
| | Hon. Thomas J. Tucker |
| Debtor. | |
| _____/ | |

## ORDER GRANTING DEBTOR'S FIRST DAY MOTION FOR ORDER AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS

Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc., d/b/a The M Den ("Debtor"), having filed its *First Day Motion for Order Authorizing Payment of Prepetition Employee Obligations* ("Motion"); Debtor having given due and sufficient notice of the Motion under the circumstances; the Court having jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334; this venue being proper under 28 U.S.C. §§ 1408 and 1409; the relief requested in the Motion being in the best interests of Debtor, its estate, creditors, and other parties-in-interest; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED:**

1.      The Motion is GRANTED.

2.     Debtor is authorized to pay the Regulated Payroll Obligations[1] and is authorized, but not directed, to pay the Employee Obligations up to the amount of $15,150 per Employee in accordance with 11 U.S.C. § 507(a)(4)-(5).

3.     Debtor is authorized, but not directed, to pay all incidental costs and expenses related to the Employee Obligations.

4.     Debtor's banks and other financial institutions are directed to receive, process, honor, and pay all checks and electronic payments related to the Employee Obligations and Regulated Payroll Obligations.

5.     Payment of the Regulated Payroll Obligations and Employee Obligations is subject to the terms of any order authorizing the Debtor's to use cash collateral, and without prejudice to the Debtor's right to change or discontinue and implement new Employee Obligations in its sole discretion and without further approval of the Court, in the ordinary course of its business.

6.     Notwithstanding any provision in Fed. R. Bankr. P. 6003 or 6004 to the contrary, (a) this Order will be effective immediately and enforceable upon its entry; (b) Debtor is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (c) Debtor is authorized and empowered, and may in its discretion and without further delay, take any action necessary or appropriate to implement this Order.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning attributed to them in the Motion.

7.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.