## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                      Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a      In Proceedings Under
M-Den, Inc., d/b/a The M Den           Chapter 11

                                       Hon.  Thomas J. Tucker

                    Debtor.

_____/

## DEBTOR'S CORRECTED COVER SHEET FOR ITS
## FIRST DAY MOTION FOR INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTOR TO USE CASH
## COLLATERAL; (II) PROVIDING ADEQUATE PROTECTION TO THE
## PRE-PETITION LENDERS; AND (III) SCHEDULING A FINAL HEARING

The above-captioned debtor (the "Debtor"), by its proposed counsel, Schafer
and Weiner PLLC, filed its *First Day Motion for Interim and Final Orders (I)
Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate
Protection to the Pre-Petition Lenders; and (III) Scheduling a Final Hearing (the
"Motion")*, and in accordance with LBR 4001-2(b) (E.D.M.), has identified below,
by page and paragraph number, the location in the proposed order accompanying
the motion of each of the following provisions:

{01068093.1}

| PROVISION | CONTAINED IN PROPOSED ORDER | LOCATION IN PROPOSED ORDER |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | ☐ Yes<br>☒ No | Page __, ¶ __ |
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | ☐ Yes<br>☒ No | Page __, ¶ __ |
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | ☐Yes<br>☒ No | Page __, ¶ __ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | ☒ Yes<br>☐ No | Page 6, ¶ 5 |
| (5) Provisions that prime any lien without that lienholder's consent. | ☐ Yes<br>☒ No | Page __, ¶ __ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | ☐ Yes<br>☒ No | Page __, ¶ __ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | ☒ Yes<br>☐ No | Pages 7-8, ¶ 14-16 |

| PROVISION | CONTAINED IN PROPOSED ORDER | LOCATION IN PROPOSED ORDER |
|---|---|---|
| (8) Provisions for the payment of prepetition debt. | ☐ Yes<br>☒ No | Page __ , ¶___ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | ☐ Yes<br>☒ No | Page __ ¶ __ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | ☐ Yes<br>☒ No | Page __ , ¶ __ |
| (16) Provisions that purport to bind a subsequent trustee. | ☐ Yes<br>☒ No | Page __ , ¶ __ |

| PROVISION | CONTAINED IN PROPOSED ORDER | LOCATION IN PROPOSED ORDER |
|---|---|---|
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | ☐ Yes<br>☒ No | Page ___, ¶ ___ |

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Kim Hillary
KIM HILLARY (P67534)
HOWARD BORIN (P51959)
Proposed Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
khillary@schaferandweiner.com

Dated: August 19, 2024

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                              Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a             In Proceedings Under
M-Den, Inc., d/b/a The M Den                        Chapter 11

                                                    Hon. Thomas J. Tucker

                    Debtor.
_____/

## DEBTOR'S FIRST DAY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL; (II) PROVIDING ADEQUATE PROTECTION TO THE PRE-PETITION LENDERS; AND (III) SCHEDULING A FINAL HEARING

Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc. (the "Debtor"), by and through its proposed counsel, Schafer and Weiner, PLLC, for its *First Day Motion for Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate Protection to the Pre-Petition Lenders; and (III) Scheduling a Final Hearing* (the "Motion"), states:

### REQUEST FOR HEARING

1.      Through this Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to use Cash Collateral (defined below) and to provide adequate protection to the Pre-Petition Lenders (defined below) in connection with its use of Cash Collateral, (ii) scheduling a final hearing on this Motion (the "Final

<u>Hearing</u>"), and (iii) establishing notice procedures regarding this Motion.

2.    Debtor must pay its casualty insurance and fund 401K obligations by August 26, 2024. As a result, Debtor respectfully requests that the Court schedule a hearing on this Motion as soon as possible, but in no event later than August 23, 2024.

## JURISDICTION

3.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

4.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

5.    Venue of this proceeding and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.    On August 16, 2024 (the "<u>Petition Date</u>"), the Debtor filed its Voluntary Petition for relief (the "<u>Chapter 11 Case</u>") Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above-captioned case (the "<u>Case</u>").[1]

7.    The Debtor continues to operate its business and manage its financial

---

[1]    Unless stated otherwise, all statutory references herein are to the Bankruptcy Code.

affairs and properties as a debtor-in-possession pursuant to §§ 1107(a) and 1108. No official committee of creditors holding unsecured claims or other committees have been formed under § 1102.

8.     Scott Hirth ("Hirth") is the President and has been selected as the Debtor's responsible person in this bankruptcy case.

9.     The *Declaration of Scott Hirth in Support of Debtor's Chapter 11 Petition and First Day Motions* ("Hirth Declaration") describes Debtor's background and the circumstances leading to its bankruptcy filing. *See* Hirth Declaration at DN 15.

### THE DEBTOR'S BUSINESS

### BACKGROUND

10.     Debtor has been operating the largest retail operation of the University of Michigan (the "University") branded clothing and other merchandise for almost fifty (50) years. *See* DN 15 at ¶ 9.

11.     For the last thirty (30) years[2], the Debtor has been the official merchandise retailer of the University of Michigan Athletics, including a link to Debtor's website on the University of Michigan Athletics' website, pursuant to a

---

[2] This thirty-year stretch was interrupted in 2009 when the Debtor's status as the University's official merchandise retailer was terminated for one year and then reinstated.

July 1, 2009 licensing agreement and amendments (collectively the "Licensing Agreement"). *See* DN 15 at ¶ 10.

12. The University purported to terminate the Debtor's right under the Licensing Agreement (including its right to be the University's official merchandise retailer, as well as the Debtor's right to use the "M Den" name and URL) effective May 13, 2024. *See* DN 15 at ¶ 11.

13. The Debtor and the University subsequently entered into a Forbearance Agreement (retroactively effective to May 13) pursuant to which the Debtor was authorized to continue to use the "M Den" name and URL and continued as the official merchandise retailer. *See* DN 15 at ¶ 12.

14. The Forbearance Agreement was terminated by the University effective June 11, 2024, but the University allowed the Debtor to continue operating as if the Forbearance Agreement remained in effect in order to minimize disruption while the University looked for a new official merchandise retailer and the Debtor pursued a going concern sale. *See* DN 15 at ¶ 13.

15. This continued until August 15, 2024, when the University demanded in writing that the Debtor cease and desist from further use of the "M Den" name and URL. *See* DN 15 at ¶ 14.

16. Until very recently, Debtor operated from five separate retail locations and sold merchandise through the MDEN.com website. *See* DN 15 at ¶ 15.

