## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:

Heritage Collegiate Apparel, Inc. f/k/a
M-Den, Inc., d/b/a The M Den

Debtor.

_____/

Case No. 24-47922-tjt

In Proceedings Under
Chapter 11

Hon. Thomas J. Tucker

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER
(I) APPROVING LIDS HOLDINGS, INC., OR ITS DESIGNATED
SUBSIDIARY AS STALKING HORSE BIDDER, (II) AUTHORIZING THE
DEBTOR'S ENTRY INTO AN ASSET PURCHASE AGREEMENT, (III)
AUTHORIZING THE SALE OF THE DEBTOR'S ASSETS FREE AND
CLEAR OF ALL ENCUMBRANCES, (IV) APPROVING CERTAIN BID
PROCEDURES, BID PROTECTIONS AND DEADLINES, (V)
SCHEDULING A SALE HEARING,
<u>AND (VI) GRANTING RELATED RELIEF</u>**

Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc., d/b/a The M Den

("<u>Debtor</u>"), by and through its undersigned proposed counsel, hereby files this

*Motion for Entry of an Order (I) Approving Lids Holdings, Inc., or its designated*

*subsidiary as Stalking Horse Bidder, (II) Authorizing the Debtor's Entry Into An*

*Asset Purchase Agreement, (III) Authorizing The Sale of the Debtor's Assets Free*

*and Clear of All Encumbrances, (IV) Approving Certain Bid Procedures, Bid*

*Protections and Deadlines, (V) Scheduling a Sale Hearing, And (VI) Granting*

*Related Relief* (the "Motion"). In support of the Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.      Venue of this chapter 11 case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On August 16, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

5.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as debtor-in-possession. No trustees or examiners have been appointed in this case.

6. Debtor has been operating the largest retail operation of the University of Michigan (the "University") branded clothing and other merchandise for almost fifty (50) years. *See* DN 15 at ¶ 9[1].

7. For the last thirty (30) years[2], the Debtor has been the official merchandise retailer of the University of Michigan Athletics, including a link to Debtor's website on the University of Michigan Athletics' website, pursuant to a June 21, 2010, licensing agreement and amendments, and prior agreements between the University and the Debtor (collectively the "Licensing Agreement"). *See* DN 15 at ¶ 10.

8. The University purported to terminate the Debtor's right under the Licensing Agreement (including its right to be the University's official merchandise retailer, as well as the Debtor's right to use the "M Den" name and URL) effective May 13, 2024. *See* DN 15 at ¶ 11.

9. The Debtor and the University subsequently entered into a Forbearance Agreement (retroactively effective to May 13) pursuant to which the

---

[1] The *Declaration of Scott Hirth in Support of Debtor's Chapter 11 Petition and First Day Motions* ("Hirth Declaration") describes Debtor's background. *See* Hirth Declaration at DN 15.

[2] This thirty-year stretch was interrupted in 2009 when the Debtor's status as the University's official merchandise retailer was terminated for one year and then reinstated.

Debtor was authorized to continue to use the "M Den" name and URL and continued as the official merchandise retailer. *See* DN 15 at ¶ 12.

10.     The Forbearance Agreement was terminated by the University effective June 11, 2024, but the University allowed the Debtor to continue operating as if the Forbearance Agreement remained in effect in order to minimize disruption while the University looked for a new official merchandise retailer and the Debtor pursued a going concern sale. *See* DN 15 at ¶ 13.

11.     This continued until August 15, 2024, when the University demanded in writing that the Debtor cease and desist from further use of the "M Den" name and URL. *See* DN 15 at ¶ 14.

12.     Until very recently, Debtor operated from five separate retail locations and sold merchandise through the MDEN.com website. *See* DN 15 at ¶ 15.

13.     Debtor's largest store by far is located on State Street in Ann Arbor (the "Flagship Store"). The Debtor has also operated from stores located (i) on Main Street in Ann Arbor, (i) in the Briarwood Mall in Ann Arbor (iii) in the Twelve Oaks Mall in Novi, and (iv) on Columbia Street in Detroit. *See* DN 15 at ¶ 16.

14.     The Debtor ceased operating its Twelve Oaks Mall location on August 16, 2024, and ceased operating at Briarwood Mall and Columbia Street in Detroit

on August 19, 2024.  The Debtor is in the process of moving its assets out of these three locations.  *See* DN 15 at ¶ 17.

15.     As a result, Debtor currently has two brick and mortar locations: (i) the Flagship Store, and (ii) the Main Street store.   In addition, Debtor sells merchandise from a tent located at the corner of Stadium and Main Streets in Ann Arbor (directly across the street from Michigan Stadium) on game days, graduation days and other special events (the "Corner Lot").  *See* DN 15 at ¶ 18.

16.     Debtor has covered the M Den signs at its two operating stores and has taken down the mden.com website.

17.     Previously, the Debtor sold merchandise on game days inside Michigan Stadium and the University's retail locations at various other sports venues, but it does not anticipate doing so going forward. *See* DN 15 at ¶ 19.

### A.     History of Marketing and Negotiations Related to Proposed Sale

18.     In February of this year, with the encouragement of the University, the Debtor began contemplating a sale of its assets and looking for interested purchasers.

19.     The University was also looking for someone to become its official merchandise retailer, which retailer would naturally also be a potential purchaser of Debtor's assets.

20.    One of the first parties the Debtor spoke to was Lids Holdings, Inc., ("Lids") and affiliate of Ames Watson, LLC, and Fanatics Holdings, Inc., who, for the past several years, had shown interest in purchasing the Debtor.

21.    Debtor spent several months negotiating with Lids in an effort to secure a purchase price that would result in the payment of all its creditors, but the price proved to be too high and the negotiations stalled.

22.    Around the same time, the Debtor reached out to the Champions Circle - Michigan Wolverines Collective ("Champion Circle")[3] to solicit offers and locate potential interested buyers.

23.    Contacts at the Champion Circle introduced Debtor to a second global corporation specializing in sale of collegiate athletic merchandise (the "Interested Party")[4].

---

[3] The Champion Circle was founding in June 2022 by former Michigan Football player, Jared Wangler and Valiant Management Group, a Michigan based sports marketing agency. According to its website, the Champion Circle is guided by a leadership circle consisting of Nate Forbes, Matt Lester, Navid Mahmoodzadegan and Tim Smith. The collective also has an advisory board, providing strategic guidance to the collective. Current board members include Jimmy King, Sierra Romero, John Wangler and Chris Wormley. Together the members Champion Circle and its leadership and board of directors have substantial industry contacts and purchasing power.

[4] The Debtor executed a Non-Disclosure Agreement with the Interested Party which limits its ability to identify the Interested Party in this Motion.

24.     The Debtor spent several months negotiating with this Interested Party.  As with the Lids negotiations, the Debtor sought a purchase price sufficient to pay its creditors in full.

25.     Unfortunately, as with Lids, the Debtor was unable to achieve an offer sufficient to pay creditors in full.

26.     The Debtor continued to negotiate with Lids and the Interested Party and ultimately secured a binding term sheet (the "Stalking Horse Bid") from Lids.[5] *See* Stalking Horse Bid attached as **Exhibit B**.

