# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# DETROIT DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| HERITAGE COLLEGIATE | ) | |
| APPAREL, INC. | ) | Case No. 24-47922-tjt |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OBJECTION AND JOINDER OF BRANDED CUSTOM SPORTSWEAR, INC. TO MOTION FOR ENTRY OF AN ORDER (I) APPROVING LIDS HOLDINGS, INC., OR ITS DESIGNATED SUBSIDIARY AS STALKING HORSE BIDDER, (II) AUTHORIZING THE DEBTOR'S ENTRY INTO AN ASSET PURCHASE AGREEMENT, (III) AUTHORIZING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES, (IV) APPROVING CERTAIN BID PROCEDURES, BID PROTECTIONS AND DEADLINES, (V) SCHEDULING A SALE HEARING AND (VI) GRANTING RELATED RELIEF**

Branded Custom Sportswear, Inc. ("BCS"), by and through its undersigned counsel, submits this objection (the "Objection") [1] to the Debtor's *Motion for Entry of an Order (I) Approving Lids Holdings, Inc., or its designated subsidiary as Stalking Horse Bidder, (II) Authorizing the Debtor's Entry Into An Asset Purchase*

---

[1] Shortly before this filing, BCS was appointed to serve as a member of the Committee of Unsecured Creditors (the "Committee") in the case of the above-captioned debtor and debtor-in-possession [Docket No. 75]. Under the circumstances, the Committee will not have adequate time to interview, much less retain, counsel prior to the expiration of the deadline to file a written response to the Motion. These exigent circumstances necessitate BCS filing this objection in its separate capacity to preserve the rights of unsecured creditors, including those of BCS.

*Agreement, (III) Authorizing The Sale of the Debtor's Assets Free and Clear of All Encumbrances, (IV) Approving Certain Bid Procedures, Bid Protections and Deadlines, (V) Scheduling a Sale Hearing, And (VI) Granting Related Relief* [Docket No. 54] (the "Motion"). In support of its Objection, BCS respectfully states as follows:

## PRELIMINARY STATEMENT

1. There can be little doubt that Heritage Collegiate Apparel, Inc. (the "Debtor") intends to hand over its assets to Lids Holdings, Inc., or its designated subsidiary ("Lids" or the "Proposed Stalking Horse Bidder") without any pretense of honoring the due process rights of the creditors in this case. The Motion, filed a few days before a major holiday weekend, contemplates an expedited sale process, with a Bid Deadline[2] that is approximately ***two days*** after the hearing scheduled to approve the Bid Procedures. The deadline to file a written response to the Motion is the calendar day immediately following this national holiday and is also the date upon which the U.S. Trustee just appointed an Official Committee of Unsecured Creditors in this case [Docket No. 75].

2. To make matters worse, the proposed Bidding Procedures are essentially meaningless. The Motion makes clear that "[t]he Debtor reserves the

---

[2] Capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Motion.

right to modify the Bidding Procedures *as necessary* or as it deems appropriate to maximize value for its estate, creditors, and other parties in interest." (Mot., ¶ 39 (emphasis added).)

3. No asset purchase agreement was filed with the Motion.[3] Rather, the Bidding Procedures contemplate that a Stalking Horse APA may be filed on September 3, 2024, which happens to coincide with the deadline to file written objections to the Motion. If a Stalking Horse APA is filed, interested parties will need to provide a mark-up of the Stalking Horse APA in order to be a Qualified Bid—a determination that the Debtor makes "in its sole and absolute discretion." (Bid Procedures, ¶ 3.iii., Mot. Ex. B at 1.)

4. The Motion contemplates a Break-Up Fee in the amount of $225,000—which is 5.3% of the estimated purchase price of $4,250,000.

5. The Term Sheet attached as Exhibit C to the Motion includes a five-year lease with M Den Stadium Properties LLC, an insider of the Debtor within the meaning of the Bankruptcy Code.