17.     Debtor's largest store by far is located on State Street in Ann Arbor (the "Flagship Store").  The Debtor has also operated from stores located (i) on Main Street in Ann Arbor, (i) in the Briarwood Mall in Ann Arbor (iii) in the Twelve Oaks Mall in Novi, and (iv) on Columbia Street in Detroit.  *See* DN 15 at ¶ 16.

18.     The Debtor ceased operating its Twelve Oaks Mall location on August 16, 2024 and ceased operating at Briarwood Mall and Columbia Street in Detroit on August 19, 2024.  The Debtor is in the process of moving its assets out of these three locations.  *See* DN 15 at ¶ 17.

19.     As a result, Debtor currently has two brick and mortar locations: (i) the Flagship Store, and (ii) the Main Street store.  In addition, Debtor sells merchandise from a tent located at the corner of Stadium and Main Streets in Ann Arbor (directly across the street from Michigan Stadium) on game days, graduation days and other special events.  *See* DN 15 at ¶ 18.

20.     Previously, the Debtor sold merchandise on game days inside of Michigan Stadium and the University's retail locations at various other sports venues, but it does not anticipate doing so going forward. *See* DN 15 at ¶ 19.

<u>CAUSES OF BANKRUPTCY FILING</u>

21.     A long chain of events contributed to Debtor's financial distress and ultimately its bankruptcy filing.  Following decades of success, and expansion of

{01068093.1}

Debtor's operations completed in 2019, Debtor was faced with the severe challenges which the COVID-19 pandemic brought to the retail sector, particularly on a suddenly empty college campus, and particularly to a company sitting on depleted cash reserves. *See* DN 15 at ¶ 20.

22. In 2019, the Debtor funded three large capital improvements from its operating capital and cash reserves. The Debtor spent nearly a million dollars updating and implementing a new ERP software system. At the same time, the Debtor funded roughly $600,000 to build out its Detroit and Main Street[3] locations, with both locations opening/reopening for business in November of 2019. The Debtor self-funded these improvements, leaving it with lower-than-normal cash reserves going into 2020, hitting head-on into the unanticipated and unprecedented COVID-19 global pandemic that immediately followed. *See* DN 15 at ¶ 21.

23. Starting in March of 2020, virtually all of Debtor's customers were removed from Ann Arbor for an entire year. The University of Michigan's football and basketball games and other athletic events were played without fans present. Students moved home, and students and faculty attended classes, graduation and other ceremonies remotely. *See* DN 15 at ¶ 22.

---

[3] The Main Street location was closed in June of 2018 as the landlord demolished the building and re-built it as a six story multi-use complex. Upon completion of the building construction, the Debtor completed the build out of its unit, all funded by cash reserves.

24.     With its customer base stuck at home, the Debtor's retail sales took a nosedive and the Debtor shifted to selling the majority of its product online.   In 2020 over sixty percent (60%) of Debtor's sales were online which was more than double the percentage of online sales in 2019.   Unfortunately for the Debtor, its online sales generated a much lower profit margin than its retail sales.[4]   *See* DN 15 at ¶ 23.

25.     In addition, the pandemic created significant uncertainty in necessary inventory levels and unpredictability in the supply chain.   Leading up to the fall of 2020, it was not clear when students would be returning to campus or whether fans would be able to attend games during the 2020 football and basketball seasons. The Debtor was forced to decide whether to purchase its fall inventory and prepare for a possible return of the students and fans, or risk being left flat footed without proper inventory if the flood gates opened.   *See* DN 15 at ¶ 24.

26.     As the University's official retail merchandise partner, the Debtor determined it was necessary to purchase its fall inventory in order to be prepared for the return of students and fans.   The Debtor purchased roughly $6,000,000 in inventory, but the COVID regulations did not lift. Classes remained remote, and college football and basketball games were played without fans, leaving Debtor

---

[4] In addition to shipping costs, the royalty Debtor owed to the University's for online sales was significantly higher than the royalty owed to the University for

with millions of dollars in inventory and vendor obligations to repay without its more profitable retail operations. *See* DN 15 at ¶ 25.

27.    With traditional financing being generally unavailable, the Debtor began seeking alternative financing to cover its cash shortages and began taking out high interest loans) which further deteriorated its financial condition. *See* DN 15 at ¶ 26.

28.    In addition to the shift to online sales, the Debtor's profit model underwent another significant shift in July of 2021 when the NCAA approved a policy allowing student athletes to monetize their name, image and likeness ("NIL Policy"). The Debtor was quick to respond to the NIL Policy and worked with the University to launch a first of its kind name and number program for the 2021 football season. The Debtor's agility in implementing the program was celebrated, but its implementation was not without cost. The increased cost associated with payment of the student athletes further depleted Debtor's profit margin. *See* DN 15 at ¶ 27.

29.    Despite all of the adversity, the Debtor's profit showed slight improvement in 2021. Students were returning to campus and sporting events and graduations were once again celebrated at in-person events. The Debtor was

---

brick-and-mortar sales.

making strides at paying back its high interest secondary market loans. *See* DN 15 at ¶ 28.

30.     Unfortunately, in fall and winter of 2022 when the supply chain issues caused by the pandemic came home to roost, the Debtor was not strong enough to withstand this final blow. *See* DN 15 at ¶ 29.

31.     Throughout 2020 and 2021, the Debtor's vendors struggled to complete orders on timelines available prior to Covid and required Debtor to order inventory a year or more in advance of shipment. Debtor met the demands, and submitted inventory orders a year or more in advance. *See* DN 15 at ¶ 30.

32.     It backfired. During a two-weeks period in December 2022, Debtor received over five million dollars ($5,000,000) in pre-ordered inventory. Much of the inventory was delivered later than expected, after the 2022 football season, in a glut difficult to even process, let alone sell. The vendors went largely unpaid and some initiated lawsuits and obtained judgments which the Debtor could not pay. *See* DN 15 at ¶ 31.

33.     The Debtor started 2023 in the red and was ultimately not able to recover. Debtor's sales sky-rocketed at the end of 2023 when University of Michigan's football team won the National Championship, but the royalties due to the University on championship merchandise was even higher and Debtor's profit margin was slim. At the end of the day, the National Championship victory and

{01068093.1}

the increase in sales was not sufficient to provide the Debtor with a financial recovery. *See* DN 15 at ¶ 32.

34.  The pandemic, the high interest unconventional financing, the deluge of inventory, lower profit margins attributable to online sales, the NIL Policy, and Championship royalites ultimately contributed to the Debtor's bankruptcy filing and the end of its nearly fifty years of success as the official merchandise retailer to the University of Michigan. *See* DN 15 at ¶ 33.