### B.     The Stalking Horse Bid

27.     The Stalking Horse Bid provides that Debtor will sell substantially all of its assets, including (i) all inventory, (ii) all PP&E, (iii) all intellectual property, including the right to use the "M Den" name – *if any*, and (iv) all claims or causes of action related to the right to use the "M Den" name[6] (the "Assets") to Lids.

28.     The purchase price in the Stalking Horse Bid is sixty-two percent (62%) of the cost value of Debtor's inventory on hand at the time of closing[7].  The

---

[5] The Stalking Horse Bid identifies the purchaser as Lids Holdings, Inc., or its designated subsidiary, which is an affiliate of Fanatics.

[6] Debtor transferred to the University the right to the M Den name under a Forbearance Agreement dated May 13, 2024 (the "Forbearance Agreement") in exchange for an extremely short forbearance.  This transfer may be subject to avoidable transfer or other claims.

[7] Based on Debtor's cash collateral budget, the purchase price on September 13, 2024 would be approximately $4,250,000.

Debtor will continue operations until the sale closes, which means the purchase price will go down with every sale made during this period.

29.     The Stalking Horse Bid contemplates that Lids will assume the Debtor's leases related to its Flagship Store, Main Street store, the Corner Lot and the Warehouse[8], and that Lids expects to offer employment to substantially all of Debtor's employees whose work primarily relates to these retail locations, the corporate office and Warehouse.

30.     Because the University of Michigan football season starts on August 31, 2024, and begins with five consecutive weeks of home games at Michigan Stadium, Lids is requiring a short timeline to close the sale.

31.     The Stalking Horse Bid expires if the sale does not close by September 20, 2024.

32.     The Debtor understands that the Interested Party would also demand that the sale close on a similar timeline.

33.     The Potential Purchasers understandably want to close the sale while there are still several home football games remaining in the season.  Home football

---

[8] The Debtor is party to (i) a Lease Agreement with third party landlord, 315-317 SMS, LLC, for the Main Street store, and (ii) a Business Property Lease with third party landlord E&J Associates, LLC commercial leases for a portion of the Flagship Store.  As set forth in the Notice section below, E&J Associates, LLC and 315-317 SMS, LLC will receive notice of this Motion and all related filings.  The Warehouse and Corner Lot are owned by entities with common ownership and control with the Debtor and as a result no separate notice is needed.

games are the source of substantial revenue that any purchaser will want to recoup in order to offset the purchase price and to carrying cost associated with the slower months.

34.     Closing the purchase of Debtor's Assets after the University's home football games have been played is like closing on the purchase of a beach resort in November.  The purchaser would not expect to see significant profits until the following season which will drive down the purchase price.

35.     As a result, the Debtor is proposing an expedited timeline to hold an auction sale of its Assets in accordance with the Bid Procedures ("Auction") and has filed contemporaneously herewith a motion for an expedited hearing on this Motion.

## **RELIEF REQUESTED**

36.     By this Motion, the Debtor requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the bidding procedures set forth below (the "Bidding Procedures") in connection with the sale of the Debtor's Assets; (ii) establishing the procedure for scheduling the Auction; and (iii) approving the notice of the Auction.

37.     The Debtor requests that the Court schedule a hearing on this Motion to approve the sale of the Debtor's Assets to the Winning Bidder (defined below) on September 12, 2024 (the "Sale Hearing").

38.     The Debtor seeks, at the conclusion of the Sale Hearing (defined below), entry of an order (a) authorizing the sale of the Debtor's property to Lids, or such other person or entity that is the Winning Bidder (defined in the Bidding Procedures), with such sale being free and clear of all liens, claims, and encumbrances, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Winning Bidder, and (c) granting certain related relief (the "Sale Order").

## PROPOSED BID PROCEDURES

39.     The Debtor intends to implement the Bidding Procedures set forth on the attached **Exhibit C**.  The Debtor reserves the right to modify the Bidding Procedures as necessary or as it deems appropriate to maximize value for its estate, creditors, and other parties in interest.

## BASIS FOR RELIEF

### A. The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets Given the Circumstances

40.     Courts have made it clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., United States Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), 2003 U.S. Dist. LEXIS 12909, at *30 n.13 (Bankr. S.D.N.Y. 2003) ("In negotiated section 363(b) sales . . . it may sometimes be necessary to offer incentives to bidders in order to maximize the price obtained. In general, the trustee or debtor in possession . . . should be able to exercise judgment with respect to bidding incentives. Consequently . . . the court should approve such agreements unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.") (quoting 3 Collier on Bankruptcy 363.03[7] (15th ed. 2002)); *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re After Six, Inc.*, 154 B.R. 876,

881 (Bankr. E.D. Pa. 1993) (noting that courts should defer to the debtor's business judgment with respect to bidding on assets).

41. The paramount goal in any proposed sale of estate property is to maximize the proceeds received by the debtor's estate. *See, e.g.*, *In re Dura Auto Sys.*, 2007 Bankr. LEXIS 2764, at *253 (Bankr. Del. 2007) ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate."); *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3rd Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp., v. Chinery*, 330 F.3d 548, 573 (3rd Cir. 2003) (same); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-565 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Integrated Resources*, 147 B.R. at 696 ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

42. To accomplish that goal, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *In re Dura Auto Sys.*, 2007 Bankr. LEXIS 2764, at

*254 (Bankr. Del. 2007) ("Courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales."); *see also In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D. N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"); *Integrated Resources, Inc.*, 147 B.R. at 659 (bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

43.    Debtor acknowledges that the timelines requested in this Motion are extremely fast.  However, Debtor believes that these timelines are justified under the circumstances and are likely to result in the highest amount paid to the Debtor by the eventual purchaser.

44.    Both the University[9] and the Debtor have been trying to locate a purchaser for the Assets since at least February of this year.

45.    The Debtor received the Stalking Horse Bid after months of negotiating with Lids and the Interested Party.

---

[9] The University has only been looking for a new official retail partner.  But the expectations have always been that the University's new official partner would have an interest in purchasing the Debtor's assets.

46.     The Stalking Horse Bid is contingent on an expedited sale process because Lids wants to purchase the Debtor's assets early in the University of Michigan football season.

47.     The Debtor believes it will risk losing the Stalking Horse Bid and the interest of the Interested Party if the sale is not completed early in the football season.

48.     As a result, the Debtor believes that offering an aggressive closing deadline will result in at least two parties bidding competitively, which has the potential to drive up the price dramatically.

49.     In sum, there are three primary reasons why this aggressive timeline will result in the highest purchase price are (i) there are only two likely bidders for the Assets and both support this timeline, and (ii) the price paid for the Assets will be a function of the amount of inventory on hand at the closing and Debtor will continue to sell inventory up until closing, and (iii) the interest in purchasing Debtor's assets is likely to wane as the University of Michigan football season progresses and the interest is highest now while the team plays home games for five straight weeks commencing on August 31st.