6. The Term Sheet further states that "Buyer expects to offer employment to substantially all of the Debtor's employees whose work primarily relates to the leased retail stores described above, and also intends to offer employment to the

---

[3] BCS reserves its right to supplement this Objection after it has had a meaningful opportunity to review the Stalking Horse APA.

corporate office and warehouse employees whose work primary relates to the revenue channels of the Company Buyer is acquiring." ([Docket No. 54] at 36.) It is unclear whether and on what terms officers, directors or other insiders are being offered employment.

7. The sale process proposed by the Debtor is riddled with serious defects that, if not corrected, will chill bidding and prevent the Debtor from any opportunity to realize the maximum value for its business and assets, and thereby fulfill its fiduciary duty to all creditors of the estate. The abbreviated sale process proposed by the Debtor is only designed to guarantee that Lids will be the Winning Bidder. There are many flags on this play and the Bidding Procedures should not be approved in their current form.

## OBJECTION

I. **The hyper-compressed timeline under the Bidding Procedures does not permit a meaningful opportunity for potentially-interested parties to submit a competing bid.**

8. The ultimate goal of an auction and a sale pursuant to section 363 of the Bankruptcy Code or through a plan of reorganization is the maximization of value realized by the bankruptcy estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex. rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 573 (3d Cir. 2003). "The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards,* 228 B.R.

552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts have discretion and latitude in approving how such sale is conducted. *See Wintz v. Am. Freightways, Inc. (In re Wintz Cos.),* 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring a sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets.") (quoting *Four B. Corp. v. Food Barn Stores (In re Food Barn Stores),* 107 F.3d 558, 566 (8th Cir. 1997)); *see also In re Cormier,* 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008).

9. As such, the Court should not simply defer to the Debtors' "sound business judgment" when evaluating proposed bid procedures; rather, the Court should instead assess the fairness and reasonableness of those procedures. In that regard, courts may approve only those bidding protections that foster, and will not chill bidder participation in the sales process. *In re President Casinos, Inc.,* 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."). Courts must not approve bidding procedures that "undermine principles of fair play," because "unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value." *In re Jon J. Peterson, Inc.,* 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).

10. Although the need for prompt action is sometimes necessary in the world of chapter 11, the "need for expedition . . . is not a justification for abandoning proper standards." *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983) (citations omitted). The Due Process Clause of the United States Constitution applies to proceedings under the Bankruptcy Code. *See In re HNRC Dissolution Co.,* 3 F.4th 912, 919 (6th Cir. 2021). "'Procedural due process' at its core requires notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Garcia v. Fed. Nat. Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015).

11. The explanation given for the compressed schedule does not reflect reality. The Debtor states that a sale must be closed quickly to coincide with the "five consecutive weeks of home games at Michigan Stadium" and that the "Stalking Horse Bid expires if the sale does not close by September 20, 2024." (Mot. ¶¶ 30-31.) The home game schedule, however, does not support a September 20, 2024 closing deadline. Three out of the five games cited by the Debtor are played before September 20, 2024, and the fourth is played on September 21, 2024.[4] Moreover, there are three additional home games between October 26, 2024, and November 23, 2024.

---

[4] The University of Michigan 2024 football schedule may be viewed at https://mgoblue.com/sports/football/schedule (visited September 2, 2024).

6

24-47922-tjt    Doc 80    Filed 09/03/24    Entered 09/03/24 15:08:08    Page 6 of 11

KC 22824137.3

12. The Proposed Stalking Horse's desires notwithstanding, there is plenty of time left on the clock to close a value-maximizing sale by mid-October, while allowing an independent third party an opportunity to investigate the extent of the pre-petition marketing of the assets and to evaluate whether the purchase price being offered is truly the highest and best.

13. Accordingly, the Bidding Procedures should be denied unless all deadlines, including the bid deadline, are extended.

## II. The Motion does not adequately address marketing efforts or accurately reflect the market.

14. The Motion does not provide sufficient details on the efforts that Debtor has undertaken or plans to undertake to market the sale of Debtor's assets.

15. The Motion references that Debtor "began contemplating a sale of its assets" in February and "reached out" to Champions Circle- Michigan Wolverines Collective,[5] but does not provide any details on the breadth of the Debtor's efforts.