## NATURE OF DEBT

### I.  DIRECT LIABILITIES TO BANK OF ANN ARBOR

35.  The Debtor and its related entities have maintained loan relationships with Bank of Ann Arbor for many years. The loan relationships which exist as of the Petition Date are described below. *See* DN 15 at ¶ 34.

36.  The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated October 5, 2023, in the face amount of $2,150,000 ("Loan 100184"). The Debtor believes the current balance on Loan 100184 is approximately $2,255,675.50. This loan matured prior to the Petition Date and is due in full. *See* DN 15 at ¶ 35.

37.  The following individuals and entities have guaranteed repayment of Loan 100184: (i) Barbara Hirth, (ii) Barbara A. Hirth Trust u/a/d/ August 15, 1996,

(iii) David Hirth, (iv) David F. Hirth Trust u/a/d August 15, 1996, as amended, (v) Scott Hirth, (vi) Julie Corrin, (vii) Steve Horning, (viii) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (ix) Scott David Hirth Trust Dated October 14, 2002, and (x) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008. *See* DN 15 at ¶ 36.

38. The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated July 29, 2022, in the face amount of $292,061.99 ("Loan 201529"). The Debtor believes the current balance on Loan 201529 is approximately $103,184.41. *See* DN 15 at ¶ 37.

39. Debtor executed a Commercial Security Agreement dated July 5, 2020, granting Bank of Ann Arbor a security interest and all asset lien on Debtor's assets, including its Cash Collateral, to secure all amounts owed by Debtor to Bank of Ann Arbor. Bank of Ann Arbor perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on May 6, 1999, file number D514533, which has been continued from time to time. *See* DN 15 at ¶ 38.

40. The following individuals and entities have guaranteed repayment of Loan 100184: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (v) Scott David Hirth Trust Dated October 14, 2002, and (vi) The David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008. *See* DN 15 at ¶ 39.

{01068093.1}

## II. GUARANTEED OBLIGATIONS TO BANK OF ANN ARBOR

### a. M-DEN PROPERTIES, LLC

41.　The Debtor executed a Commercial Guaranty dated July 27, 2017 (the "Heritage Properties Guaranty"), guaranteeing repayment of all amounts owed by M-Den Properties, LLC ("Heritage Properties") to Bank of Ann Arbor. *See* DN 15 at ¶ 40.

42.　Heritage Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 29, 2022, in the face amount of $658,554.57 ("Loan 401828"). The Debtor believes the current balance on Loan 401828 is approximately $606,290.36. *See* DN 15 at ¶ 41.

43.　The Scott David Hirth Trust Dated October 14, 2002, and Scott Hirth guaranteed repayment of Loan 401828. *See* DN 15 at ¶ 42.

44.　Heritage Properties is also indebted to Bank of Ann Arbor pursuant to a Promissory Note dated June 25, 2022, in the face amount of $283,599.54 ("Loan 400994"). The Debtor believes the current balance on Loan 400994 is approximately $179,530.36. *See* DN 15 at ¶ 43.

45.　The obligations of Heritage Properties to Bank of Ann Arbor are also secured by a mortgage and assignment of rents on real property located at 5000 Carpenter Rd. in Ypsilanti, Michigan (the "Warehouse"). *See* DN 15 at ¶ 44.

46.     The Warehouse is owned by Heritage Properties and is leased to Debtor.  *See* DN 15 at ¶ 45.

47.     The following individuals and entities have guaranteed repayment of Loan 400994: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (v) Scott David Hirth Trust Dated October 14, 2002, and (vi) The David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.  *See* DN 15 at ¶ 46.

### b. STADIUM PROPERTIES

48.     The Debtor executed a Commercial Guaranty dated June 27, 2017 ("Stadium Properties Guaranty"), guarantying repayment of all amounts owed by M Den Stadium Properties, LLC ("Stadium Properties") to Bank of Ann Arbor.  *See* DN 15 at ¶ 47.

49.     Stadium Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated March 23, 2024, in the face amount of $870,335 ("Loan 401827").  The Debtor believes the current balance on Loan 401827 is approximately $861,082.35.  *See* DN 15 at ¶ 48.

50.     Loan 401827 is also secured by a mortgage and assignment of rents on real property located at 1336 South Main and 210 West Stadium Blvd. in Ann Arbor. *See* DN 15 at ¶ 49.

51. The following individuals and entities have guaranteed repayment of Loan 401827: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008. *See* DN 15 at ¶ 50.

### c. STATE STREET PROPERTIES

52. The Debtor executed a Commercial Guaranty dated June 27, 2017 ("State Street Guaranty"), guarantying repayment of all amounts owed by M Den State Street Properties, LLC ("State Street Properties") to Bank of Ann Arbor. *See* DN 15 at ¶ 51.

53. State Street Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 27, 2022, in the face amount of $2,256,976.20 ("Loan 401636"). The Debtor believes the current balance on Loan 401636 is approximately $2,057,684.10. *See* DN 15 at ¶ 52.

54. Loan 401636 is also secured by a mortgage and assignment of rents on real property located at 307-309 State Street in Ann Arbor, Michigan. *See* DN 15 at ¶ 53.

55. The following individuals and entities have guaranteed repayment of Loan 401636: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D.

Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.  *See* DN 15 at ¶ 54.

### III.    LIABILITY TO NEWTEK BANK

56.    Debtor is indebted to Newtek Bank pursuant to U.S. Small Business Administration Note dated December 10, 2020 in the face amount of $4,600,000 ("Newtek Note").  The Debtor believes the current balance on the Newtek Note is approximately $4,835,106.04.  *See* DN 15 at ¶ 55.

57.    The Newtek Note is secured by a lien on the Debtor's all asset lien on Debtor's assets, including its Cash Collateral, pursuant to a Commercial Security Agreement dated December 10, 2020.    Newtek perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on November 13, 2020, file number 20201113000487-3.  *See* DN 15 at ¶ 56.

58.    The following individuals and entities have guaranteed repayment of the Newtek Note (i) Rennae Whitt; (ii) Elizabeth Horning, (iii) Steven Horning, (iv) M Den State Street Properties, LLC, (v) Scott David Hirth, (vi) July Carol Corrin, (vii) M Den Stadium Properties, LLC, (viii) M-Den Properties, LLC, and (ix) David Corrin.  *See* DN 15 at ¶ 57.

## IV.  LIABILITY TO TVT

59.    Debtor is indebted to TVT 2.0, LLC ("TVT") pursuant to Business Loan and Security Agreement dated March 23, 2023 in the face amount of $2,500,000 ("TVT Agreement").   The Debtor believes the current balance on the TVT Note is approximately $1,003,941.  *See* DN 15 at ¶ 58.