### (i)   Debtor Has Two Likely Bidders

50.   Lids and the Interested Party ("Potential Bidders") are both large national retailers who have the ability to purchase Debtor's assets without a financing contingency and quickly take over Debtor's operations.

51.   Each of the Potential Bidders operates retail and online stores for both NCAA and professional sports franchises.

52.   Each of the Potential Bidders have been involved in discussions with Debtor for the last several months and have had the opportunity to conduct substantial due diligence.

53.   Each of the Potential Bidders desire and consent to the proposed expedited sale process.

54.   Accordingly, the expedited sale process will keep the Potential Bidders at the table and will provide the Debtor and its estate with the best opportunity for a robust bidding process.

### (ii)   The Debtor's Risk Goes Up Every Day

56.   The purchase price is a function of the amount of inventory on the date of closing.

57.   Debtor's cash collateral budget does not provide for the purchase of any new inventory and Debtor does not anticipate purchasing any new inventory.

58.   Accordingly, with every sale the purchase price goes down.

59.     With regard to Debtor's inventory sales over the next couple of weeks, Debtor expects to net more than 62% of the cost value of its inventory.

60.     However, as time goes on and the Debtor's prime inventory is sold, Debtor risks not being able to net 62% of cost value on sale of the remaining inventory.   After this shift occurs, every sale will bring in less for the estate than it receives under the Stalking Horse Bid.

61.     As a result, the sooner the sale closes, the less risk the Debtor and creditors face that continued operations will result in a loss to the estate.

### (iii)    A Larger Number of Home Footballs Games after Closing Will Enhance the Sale Price.

62.     Historically, Debtor's sales increase by 300% on any weekend in which the University plays a home football game.

63.     The University opens its home football season on August 31, 2024, which is the first of 5 consecutive home football games.

64.     If a sale does not close until after September 27, 2024, the purchaser will not be able to operate during any of the first 5 games, and will have only the three games from October 26 through November 23 to operate this season.

65.     The more home football games still to be played at the time of closing, the more a purchaser will be willing to pay.  The Debtor's Assets simply become less attractive and less valuable if a purchaser has to carry the Assets until next season before generating a profit.

66.     The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, taking into account the financial exigencies facing the Debtor.

67.     Given that the Potential Bidders have indicated that they will be able to bid and participate in an Auction set in accordance with the Bidding Procedures, the Debtor believes that the period between the filing of this Sale Motion and the deadline for submission of bids provides a reasonable means for maximizing the return from sale of the Assets under the circumstances.

68.     At the same time, the Bidding Procedures provide the Debtor with the opportunity to consider all competing offers and to select the highest or best offer for the completion of the Sale. The Bidding Procedures and Auction process will ensure that the consideration paid for the Assets will be fair, reasonable, and in the best interest of the Debtor's estate and its creditors, and there are sound business reasons to approve the Bidding Procedures.

### (iv)     The Proposed Overbid Protections and Break-up Fee Are Appropriate

69.     The Stalking Horse Bid contains a break-up fee of $225,000 for the Stalking Horse Bidder ("Break-up Fee") to reimburse the Staking Horse Bidder for the cost of due diligence and negotiations in the event it is not the Winning Bidder.

70.     The Break-up Fee was agreed upon in order to the Staking Horse Bidder to submit the Stalking Horse Bid and pursue a transaction through the proposed Auction and is in the best interest of the estate.

71.     The Break-up Fee is reasonable and is in the best interest of the estate. *See In re JW Resources, Inc*., 536 B.R. 193, 196 (Bankr. E.D. Ky. 2015).

72.     In addition, the Bidding Procedures require a minimum "overbid" amount in order for a bid to be a Qualified Bid (as that term is defined in the Bidding Procedures).  Under the Bidding Procedures, the Auction shall start at the amount that is $250,000.00 more than the purchase price stated in the Auction Bid (the "Starting Qualified Overbid"), and then continue in minimum increments of at least $25,000.00 (the "Overbid Increment").

73.     The Debtor intends to conduct the Auction so that each bid at the Auction is higher or otherwise better than the previous bid, and the Debtor retains the right to modify both the Starting Qualified Overbid and the Overbid Increment (collectively, the "Overbid Protections") as appropriate.  Under the circumstances, incorporating the Overbid Protections in the Bidding Procedures is reasonable, and will enable the Debtor to maximize the sale value of its assets while limiting any chilling effect on the auction process.

74.     Courts frequently authorize debtors to require a subsequent bidder to include an overbid amount as part of an auction process if they do not unduly

burden the debtor's estate and the relative rights of the parties in interest are protected. *See In re Hupp Indus.*, 140 B.R. 191, 195-196 (Bankr. N.D. Ohio 1992).

75.     The Debtor, in the exercise of its sound business judgment, believes these Break-up Fee and the Overbid Protections are reasonable and will ensure that the bidders are bidding in good faith.

### B.     The Sale of The Assets Free and Clear of Liens, Claims, and Interests Is Authorized Under Bankruptcy Code Sections 363(b)(1) and 363(f)

76.     At the conclusion of the Sale Hearing, the Debtor requests that the Court approve the sale of its Assets to the Winning Bidder[10]. The Debtor submits that the sale of its Assets pursuant to the Bidding Procedures is in the best interest of the Debtor's estate and its creditors.

77.     Pursuant to Bankruptcy Rule 6004(f), sales of property outside the ordinary course of business may be by private sale or auction.

78.     Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use, sale or lease of property outside the ordinary course of business, this Court need only

---

[10] This portion of the relief is requested to be entered after the Sale Hearing in the form of the Sale Order. The Debtor hereby reserves the right to file supplemental pleadings in support of its request for entry of the Sale Order.

determine that the Debtor's decision is supported by "some articulated business justification," as established by the Second Circuit in <u>Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070 (2nd Cir. 1983), which decision has been adopted in this circuit. <u>Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)</u>, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also,* <u>Fulton State Bank v. Schipper</u>, 933 F.2d 513, 515 (7th Cir. 1991); <u>In re San Jacinto Glass Industries, Inc.</u>, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988); <u>In re Condere Corp.</u>, 228 B.R. 615, 628-69 (Bankr. S.D. Miss. 1998).

79.     The business judgment rule shields a debtor's management from judicial second-guessing. *See* <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions"). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting* <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).

80.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). When

applying the business judgment standard, courts show great deference to a debtor's business decisions. *See* GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 254 (N.D. Tex. 2005); In re First Wellington Canyon Assocs., 1989 U.S. Dist. LEXIS 10687, at *8-9 (N.D. Ill. September 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

81.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

    i.      applicable nonbankruptcy law permits sale of such property free and clear of such interests;

    ii.     such entity consents;

    iii.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    iv.    such interest is in bona fide dispute; or

    v.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

82.     This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

83.    Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets free and clear of the interests. In re Nature Leisure Times, LLC, 2007 WL 4554276, *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."); In re Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale 'free and clear' provided at least one of the subsections of section 363(f) is met).