16. The Sale Motion is devoid of any information about who is marketing the assets or whether the Debtor has considered hiring an investment banker. Beyond referencing that it "reached out" to a community designed to support student-

---

[5] From its website, Champions Circle- Michigan Wolverines Collective describes itself as "a community of fans, alumni, and supporters whose goal is empowering University of Michigan student-athletes to be the leaders and best through name, image, and likeness." https://www.championscircleuofm.com/whoweare (visited September 2, 2024). It is not an investment banker or broker.

athletes, there is no information about how Debtor marketed its assets or to whom the assets are being marketed. There is no indication that Debtor made any attempt at a robust marketing process.

17. Debtor instead summarily concludes that there are only two likely bidders for the assets. This is not accurate. BCS is aware of at least one additional interested party (Rally House) that had reached out to Debtor pre-petition regarding a potential sale agreement; it is BCS's understanding that Debtor did not respond. However, as discussed above, Debtor's compressed bidding procedures all but guarantee no other potential bidders will come forward, as it is not feasible to expect a potential purchaser to conduct sufficient due diligence in two days' time to submit a competing bid.

### III. The Break-Up Fee should not be approved at this time

18. Bankruptcy courts may award break-up fees and expense reimbursements only insofar as they represent "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b). The "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 535 (3d Cir. 1999). As the *O'Brien* court noted, "[n]ot

all of the purposes that break-up fees serve in corporate transactions are permissible in bankruptcy." *Id.* The *O'Brien* court explained that

> [a]lthough the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of the acquisition to other bidders (an impermissible purpose).

*Id.*; *see also In re Integrated Res., Inc.*, 147 B.R. 650, 662 (S.D.N.Y. 1992) (considering "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders.").

19. The Bidding Protections solely ensure that Lids is the Winning Bidder by chilling the bidding and deterring other bidders from participating in a fulsome sale process. Accordingly, the Court should deny approval of the Break-up Fee.

### IV. The sale process cannot be run for the exclusive benefit of secured creditors

20. The Purchase Price (which is a moving target depending upon available inventory at closing) is not sufficient to satisfy the $6,063,447.09 alleged secured debt owed to the Bank of Ann Arbor, much less the total alleged prepetition secured debt of $11,902,494.12, identified in the cash collateral motion [Docket No. 16].

21. Sales pursuant to Section 363 cannot be run for the exclusive benefit of secured lenders. The court in *In re Gulf Coast Oil Corp.* denied a sale motion because the sale made no provision for payment of administrative and priority claims

which would make a subsequent chapter 11 plan impossible. 404 B.R. 407, 428 (Bankr. S.D. Tex. 2009). The Debtor must set forth a proposal that will, at a minimum, satisfy all chapter 11 administrative expenses and provide for a recovery to unsecured creditors. Until they do so, the Bid Procedures should not be approved.

22. Unless funds are carved-out of sale proceeds in order to provide a recovery to unsecured creditors, a sale to the Proposed Stalking Horse Bidder cannot be approved.

### JOINDER IN OBJECTIONS RAISED BY OTHER UNSECURED CREDITORS

23. To the extent consistent with the objections expressed herein, BCS also joins in the objections of any other similarly situated creditors to the Debtor's proposed relief.

### RESERVATION OF RIGHTS

24. BCS reserves its rights to raise further or other objections to the entry of an order on the Motion once a proposed Stalking Horse APA is made available.

### CONCLUSION

25. The Court should require that the any order approving the Motion on a final basis be modified consistent with this Objection and grant such further relief as the Court deems proper.

Dated: September 3, 2024.

/s/ Mark Bogdanowicz
Mark Bogdanowicz, #75399MO
SPENCER FANE LLP
1000 Walnut., Ste. 1400
Kansas City, MO 64106
Telephone: (816) 474-8100
Facsimile: (816) 474-3216
mbogdanowicz@spencerfane.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of September, 2024, a true and exact copy of the foregoing document was filed electronically. Notic of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt.

/s/ Mark Bogdanowicz
Mark Bogdanowicz