60.    The TVT Agreement provides that the debt is secured by a lien on the Debtor's all asset lien on Debtor's assets, including its Cash Collateral.  The Debtor believes that TVT has perfected its lien by the filing of a UCC Financing Statement with the State of Michigan, however, it has been unable to identify the filing.  *See* DN 15 at ¶ 59.

61.    In addition, the Debtor previously borrowed funds from various creditors who filed UCC Financing statements against the Debtor's assets, including Cash Collateral.   These creditors are identified on the attached Exhibit B.   The Debtor believes that all amounts owed to these creditors have been repaid and as a result none of these creditors have an interest in the Debtor's Cash Collateral. However, these creditors have not filed termination statements terminating their filed Financing Statements so the Debtor is notifying them of its proposed use of Cash Collateral.  *See* DN 15 at ¶ 60.

62.     Debtor is informed that no other party-in-interest has an interest in the Debtor's Cash Collateral.  *See* DN 15 at ¶ 61.

## REQUEST FOR USE OF CASH COLLATERAL

63.     As of the Petition Date, Debtor, without admission, Debtor believes that its cash collateral, as defined in 11 U.S.C. §363, (the "Cash Collateral") consisted of the following collateral:

   a.     Cash of approximately $1,159.03;
   b.     Accounts Receivable of approximately $161,488.53[5];
   c.     Inventory valued at approximately $8,100,000.00 (cost basis).

*See* DN 15 at ¶ 63.

64.     Debtor requires the use of Cash Collateral to make such payments as are necessary for the continuation of its business as shown in the budget attached to the Cash Collateral Motion as Exhibit C (the "Budget").  The projected revenue and expenses in the Budget are based upon historical financial data.  *See* DN 15 at ¶ 64.

65.     The Budget projects Debtor's anticipated revenue and expenses and demonstrates the amount of funds the Debtor anticipates needing to spend on its operations over a thirteen-week period.  *See* DN 15 at ¶ 65.

66.     Debtor is confident that Debtor's post-petition operations will be profitable as further set forth in the Budget.   *See* DN 15 at ¶ 66.

67. From the Petition Date through September 15, 2024, Debtor projects that it will need to spend approximately $936,489 to avoid immediate and irreparable harm as set forth in the Budget. *See* DN 15 at ¶ 67.

68. Without the ability to make the payments as set forth in the Budget, (i) the Debtor will suffer irreparable harm, (ii) it will be unable to fund operations necessary to continue operations (iii) its employees will abandon it because the Debtor will be unable to pay for their services, and (iv) the Debtor will be forced to cease operating. *See* DN 15 at ¶ 68.

69. The majority of the Debtor's value arises from its on-going operations and its ability to continue operating as a going concern out of its Flagship Store. If the Debtor ceases operating and is forced into liquidation, its value will be substantially reduced. *See* DN 15 at ¶ 69.

70. Accordingly, authorizing Debtor to use Cash Collateral as set forth in the Budget is in the best interests of all creditors and parties-in-interest. *See* DN 15 at ¶ 70.

71. As part of its request to use Cash Collateral, the Debtor is requesting that this Court allow it to escrow, on a monthly basis, $40,000 into a debtor-in-possession account (the "Professional Fee Account") earmarked to pay the

---

[5] The vast majority of Debtor's accounts receivable are owed to it by the University and are likely subject to set-off against the University's claim of

professional fees incurred by its legal counsel in connection with the bankruptcy proceeding to the extent the fees are allowed by this Court.

72.     The Debtor submits that funds held in the Professional Fee Account will remain property of the estate, until such time that professional fees are allowed by Court order and will be free and clear of the liens, claims, and encumbrances of the Prepetition Lenders.   This arrangement provides a practical and necessary mechanism for the payment of allowed administrative expenses to Debtor's retained legal counsel[6] and counsel for a committee of unsecured creditors if one is formed.

**ADEQUATE PROTECTION**

73.     The Bankruptcy Code does not explicitly define "adequate protection," but section 361 of the Bankruptcy Code provides a nonexclusive list of how a debtor-in-possession may provide it, including: (i) periodic cash payments, (ii) additional or replacement liens, or (iii) other relief resulting in the "indubitable equivalent" of the secured creditor's interest in such property.

74.     What constitutes adequate protection must, therefore, be decided on a case-by-case basis.  *See*, *e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y.

---

approximately $8,855,882.

[6] On the Petition Date, the Debtor filed its *Application to Employ Schafer and Weiner, PLLC as Bankruptcy Counsel for the Debtors and Debtors-in-Possession*

1996); *see also*, *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The proposed adequate protection is intended to protect a secured creditor from diminution in the value of its pre-petition collateral while the Debtor uses it. *See In re 494 Central Park Avenue Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. at 736; *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

75.    As adequate protection under sections 363 and 361 of the Bankruptcy Code for any security interests that Bank of Ann Arbor may assert, and to the extent that the Debtor uses Cash Collateral and does not replace same, Debtor offers replacement liens in all such types and descriptions of collateral which secured Bank of Ann Arbor's pre-petition liabilities and which are created, acquired or arise after the Petition Date.

76.    In addition, and as set forth in the Budget, the Debtor seeks authority to pay $40,000 per month to Bank of Ann Arbor as adequate protection of its interest in Cash Collateral.

77.    As adequate protection under sections 363 and 361 of the Bankruptcy Code for any security interests that Newtek may assert, and to the extent that the Debtor uses Cash Collateral and does not replace same, Debtor offers replacement

[DN 6] *and its Application to Employ Conlin McKenney & Philbrick, P.C. as General Corporate Counsel for the Debtors and Debtors-in-Possession* [DN 7].

liens in all such types and descriptions of collateral which secured Newtek's pre-petition liabilities and which are created, acquired or arise after the Petition Date.

78.     In addition, and as set forth in the Budget, the Debtor seeks authority to pay $62,760 per month to Newtek as adequate protection of its interest in Cash Collateral.

79.     As adequate protection under sections 363 and 361 of the Bankruptcy Code for any security interests that TVT may assert, and to the extent that the Debtor uses Cash Collateral and does not replace same, Debtor offers replacement liens in all such types and descriptions of collateral which secured TVT's pre-petition liabilities and which are created, acquired or arise after the Petition Date.

80.     In addition, and as set forth in the Budget, the Debtor seeks authority to pay $40,000 per month to TVT as adequate protection of its interest in Cash Collateral.

81.     To the extent that this Court determines that any other creditor has an interest in Cash Collateral, including the creditors listed on Exhibit B, Debtor will offer that creditor replacement liens consistent with the priority of the lien held by that creditor prior to the Petition Date and will not attach to the funds in the Professional Fee Account.