84.    The fairness and reasonableness of the consideration to be paid for the Assets by the Winning Bidder, as may be declared at the Sale Hearing, will be conclusively demonstrated by the exposure of the opportunity to the marketplace.

85.    The Debtor has proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of the Assets for the benefit of the Debtor's estate and its creditors. The Debtor's decision to proceed with the sale process is consistent with sound business judgment.

86.    Under the circumstances, the Bidding Procedures and Auction process represent the best way to achieve substantial consideration for the Debtor's business and offer the best resolution to the Debtor's current financial situation in the

manner that will maximize the value available to the Debtor's estates and its creditors.

87.    The Debtor believes that one or more of the tests under section 363(f) will be satisfied with respect to the transfer of the Assets pursuant to a Sale Order. In particular, the Debtor believes that section 363(f)(3) and/or (5) will be satisfied.

88.    The Debtor believes that good cause exists to sell the Debtor's assets at Auction. The Auction conducted substantially in accordance with the proposed Bidding Procedures will enable the Debtor to obtain the highest and best offer for the Assets, thereby maximizing the value of the Assets for the benefit of their creditors.

## NOTICE

89.    Immediately after the entry of the Order approving the relief requested herein (the "Bidding Procedures Order"), the Debtor proposes to serve the Bidding Procedures Order and Bidding Procedures (in the form approved by the Court), via the Court's ECF system, electronic mail, facsimile, or Federal Express for overnight delivery, as the case may be, upon (i) the United States Trustee; (ii) all secured creditors; (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; and (v) all other entities known to have expressed an interest in a transaction with

respect to all or part of the Assets, (vi) E&J Associates, LLC, and (vii) 315-317 SMS, LLC.

90.     The notices to be provided and the method of service proposed herein constitute good, proper and adequate notice of the sale of the Assets and the proceedings to be had with respect thereto.

<u>**CONCLUSION**</u>

**WHEREFORE**, the Debtor respectfully requests that the Court (i) issue the Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**, (ii) issue the Sale Order, (to be filed as a proposed order at a later date), after the Sale Hearing, and (iii) grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Howard Borin
KIM HILLARY (P67534)
HOWARD BORIN (P51959)
Proposed Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
khillary@schaferandweiner.com

Dated:  August 27, 2024

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a          In Proceedings Under
M-Den, Inc., d/b/a The M Den                      Chapter 11

                                                          Hon.  Thomas J. Tucker

                       Debtor.
_____/

**ORDER (I) APPROVING LIDS HOLDINGS, INC., OR ITS DESIGNATED
SUBSIDIARY AS STALKING HORSE BIDDER, (II) AUTHORIZING THE
DEBTOR'S ENTRY INTO AN ASSET PURCHASE AGREEMENT, (III)
AUTHORIZING THE SALE OF THE DEBTOR'S ASSETS FREE AND
CLEAR OF ALL ENCUMBRANCES, (IV) APPROVING CERTAIN BID
PROCEDURES, BID PROTECTIONS AND DEADLINES, (V) SCHEDULING
A SALE HEARING, AND (VI) GRANTING RELATED RELIEF**

Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den (the

"Debtor") having filed its *Motion for Entry of an Order (I) Approving Lids Holdings,*

*Inc., or its designated subsidiary as Stalking Horse Bidder, (II) Authorizing the*

*Debtor's Entry Into An Asset Purchase Agreement, (III) Authorizing The Sale of the*

*Debtor's Assets Free and Clear of All Encumbrances, (IV) Approving Certain Bid*

*Procedures, Bid Protections and Deadlines, (V) Scheduling a Sale Hearing, And (VI)*

*Granting Related Relief* ("Motion"); this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334; this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); this Court having found that venue of

this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estates, its creditors, and other parties in interest; this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Sale Hearing"); this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, this Court **HEREBY FINDS THAT**:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    The Bidding Procedures[1] are fair, reasonable, and appropriate under the circumstances of this case and are designed to promote participation and active bidding.

---

[1] All capitalized terms not defined in this Order shall have the meanings ascribed to such terms in the Motion.

C.     The Bidding Procedures were negotiated at arm's length, in good faith, and without collusion.

D.     The Debtor engaged in a robust and extensive marketing and sale process prior to the Petition Date to solicit and develop the highest or otherwise best offer for its Assets.

E.     The Break-up Fee and Overbid Protections ("Bid Protections") set forth in the Bidding Procedures shall be deemed an actual and necessary cost of preserving the Debtor's estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and treated as an allowed administrative expense claim against the Debtor's estates pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

F.     The Bid Procedures do not prohibit credit bidding in accordance with 11 U.S.C. §363(k).

**IT IS, THEREFORE, HEREBY ORDERED THAT:**

1.     The Motion hereby is approved and granted in all respects, except as expressly set forth herein.

2.     All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights and/or statements included in such objections, are overruled and denied on the merits with prejudice, and the Bidding Procedures are approved as set forth herein.

3.     Lids Holdings, Inc., or its designated subsidiary ("Stalking Horse Bidder") is deemed to be a Qualified Bidder and is approved as the Stalking Horse Bidder.

4.     In the event that Debtor receives a Qualified Bid (as defined in the Bid Procedures) and Stalking Horse Bidder is not the successful bidder, Stalking Horse Bidder shall receive a breakup fee of $225,000.

5.     The following dates and deadlines are approved:

| September 6, 2024 | Bid Deadline |
|---|---|
| September 8, 2024 | Deadline for Debtor to notify Potential Bidders of whether their Bids are Qualified Bids |
| September 10, 2024 | Auction (if necessary) |
| September 10, 2024 | Deadline for Debtors to file and serve Notice of Successful Bidder(s) |
| September 11, 2024 | Deadline to object to the Sale of the Assets |
| September 12, 2024 | Sale Hearing |

The other hearing dates, deadlines, and notice requirements set forth in the Motion also are approved.

6.     If the Debtor determines not to conduct an Auction, it shall file a notice with the Court of such determination within one (1) business day of their making such determination.

7.     The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

8.     If the Stalking Horse Bidder is determined at the Sale Hearing to be the Winning Bidder, the Debtor be authorized and entitled to accept the Stalking Horse Bid and to enter into, and to perform their obligations under, a related Asset Purchase Agreement, as the same may be modified, or otherwise amended, prior to the closing

thereof by agreement of the Debtor, in its good faith business judgment, and of the Stalking Horse Bidder.

9.     Immediately after the entry of this Order, Debtor shall serve this Order via the Court's ECF system, electronic mail, facsimile, or Federal Express for overnight delivery, as the case may be, upon (i) the United States Trustee; (ii) all secured creditors; (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; and (v) all other entities known to have expressed an interest in a transaction with respect to all or part of the Assets, (vi) E&J Associates, LLC, and (vii) 315-317 SMS, LLC.

10.     Except as expressly provide herein, nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party intertest (including the Debtor and the Stalking Horse Bidder) has or may have under applicable bankruptcy and non-bankruptcy law.

11.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon entry hereof.