82.     The Debtor will thereby be able to provide its secured creditors with adequate protection through its continuing operations and through the replacement

liens. *See, e.g.,* <u>Matter of Pursuit Athletic Footwear, Inc.</u>, 193 B.R. 713 (Bankr. D. Del. 1996).[7]

83.     On the basis of the adequate protection submitted above, the Debtor submits that it should be granted authority to use its Cash Collateral.

### <u>INTERIM APPROVAL OF THE USE OF CASH COLLATERAL</u>

84.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to § 363, and to obtain credit under § 364 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court can conduct a preliminary, expedited hearing on such a motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable to the Debtor's estate.

85.     To avoid a disruption in the Debtor's operations pending the Final Hearing, the Debtor requests that the Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor from and after the entry of the Interim Order until the Final Hearing to use Cash Collateral pursuant to the terms of the Interim Order.

---

[7] In <u>Pursuit Athletic Footwear</u>, the Court found that credible projections of post-petition operating profits provided the secured creditor with adequate protection. 193 B.R. at 717-718.

## Establishing Notice Procedures And Scheduling Final Hearing

86.     The Debtor will: (a) within twenty-four hours, provide notice of the hearing on this Motion to: (i) the United States Trustee for the Eastern District of Michigan, (ii) Bank of Ann Arbor, (iii) Newtek, (iv) TVT, (v) the entities listed on Exhibit B or their agent, (vi) the Debtor's 20 largest unsecured creditors, and (v) all other parties who were required to be served under Fed. R. Bank. P. 4001(d), and (b) give such notice by any one of the following methods which is available: (i) ECF service; (ii) personal service; (iii) overnight mail; (iv) facsimile, or (v) e-mail.   In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

87.     The Debtor further respectfully requests that the Court schedule the Final Hearing and authorize it to serve copies of the entered Interim Order, which fixes the date, time and manner for the filing of objections, to: (i) the United States Trustee for the Eastern District of Michigan, (ii) Bank of Ann Arbor, (iii) Newtek, (iv) TVT, (v) the entities listed on Exhibit B or their agent, (vi) the Debtor's 20 largest unsecured creditors, and (v) all other parties who were required to be served under Fed. R. Bank. P. 4001(d), and (b) give such notice by any one of the following methods which is available: (i) ECF service; (ii) personal service; (iii) overnight mail; (iv) facsimile, or (v) e-mail.   The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy

Rule 4001.

88.    No previous request for the relief sought herein has been made to this Court or any other court.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order, substantially in the form of attached Exhibit A, granting the relief requested in this Motion and granting such further relief as the Court deems appropriate.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Kim Hillary
KIM HILLARY (P67534)
HOWARD BORIN (P51959)
Proposed Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
Dated:  August 19, 2024          khillary@schaferandweiner.com

# Exhibit

# A

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Heritage Collegiate Apparel, Inc. f/k/a
M-Den, Inc., d/b/a The M Den

                   Debtor.

_____/

Case No. 24-47922-tjt

In Proceedings Under
Chapter 11

Hon. Thomas J. Tucker

## ORDER GRANTING
## DEBTOR'S FIRST DAY MOTION FOR INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTOR TO USE CASH COLLATERAL;
## (II) PROVIDING ADEQUATE PROTECTION TO THE PREPETITION
## LENDERS; AND (III) SCHEDULING A FINAL HEARING

Upon consideration of Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc.,
d/b/a/ The M Den's ("Debtor") *First Day Motion for Interim and Final Orders (i)
Authorizing Debtor to Use Cash Collateral; (ii) Providing Adequate Protection to
the Prepetition Lenders; and (iii) Scheduling a Final Hearing* (the "Motion"); upon
consideration of the *Declaration of Scott Hirth* (the "Hirth Declaration"); and the
Court having jurisdiction pursuant to sections 157 and 1334 of title 28 of the United
States Code to consider the Motion and the relief requested therein; and venue being
proper in this Court pursuant to sections 1408 and 1409 of title 28 of the United
States Code; and this matter being a core proceeding within the meaning of section
157 of title 28 of the United States Code; and the Court having determined that the

relief sought in the Motion is in the best interest of the Debtor, its creditors, and all parties-in-interest; and the Court having heard the sufficient evidence and statements of counsel regarding the Motion and having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, therefore;

**IT APPEARS, AND THE COURT HEREBY FINDS** that:

A.      On August 16, 2024 ("<u>Petition Date</u>"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Since the Petition Date, Debtor has continued in possession of its assets and has continued to operate its business as a debtor-in-possession pursuant to sections 1107(A) and 1108 of the Bankruptcy Code, with no official committee of unsecured creditors having been formed.

B.      Debtor requires the use of the Cash Collateral (as defined in the Motion) for the maintenance, preservation and liquidation of its assets, and for the operation of its business and the payment of business expenses in the ordinary course.

C.      The relief provided herein is necessary, essential and appropriate for Debtor's continued operations and is otherwise necessary to avoid immediate and irreparable harm to the Debtor and its estate pending a final hearing on the Motion.

D.      The Debtor provided notice of the initial hearing on the Motion by serving notice in accordance with Local Rule 9013-1 (E.D. Mich.).  The notice

provided is appropriate, adequate and proper under the circumstances of this case in accordance with Fed. R. Bankr. P. 4001(b) and Local Rule 4001-2 (E.D. Mich.).

E.     Pursuant to a Commercial Security Agreement dated July 5, 2020, Bank of Ann Arbor has a first priority perfected security interest in and lien on all of Debtor's assets, including its Cash Collateral, to secure all amounts owed by Debtor to Bank of Ann Arbor.  Bank of Ann Arbor perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on May 6, 1999, file number D514533, which has been continued from time to time.

F.     The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated October 5, 2023, in the face amount of $2,150,000 ("Loan 100184").  The current balance on Loan 100184 is approximately $2,255,675.50.  This loan matured prior to the Petition Date and is due in full.

G.     The Debtor is indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated July 29, 2022, in the face amount of $292,061.99 ("Loan 201529").     The current balance on Loan 201529 is approximately $103,184.41.

H.     Debtor guaranteed repayment of all amounts owed by MDen Properties, LLC ("MDen Properties") to Bank of Ann Arbor pursuant to a Commercial Guaranty dated July 27, 2017.

I.      MDen Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 29, 2022, in the face amount of $658,554.57 ("Loan 401828").  The current balance on Loan 401828 is approximately $606,290.36.

J.      MDen Properties is also indebted to Bank of Ann Arbor pursuant to a Promissory Note dated June 25, 2022, in the face amount of $283,599.54 ("Loan 400994").  The current balance on Loan 400994 is approximately $179,530.36.