12.     The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**BID PROCEDURES**
**Heritage Collegiate Apparel, Inc.**

Set forth below are the procedures to be employed by Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den ("*Seller*") with respect to the proposed disposition of the Seller's right, title and interest in and to certain "Assets" as more particularly defined in the Stalking Horse Bid Term Sheet between Seller and Lids Holdings, Inc., or its designated subsidiary (the "*Stalking Horse Bidder*"). Unless otherwise indicated, capitalized terms shall have the meanings ascribed to them in the Bid Procedures Order

The Seller has entered into a Stalking Horse Bid Term Sheet with the Stalking Horse Bidder for the acquisition by the Stalking Horse Bidder of certain assets of Seller (the "*Stalking Horse Bid*"). The proposed sale to the Stalking Horse Bidder is subject to higher or better offers pursuant to these Bid Procedures, as follows:

1. <u>Bid Deadline</u>: A Qualified Bid for the Assets must be in writing and actually received on or before 5:00 p.m. prevailing Eastern Time on *September 6, 2024* (the "*Bid Deadline*"). **Any party other than the Stalking Horse Bidder that does not submit a Qualified Bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

2. <u>Due Diligence</u>: The due diligence period for parties other than the Stalking Horse Bidder shall extend through and including the Bid Deadline.

3. <u>Qualified Bids</u>: A "*Qualified Bid*" is a bid that the Seller determines in its sole and absolute discretion (a) is a higher and better bid than the Stalking Horse Bid, and (b) complies with all of the following:

    i. It is irrevocable until the earlier of (i) the approval by the Bankruptcy Court of the winning bidder, and (ii) the conclusion of the Auction; <u>provided, however</u>, that if such Qualified Bid is selected as the highest or otherwise best Qualified Bid (the "*Winning Bid*", and the party submitting the Winning Bid, the "*Winning Bidder*") or the Backup Bid (as defined below), it shall remain irrevocable until the closing of the Sale to the Winning Bidder or the Backup Bidder (defined below), as the case may be;

    ii. It includes a binding term sheet that is marked to show any differences from the Stalking Horse Bid, including the purchase price, which shall be payable in United States Dollars (the "*Proposed Purchase Price*");

    iii. If Seller files a proposed APA with the Stalking Horse Bidder on or before September 3, 2024 (the "*Stalking Horse APA*"), a marked-up version of the Stalking Horse APA showing the proposed changes to

the Stalking Horse APA shall be included as part of any bid submission.

iv. It is for the purchase of all of the Assets that are the subject of the Stalking Horse Bid, to be purchased in a single transaction;

v. The Proposed Purchase Price includes cash consideration ("***Proposed Cash Consideration***") that is at least $250,000 greater than the Stalking Horse Bid total cash consideration in the Stalking Horse Bid;

vi. It does not include any request or entitlement to any breakup fee, expense reimbursement or similar type of payment;

vii. It is not conditioned on (i) the outcome of unperformed due diligence by the bidder, or (ii) obtaining any financing.

viii. Includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

ix. It includes an acknowledgement and representation that the bidder (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets to be acquired and liabilities to be assumed in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets to be acquired or liabilities to be assumed or the completeness of any information provided in connection therewith, including by Seller, their professionals or any of their respective professionals and advisors, (iii) is a sophisticated party capable of making its own assessments in respect of making its bid; and (iv) has had the benefit of independent legal advice in connection with its bid;

x. It includes evidence, in form and substance reasonably satisfactory to Seller, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the purchase of the Assets;

xi. It is accompanied by a refundable deposit (the "***Deposit***") in the form of a wire transfer (to Seller's counsel's bank account), in accordance with wiring instructions to be provided to competing bidders), in an amount equal to the greater of (A) $250,000 and (B) 10% of the Proposed Cash Consideration, which such Deposit shall be held and disbursed with in accordance with these Bid Procedures and the APA;

xii. it provides for closing of the Sale by no later than September 17, 2024;

xiii. it provides evidence satisfactory to the Seller that such Qualified Bidder has the wherewithal and financial ability to consummate the purchase and sale of the Assets in accordance with its Qualified Bid. For the avoidance of doubt, Stalking Horse Bidder and Legends Global Merchandise, LLC or its affiliates have satisfied this provision;

xiv. it contains other information reasonably requested by Seller, or its professionals or advisors; and

xv. it is received no later than the Bid Deadline.

4. <u>Return of Deposit</u>: All Deposits shall be held by the Seller's counsel in trust. If a Qualified Bidder becomes the Winning Bidder, then the Deposit paid by the Winning Bidder whose bid is approved at the Sale Hearing shall be applied to the purchase price to be paid by the Winning Bidder upon closing of the transaction. The Deposit paid by the Backup Bidder (as defined below), if there is a Backup Bidder, shall be retained until the closing of the sale to the Winning Bidder or, if the Backup Bidder becomes the ultimate purchaser pursuant to the Bid Procedures, shall be applied to the purchase price to be paid by the Backup Bidder upon closing of the sale. The Deposits of all bidders (including the Stalking Horse Bidder) not selected as having the highest or otherwise best Qualified Bid or selected as the Backup Bidder shall be returned to such bidders within two (2) business days following the Auction. If an entity selected as the Winning Bidder (including, if selected as the Winning Bidder, the Backup Bidder) breaches its obligations to close, it shall forfeit its Deposit to the Seller; ***provided, however***, that the forfeit of such Deposit shall be in lieu of any other rights in law or equity that Seller has against such breaching entity.

5. <u>Break-Up Fee</u>: Seller has determined, in an exercise of its business judgment, that payment of a break-up fee of $225,000 as provided in the Stalking Horse Bid (the "***Break-Up Fee***") is necessary to induce the Stalking Horse Bidder to present the Stalking Horse Bid and participate in the Auction, and Seller deems such protections appropriate, necessary and value-additive to the process under the circumstances. Accordingly, if the Stalking Horse Bid is not ultimately the Winning Bid, then the Seller shall pay the Break-Up Fee to the Stalking Horse Bidder in cash concurrent with the closing of the sale to the Winning Bidder (or Backup Bidder as the case may be);

6. <u>No Qualified Bids</u>. If no timely Qualified Bids other than the Stalking Horse Bid (which shall be considered a Qualified Bid by the Stalking Horse Bidder for all purposes of these Bid Procedures) are submitted on or before the Bid Deadline, then Seller shall not hold an Auction and shall request at the Sale Hearing that the Stalking Horse Bidder be deemed the "Winning Bidder" (as defined below) and that the Bankruptcy Court approve the Stalking Horse APA and the transactions contemplated thereunder.

7. <u>Auction</u>:  In the event that Seller timely receives at least one Qualified Bid in addition to the Stalking Horse Bid, then Seller shall conduct an Auction. Unless Seller announces a different time and place with notice to all entities submitting a Qualified Bid, the Auction will be conducted at Schafer and Weiner, PLLC, 40950 Woodward Ave., Suite 100, Bloomfield Hills, MI 48304 on ***September 10, 2024 at 10:00 a.m.*** to determine the Winning Bidder. Any bidder submitting a Qualified Bid may appear and submit its highest and best bid at the Auction.  The Stalking Horse Bidder shall be deemed to be a bidder submitting a Qualified Bid.  The Auction may be adjourned by announcement at the Auction without further notice.  Only the Stalking Horse Bidder and the other persons who submitted Qualified Bids prior to the Bid Deadline shall be entitled to make any subsequent bids at the Auction.