K.      Debtor guaranteed repayment of all amounts owed by MDen Stadium Properties, LLC ("Stadium Properties") to Bank of Ann Arbor pursuant to a Commercial Guaranty dated June 27, 2017.

L.      Stadium Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated March 23, 2024, in the face amount of $870,335 ("Loan 401827").  The current balance on Loan 401827 is approximately $861,082.35.

M.      M.      Debtor guaranteed repayment of all amounts owed by MDen State Street Properties, LLC ("State Street Properties") to Bank of Ann Arbor pursuant to a Commercial Guaranty dated June 27, 2017.

N.      State Street Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 27, 2022, in the face amount of $2,256,976.20 ("Loan 401636").  The current balance on Loan 401636 is approximately $2,057,684.10.

O.      Debtor is indebted to Newtek Bank ("Newtek") pursuant to a U.S. Small Business Administration Note dated December 10, 2020, in the face amount

of $4,600,000 ("Newtek Note").    The current balance on the Newtek Note is approximately $4,835,106.04.

P.      The Newtek Note is secured by a lien on the Debtor's assets, including its Cash Collateral, pursuant to a Commercial Security Agreement dated December 10, 2020.    Newtek perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on November 13, 2020, file number 20201113000487-3.

Q.      Debtor is indebted to TVT 2.0, LLC ("TVT") pursuant to a Business Loan and Security Agreement dated March 23, 2023, in the face amount of $2,500,000 ("TVT Agreement").    The current balance on the TVT Agreement is approximately $1,003,941 and TVT alleges that this debt is secured by a lien on Debtor's Cash Collateral.

**NOW THEREFORE, IT IS HEREBY ORDERED** that:

1.      The Motion is Granted.

2.      All capitalized terms not defined in this Order shall have the meanings ascribed to them in the Motion.

3.      Debtor is authorized to use Cash Collateral and grant adequate protection in accordance with the terms of the Motion.

4.      From the Petition Date through September 15, 2024, Debtor projects that it will need to spend approximately $936,489 to avoid immediate and irreparable harm and to pay the immediate operating expenses of the Debtor's business, as set

forth in the Budget with allowance for a fifteen percent (15%) variance per line item. The Debtor's authorized use of Cash Collateral is limited to the amounts set forth in the Budget prior to the entry of a final order authorizing the Debtor to use Cash Collateral or the time this Order becomes a final order, as the case may be.

5.     Bank of Ann Arbor has a perfected, first priority security interest in the Cash Collateral and substantially all of the Debtor's assets, including accounts receivable, other cash collateral, and inventory.

6.     To the extent that Debtor uses such Cash Collateral and does not replace it, and only to the extent of any diminution in the value of such Cash Collateral, Bank of Ann Arbor is granted replacement liens in all types and descriptions of collateral that were secured by the applicable pre-petition loan documents, which are created, acquired, or arise after the Petition Date.

7.     To the extent that Debtor uses such Cash Collateral and does not replace it, and only to the extent of any diminution in the value of such Cash Collateral, Newtek is granted replacement liens in all types and descriptions of collateral that were secured by the applicable pre-petition loan documents, which are created, acquired, or arise after the Petition Date.

8.     To the extent that Debtor uses such Cash Collateral and does not replace it, and only to the extent of any diminution in the value of such Cash Collateral, TVT is granted replacement liens in all types and descriptions of collateral that were

secured by the applicable pre-petition loan documents, which are created, acquired, or arise after the Petition Date.

9.      As additional adequate protection to Bank of Ann Arbor, the Debtor shall pay it $40,000 per month as set forth in the Budget.

10.     As additional adequate protection to Newtek, the Debtor shall pay it $66,000 per month as set forth in the Budget.

11.     As additional adequate protection to TVT, the Debtor shall pay it $40,000 per month as set forth in the Budget.

12.     The Debtor shall provide weekly reports to Bank of Ann Arbor, Newtek and TVT evidencing its compliance with the Budget.

13.     To the extent another creditor claims an interest in Cash Collateral, and to the extent that Debtor uses such Cash Collateral and does not replace it and only to the extent of any diminution in the value of such Cash Collateral, such creditor shall be entitled to a replacement lien on all types and descriptions of collateral that were secured by the applicable pre-petition loan documents, which are created, acquired, or arise after the Petition Date.

14.     The Debtor is authorized to voluntarily escrow, on a monthly basis, $40,000 into a debtor-in-possession account (the "Professional Fee Account") earmarked to pay the professional fees incurred by its legal counsel in connection with the bankruptcy proceeding to the extent the fees are allowed by this Court.

15.     The Professional Fee Account will remain property of the estate, until such time that professional fees are allowed by court order and will be free and clear of the liens, claims, and encumbrances of prepetition lenders.

16.     The replacement liens granted to pre-petition lenders under this Order shall not apply to this Professional Fee Account.

17.     The Debtor shall, within twenty-four (24) hours following the entry of this order, serve copies of this Order and the Debtor's motion for entry of this order with all attachments on the 20 largest unsecured creditors, all secured creditors, any committee formed in this case, the United States Trustee's Office, and all other parties who are required to be served under Fed. R. Bankr. P. 4001(d).

18.     All parties seeking to object to this Order must file a written objection within fourteen (14) days after the entry of this Order, except that an official committee may file objections within fourteen (14) days after the official committee is served with the entered Order.

19.     If an objection is timely filed, the final hearing on this Order will be held before the Honorable Thomas J. Tucker, United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, 211 West Fort Street, 19th Floor, Detroit, Michigan, on the _____ day of _____, 2024, at ____:___ __.m. to consider such objections.

20.     If no timely objections are filed, then this Order will become a final order without a further hearing, and the Debtor will be authorized to spend for those expenses referenced in the Motion, as well as any other expenses necessary for operating the business in the ordinary course going forward.