8. <u>Auction Procedures</u>:  After the expiration of the Bid Deadline, Seller shall disclose the terms and conditions of any and all Qualified Bids to the Stalking Horse Bidder and all other Qualified Bidders, and shall advise the Stalking Horse Bidder and all other Qualified Bidders of what Seller deems to be the highest or otherwise best Qualified Bid for purposes of the start of the Auction.  Subsequent bids (each, an "Overbid") may only be made at the Auction and shall be at least (i) $25,000 over the previous bid plus (ii) for any bidder other than the Stalking Horse Bidder, the Breakup Fee (a "Minimum Overbid"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. Seller may, in its business judgment, announce increases or reductions to the Minimum Overbid at any time during any Auction after the initial Minimum Overbid.  For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at any Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that Seller, in its business judgment deems equivalent that exceeds the then-existing highest Bid by at least the amount of the Minimum Overbid.  Each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by Seller. During the Auction, Seller shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of such Overbid and inform each Qualified Bidder whether such Overbid reflects, in Seller's view, the then highest or otherwise best bid(s) for the applicable Assets.  To remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction.  The Auction will be transcribed to ensure an accurate recording of the bidding at the Auction.  At the Auction, bidding may continue until the Seller determines that it has received the highest or otherwise best bid for the Assets.  After the Seller makes such determination, the Auction will be closed.

9. <u>Determination of Winning Bidder</u>.  The Seller will determine and announce at the conclusion of the Auction which Qualified Bid it has selected as the

Winning Bid.  At the same time, the Seller will identify the *next* highest or otherwise next best Qualified Bid and announce that the bidder providing such bid has been selected as the "***Backup Bidder***" (the Backup Bidder's highest or otherwise best bid, the "***Backup Bid***").  If a Backup Bidder is identified in accordance with the Bid Procedures, then the Backup Bid shall remain open until the closing of the sale to the Winning Bidder, and available for the Seller's to consummate in the event the Winning Bidder fails to timely consummate the closing.

{01072487.1}

EXHIBIT C

 **AMES WATSON**

August 21, 2024

**Attn:** Principals of M-Den, Inc (Scott Hirth, Julie Corrin and Steve Horning)
**Via email:** shirth@mden.com

**RE: Stalking Horse Bid for assets of Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc.**

Dear Mr. Hirth and Partners,

We are pleased to present, on behalf of Lids Holdings, Inc. or its designated subsidiary ("Buyer") an affiliate of Ames Watson, LLC ("AW"), this stalking horse bid ("Bid") for substantially all assets of Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc. ("Debtor" or "Company").

AW's management team has deep experience with bankruptcy procedures and understands the process. In each case, we've been able to offer both certainty and the ability to close on a tight timeline.

Lids Holdings, Inc. is the owner-operator of the Lids brand most notably known for its mall-based stores focused on headwear, however, Lids is a leading North American omni-channel licensed sports apparel retailer with deep partnerships with NCAA and professional sports leagues. The business generates $1+ billion of revenue annually and is comprised of ~1,400 retail stores, 800 college campus stores and 50+ specialty "clubhouse" stores. Buyer, through its affiliates and suppliers, has access to relevant inventory for the store locations (University of Michigan licensed apparel and hard goods) and the expertise to quickly take-over going concern retail stores to provide the least amount of disruption possible.

As a result of our experience outlined above, we believe that we are the right type of buyer who can give the Debtor the most transaction certainty. We are comfortable with these types of transactions and, as you know, have spent considerable time and expense in conducting diligence. For these reasons, we are confident we can close in a timely manner on the terms herein.

**Consideration:** The purchase price for the assets to be acquired as described below is 62% of the Company's inventory cost ("Purchase Price") which will be paid in cash at closing.

Buyer is prepared to fund a deposit of up to $200,000 concurrent with the Debtor's acceptance of this Bid. The deposit shall be credited to the Purchase Price due at closing, and any balance owing shall be paid in cash on closing.

**Assets to be Acquired:** Buyers expect to acquire substantially all assets of the Company including without limitation, all Company inventory ("Inventory"), deposits, prepaid assets, other assets, trademark names, customer lists, intellectual property including rights if any to use the "M-Den" tradename (including any claims or causes of action related thereto), and all PP&E. The transaction assumes that the Company owns, and has right and title to, all of the operating assets and that such operating assets are the only assets needed to operate the business as contemplated.



**Liabilities to be Assumed:** Other than the leases at the locations set forth below, and any other executory contracts or unexpired leases subsequently identified by Buyer and the subject of a separate motion for assumption and assignment to be filed in the Bankruptcy Court, Buyer will assume no liabilities of the Debtor, including without limitation any pre or post petition liabilities in respect of executory contracts or unexpired:

1. State Street retail store; 2 separate leases (301-303 South State St. and 307-309 South State St. Ann Arbor, MI). The landlord of 307-309 S. State Street, M Den State Street Properties, LLC, is under common ownership with Company.
2. Main Street retail store (315-317 S Main St. Ann Arbor, MI)
3. Parking Lot pop-up tent (1336 S. Main St. Ann Arbor, MI) – No current lease exists and the Buyer and the Landlord for the Parking Lot, Buyer shall enter into a new lease with the landlord in substantially the same terms as Exhibit A attached hereto. The Parking Lot Landlord, M Den Stadium Properties, LLC, is an entity which is under common control and ownership as the Company.
4. Warehouse and Corporate Office (5000 Carpenter Rd. Ypsilanti, MI) The Warehouse landlord, M Den Properties, LLC, is an entity which has common control and ownership as Company.

**Employees:** Buyer expects to offer employment to substantially all of the Debtor's employees whose work primarily relates to the leased retail stores described above, and also intends to offer employment to the corporate office and warehouse employees whose work primarily relates to the revenue channels of the Company Buyer is acquiring.

**Financing & Expenses:** There is no financing contingency. The Buyer has sufficient cash and liquidity to fund the consideration and ongoing working capital requirements of the business. Except for the break-up fee, should one be provided for, the parties shall each be responsible for their own expenses in negotiating and executing a definitive agreement, including any related diligence.

**Going Concern:** Company will continue to operate the store located in the leased premises set forth above, as well as its operations in the Warehouse in the ordinary course of business consistent with Company's past practices, from the effective date of the Bid through the closing of the definitive agreement ("Sale Period").