21.     The Debtor's authority to use Cash Collateral shall continue until otherwise ordered by this Court.

# Exhibit

# B

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| Amerifi Capital, LLC | M Den, Inc. | 20230817000417-3 | 8/17/2023 | all of Debtor's accounts, accounts receivable, contract receivables, contract rights, notes, drafts, acceptances, instruments, chattel paper and general intangibles, and all guarantees and suretyship agreements relating thereto and all security for payment thereof, now and hereafter existing or arising; and all of Debtor's equipment, including all furniture, furnishings, machinery, fixtures, storage shelves and other goods used in the conduct of Debtor's business, including, but not limited to, all motor vehicles and rolling stock, now owned or hereafter acquired. |
| Cash Coin, LLC | M Den, Inc. | 201209090000986-0 | 9/9/2021 | All assets of the Debtor(s) now owned or hereafter acquired and wherever located including but not limited to, any and all equipment, fixtures, accounts receivables, inventory, accounts, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, and deposit accounts. |
| Churchill Capital Partners, LLC | M Den, Inc. | 20240312000439-4 | 3/12/2024 | (a) all assets, including without limitation, all deposit accounts, accounts- receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, investment property, general tangibles and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to Churchill Capital under any other agreement between any Merchant or Guarantor and Churchill Capital Partners (the "Cross -Collateral") will secure the obligations hereunder and under this Agreement. |
| Clearview Funding Solutions, LLC | M Den, Inc. | 20231208000240-8 | 12/8/2023 | All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and I. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCER IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| Corporation Service Company as Representative | M Den, Inc. | 20230918000125-3 | 9/18/2023 | Future receipts of accounts receivable |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| Corporation Service Company as Representative | M-Den, Inc. | 20230609000353-9 | | Receivables- All Assets now owned or hereafter acquired and wherever located, includ ng bu not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts: I Letter of Credit Rights: j. General Intangibles; k. Supporting Obligations; and i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and i. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| Crusader Group LLC | M-Den, Inc. | 20231204000694-9 | | ACCOUNTS RECEIVABLE |
| CT Corporation as Representative | M Den, Inc. | 20200312000523-6 | 3/12/2020 | All Assets now owned or hereafter acquired and wherever located, including, but not limited to, the following subcategories of assets:  a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including, but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General IntaNgibles; k. Supporting Obligations; l. Prodeeds and Products of the foregoing.  NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER, OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE. THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| CT Corporation as Representative | M Den, Inc. | 20230403000622-4 | 4/3/2023 | "Debtor and Secured Party also hereby agree that the security pledged by Debtor as collateral for the underlying obligation includes the following: All current assets of the Debtor as of the enforcement date of this Security Instrument, including but not limited to cash, accounts receivable, other receivables, equipment, inventory, along with all trade fixtures belonging to the Debtor; all inclusive of after acquired property." |
| CT Corporation as Representative | M Den, Inc. | 20230605000181-8 | 6/5/2023 | All assets of the Debtor, now existing and hereafter arising, wherever located. NOTICE -PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH SECURED PARTY'S RIGHTS BY SUCH ENCUMBRANCER. IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, INVENTORY, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| CT Corporation as Representative | M Den, Inc. | 20230612000843-1 | 6/12/2023 | All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of the debtor's books and records relating to any of the foregoing. |
| CT Corporation as Representative | M Den, Inc. | 20230821000625-3 | 8/21/2023 | All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned or arising, and all of the debtor's books and records relating to any of the foregoing. |
| CT Corporation as Representative | M Den, Inc. | 20240117000614-0 | 1/17/2024 | All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of the debtor's books and records relating to any of the foregoing. |
| CT Corporation as Representative | M Den, Inc. | 20240327000283-9 | 3/27/2024 | All assets now owned, or hereafter acquired, including without limitation: (a) all accounts, including without limitation, all deposit accounts, accounts- receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC ("a" and "b" collectively, the "Collateral"). |
| CT Corporation as Representative | M Den, Inc. | 20240521000542-3 | 5/21/2024 | All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of the debtor's books and records relating to any of the foregoing. |
| CT Corporation as Representative | M Den, Inc. | 20231101000671-2 | 11/1/2023 | All accounts receivable, receipts, instruments, contract rights and other rights to receive the payment of money, patents, chattel paper, licenses, leases and general intangibles, whether now owned acquired or arising, and all of the debtor's books and records relating to any of the foregoing. |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| CT Corporation as Representative | M Den, Inc. | 20240618001097-0 | 6/18/2024 | Receivables- All personal property of every kind and nature, including, without limitation, al accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electr'c chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and any nature, regardless of the medium of recording; together with, to the extent not listed above as the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| First Corporate Solution as Representative | M Den, Inc. | 20201102000848-4 | 11/2/2020 | All accounts receivable, inventory, instruments, contract rights and other rights to receive the payment of money, patents chattel paper, licenses, leases, intellectual property, and general intangibles, whether now owned of hereafter acquired or arising, and all of Debtor's books and records relating to any of the foregoing. |
| First Corporate Solution as Representative | M Den, Inc. | 20240530000539-7 | 5/30/2024 | All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and I. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| Gold Crest Capital, LLC | M Den, Inc. | 202104130000408-5 | 4/13/2021 | Receivables |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| Grover Capital, LLC | M Den, Inc. | 202010150000596-9 | 10/15/2020 | All Assets now owned or hereafter accuried and wherever located, including but not limited to , he following Subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. chatttel paper; c. Inventory; d. equipment; e. Instruments, including but not limited to, promissory Notes; f. Investment property; g. Documents; h. Deposit Accounts; i. Letter of credits rights; j. General intangibiles ; k. Supporting obligations; and 1. proceeds and prouducts of the foregoing. Notice pursuant to an agreement betweeen debtor and the secured party, debtor has agreed not to further encumber the collateral described herin, the furthere encumbering of which may constitute the tortious interference with the secured party's right by such encumbrancer. In the event that any entity is granted a security interest in debtor's account, chattel paper or general intangibles contrary to the above, the secured party asserts a claim to any proceeds thereoff received by such entity |
| Kesef Funding Group | M Den, Inc. | 20231101000839-4 | 11/1/2023 | All assets of the Debtor now owned or hereafter acquired and wherever located, including, but not limited to, any and all equipment, fixtures, inventory, accounts, accounts receivables, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, letter -of -credit rights and deposit accounts, together with any products and proceeds thereof. |
| Ocean Funding Corp. | M-Den, Inc. | 20240620000859-0 | | As security for the prompt and complete payment and performance of any and all liabilities, obligations, covenants or agreements of the Seller pursuant to this Agreement (collectively, the "Obligations"), the Seller hereby pledges, assigns and hypothecates to the Purchaser (the "Pledge") and grants to the Purchaser a continuing, perfected and first priority lien upon and security interest in all of the Seller's rights, titles and interest in all accounts, including, but not limited to: deposit accounts, accounts receivables, other receivables, chattel paper, documents, equipment, general intangibles, instruments and inventory (collectively, the "Collateral"), whether now existing or hereinafter acquired. |
| Proventure Capital, LLC | M Den, Inc. | 20231026000207-1 | 10/26/2023 | All assets of the Debtor now owned or hereafter acquired and wherever located, including, but not limited to, any and all equipment, fixtures, inventory, accounts, accounts receivables, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, letter -of -credit rights and deposit accounts, together with any products and proceeds thereof. |
| Prudential Capital Funding, LLC | M Den, Inc. | 20230707000249-8 | 7/7/2023 | All assets of the Debtor(s) now owned or hereafter acquired and wherever located including but not limited to: any and all equipment, fixtures, accounts receivables, inventory, accounts, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, and deposit accounts. |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| V Cap Group | M Den, Inc. | 20230222000528-6 | 2/22/2023 | Receivables- All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts: I Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and i. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| Vault 26 Capital, LLC | M Den, Inc. | 20231109000701-4 | 11/9/2023 | All assets, including Accounts Receivable, now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and I. Proceeds and Products of the foregoing. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY. |
| Westwood Capital Funding, LLC | M Den, Inc. | 202012280000121-1 | 12/28/2020 | Seller grants Buyer a security interest in all of Seller's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Seller. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code (""UCC"") in order to give notice of this security interest and that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings. |