**Timing:** Buyer's offer assumes that a motion for bid procedures would be filed promptly following acceptance of this offer and in any event by Tuesday, August 27, 2024, and for the Bankruptcy Court to approve an expedited sale process that would result in a sale order within 21 days of filing the bid procedures motion. While Buyer appreciates the procedural challenges associated with its desired timing, time is truly of the essence due to seasonality related to both the new school year starting and the fall football season – and ability to realize on that expeditiously is a critical part of Buyer's offer. That being said, Buyer is confident that within such three-week window, it will fully mobilize to have the retail operations staffed, open, and stocked with new inventory in time to meaningfully serve the University of Michigan community for back-to-school and the football season. Buyer, through its affiliates and suppliers, has immediate access to relevant inventory for the store locations (University of Michigan licensed apparel and hard goods) and the expertise to quickly take-over going concern retail stores to provide the least amount of disruption possible for employees and customers. If the transactions contemplated under this offer are not reduced to an agreed upon definitive agreement and closed on by September 30, 2024, this offer and any binding terms shall expire.

**Bid Procedures:** The parties to agree to any proposed bid procedures to be submitted to the Bankruptcy Court for approval, which shall be in form and substance acceptable to Buyer and Company, including a


break-up fee, which is only paid to Buyer should Buyer not be the winning bid.

**Due Diligence:** The only remaining diligence item that Buyer requires is an inventory count to be done at closing for purposes of determining the final purchase price.

**Expiration of Offer:** This offer will expire at 5:00 pm EST on Friday, August 23, 2024, unless executed by Debtor and AW, as agent for the Buyer.

**Binding Commitment:** This Term Sheet shall be binding upon execution of both of the parties below. Both parties recognize and agree that any definitive agreement is expressly conditioned on the bid procedures set forth by the Bankruptcy Court and final Bankruptcy Court approval.

We look forward to working with you on this transaction.

Agreed to and accepted by,

**Ames Watson, LLC, as agent for the Buyers**          **Company: Heritage Collegiate Apparel, Inc.**

_Ryan Scott_
8/22/24                                                           _Scott Hirth_
                                                                 8-23-24

Ryan Scott                                                Name: Scott Hirth

Principal                                                 Title: President

cc:     Lawrence Berger, Partner
        Alan Noskow, King & Spalding LLP


**EXHIBIT A**

**COMMERCIAL LEASE AGREEMENT**

This Commercial Property Lease (the "**Lease**") is entered into effective _____, 2024 (the "**Effective Date**"), by and between **M Den Stadium Properties LLC**, a Michigan limited liability company, with offices at 5000 Carpenter Rd., Ypsilanti, MI 48197 ("**Landlord**"), and _____, a _____, with offices at _____ ("**Tenant**"), on the following terms and conditions.

For valuable consideration received, Landlord and Tenant agree as follows: need permit, reduce rent to 150k

1. **Parking Lot.** Landlord leases to Tenant the paved parking lot (the "**Parking Lot**") on the properties at 1336 S. Main Street and 210 W. Stadium, Ann Arbor, Michigan 48104 (together, the "**Property**") for use only on eleven (11) days of special events per year, including all University of Michigan home football games and other major events held at Michigan Stadium or Crisler Arena, which may include other sporting events and concerts (collectively, "**Special Events**"). Such use shall allow pedestrian traffic to and from Main Street and the main entry/exit doors of the building on the Parking Lot during such events.

2. **Term and Options to Renew.** The term of this Lease shall be **five (5) years** commencing on _____, 2024 (the "**Commencement Date**"), and expiring on _____, 2029 (the "**Initial Term**"). Provided Tenant is not then in default beyond any applicable notice or cure period of the Lease, Tenant shall have the option to renew this Lease on the expiration of the initial Term of the Lease, for one (1) additional term of five (5) years (the "**Option Term**"), by giving written notice of Tenant's exercise of the option to Landlord at least one hundred eighty (180) days before the expiration of the Initial Term. The renewal shall be on the same terms and conditions as stated in this Lease except that the Rent during the Option Term shall as set forth in Section 3. The Initial Term and the Option Term, if exercised, are referenced as the "**Term**."

3. **Rent.** For the Initial Term, Tenant shall pay Landlord as rent for the Parking Lot the following ("**Rent**"):

| Lease Years | Annual Rent | Monthly Rent |
|---|---|---|
| Lease years 1 – 5 | $174,000 | $14,500 |
| Option Years 6 -10 | $191,400 | $15,950 |

Monthly installments of Rent shall be due and payable in advance on the first day of each calendar month, with such obligation commencing on the earlier of (i) seven (7) days following the Commencement Date of this Lease; or (ii) the date that Tenant has obtained all necessary permits and authorizations (if any) to conduct its retail business at the Premises (the "**Rent Commencement Date**"), even if such date is after the Commencement Date. Rent for any partial month of occupancy shall be prorated. Rent payments shall be made to Landlord at its address shown above or any other place designated in writing by Landlord.

If Tenant fails to timely pay any Rent due under this Lease, a late payment charge of $100 shall be assessed and the amount of Rent not paid shall be subject to a service charge, at the lesser of the rate of ten percent (10%) per month or the highest rate permitted by law, until the delinquent amount is paid in full.



4. **Insurance for Building**. During the Term, Landlord shall keep the Property insured against loss or damage by fire and other hazards covered by customary extended-coverage insurance in the amounts determined by Landlord to be the full replacement value of the building.

5. **Taxes**. Landlord shall pay or cause to be paid all real property taxes and special assessments levied against the Property.

6. **Maintenance, Repair & Alterations**. Landlord shall, at its expense, keep the Parking Lot in good order and repair.

Tenant shall not make any alterations, additions, or improvements to the Property without Landlord's written consent.

Tenant shall not perform any acts or carry on any practice that may injure the Property. After each use by Tenant, the Tenant shall leave the Parking Lot clean and free from rubbish and dirt. Tenant shall, at its own expense and under penalty of forfeiture and damages, promptly comply with all Laws affecting Tenant's use of the Parking Lot. Tenant shall also be responsible for all repairs of the Parking Lot occasioned by the negligent or willful act of Tenant or its agents, employees, invitees, or licensees.

7. **Use**. Tenant shall use and occupy the Parking Lot for the operation of retail sales from a tent erected on the Parking Lot, in accordance with all applicable federal, state, local, and other laws, rules, regulations, ordinances, codes and other governmental requirements (collectively, "**Laws**") and for no other purpose without the consent of Landlord, which consent Landlord may withhold in its sole discretion. Tenant shall not knowingly use the Parking Lot for any purpose or in any manner in violation of any Laws. Tenant shall not deface or injure the Parking Lot, nor permit anything to be done on the Parking Lot that will result in an increase of any premium or cancellation of any policy for insurance on the Property.

8. **Assignment and Subletting**. Tenant shall not sell, assign, mortgage, pledge, or in any manner transfer this Lease or sublet the Parking Lot or any portion of the Parking Lot without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. Notwithstanding any assignment or subletting, Tenant shall remain fully liable on this Lease. Landlord's right to assign this Lease is and shall remain unqualified. On any sale of the Property in which the purchaser assumes all obligations under this Lease, Landlord shall be free of all its obligations under this Lease and shall not be subject to any liability resulting from any act, omission, or event occurring after the conveyance. Tenant shall recognize and attorn to the transferee as Landlord, and Tenant further agrees to, within 10 days following Landlord's request, execute and deliver the documents and letters that Landlord may request to assist in that transfer, including, without limitation, an attornment agreement and estoppel letter. Notwithstanding anything contained herein, Tenant shall have the right to assign, transfer, or sublet the Premises (without Landlord's consent and without recapture rights, rent increases, charges or additional fees) to any wholly owned or affiliated corporation, division or subsidiary or a corporation merging with Tenant, a corporation resulting from the merger between Tenant and another corporation and any entity buying all or a majority of Tenant's assets.