| Creditor | Debtor | Financing Statement Number | Initial Financing Statement Date | Collateral |
|---|---|---|---|---|
| Westwood Funding Solutions, LLC | M Den, Inc. | 202102020000626-5 | 2/2/2021 | The Collateral includes the following property that Debtor now owns or shall acquire or create immediately upon the creation thereof: (1) any and all amounts owing to Debtor now or in the future from any merchant processor(s) processing charges made by customers of Debtor via credit card or debit card transactions; and (2) all other tangible and intangible personal property, including but not limited to (a) inventory, (b) equipment, (c) investment property, including certified and uncertified securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes, (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letters of credit rights, (h) accounts, including health care insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general tangibles, including payment intangibles and software, and (l) cash proceeds; as all of the above terms shall be defined by the Uniform Commercial Code (the "UCC"). The security interest Debtor grants includes all accessions, attachments, parts, supplies and replacements for the collateral, all products, proceeds and collections thereof and all records and data relating thereto. |

# Exhibit C

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF | WEEK OF |
| | 8/19/2024 | 8/26/2024 | 9/2/2024 | 9/9/2024 | 9/16/2024 | 9/23/2024 | 10/1/2024 | 10/7/2024 | 10/14/2024 | 10/21/2024 | 10/28/2024 | 11/4/2024 | 11/11/2024 |
| CAMPUS STORE | 750,160 | 831,904 | 633,929 | 689,143 | 708,782 | 677,366 | 301,479 | 408,761 | 396,825 | 710,046 | 117,576 | 862,428 | 554,857 |
| TENT | - | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | - | - | - | 100,000 | - | - | - |
| TOTAL | 750,160 | 931,904 | 733,929 | 789,143 | 808,782 | 777,366 | 301,479 | 408,761 | 396,825 | 810,046 | 117,576 | 862,428 | 554,857 |
| OTHER | - | 9,500 | 5,000 | 5,000 | 5,000 | 9,500 | - | - | - | - | 4,500 | | |
| GRAND TOTAL CASH IN | 750,160 | 936,404 | 733,929 | 789,143 | 808,782 | 781,866 | 301,479 | 408,761 | 396,825 | 810,046 | 122,076 | 1,724,856 | 1,109,714 |
| PAYROLL REGULAR | (19,000) | (144,000) | (15,000) | (144,000) | (15,000) | (96,000) | (10,000) | (66,000) | (10,000) | (66,000) | (10,000) | (66,000) | (10,000) |
| PAYROLL BONUS | | | | | | | | | | | | | (150,000) |
| OVERHEAD/HEALTH INSURANCE | | (36,136) | | | | (25,000) | | | | (25,000) | | | |
| INTERNET | - | - | (2,465) | - | - | - | (2,465) | - | - | - | - | (2,465) | - |
| UTILITIES | - | - | (5,800) | - | - | - | (5,800) | - | - | - | - | (5,800) | - |
| PHONES | - | - | (5,000) | - | - | - | (5,000) | - | - | - | - | (5,000) | - |
| WEB HOSTING | - | - | - | - | - | - | - | | | | | | |
| SALES TAX SERVICE | - | - | (3,294) | - | - | - | (3,294) | - | - | - | - | (3,294) | - |
| P&C INSURANCE | - | (17,651) | (5,516) | - | - | - | (5,516) | - | - | - | - | (5,516) | - |
| SHIPPING | - | (15,000) | (15,000) | - | (25,000) | - | - | | | | | | |
| SHIPPING SUPPLIES | - | (10,000) | - | - | (10,000) | - | - | - | - | - | - | - | (10,000) |
| SOFTWARE PAYMENTS | - | - | - | - | - | - | - | | | | | | |
| TAXES - SALES / OTHER | - | - | - | (150,000) | - | - | (62,760) | - | (50,000) | - | - | (62,760) | (50,000) |
| NEWTEK SBA | - | - | (62,760) | | | | (62,760) | | | | | (62,760) | - |
| TVT | | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| BOAA CONSTRUCTION LOAN | | (8,828) | | | | (8,828) | | | | (8,828) | | | |
| CH 11 COSTS | - | - | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| CC PAYMENTS | - | - | - | - | (55,000) | - | - | - | - | (55,000) | - | - | - |
| BOAA LINE OF CREDIT | - | - | (31,172) | - | - | - | - | (31,172) | - | - | - | (31,172) | - |
| RENT WAREHOUSE | | (15,000) | | | | (15,000) | | | | (15,000) | | | |
| RENT STADIUM PROPERTIES | | (19,000) | | | | (19,000) | | | | (75,000) | | | |
| RENT STATE STREET PROPERTIES | | (16,000) | | | | (16,000) | | | | (16,000) | | | |
| RENT E&J ASSOCIATES- STATE STREET | | (54,867) | | | | (54,867) | | | | (54,867) | | | |
| RENTS - OTHER | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NET CASH | 731,160 | 589,922 | 567,922 | 475,143 | 683,782 | 527,171 | 186,644 | 291,589 | 316,825 | 635,218 | (68,791) | 1,522,849 | 869,714 |
| CUMULATIVE - CASH | 731,160 | 1,321,082 | 1,889,004 | 2,364,147 | 3,047,928 | 3,575,100 | 3,761,743 | 4,053,332 | 4,370,157 | 5,005,375 | 4,936,584 | 6,459,433 | 7,329,147 |
| INVENTORY | 8,100,000 | 7,631,798 | 7,264,834 | 6,870,262 | 6,465,871 | 6,074,938 | 5,924,199 | 5,719,819 | 5,521,406 | 5,116,383 | 5,055,345 | 4,192,917 | 3,638,060 |