9. **Utilities**. Landlord shall pay the cost of Tenant's use of electricity, provided that if Tenant expands its use of utilities beyond what is necessary to run standard retail sales operations out of a tent on the Parking Lot, Tenant shall pay all additional utility costs in connection with such expanded use. Landlord shall not be liable for damages if the furnishing of any utilities is interrupted by fire or other casualty, accident, strike, labor dispute, or disagreement; or any other causes beyond Landlord's reasonable control.



10. **Liability Insurance**. Tenant shall indemnify Landlord and save harmless Landlord from any liability or claim for damages (including reasonable attorney fees) that may be asserted against Landlord because of any accident or casualty occurring on the Property in connection with Tenant's use. Tenant shall, at its own cost and expense, obtain and keep in force a policy or policies of public liability insurance with an insurance company approved by Landlord, with liability coverage in commercially reasonably amounts. At the commencement of the Term, Tenant shall furnish Landlord with certificates or other evidence acceptable to Landlord indicating that the foregoing insurance is in effect and providing that Landlord shall be notified in writing at least 30 days before cancellation of, any material change in, or renewal of the policy. All insurance policies shall name Landlord and any persons designated by Landlord as insured parties.

Any insurance maintained by either party pursuant to this paragraph shall contain a clause or endorsement under which the insurer waives all rights of subrogation against the other party and its agents or employees with respect to losses payable under the policy.

Any personal property which is on the Property in connection with Tenant's use shall be kept at Tenant's sole risk.

11. **Acceptance of Parking Lot**. Tenant's execution of this Lease shall constitute an acknowledgment by Tenant of its acceptance of the Parking Lot in its "as is" condition.

THE PARKING LOT ARE LEASED TO TENANT IN ITS PRESENT "AS IS" CONDITION WITHOUT REPRESENTATION, WARRANTY, OR COVENANT (EXPRESSED OR IMPLIED) BY LANDLORD AND SUBJECT TO THE PRESENCE OR ABSENCE OF ANY ENVIRONMENTAL CONDITION ON THE PARKING LOT OR ANY PROPERTY IN THE VICINITY OF THE PARKING LOT. TENANT HAS EXAMINED THE PARKING LOT AND ALL IMPROVEMENTS TO IT AND HAS FOUND THEM SATISFACTORY FOR ALL PURPOSES. LANDLORD HAS NOT MADE, NOR SHALL BE DEEMED TO HAVE MADE, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION OF THEM.

12. **Remedies and Default**. If Tenant: (a) defaults in paying any sums to Landlord when due and does not cure the default within 5 business days without notice from Landlord, and/or (b) defaults in performing any other covenant or condition of the Lease and does not cure the default within 30 days after written notice from Landlord specifying the default, and/or (c) is bankrupt or makes any assignment for the benefit of creditors, Landlord may accelerate the full balance of the Rent payable for the remainder of the Term and sue for the sums, may terminate this Lease, or may, without terminating this Lease, dispossess Tenant of the Parking Lot, remove and dispose of Tenant's effects, and relet the Parking Lot for the Rent on the terms that are satisfactory to Landlord, crediting the proceeds, after deducting the costs of reentry, alterations, additions, and reletting, to the unpaid Rent and the other amounts due during the remainder of the Term. Tenant shall remain liable to Landlord for any unpaid balance. Tenant shall pay to Landlord all of Landlord's out-of-pocket costs and attorney fees and other legal expenses incurred by Landlord in exercising its rights under this Lease. The pursuit of one or more of the above remedies shall not constitute an election of remedies by Landlord.

13. **Waiver**. Landlord's failure to insist on strict performance of any of the terms, covenants, or conditions of this Lease shall not be deemed a waiver of any subsequent breach or default in the terms, covenants, and conditions or rules and regulations. This Lease may not be changed, modified, or discharged orally.



14. **Notices**. All notices required under this Lease shall be in writing and shall be deemed to have been given if either delivered personally or mailed by certified or registered mail to Landlord or to Tenant at the addresses listed above.

15. **Subordination to Mortgage**. Any mortgage existing on the Property, now or later placed, shall be deemed to be prior in time and senior to the rights of Tenant under this Lease. Tenant subordinates all of its interest in the leasehold estate created by this Lease to the lien of any mortgage. Tenant shall, at Landlord's request, execute any additional documents necessary to confirm this subordination, so long as such document does not increase Tenant's obligations or decrease its rights under the Lease. Notwithstanding the foregoing, Tenant's use of the Parking Lot under this Lease shall not be disturbed by any mortgagee, owner, or holder of note secured by a mortgage placed on the Property unless Tenant breaches any of the provisions of this Lease and Tenant's right to possession has been lawfully terminated in accordance with the provisions of this Lease.

16. **Recording**. At the request of either party, the other party shall join in the execution of a memorandum of this Lease for the purpose of recordation. The memorandum or short form of this Lease shall describe the parties, the Parking Lot, and the term of this Lease and shall incorporate this Lease by reference. Economic terms shall not be disclosed in any memorandum, and this Lease shall not be recorded.

17. **Applicable Law**. This Lease shall be construed under the laws of the State of Michigan. If any provision of this Lease, or its application to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Lease shall not be affected, and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

18. **Successors**. This Lease and the covenants and conditions shall inure to the benefit of and be binding on the Landlord and its successors and assigns and shall be binding on Tenant and permitted assigns of Tenant.

19. **Third-Party Beneficiaries**. This Lease is made solely for the benefit of the parties to this Lease. Nothing contained in this Lease shall be deemed to give any person, partnership, joint venture, corporation, limited liability company, governmental entity, or other entity any right to enforce any of the provisions of this Lease, nor shall any of them be a third-party beneficiary of this Lease.

20. **Confidentiality**. The financial and other information contained in this Lease shall be deemed confidential and proprietary to the Landlord and shall not be disclosed by Tenant to any third party except to its attorneys, accountants, agents, and employees.

21. **Entire Agreement**. This Lease constitutes the entire agreement of the parties with respect to its subject matter, and it supersedes all prior discussions, negotiations, and communications between the parties.

22. **Amendment**. No provisions of this Lease shall be amended unless a written amendment is signed by both parties.

Landlord and Tenant have executed this Lease on the date listed on the first page.



TENANT

_____, a _____

By:_____
Its:_____

LANDLORD

**M Den Stadium Properties LLC**, a Michigan
limited liability company

By:_____
    Scott Hirth, Member

By:_____
    Julie Corrin, Member

By:_____
    Steve Horning, Member