**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re:<br><br>HERITAGE COLLEGIATE APPAREL, INC.,<br>f/k/a M-DEN, INC., d/b/a The M Den,<br><br>                            Debtor. | Case No. 24-47922-tjt<br><br>Chapter 11<br><br>Judge Thomas J. Tucker |

**THE REGENTS OF THE UNIVERSITY OF MICHIGAN'S
OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I)
APPROVING LIDS HOLDINGS, INC., OR ITS DESIGNATED
SUBSIDIARY AS STALKING HORSE BIDDER, (II) AUTHORIZING THE
DEBTOR'S ENTRY INTO AN ASSET PURCHASE AGREEMENT, (III)
AUTHORIZING THE SALE OF THE DEBTOR'S ASSETS FREE AND
CLEAR OF ALL ENCUMBRANCES, (IV) APPROVING CERTAIN BID
PROCEDURES, BID PROTECTIONS AND DEADLINES, (V)
SCHEDULING A SALE HEARING, AND
(VI) GRANTING RELATED RELIEF**

The Regents of the University of Michigan (the "University of Michigan"), a

Michigan constitutional corporation, by counsel, files this *Objection* (the

"Objection") to Debtor Heritage Collegiate Apparel, Inc.'s ("Debtor") *Motion for*

*Entry of an Order (I) Approving Lids Holdings, Inc., or its Designated Subsidiary*

*as Stalking Horse Bidder, (II) Authorizing the Debtor's Entry into an Asset*

*Purchase Agreement, (III) Authorizing the Sale of the Debtor's Assets Free and*

*Clear of All Encumbrances, (IV) Approving Certain Bid Procedures, Bid*

*Protections and Deadlines, (V) Scheduling a Sale Hearing, and (VI) Granting Related Relief* (the "Bid Procedures Motion"). The University of Michigan objects to the Bid Procedures Motion to the extent that it proposes to allow the sale of intellectual property owned by the University of Michigan. The University of Michigan also objects to the aggressive timeline and break-up fee set forth in the Bid Procedures Motion.

## I. Background

1. The University of Michigan is an interested party in Debtor's bankruptcy case both as a creditor and because Debtor has infringed, and has signaled through the Bid Procedures Motion that it plans to continue to infringe, the University of Michigan's intellectual property rights.

2. Debtor and the University of Michigan were parties to an agreement dated July 1, 2009, as amended ("2009 Agreement"), an agreement dated effective as of June 2010, as amended ("2010 Agreement"), and a forbearance agreement dated effective as of May 13, 2024 ("Forbearance Agreement"). Copies of the 2009 Agreement, 2010 Agreement, and Forbearance Agreement are collectively referred to herein as the "Agreements" and are attached hereto as Exhibits 1, 2, and 3, respectively.

3. As set forth in the Agreements, the University of Michigan is the owner of certain trademarks, service marks, trade names, colors, seals, and symbols which have become associated with the University,

2

used by the University in commerce, non-exclusively licensed by the University to third parties for use in commerce, and on some of which U.S. or state trademark registrations have been obtained (the "Marks" as more fully described below).

[*See* Exhibit 1, 2009 Agreement, Recitals at ¶ 1.]

4.    Debtor has acknowledged and agreed that:

the University has **all** right, title, and interest in and to and is the sole and exclusive owner of the Marks, the goodwill associated with the Marks, and all United States and foreign registrations thereon. Marks shall mean any and all of the trademarks, service marks, **trade names**, school colors, seals, and/or symbols of the University, whether now owned or developed or acquired in the future, which have or which become associated with the University, used by the University in commerce, and/or licensed to [Debtor] or third parties for use in commerce, whether registered or unregistered in the United States or the world, including, without limitation, the "M" in the name "M-Den." [Debtor] agrees that it has no proprietary interest in the Marks and that all use of the Marks shall inure to the benefit of the University. . . [Debtor] agrees that it will not contest, oppose or challenge the University's use or ownership of the Marks.

[*See* Exhibit 1, 2009 Agreement, at ¶ 1(b) (emphasis added).]

5.    The Agreements granted Debtor, among other things, rights to use certain of the Marks.

6.    Further, the University of Michigan granted Debtor "the right, subject to the terms and conditions of [the 2009 Agreement] to use the description "M-Den" (part of the Marks) solely as a corporate name to identify its approved retail locations and to identify its internet website (www.mden.com) , and its catalogs . . . No other right to use the Marks is granted to [Debtor].". [*Id.* at ¶ 3(a).]

7. Debtor was "permitted to use only the Marks described above" and "only in the manner authorized and permitted by the University in [the 2009 Agreement] . . . ." [*Id.* at ¶ 3(b).] To that end, Debtor was only authorized in the 2009 Agreement to use the Marks for operation of its retail locations, website and catalogs (as approved by the University), and in accordance with Appendix A of the 2009 Agreement.

8. Importantly, Debtor was not permitted to use "M-Den" or the Marks as part of its corporate name, but instead, was authorized to utilize "M-Den" only as an assumed name and solely during the term of the 2009 Agreement. [*Id.* at ¶ 3(e)]. Upon the termination of the 2009 Agreement, Debtor was to terminate its assumed name and no longer do business under the name "M-Den". [*Id.*] The University of Michigan also originally agreed that it would not use or license to others the M-Den name after termination of the 2009 Agreement; however, the University of Michigan received the right to use or license the M-Den name to a third-party through the Forbearance Agreement. [*Id.*; *see also* Exhibit, 3, Forbearance Agreement, ¶ 1(a).]

9. Additionally, the Agreements contained anti-assignment language, prohibiting Debtor from assigning its licensing rights to a third party. [*See* Exhibit 1, 2009 Agreement, Acknowledgements (4)(d) ("This Agreement cannot be assigned by [Debtor], either directly or indirectly, including, but not limited to,

through the transfer of any ownership interest in [Debtor], without the prior written consent of the University.")]

10. In June of 2010, the University of Michigan and Debtor entered into the 2010 Agreement whereby, among other things, Debtor was to act as the official merchandise retailer for the Athletics Department for the University of Michigan. [*See* Exhibit 2, 2010 Agreement.]

11. The 2010 Agreement also confirmed that Debtor only had the right to use the M-Den name until a change in control or termination of the 2009 Agreement. [*See* Exhibit 2, 2010 Agreement, §2.4].

12. Due to Debtor's material breaches of the Agreements, the University of Michigan sent a notice of termination of the Agreements on February 7, 2024, stating that termination would be effective March 11, 2024, and that beginning on that date, among other things, Debtor must not operate under the name M-Den. A copy of the notice of termination ("Termination Notice") is attached hereto as Exhibit 4.

13. The University of Michigan gave Debtor several extensions of the Agreements' termination deadline while the parties negotiated the sale of Debtor's assets and the cure of Debtor's breaches. Effective May 13, 2024, the University of Michigan and Debtor entered into the Forbearance Agreement, pursuant to which the University of Michigan agreed to forebear from exercising its rights

under the Agreements in order to give Debtor an opportunity to negotiate terms for the sale of its inventory and other assets while operating as a going concern. [*See* Exhibit 3.]

14.     Pursuant to the Forbearance Agreement, Debtor confirmed that it irrevocably assigned any rights it had, if any, to the M-Den name and URL to the University of Michigan, and further agreed that the University of Michigan owned all right, title, and interest to the M-Den name and URL (mden.com). Specifically, in the Forbearance Agreement, Debtor agreed that the University of Michigan had the right to use or license the M-Den name after termination of the Agreements "for any purpose". [*See* Exhibit 3, Forbearance Agreement, at ¶¶ 1(a), 2(a).] Importantly, pursuant to the Forbearance Agreement, Debtor's right to use the M-Den name was strictly limited to the term of the Forbearance Agreement, following the termination of which, Debtor was to "immediately cease all use of the M-Den name."

15.     Before the Petition Date, as described above, the University of Michigan terminated the 2009 Agreement and 2010 Agreement with Debtor.

16.     Also before the Petition Date, the University of Michigan contacted Debtor to demand that it stop infringing on the University of Michigan's intellectual property rights, including by sending the cease and desist letter dated August 15, 2024 ("Cease and Desist Letter") attached hereto as Exhibit 5.

17.     On August 16, 2024, prior to the filing of the Petition, Debtor terminated the assumed name "The M Den"[1].

18.     Despite Debtor no longer having any rights to continue using the University of Michigan's intellectual property or to assert in any manner any ownership or control of the "M-Den" name, the Bid Procedures Motion seeks to sell substantially all of the assets of Debtor, free and clear of liens, claims, and encumbrances, inclusive of "all intellectual property, including the right to use the "M Den" name – if any, and . . . all claims or causes of action related to the right to use the "M Den" name." [*See* the Bid Procedures Motion at ¶ 27.]

19.     The Bid Procedures Motion proposes to conduct this sale on an overly aggressive timeline that provides insufficient notice periods to parties in interest. [*See Id.*, at Proposed Order, ¶ 5].

20.     The Bid Procedures Motion also includes a proposed break-up fee to the Stalking Horse Bidder in the amount of $225,000 ("Break-Up Fee").  [*See Id.*, at ¶ 69].

---

[1] Debtor had previously changed its name from M-Den, Inc. to Heritage Collegiate Apparel, Inc.

## II. <u>Argument</u>

### a. <u>The Bid Procedures Motion improperly suggests that Debtor is selling the University of Michigan's property.</u>

21.     Bankruptcy Code section 363 authorizes a debtor to convey only a property interest of the debtor.  11 U.S.C. § 363(b)(1) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, *property of the estate . . .*") (emphasis added); s*ee also, In re Cattron*, 651 B.R. 205, 214 (Bankr. E.D. Mich., 2023) (recognizing that "[u]nder § 363, the Debtor may only use, sell, or lease property that is property of the estate") (citations omitted); *see also Anderson v. Connie*, 203 F.3d 855, 863 (5th Cir. 2000) (trustee could not sell property owned by debtor's former spouse); *see also Darby v. P.J. Zimmerman*, 323 B.R. 260, 271 (B.A.P. 9th Cir. 2005) (relief granted in sale order was not authorized by section 363 when the debtor attempted to "expropriate non-estate property"); *In re Manning*, 831 F.2d 205, 212 (10th Cir. 1987) (trustee lacked authority under section 363(f) to sell partnership assets that were not property of the estate).

22.     There is no dispute that the M-Den name is the University of Michigan's property[2] rather than "property of the estate" that can be sold under Bankruptcy Code § 363.  *See In re Portrait Corp. of Am, Inc.*, 406 B.R. 637, 642 (Bankr. S.D.N.Y. 2009) ("the Debtors could not have sold to CPI what they did not

---

[2] *See* 2009 Agreement, at ¶ ¶ 3(a) and 3(e); Forbearance Agreement at ¶ 1(a).

at least colorably own" and therefore, if Debtors did not own the trademark, "they could not have sold it free and clear of" the licensor's interest). Trademarks protect their owners against unfair competition, permit them to build a business around trade names by which their articles are known, and establish good will that is valuable to the trademark owner. *Champion Spark Plug Co. v. Champion*, 23 F.Supp. 638 (E.D. Mich., 1938).

23. The 2009 Agreement expressly provided that Debtor retained no further interest in the M-Den name after termination. To the extent there was any outstanding question as to the ownership and/or Debtor's continued use of the M-Den name, the Forbearance Agreement made it abundantly clear that Debtor transferred any remaining rights to the University of Michigan as of the effective date, May 13, 2024. [*See* Forbearance Agreement at ¶ 1(a)].

24. Likewise, the 2010 Agreement confirms that Debtor has no right to use, assign, sell or otherwise grant any rights in the M-Den name after termination of the 2009 Agreement. [*See* 2010 Agreement at §2.4].

25. Therefore, the Bid Procedures Motion's reference to the University of Michigan's property; specifically, its description of Debtor's assets as including "all intellectual property, including the right to use the "M Den" name – if any, and . . . all claims or causes of action related to the right to use the "M Den" name, [*see*

9

7

22-tjt   Doc 81   Filed 09/03/24   Entered 09/03/24 16:58:36   Page 9 of 90

the Bid Procedures Motion at ¶ 27], is inappropriate and should be stricken from any order granting the Bid Procedures Motion.

**b.** **The Bid Procedures Motion improperly suggests that Debtor is selling an avoidance action against the University of Michigan.**

26.    In the Bid Procedures Motion, Debtor improperly suggests that Debtor transferred the M-Den name to the University of Michigan as of May 13, 2024 and that this may be subject to an avoidable transfer.  [*See* the Bid Procedures Motion, at ¶ 28, fn. 7].  This fails factually and as a matter of law.

27.    First, the limited rights granted to Debtor to use certain intellectual property owned by the University of Michigan were pursuant to the 2009 Agreement and 2010 Agreement.   These agreements terminated at least two months before the Petition Date.  Accordingly, there is no basis for an avoidance action, as the underlying transactions were merely terminations of contracts and not transfers of property.  *See, e.g.*, *In re VitaHEAT Medical, LLC*, 629 B.R. 250, 260 (Bankr. N.D. Ill., 2021) (holding that "a contract's termination is not an avoidable transfer because it does 'not operate to the prejudice of the legal or equitable rights of the Debtor's creditors'") (quoting *Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball, Inc.*, 157 B.R. 742, 747 (Bankr. W.D.N.Y. 1993). When a contract is terminated, there has been no transfer, as defined by 11 U.S.C. § 101(54)(D), because there has been no "disposing of or parting with property" that the trustee can recover.  Instead, upon the contract termination, the debtor's

contractual rights have expired, and the "[p]ossession of expired rights is the equivalent of the possession of no rights." *Sullivan v. Willock*, 854 F.2d 196, 199 (7th Cir. 1988); *see also Nathan v. Minardi*, No. 17-12099, 2017 WL 5903457, at *4 (E.D. Mich. Nov. 30, 2017) (stating that if a bankruptcy court were to hold that a lease termination was an avoidable transfer under the Bankruptcy Code, it would contravene the intent of the drafters of the Bankruptcy Code and muddy the landscape for lessors dealing with insolvent debtors).

28.     Second, to the extent that the University of Michigan was not already the owner of all rights to the M-Den name, Debtor transferred any remaining rights it may have had on May 13, 2024 pursuant to the Forbearance Agreement. That transfer occurred more than 90 days prior to the Petition Date and cannot give rise to a preferential transfer.  Additionally, assuming a transfer occurred under the Forbearance Agreement, to the extent Debtor attempts to argue that the Forbearance Agreement gave rise to a fraudulent transfer, Debtor received reasonably equivalent value for such transfer in the form of additional time to negotiate the potential sale of its stock or assets to a third-party as a going concern and to cure its defaults under the 2009 and 2010 Agreements.  Arguably, the time afforded to Debtor resulted in it being able to negotiate with the Stalking Horse Bidder and allow due diligence to be conducted. *See, e.g., In re 274 Atlantic Isles, LLC*, 651 B.R. 319 (Bankr. S.D. Fla. 2023) (holding that debtor received

reasonably equivalent value for execution of deed-in-lieu of foreclosure naming lender as grantee, for fraudulent transfer avoidance purposes, where debtor bargained away its redemption rights for additional time under forbearance agreement to cure loan default).

29.     Third, this Court has previously held that avoidance actions are not assignable. *See In re Clements Manufacturing Liquidation Company, LLC*, 558 B.R. 187, 188-89 (E.D. Mich. Bankr. 2016) (whereby the Court noted that there is a split in case law on whether avoidance actions are assignable and held that they are not).     Therefore, any purported assignment of an avoidance action to a prospective purchaser should be stricken.

**c.    Even if Applicable, the 2009 Agreement and 2010 Agreement cannot be assigned.**

30.     Not only is the M-Den name not property of Debtor's estate, but also the 2009 Agreement and 2010 Agreement are not property of Debtor's estate because the University of Michigan terminated these agreements well before the Petition Date.  Therefore, these are not executory contracts and are not proprety of the estate.  *See, e.g., In re Jim Palmer Equipment, Inc.*, 2008 WL 5869690 (Bankr. D. Mont. 2008) (stating that "[a] lease which is matured and expired prepetition is not property of a debtor's bankruptcy estate"); *see also In re Pyramid Operating Authority, Inc.*, 144 B.R. 795, 808 (Bankr. W.D. Tenn. 1992) (stating that "[i]t is

well established that an agreement or contract which is validly terminated prepetition under applicable state law is not assumable under section 365(a)").

31.     Even if the 2009 Agreement and 2010 Agreement were not terminated pre-petition, Debtor's rights to use the University of Michigan's intellectual property is limited to the rights granted by those Agreements. *In re Coomer*, 375 B.R. 800, 804 (Bankr. N.D. Ohio, 2007) ("[T]he estate's interest remains identical to and also limited to those interests held by the debtor when the petition was filed. 'Whatever rights a debtor had at the commencement of the case continue into bankruptcy-no more, no less.'") (quoting *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984)).

32.     Under Section 365(a) of the Bankruptcy Code, a debtor may, subject to court approval, assume and assign an executory contract. 11. U.S.C. §365(a). However, a debtor's power to assume or assign is subject to an exception contained in section 365(c)(1), which excuses the non-debtor party of an executory contract from rendering performance to or accepting performance from the would-be assignee when applicable law excuses it from doing so:

> (c) the trustee [or debtor-in-possession] may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity

13

other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment . . .

11 U.S.C. § 365(c).

33. Therefore, bankruptcy courts must look to federal trademark law as the "applicable law" and determine whether a debtor can assign a license for trademarks without the licensor's consent. *In re Kazi Foods of Michigan, Inc.*, 473 B.R. 887, 889 (Bankr. E.D. Mich., 2011).

34. It is well settled that federal trademark law prohibits a licensee from assigning the license to a third party without the consent of the trademark owner. *Id.* ("trademark law is an 'applicable law' that excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession") (quotations omitted).

35. The 2009 Agreement and the 2010 Agreement both had anti-assignment language. [*See* Exhibit 1, 2009 Agreement, Acknowledgements at 4(d); *see also* Exhibit 2, 2010 Agreement, Terms at 20.3.]

36. The University of Michigan expressly objects, and does not consent to, the assumption and assignment of the 2009 Agreement or the 2010 Agreement in connection with the proposed bid. Therefore, even if the 2009 Agreement and

14

2010 Agreement were not terminated pre-petition and were executory contracts, they are nonetheless not assignable to the purchaser.

      **d.**     **Debtor's sale of its assets will not be free and clear of the University of Michigan's right to enforce post-petition infringements of its intellectual property.**

37.     If Debtor continues to purport to sell the University of Michigan's intellectual property, any purchaser of Debtor's assets risks liability for trademark infringement.

38.     Bankruptcy Code § 363(f) does not provide purchasers of a debtor's assets with immunity from claims for post-sale trademark infringement or similar claims. *See In re AutoStyle Plastics, Inc.*, 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998) ("a sale free and clear does not include future claims that do not arise until the conclusion of the bankruptcy proceeding"). Section 363(f) only applies to pre-petition claims against the debtor. Any unauthorized sale of the University of Michigan's property or other infringements of the University of Michigan's trademarks, copyrights, or other intellectual property rights by the purchaser would be a post-petition claim against the non-debtor purchaser. *See, e.g., Schieffelin & Co., v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1319 (S.D.N.Y. 1989) (citing *Fair Mills v. T. Easton Co.*, 234 F.2d 633, 639 (2d Cir. 1956) ("in cases of trademark infringement . . . the wrong takes place . . . when the passing off occurs; i.e., where the deceived customer buys the defendant's product")).

39.     Accordingly, the University of Michigan objects to the Bid Procedures Motion to the extent Debtor seeks to sell any property interest of the University of Michigan free and clear of the University of Michigan's right to enforce post-petition infringements of its trademark, copyright, or related rights against the purchaser.

**e.     The Bid Procedures and aggressive timeline are not in the best interests of creditors.**

40.     The primary goal of any sale of estate property is to maximize value for the estate. *In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich., 2008).

41.     To effectuate that goal, courts allow bidding procedures that enhance the competitive bidding process. *Id.* ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.") (Citations omitted).  However, the bidding procedures must be carefully evaluated in an effort to ensure that they are enhancing the competitive sale process and not dissuading other potential bidders from participating through unnecessary barriers.  *Id.* (stating that the court "should be mindful to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets") (citations omitted).

42.     Here, both the form and substance of the bidding procedures impair competition through the purported inclusion of non-estate assets, unnecessarily aggressive timelines, and an unreasonable break-up fee.

16

### i. **Improperly included assets creates confusion and ambiguity as to the value assigned to Debtor's actual assets.**

43.     By infringing upon the University of Michigan's trademarks, as the Bid Procedures Motion proposes, Debtor's sale of its assets will cause additional claims against the estate that may outweigh the value of any proceeds Debtor would receive from the sale.

44.     It is unclear from the term sheet submitted whether the proposed Stalking Horse Bidder (as defined in the Bid Procedures Motion) has placed a value on the M-Den name.  In the event that the Stalking Horse Bidder's bid did assign value to the M-Den name and/or related claims to the name, then the Stalking Horse Bidder may very likely claim it has not sufficiently received the full benefit of its full purchase price if it does not actually receive the assets identified by Debtor.

45.     Thus, the purported inclusion of non-estate assets creates confusion for interested buyers and has the potential to derail the overall sale approval process.

### i. **The aggressive timeline is not in the best interest of creditors and will not maximize value for the estate.**

46.     Debtor filed the Bid Procedures Motion on August 27, 2024 and requested that the Court set a hearing not more than eight days[3] later, on September 4, 2024 to approve that motion on a final basis.   The remaining deadlines that the Bid Procedures Motion requests are similarly aggressive, and the University of Michigan objects to those deadlines as unreasonable and contrary to the best interests of the creditors.

47.     The interested parties, including the University of Michigan, have not had sufficient time to vet fully the proposed procedures set forth in the Bid Procedures Motion.

48.     Similarly, other parties in interest do not have sufficient time to evaluate the matter.   The U.S. Trustee was accepting interest forms for unsecured creditors to serve on the unsecured creditors' committee (the "UCC") through Friday, August 30, 2024.   The formation of the UCC, retention of counsel, and counsel's evaluation of and potential objection to the Bid Procedures Motion all essentially needed to occur between Saturday, August 31, and Tuesday, September 3, which was inclusive of the Labor Day holiday.   This is an insufficient amount of time for the UCC to determine if the Bid Procedures Motion is in the best interest

---

[3] Given the federal holiday on September 2, the hearing was set only five business days after the Bid Procedures Motion was filed.

of the unsecured creditors, including the University of Michigan, which has an unsecured claim over $8.5 million dollars.

49.    Moreover, the proposed timeline does not give potential bidders sufficient time to evaluate the transaction, as the deadline for submission of bids is only two (2) days after the anticipated entry of the order approving the Bid Procedures Motion.

50.    The timeline should be adjusted to allow interested bidders enough time to evaluate the terms on the transaction, which should lead to more bidders actually participating in the sale process and maximizing value for the estate.

51.    As it stands, the aggressive timeline and terms of the Bid Procedure Motion heavily favor the Stalking Horse Bidder and discourage meaningful competition.

52.    For example, the Stalking Horse Bidder is contemplated to receive a Break-Up Fee in the amount of $225,000.00 when no asset purchase agreement has been made available and seemingly only an initial bid has been submitted.  This Break-Up Fee amounts to approximately five percent (5%) of the overall contemplated purchase price. [*See* the Bid Procedures Motion at ¶ ¶ 28, 69.]

53.    Bankruptcy courts have used several approaches in evaluating break-up fees, but the reason that break-up fees can be appropriate does not seem to be served here.  *See, e.g., In re JW Resources, Inc.*, 536 B.R. 193, 196 (Bankr. E.D.

Ky., 2015) ("The stalking horse bidder spends substantial time and money performing due diligence and negotiating an agreement. In bankruptcy auctions, subsequent bidders will often forego due diligence because they gain the required comfort from the willingness of the stalking horse bidder to enter into the proposed agreement.")

54.　　Additionally, assuming the Stalking Horse Bidder has done more than simply submitting an initial bid, one way to evaluate the reasonableness of the break-up fee is to compare the break-up fee to the total consideration paid. "Fees in the range of 1% to 2% of the purchase price are often approved." *Matter of Tiara Motorcoach Corp.*, 212 B.R. 133, 138 n. 6 (Bankr. N.D. Ind. 1997). Here, the Break-Up Fee makes up approximately five percent (5%) of the overall contemplated purchase price.

55.　　This stifles competition and is not consistent with a value-maximizing process.

56.　　Moreover, the University of Michigan is aware that at least one other bidder, Legends Global Merchandise, LLC (defined as the "Interested Party" in the Bid Procedures Motion and hereinafter, "Legends"), is interested in the sale of its assets and engaged in negotiations prior to the filing of the Bid Procedures Motion. [*See e.g.* the Bid Procedures Motion, at ¶ 24]. The University of Michigan recently learned that Legends submitted a bid over the Labor Day weekend, and the

20

University of Michigan received a copy of the binding term sheet today, September 3, 2024 ("Legends Term Sheet")[4].

57.     Pursuant to the Legends Term Sheet, Legends is proposing to pay Debtor cash equal to 64% of Debtor's inventory costs for inventory Debtor has at closing.  This is compared to the 62% set forth in Exhibit C to the Bid Procedures Motion offered by the Stalking Horse Bidder.  Further, Legends is not seeking any expense reimbursement or a break-up fee.

58.     While the University of Michigan has had minimal time to fully evaluate the terms, it appears that the terms of the Legends Term Sheet may be higher and economically better than the Stalking Horse Bid.  Significantly, the Legends Term Sheet does not require the Break-Up Fee, which is of substantial benefit to the estate.  This alone should necessitate Debtor to take a step back, re-evaluate the process, and revise the Bid Procedures Motion to remove the Break-Up Fee and other related protections offered to the Stalking Horse Bidder and/or pivot to the Legends bid in an effort to ensure the process is as open and competitive as possible to maximize value for the estate.

59.     Accordingly, the University of Michigan seeks to ensure that (i) all interested bidders have an opportunity to evaluate the transaction and participate in

---

[4] The University of Michigan is of the understanding that the Legends Term Sheet will be remitted to the Court in a filing by Legends, if that has not already occurred as of the time of the filing of this Objection.

the sale; (ii) the Stalking Horse Bidder does not receive an unnecessary advantage by way of a compressed schedule and a Break-Up Fee that harms competition and stifles the overall sale price; and (iii) the sale maximizes value for all creditors.

**f.**      <u>**The bid procedures order should include language protecting the University of Michigan's property.**</u>

60.      To the extent the Court grants the Bid Procedures Motion, the University of Michigan respectfully requests that the Court add the following language to Debtor's proposed order:

> Notwithstanding any contrary language in the Bid Procedures Motion or this Order, Debtor cannot assume and assign, and the Purchaser cannot acquire, any license agreement by and between any Debtor and the University of Michigan without the University of Michigan's express written consent.

> Notwithstanding any contrary language in the Bid Procedures Motion or this Order, nothing contained in this Order authorizes the transfer of any trademarks, intellectual property, goodwill, copyright, design patents, or any other property interests owned by the University of Michigan and used by Debtor under any licensing agreement by and between Debtor and the University of Michigan, inclusive of the M-Den name.

> Notwithstanding any contrary language in the Bid Procedures Motion or this Order, nothing contained in this Order authorizes the transfer of any preference or avoidance actions against the University of Michigan relating to any transfers of Debtor's rights, if any, in the M-Den name and URL, as contemplated in the Forbearance Agreement, to any purchaser of Debtor's assets.

22

Notwithstanding any contrary language in the Bid Procedures Motion or this Order, nothing contained in this Order shall release or discharge or otherwise prevent or impair the University of Michigan (or any affiliate of the same) from taking any action under applicable law to protect its trademark, copyright, or other intellectual property rights in respect of any activity occurring after entry of this Order, including but not limited to asserting any claim for trademark infringement, misappropriation, dilution, gray market, or any other claim under state or federal law, against the purchaser or any parent, subsidiary, affiliate, or successor of the same.

Any purported conveyance of property bearing the trademarks or other intellectual property of the University of Michigan is without the University of Michigan's consent.

61.     Additionally, the University of Michigan requests that the deadlines proposed in the Bid Procedures Motion be extended to give parties in interest a reasonable amount of time to investigate Debtor's requested relief and that the Break-Up Fee be stricken.

## III.     Reservation of Rights

62.     The University of Michigan reserves the right to supplement or amend this Objection.

## IV.     Conclusion

WHEREFORE, the University of Michigan respectfully requests that:

(a)     that any order entered with respect to the Bid Procedures Motion

        address the objections set forth herein; and

(b)     for such other and further relief as this Court deems just and proper.


Dated:  September 3, 2024          /s/ Lisa D. Starks
                                   Lisa D. Starks (P78128)
                                   BARNES & THORNBURG LLP
                                   888 S. Harrison Street, Suite 600
                                   Fort Wayne, IN 46802
                                   Telephone: (260) 425-4627
                                   Facsimile: (260) 424-8316
                                   E-mail:  lisa.starks@btlaw.com

                                       -and-

                                   Robert C. Folland (OH Bar No. 0065728)
                                   BARNES & THORNBURG LLP
                                   41 South High Street, Suite 3300
                                   Columbus, OH  43215
                                   Tel: 614-628-0096
                                   Fax: 614-628-1433
                                   Email: Rob.Folland@btlaw.com


                                   *Attorneys for the University of Michigan*

24

# Exhibit 1

**2009 Agreement Between**
**The Regents of the University of Michigan and M-Den, Inc.**

This Agreement is made between the Regents of the University of Michigan for its Department of Athletics ("University") and M-Den, Inc., a Michigan corporation ("M-Den"), effective July 1, 2009.

## Recitals

1. The University is the owner of certain trademarks, service marks, trade names, colors, seals, and symbols which have become associated with the University, used by the University in commerce, non-exclusively licensed by the University to third parties for use in commerce, and on some of which U. S. or state trademark registrations have been obtained (the "Marks" as more fully described below).

2. The parties have had various contractual arrangements in the past regarding the ownership of the Marks and the relationship between the parties.

3. The parties wish to confirm certain facts and understandings and confirm their relationship and rights under the terms and conditions of this Agreement.

The parties agree as follows:

1.    **Acknowledgments.**

a)    *Prior Agreements.* The parties agree that, with the exception of M-Den's obligations relating to payments due to the University for the quarter ending June 30, 2009 and the University's right to audit pursuant to section 11.6 of that agreement, the July, 1999 agreement between the parties has been fully performed by each party. Without limiting the generality of the foregoing, all leases for premises and licenses granted by the July 1999 agreement have expired by their own terms without extension.

b)    *University Ownership of Marks.* M-Den acknowledges and agrees that the University has all right, title, and interest in and to and is the sole and exclusive owner of the Marks, the goodwill associated with the Marks, and all United States and foreign registrations thereon. Marks shall mean any and all of the trademarks, service marks, trade names, school colors, seals, and/or symbols of the University, whether now owned or developed or acquired in the future, which have or which become associated with the University, used by the University in commerce, and/or licensed to M-Den or third parties for use in commerce, whether registered or unregistered in the United States or the world, including, without limitation, the "M" in the name "M-Den." M-Den acknowledges that the Marks and the registrations are valuable assets of and form a valuable part of the business and operations of the University. M-Den agrees that it has no proprietary interest in the Marks and that all use of the Marks shall inure to the benefit of the University. M-Den will not register or attempt to register the Marks in any jurisdiction. M-Den agrees that it will not contest, oppose or challenge the University's use or ownership of the Marks.

24-47922-tjt    Doc 81    Filed 09/03/24    Entered 09/03/24 16:58:36    Page 26 of 90

2.    **Agreements.**

   a)    *Product Purchases.* M-Den shall purchase products and articles of merchandise that bear one of more of the University's Marks only from licensed manufacturers, and the wholesale price charged to M-Den shall include the standard royalty due under the manufacturer's license.

   b)    *No Licenses Separate from License Agreement.* M-Den and CLC have entered into a License Agreement, attached as Appendix A, for certain uses by M-Den of the University's Marks ("CLC Agreement"). Nothing in this Agreement shall be construed as granting M-Den a license to utilize the University's Marks or to sell merchandise bearing the Marks that have not been separately licensed by the University in this Agreement or by CLC in the CLC Agreement.

   c)    *No Representation of Affiliation.* M-Den may not state, represent or imply, directly or indirectly, that its activities or operations or products or articles are supported, endorsed or sponsored by the University.

   d)    *Payment to M-Den.* Within fifteen days of the execution of this Agreement, University shall pay M-Den $115,000 for reimbursement of build-out investments and any other expenses made by the M-Den pursuant to the prior agreements between the parties including, without limitation, expenses for physical locations on University real property.

   e)    *Internet websites.* Effective upon execution of the Agreement, M-Den shall terminate all direct links or references to University's website (www.mgoblue.com) on M-Den's website unless M-Den otherwise obtains University's written permission to continue or establish such links or references to University's website. M-Den shall also remove all references on M-Den's website that refer to it as being "The Official On-Line, On-Campus, and Catalog Retailer of Clothing and Gifts for The University of Michigan" as well as any other verbiage or imagery on the website that would indicate an official or implied relationship with the University. In addition, M-Den agrees to facilitate the immediate removal of links or references that have been "crawled" or indexed by the major web search engines (Google, Bing, Yahoo!, MSN, etc.) by using the "urgent removal" tools available online at the search engines' support websites. M-Den also agrees to provide to University in a digital format its retail catalog mail list and Internet e-commerce mail list (both as of 6/30/09) within fifteen (15) days of receiving a written request from the University.

   f)    *No separate rights or claims.* Both parties agree that they do not have any rights with respect to the matters described herein separate from those rights specifically defined in this Agreement or in the CLC Agreement attached as Appendix A. Without limiting the generality of the foregoing, all rights to conduct "game day" sales on real estate owned by the University from any prior agreements have expired.

   g)    *Releases.* With the exception of (i) M-Den's obligations related to proper payments due to the University under the July 1999 Agreement and (ii) University's payment obligation set forth in paragraph 2.d) above, each party, for itself and all natural

and legal persons claiming by, through or under it, hereby releases the other party and its officers, directors, agents, employees, affiliated companies, legal representatives, heirs and assigns from all rights, obligations, claims, debts, demands, covenants, contracts, promises, agreements, liabilities, costs, attorney's fees, actions or causes of action whatsoever, whether known or unknown, which such party had, has or claims to have against any or all of the parties described above as of the date hereof, arising out of, pursuant to, or related to any matter between the parties, the prior agreements between the parties or the relationship(s) created thereby.

      h)     *Audit and Inspection.* M-Den shall grant University and its representatives the right to enter upon any M-Den business premises during normal business hours for the purpose of conducting inspections to assure compliance with this Agreement and shall cooperate with University's representatives in such inspections by rendering such assistance as they may reasonably request. University or its designated representatives shall also maintain the right to examine the books and records of M-Den to determine the accuracy of any or all of the reports and payments submitted by M-Den pursuant to section 11.6 of the July, 1999 Agreement.

      i)     *Term and Termination of Agreement.* This Agreement shall be effective July 1, 2009 and shall expire on June 30, 2013 according to the terms and conditions set forth in the CLC Agreement at Appendix A. This Agreement shall automatically be extended for additional yearly periods under the same terms and conditions unless either party shall give written notice of termination at least one (1) year prior to the end of the then-current period. The University may terminate this Agreement at any time immediately upon written notice to M-Den under any of the following circumstances:

      1)     M-Den is insolvent, becomes bankrupt or has made an assignment for the benefit of creditors which has not been corrected or withdrawn within two months; or

      2)     M-Den has failed to pay any amounts due under the CLC Agreement or this Agreement or has otherwise breached or failed in performance under this Agreement and has not corrected such breach or failure of performance within thirty (30) days after being served with a written notice by the University clearly setting forth the claimed breach or failure of performance; or

      3)     If M-Den or any officer, director, or partner of M-Den, is convicted of a felony, a crime involving moral turpitude, or any other crime, offense or activity (whether criminal or civil) that University reasonably believes is likely to have a material adverse effect on the University, the Marks, the goodwill associated therewith, or University's interest therein; or

      4)     In the event three or more breaches of any kind or kinds shall occur under this Agreement or the CLC Agreement, including for nonpayment of any amounts due, for which notice of default is given, the University may elect to terminate the Agreement with a minimum of thirty (30) days prior written notice upon the occurrence of a further breach and M-Den shall have no right to cure the default; or

5) In the event that the CLC Agreement is terminated for any reason as provided therein or if the CLC Agreement expires by its terms.

Any notice of default provided pursuant to the CLC Agreement shall be deemed to be notice of default by the University under this Agreement.

3. **Grant of License.**

a) *License Grant:* University grants to M-Den the right, subject to the terms and conditions of this Agreement to use the description "M-Den" (part of the Marks) solely as a corporate name to identify its approved retail locations and to identify its internet website ([www.mden.com](www.mden.com)), and its catalogs. Through the CLC Agreement, University has granted M-Den permission to use Licensed Indicia in connection with the advertising and promotion of its retail outlets. No other right to use the Marks is granted to M-Den.

b) *Use only as authorized.* M-Den is permitted to use only the Marks described above and shall use such Marks only in the manner authorized and permitted by University in this Agreement or in the CLC M-Den Agreement (Appendix A).

c) *Limitation on locations.* M-Den shall use the Marks only for the operation of its retail locations, internet websites and catalogs, as approved in writing by University, and all such use of the Marks must be in accordance with the requirements of the CLC Agreement.

d) *Identification as independent business.* M-Den shall identify itself as an independently owned and operated licensee of the University of Michigan.

e) *No use as corporate name.* While M-Den has been referred to in its prior corporate name for sake of convenience in this Agreement, M-Den agrees to change its corporate name to a name other than "M-Den" and shall not use "M-Den" or the Marks as part of its corporate or other legal name after the effective date of this Agreement. Contemporaneous with the modification of the corporate name, M-Den shall file an assumed name notice filing that it does business as "M-Den" consistent with its licensed rights under this Agreement. Further, upon termination or expiration of this Agreement, M-Den agrees to terminate the assumed name ("dba") filing and shall no longer do business under the name "M-Den." University agrees that, even after termination of this Agreement, it will not use the name "M-Den" or license others to use that name.

e) *Any other use infringement.* M-Den's right to use the Mark is limited to such uses as are authorized under this Agreement and the CLC Agreement, and any unauthorized use thereof shall constitute an infringement.

f) *Execution of documents.* M-Den shall execute any documents reasonably deemed necessary by University or its affiliates to obtain protection for the Marks or to maintain their continued validity and enforceability.

4. **Miscellaneous**

a) *No Agency.* This Agreement does not make either party the agent, employee, partner, joint venturer, or legal representative of the other party for any purpose. By this Agreement, no party is granted any right or authority to assume or create any obligation or responsibility, expressed or implied, on behalf of or in the name of the other party, or to bind the other party in any manner or thing.

b) *Waiver.* No waiver by any party of any breach or default of any of the terms of this Agreement shall be deemed a waiver of any subsequent breach or default even if similar to or the same as such prior breach or default. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

c) *Integration and Modifications.* This Agreement and its Attachments contain the entire understanding between the parties regarding its subject matter, and supersede any prior or contemporaneous discussion, negotiation, agreement whether oral or written, or understanding regarding the subject matter. None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both of the parties.

d) *Assignment.* This Agreement cannot be assigned by M-Den, either directly or indirectly, including, but not limited to, through the transfer of any ownership interest in M-Den, without the prior written consent of the University, which consent shall not be unreasonably withheld. The prior written consent of the University shall not be required for the transfer of stock in M-Den by the current principal stockholders to immediate family members (defined as spouse, children, grandchildren, nieces and nephews) or to a trust for the benefit of family members. This Agreement or any of the rights or benefits under this Agreement may be assigned by the University.

e) *Governing Law.* This Agreement and all collaterally related issues shall be governed by Michigan law.

f) *Severability.* Any provision of this Agreement found by a court to be void or unenforceable shall not affect the validity or enforceability of any other provision.

g) *Headings.* Provision headings are solely for convenience and have no legal significance.

h) *Equal Opportunity Employer.* M-Den certifies that it is an equal opportunity employer, and that, during the performance of this Agreement, it will comply with all applicable federal, state and local civil rights statues, rules, regulations and executive orders.

i) *Notices.* All notices under this Agreement shall be effective and given when mailed, first class mail, postage prepaid, or when personally delivered as follows:

The University:

    William Martin
    Director of Intercollegiate Athletics
    University of Michigan
    1000 South State Street
    Ann Arbor, Michigan 48109-3717

    With a separate copy mailed or personally delivered to:

    Timothy Slottow
    Executive Vice President and Chief Financial Officer
    University of Michigan
    3014 Fleming Administration Building
    Ann Arbor, Michigan 48109-1340

To M-Den:

    Douglas Horning
    M-Den, Inc.
    315 South Main Street
    Ann Arbor, Michigan 48104

    With a separate copy mailed or personally delivered to:

    Chris L. McKenney, Esq.
    Conlin, McKenney & Philbrick, P.C.
    350 S. Main Street, Suite 400
    Ann Arbor, Michigan  48104-2131


**The University of Michigan**　　　　**M-Den, Inc.**
**Department of Athletics**

_[signature]_　　　　　　　　　　　Name  DAVID HIRTH

William Martin, Director　　　　　　Signature _[signature]_ David Hirth

Date: 9-4-09　　　　　　　　　　　Title  VP / Sec

　　　　　　　　　　　　　　　　　Date  8/28/09

---

M-Den UM Final 082709　　　　　　　　　　　　　　　Page 6

**The Regents of**
**The University of Michigan**

_[signature]_

Timothy Slottow, Executive Vice President
and Chief Financial Officer

Date ___9/3/09___

Appendix A
CLC Agreement

## LICENSE AGREEMENT

This shall serve as a legal and binding Agreement by and between M-Den, Inc., a corporation organized under the laws of the state of Michigan, having its principal place of business at 315 S. Main Street, Ann Arbor, Michigan 48104 ("Business") and the Collegiate Licensing Company, a corporation organized under the laws of the state of Georgia, having a principal place of business at 290 Interstate North Circle, Suite 200, Atlanta, Georgia 30339 ("CLC"), as agent on behalf of the University of Michigan ("University").

WHEREAS, University owns and controls the "Block M" logos shown in Appendix A and any other uses of the letter "M" when used to trade upon the goodwill of the University (hereinafter "Marks").

WHEREAS, University has authorized CLC to enter into this Agreement for the purpose of authorizing the use of its Marks in the manner provided herein.

WHEREAS, Business desires to use certain of the Marks in connection with the advertising and promotion of its retail outlets.

NOW, therefore, in consideration of the mutual promises, covenants and conditions contained herein, the parties agree as follows:

1.    OWNERSHIP OF RIGHTS

Business acknowledges and agrees that the University owns the Marks as shown in Appendix A, modifications of the Marks, as well as any other Marks adopted for use by the University, that each of the Marks is valid, and that the University has the exclusive right to use each of the Marks subject only to limited permission granted to Business to use the Marks pursuant to this Agreement and a separate agreement entered into by the University and Business for the Business to use the description "M-Den" as part of a corporate name to identify its retail outlets, its Internet website (www.mden.com), and its catalogs ("Michigan Agreement"). Business acknowledges the validity of the state and federal registrations the University owns, obtains or acquires for the Marks. Business shall not, at any time, file any trademark application with the United States Patent and Trademark Office, or with any other governmental entity for the Marks, regardless of whether such Marks are shown in Appendix A. Business shall not use any of the Marks or any similar mark as, or as part of, a trademark, service mark, trade name, fictitious name, company or corporate name anywhere in the world, unless otherwise authorized herein.

2.    GRANT

(a)    CLC, on behalf of the University, hereby grants Business permission to use the Marks in connection with the advertising and promotion of its permanent retail locations, Internet website and its catalogs. Business shall only use the Marks as approved in this

Agreement, or as approved in writing by CLC in accordance with Paragraph 5 of this Agreement. Approved uses of the Marks are set forth in Appendix B. As of the date of this Agreement, Business operates the following permanent retail locations:

- 315 S. Main Street, Ann Arbor, Michigan 48104
- 303 S. State Street, Ann Arbor, Michigan 48104
- 656 Briarwood Circle, Ann Arbor, Michigan 48108
- 37538 W. 6 Mile Road, Livonia, Michigan 48152
- 27326 Novi Road, Novi, Michigan 48377.

Business may also use the Marks in connection with the operation of any permanent retail location established as a substitute for one of the specific addresses set forth above provided however that such substitute permanent location shall be no closer to the Michigan athletic campus than the closest of the current permanent locations. Business shall provide the University with advance written notice of substitution of permanent retail locations. Business may also use the Marks on other permanent retail locations with the University's advance written consent, which consent shall not be unreasonably withheld. Business is also permitted to use the Marks in their approved format (or such other marks or format as the University may approve in writing in advance) to conduct retail sales via www.mden.com and Business' catalog mailings.

(b)     Business shall be allowed to work with manufacturers licensed by CLC (acting on behalf of the University) to create neck labels, jock tags or other forms of product labeling featuring the name "M-Den," provided that the product also carry a hang-tag identifying the applicable manufacturer. The neck labels, jock tags or other forms of product labeling must be approved in writing by CLC prior to the production of any merchandise and must be consistent with the University's and CLC's policies with respect to such co-branding. Specifically, any reference to the "M-Den" must constitute no more than fifty percent (50%) of the neck label, jock tag or other form of product labeling and must also comply with similar requirements imposed on other private label programs in place with other University of Michigan/CLC-licensed operators. Any merchandise manufactured, distributed and sold as described herein shall be done in accordance with the terms and conditions of the license agreement between CLC and the licensed manufacturer.

3.     TERM

This Agreement shall take effect on July 1, 2009 and shall expire on June 30, 2013, unless terminated sooner or extended in accordance with the provisions hereof. This Agreement shall automatically be extended for additional yearly periods under the same terms and conditions unless either party shall give written notice of termination at least one (1) year prior to the end of the then-current period.

4.    RIGHTS FEE

(a)    Business, in consideration of the rights granted herein, shall pay CLC, on behalf of the University, an annual rights fee in the amount of fifty thousand dollars ($50,000). The annual rights fee is due and payable in quarterly installments of twelve thousand five hundred dollars ($12,500) each on July 1st, October 1st, January 1st and April 1st during each year of the Agreement and any extensions. Business shall also pay CLC an additional rights fee in the amount of twenty-five thousand dollars ($25,000) for each Bowl Championship Series ("BCS") appearance that the University's football team makes, and an extra twenty-five thousand dollars ($25,000) for each BCS (or comparable future equivalent) national football championship and each NCAA national basketball championship that the University wins. These additional rights fees are due and payable within thirty (30) days following the respective accomplishment(s).

(b)    Business shall pay CLC an additional charge of one and one-half percent (1.5%) per month, compounded on a monthly basis, or the maximum rate allowed by law, if lower, on any payment due under the Agreement that remains unpaid after such payment becomes more than ten (10) days past due.

(c)    Business shall send all payments to CLC to the attention of Michael Drucker, Vice President and Associate General Counsel, at the address set forth in the heading of this Agreement.

5.    QUALITY CONTROL AND GOOD WILL

(a)    Business shall use the Marks properly on all items displaying the Marks that are used in connection with the advertising and promotion of its retail outlets, including, but not limited to, the use of the Marks on storefronts, store display materials, web sites, shopping bags, gift boxes, gift cards, and any other advertising or promotional materials. The manner and style in which the Marks are used by the Business and the services provided by the Business shall be of high and consistent quality, and shall remain consistent throughout the Term and any extensions. In the event that the above-stated quality standards are not maintained, CLC on behalf of the University, shall give notice to Business of the nature of the default and allow business a period of thirty (30) days within which to cure the default. In the event the default is not cured within the thirty (30)-day period, then CLC, acting on behalf of the University, shall have the right to require the Business to terminate its use of the Marks.

(b)    A true representation or example of any proposed use by Business of any of the Marks listed shall be submitted, at Business' expense, to CLC for written approval prior to such use. Appendix B reflects all uses of the Marks that have been pre-approved by CLC on behalf of the University. Business shall not use any Marks in any form or in any material disapproved or not yet approved by CLC.

(c)    The Business shall notify CLC of any significant change in the nature, purpose or character of the Business, or its services or activities. CLC and/or the University have the right,

24-47922-tjt    Doc 81    Filed 09/03/24    Entered 09/03/24 16:58:36    Page 36 of 90

upon reasonable notice to Business, to inspect the Business' premises to ensure that the Business has maintained the high quality of services and proper use of the Marks in a manner consistent with that approved by the University.

(d)     The Business agrees that its use of the Marks inures solely to the benefit of the University and the Business shall not acquire any rights in the Marks.

(e)     Business agrees to assist CLC in the protection of the rights of the University in and to the Marks, and shall notify CLC in writing of any infringements by others of the Marks of which it is aware. CLC and the University shall have the right to determine whether any action shall be taken on account of any such alleged infringements. Business shall not institute any suit or take any action on account of any such alleged infringements. Business agrees that it is not entitled to share in any proceeds received by CLC or the University (by settlement or otherwise) in connection with any formal or informal action brought by CLC or the University.

6.     INDEMNIFICATION AND INSURANCE

(a)     CLC and the University shall not have any liability arising out of the Business' use of the Marks during the Term or any extensions. The Business hereby agrees to indemnify and hold harmless CLC and the University, and their respective officers, employees and agents from any and all liability which arises in connection with the Business' use of the Marks.

(b)     Business shall maintain Commercial General Liability insurance, including product, advertising and contractual liability insurance, providing protection for the CLC and the University, and their respective officers, employees and agents as additional insured parties against any claims, demands, causes of action, or damages, including reasonable attorney's fees, arising out of Business' use of the Marks. Business agrees that such insurance policy shall provide coverage of two million dollars ($2,000,000) for personal injury, bodily injury and property damage arising out of each occurrence, or Business' standard policy limits, whichever is greater.

7.     INJUNCTIVE RELIEF

Business acknowledges that its breach or threatened breach of this Agreement will result in immediate and irremediable damage to CLC and the University and that money damages alone would be inadequate to compensate CLC and the University. Therefore, in the event of a breach or threatened breach of this Agreement by Business, CLC and the University may obtain and enforce injunctive relief prohibiting the breach or threatened breach.

8.     RELATIONSHIP OF PARTIES

Nothing herein contained shall be construed to place the parties in the relationship of partners, joint venturers, or agents, and Business shall have no power to obligate or bind CLC or the University in any manner whatsoever, and CLC and the University do not in any way

represent itself as a guarantor of the quality of any product or service produced or provided by the Business. Business shall not imply sponsorship or endorsement by the University.

9.      DEFAULT; TERMINATION

(a)     Business' failure to fully comply with each provision of the Agreement or the Michigan Agreement, including but not limited to Business' failure to perform as required or breach of any provision, shall be deemed a default under the Agreement. Upon default, CLC and the University may require the Business to take action to correct such default.

(b)     In addition to the right to require corrective action for default as set forth in Paragraph 9(a) above, CLC and the University shall have the right to terminate this Agreement without prejudice to any other rights under this Agreement, in law, in equity or otherwise, at any time should any of the following defaults occur, and Business fails to cure said default within thirty (30) days of written notice from CLC:

(1)     Business fails to make any payment due or fails to deliver any required statement.

(2)     Business fails to make its premises available as required in this Agreement.

(3)     Business closes, ceases doing business in the manner in which it presently operates, fails to pay its liabilities when due, or makes any assignment for the benefit of creditors, or files any petition under any federal or state bankruptcy statute, or is adjudicated bankrupt or insolvent, or if any receiver is appointed for its business or property, or if any trustee in bankruptcy shall be appointed under the laws of the United States government or the several states.

(4)     Business attempts to grant or grants a sublicense or attempts to assign or assigns any right or duty under this Agreement to any person or entity without the prior written authorization of CLC.

(5)     If an person or entity acquires in a single transaction or through a series of transactions more than fifty percent (50%) ownership or controlling interest in Business, unless that ownership interest is transferred to immediate family members of the current principal stockholders (defined as spouse, children, grandchildren, nieces and nephews) or a trust for the benefit of such family members, in which case the business interest may be transferred.

(6)     Business fails to maintain in full force and effect the insurance referred to in Paragraph 6(b).

(7)     Business commits any act or omission that damages or reflects unfavorably, embarrasses or otherwise detracts from the good reputation of the University.

(8)      Business commits a default under any other provision of this Agreement.

(9)      In the event that the Michigan Agreement is terminated for any reason as provided therein or if the Michigan Agreement expires by its terms.

(c)      In the event that this Agreement is terminated for any reason, Business shall not be entitled to a refund of any of the rights fees previously paid to CLC on behalf of the University. Additionally, Business shall be responsible for paying to CLC any rights fees owing and due but not paid as of the date of termination of the Agreement.

## 10.    EFFECT OF EXPIRATION OR TERMINATION; DISPOSAL OF INVENTORY

After expiration or termination of this Agreement for any reason, Business shall immediately discontinue the use and/or sale of all items displaying the Marks and all similar marks, including but not limited to any co-branded products described in Paragraph 2(b) above.

## 11.    SEVERABILITY

In the event that any term or provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision and this Agreement shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal or unenforceable, had never been contained herein.

## 12.    NON-ASSIGNABILITY

This Agreement is personal to Business. Neither this Agreement nor any of Business' rights shall be sold, transferred or assigned by Business without CLC's prior written approval, and no rights shall devolve by operation of law or otherwise upon any assignee, receiver, liquidator, trustee or other party. The prior written consent of the University and/or CLC shall not be required for the assignment by M-Den to an entity controlled by the current principal stockholders or by immediate family members (defined as spouse, children, grandchildren, nieces and nephews) or a trust for the benefit of such family members. Subject to the foregoing, this Agreement shall be binding upon any approved assignee or successor of Business and shall inure to the benefit of CLC, its successors and assigns.

## 13.    ENTIRE AGREEMENT / NO WAIVER

Unless otherwise specified herein, this Agreement or any renewal, including appendices, constitutes the entire agreement and understanding between the parties and cancels, terminates, and supersedes any prior agreement or understanding, written or oral, relating to the subject matter hereof between Business, CLC and the University. There are no representations, promises, agreements, warranties, covenants or understandings other than those contained herein.

None of the provisions of this Agreement may be waived or modified, except expressly in writing signed by both parties. However, failure of either party to require the performance of any term in this Agreement or the waiver by either party of any breach shall not prevent subsequent enforcement of such term nor be deemed a waiver of any subsequent breach.

14.    UNIVERSITY RIGHT TO ENFORCE

University is entitled to enforce its rights in the Marks and the terms of this Agreement directly against the Business; and University is entitled to all the rights and remedies available under this Agreement.

15.    APPLICABLE LAW

This Agreement shall be governed by the laws of the State of Michigan without regard to its choice of law provisions.

By their execution below, the parties hereto have agreed to all of the terms and conditions of this Agreement.

**M-Den, Inc.**                                 **The Collegiate Licensing Company**

By: _David Hirth_                          By: _____

Title: _VP / Sec_                          Title: _Sup. Managing Director_

Date: _8/28/09_                            Date: _8/31/09_

# APPENDIX A
## MARKS



When raising the middle of the "Block M" in embroidery, a second outline may be added to the logo.
The second outline MUST be visually narrower than the inner border.

## APPENDIX B
## APPROVED USES OF MARKS

Insert Pictures with each item.

Storefront signs at:
1. M-Den on Main Street
2. M-Den on Campus
3. M-Den Briarwood
4. M-Den 12 Oaks
5. M-Den Laurel Park

Use of approved "M-Den" logo on:
6. Catalog Covers
7. Website – Screen Shot of home page and on signs, banner ads, etc. as www.mden.com
8. Bags, boxes and gift cards in support of retail sales
9. Social media – such as Twitter, Facebook and the like,
10. Neck labels, jock tags, and other forms of product labeling when used in accordance with paragraph 2(b) of the Agreement
11. Advertising and advertising items in support of approved retail operations

In uses of the "M-Den" logo, the letter size of the word Den shall be the same height size as the Michigan "Block M" provided however, that signs for current locations that currently use different sizes shall be permitted to continue as is as long as the signage for such current location continues and provided further that M-Den shall have the right to use all current and committed inventory of the above approved use items (documented to the reasonable satisfaction of the University) until such inventory is exhausted or June 30, 2010, whichever comes first.

# Exhibit 2

AGREEMENT

This Agreement is entered into as of the _____ day of June, 2010 by and between the Regents of the University of Michigan for its Department of Athletics ("University") and M-Den, Inc., a Michigan corporation ("M-Den").

## Recitals

A.     The University is the owner of certain trademarks, service marks, trade names, colors, seals, and symbols which have become associated with the University, used by the University in commerce, non-exclusively licensed by the University to third parties for use in commerce, and on some of which U.S. trademark registrations have been obtained.

B.     M-Den operates permanent retail locations under the name "M-Den" and conducts retail sales via m-den.com and catalog mailings.

C.     M-Den and the University are parties to the *2009 Agreement Between the Regents of the University of Michigan and M-Den, Inc.* dated as of July 1, 2009 (the "2009 Agreement"), and M-Den is a party to a License Agreement with Collegiate Licensing Company (the "CLC Agreement"), acting as agent for University, that was executed in connection with and pursuant to the 2009 Agreement, which, *inter alia,* sets forth the terms and conditions upon which M-Den is licensed the use of the certain of the University's MARKS.

D.     The University and M-Den wish to enter into an arrangement whereby M-Den will act as the University's official merchandise retailer for the Athletic Department, pursuant to and in accordance with the terms set forth herein.

## Terms

The parties agree as follows:

**Section 1.    Definitions**

1.1     ARTICLES means the products and articles of merchandise bearing one or more of the MARKS, which have been duly licensed by the University or its designated licensing agent.

1.2     CHANGE IN CONTROL means the acquisition by a person or entity in a single transaction or a series of transactions of more than fifty percent (50%) ownership or controlling interest in M-Den, unless the ownership interest is transferred to immediate family members of the current principal stockholders (defined as spouse,

1

children, grandchildren, nieces and nephews) or a trust for the benefit of such family members, in which case the business interest may be transferred.

1.3     FISCAL YEAR means the period of July 1 through June 30.

1.4     GAME DAY SALES are sales resulting from the retail sales operations conducted on PREMISES on the day during which home games occur.  GAME DAY SALES do not include LEASED AREA SALES that are accounted for separately per section 10.1(b).

1.5     GROSS SALES means the gross retail price of ARTICLES sold by M-Den, exclusive of sales tax and less any credits actually given for returns actually made and allowed as such by M-Den.

1.6     INTERNET SALES means sales resulting from the RETAIL INTERNET MERCHANDISING PROGRAM.

1.7     LEASED AREAS means any property leased M-Den, or by the University and reimbursed by M-Den, on a temporary basis for the purpose of enabling retail sales operations on the day during which home games occur.

1.8     LEASED AREA SALES are sales resulting from the retail sales operations conducted on LEASED AREAS on the day during which home games occur.

1.9     MARKS means any and all of the trademarks, service marks, trade names, school colors, seals and/or symbols of the University (whether now owned or developed or acquired in the future) which have become associated with the University, used by the University in commerce, and/or licensed to third parties for use in commerce, whether registered or unregistered in the United States or the world.  The current MARKS are shown in Attachment A.

1.10    MATERIAL BREACH means a breach of this Agreement that is not cured within the notice period, unless the breach is one which evidences a consistent course of conduct by M-Den.

1.11    NON-PREMISES RETAIL SALES are sales resulting from the retail sales operations conducted at any other M-Den retail location that is not located on PREMISES or any LEASED AREA.

1.12    ON-PREMISES RETAIL SALES are sales resulting from the retail sales operations conducted at any PREMISES on non-game-days.

1.13    PREMISES shall mean any place where M-Den performs services or conducts operations pursuant to the terms of this Agreement which is located on real property owned or leased on a long-term basis by the University.

2

06/17/10

1.14    RETAIL CATALOG MERCHANDISING PROGRAM means a program for the promotion, retail sale, and distribution of merchandise through the use of a print catalog and not through any other medium.

1.15    RETAIL CATALOG SALES means sales resulting from the RETAIL CATALOG MERCHANDISING PROGRAM (*i.e.*, orders that are received from the M-Den call center, via fax and via direct mail).

1.16    RETAIL INTERNET MERCHANDISING PROGRAM means a program for the promotion, retail sale, and distribution of merchandise through the use of the official merchandising internet website and not through any other medium.

1.17    RETAIL SEASON SHIRT PROGRAM means a program for the promotion, retail sale, and distribution of an annual season shirt through the use of the internet website, retail sales locations, GAME DAY SALES locations, print catalogs and other mediums.

## Section 2.    <u>Term and Termination</u>

2.1    This Agreement shall be effective July 1, 2010, and shall expire on June 30, 2020.  M-Den shall have the right to renew this Agreement for an additional five year term if (i) M-Den has not been in MATERIAL BREACH of any of the terms of this Agreement and (ii) M-Den gives written notice of its intent to renew on or before March 31, 2018.

2.2    The University may terminate this Agreement at any time immediately upon written notice to M-Den under any of the following circumstances:

(a)    M-Den is insolvent, becomes bankrupt or has made an assignment for the benefit of creditors which has not been corrected or withdrawn within two months; or

(b)    M-Den has failed to pay any amounts due under this Agreement and such amount remains unpaid within 30 days after receiving written notice of nonpayment; or

(c)    If M-Den or any officer, director, or partner of M-Den is convicted of a felony, a crime involving moral turpitude, or any other crime, offense or activity (whether criminal or civil) that the University reasonably believes is likely to have a material adverse effect on the University, the MARKS, the goodwill associated therewith, or the University's interest therein; or

(d)    Other than for nonpayment of amounts due under this Agreement, M-Den has breached or failed in performance under this Agreement and has not corrected such breach or failure of performance within 30 days after being

3

served with a written notice by the University clearly setting forth the claimed breach or failure of performance; or

(e)     In the event of a CHANGE IN CONTROL of M-Den.

(f)     In the event three or more total material breaches of any kind or kinds shall occur under this Agreement, including for nonpayment of any amounts due, for which notice of default is given under paragraph (c) of this section or under paragraph (b) of this section for nonpayment of fees, the University may elect to terminate the Agreement with a minimum of 15 days prior written notice upon the occurrence of a further material breach and M-Den shall have no right to cure the default.

2.3     M-Den may terminate this Agreement at any time immediately upon written notice to the University under any of the following circumstances:

(a)     The University is insolvent, becomes bankrupt or has made an assignment for the benefit of creditors which has not been corrected or withdrawn within 60 days; or

(b)     The University has breached or failed in performance under this Agreement and has not corrected such breach or failure of performance within 60 days after being served with a written notice by M-Den clearly setting forth the claimed breach or failure of performance.

2.4     Upon termination of this Agreement, M-Den shall have the continuing right to use the name M-Den and/or M Den as its assumed name and in the conduct of its continuing business in accordance with the terms of the 2009 Agreement and the CLC Agreement, both as amended in accordance with the terms of paragraph 11.3 below, until such time as there is a CHANGE IN CONTROL or the 2009 Agreement and/or the CLC Agreement otherwise terminate in accordance with their terms. Upon the occurrence of a CHANGE IN CONTROL, the parties agree to enter into good faith negotiations with a view toward extending the right to use the name M-Den and/or M Den on mutually acceptable terms and conditions, provided, that the University shall have the sole discretion in determining whether to grant any such extension.

## Section 3.     OFFICIAL DESIGNATION AND PROMOTION; PURCHASE AND SALE OF ONLY LICENSED GOODS

3.1     The University and M-Den agree that during the term of this Agreement, M-Den shall be designated as "The Official Merchandise Retailer of the University of Michigan Athletic Department." This designation only applies to the exclusive services provided by M-Den as set forth herein. The use of the designation and the use of any

4

and all MARKS in advertising or elsewhere by M-Den shall require the prior review and written permission of the University.

     3.2    The University shall use reasonable efforts to promote, publicize and market the Official Retailer status of M-Den. The parties shall agree on a specific promotion plan at least annually (coaches' appearances, e-mail blasts, Internet links, ticket inserts, etc.).

     3.3    M-Den shall purchase ARTICLES only from licensed manufacturers, and the wholesale price charged to M-Den shall include the standard royalty due under the manufacturer's license.

     3.4    Nothing in this Agreement shall be construed as granting M-Den a license to utilize the University's MARKS or to sell merchandise bearing the MARKS that have not been separately licensed by the University or its designated licensing agent.

## Section 4.   GAME DAY SALES AND LEASED AREA SALES

     4.1    The University grants to M-Den an exclusive right and license, without right to sublicense, to conduct under the service mark, trade name and company name "M-Den", all retail sales operations for the sale of ARTICLES on PREMISES or on LEASED AREAS, for all games at Michigan Stadium and Crisler Arena. University and M-Den shall document separately a plan (e.g., M-Den operated or University operated) for other sports and venues on a specific sport by sport basis for other University athletic events.

     4.2    M-Den shall operate all sales locations for GAME DAY SALES and LEASED AREA SALES in accordance with the following provisions:

     4.2.1   The positions of sales locations shall be mutually agreed upon by the parties and consist of tents, portable units, permanent locations, and LEASED AREAS. Sales locations shall be planned to meet customer demand and maximize GAME DAY SALES and LEASED AREA SALES. Fixtures required for these sales locations will be supplied by M-Den at its cost.

     4.2.2   M-Den, at its cost, will acquire the portable units and tents, cause them to be delivered to each location, and furnish the interior of the portable units to support its retail sales. The University Athletic Department, at its cost, will provide necessary hookups for electrical and telephone service and necessary entrance and exit ramps and site work.

     4.2.3   University and M-Den agree to share equally the signage fabrication/installation costs. Any such costs shall be agreed to in advance by both parties.

06/17/10

4.2.4 All physical building structure of permanent GAME DAY SALES locations at Michigan Stadium and Crisler Arena will solely be the responsibility of the University. University will also be responsible for utilities at these permanent locations. M-Den shall be responsible for all costs related to leasing and equipping the LEASED AREAS and for any build-out costs and fixtures of new permanent locations or upgrades to existing permanent locations.

4.3 M-Den shall manage and operate GAME DAY SALES and LEASED AREA SALES merchandise services. M-Den shall provide merchandise staffing ("Merchandise Staff") for all GAME DAY SALE and LEASED AREA SALE events which M-Den is scheduled to sell merchandise. M-Den shall be responsible to pay Merchandise Staff salaries and benefits. M-Den shall be responsible for all GAME DAY SALE and LEASED AREA SALE non-permanent merchandise fixtures and improvements and shall remain the property of M-Den during and after contract completion.

4.4 M-Den shall provide safe, efficient, courteous and quality services to the guests and patrons of the University. M-Den shall: (i) ensure that sales personnel provide, the highest level of quality service and hospitality in performing GAME DAY SALES and LEASED AREA SALES; (ii) use, and shall ensure that sales personnel use, all reasonable care to conduct the GAME DAY SALES and LEASED AREA SALES in a safe and lawful manner; (iii) ensure that all sales personnel are neatly and cleanly dressed and maintain personal cleanliness; and (iv) ensure that all sales personnel shall be polite and courteous to guests and patrons of the University.

4.5 M-Den shall acquire, install and maintain all necessary and appropriate technology infrastructure (hardware and software), service and support for the GAME DAY SALES and LEASED AREA SALES.

4.6 M-Den agrees to observe and comply with all of the rules, regulations, policies and procedures established by the University that are generally applicable to employees, consultants and/or contractors of such parties and all applicable laws, rules and regulations imposed by governmental and regulatory authorities from time to time ("Policies").

4.7 The University reserves the right to approve the retail GAME DAY SALES contents and promotional mentions. The University expressly reserves the right to reject and/or terminate any such placements in the GAME DAY SALES sites that the University believes are unsuitable or contrary to public policy; contrary to any federal, state, or local statute, rule or regulations; contrary to any Big Ten Conference, Central Collegiate Hockey Association or NCAA rules and regulations; or which are injurious to the reputation and image of the University.

06/17/10

**Section 5.   RETAIL INTERNET SALES**

5.1     The University grants to M-Den during the term of this Agreement an exclusive right and license, without right to sublicense, to conduct under the service mark, trade name and company name "M-Den" a RETAIL INTERNET MERCHANDISING PROGRAM for the sale of ARTICLES. The RETAIL INTERNET MERCHANDISING PROGRAM internet site shall be used solely for the sale, distribution, promotion and/or advertising of ARTICLES on a retail basis, and not to sell, distribute or promote any other merchandise. A site consisting of multiple pages dedicated to the RETAIL INTERNET MERCHANDISING PROGRAM (the "Site") shall be maintained. M-Den shall be responsible for providing and updating the content for the Site. M-Den shall be prohibited from the sale of ARTICLES using any other Internet site (unless authorized to provide services for the University of Michigan Alumni Association, in which case the specifics of that must be approved in writing by the University Athletic Department in advance).

5.2     M-Den shall provide and maintain content for the Site which meets or exceeds prevailing industry standards for merchandising websites in existence from time to time. M-Den shall perform customer service, fulfillment and all other activities relating to the RETAIL INTERNET MERCHANDISING PROGRAM in a highly professional manner that meets or exceed industry standards in existence from time to time and shall take all steps reasonably calculated to maximize INTERNET SALES of ARTICLES. If the University believes reasonably that M-Den is not meeting the then current industry standards for Site and/or the operation of a RETAIL INTERNET MERCHANDISING PROGRAM and/or taking all steps reasonably calculated to maximize INTERNET SALES of ARTICLES, it shall give 60 days written notice to M-Den detailing the deficiencies in M-Den's performance. If M-Den fails to cure the deficiencies within the 60 day period, the University may terminate the agreement with respect to the INTERNET MERCHANDISING PROGRAM by giving written notice to M-Den.

5.3     M-Den agrees to a web site redesign by August 1, 2011. M-Den and University agree to meet periodically on the plan and rollout of such design, with an initial plan and timeline to be determined no later than February 1, 2011.

5.4     During the term of the license granted under this Agreement, the University's Athletic Department shall not participate directly or indirectly in any retail internet merchandising sales of ARTICLES, except as provided in Section 15 (Reservation of Rights). The University will not permit a retailer of ARTICLES (other than M-Den) to place an advertisement or sponsorship on the Athletic Department website that features or displays ARTICLE(S) or that permits a click-over to the retailer's website for INTERNET SALES of ARTICLES. The prohibition against a click-over shall not apply to national companies unless the click over is to an Internet store that would substantially or directly compete with M-Den's RETAIL INTERNET MERCHANDISING PROGRAM.

7

06/17/10

5.5    M-Den shall pay all reasonable costs for the design, construction and maintenance of the Site. M-Den may elect to have a third party build and maintain the Site, provided the Site is consistent with the design of MGOBLUE.COM and the design is subject to the reasonable approval of the University. The parties shall coordinate promotions for the Site within MGOBLUE.COM. M-Den has the sole responsibility for meeting the then current industry standards for the content of the Site and/or the operation of a RETAIL INTERNET MERCHANDISING PROGRAM and/or taking all steps reasonably calculated to maximize INTERNET SALES of ARTICLES.

5.6    University and M-Den shall agree to a marketing plan on no less than an annual basis. Such plan shall document agreed upon frequency and narrative o f M-Den marketing deliverables (e.g., e-mail blasts). All e-mail marketing blasts shall be approved by the University prior to distribution.

5.7    The University reserves the right to approve the retail internet site contents and promotional mentions. The University expressly reserves the right to reject and/or terminate any such placements in the retail internet site that the University believes are unsuitable or contrary to public policy; contrary to any federal, state, or local statute, rule or regulations; contrary to any Big Ten Conference, Central Collegiate Hockey Association or NCAA rules and regulations; or which are injurious to the reputation and image of the University.

## Section 6.    <u>RETAIL CATALOG SALES</u>

6.1    The University grants to M-Den during the term of this Agreement an exclusive right and license, without right to sublicense, to conduct under the service mark, trade name and company name "M-Den" a RETAIL CATALOG MERCHANDISING PROGRAM for the sale of ARTICLES. The catalog shall be used solely for the sale, distribution, promotion and/or advertising of ARTICLES on a retail basis, and not to sell, distribute or promote any other merchandise.

6.2    The University reserves the right to approve the retail catalog contents and promotional mentions. The University expressly reserves the right to reject and/or terminate any such placements in the retail catalog that the University believes are unsuitable or contrary to public policy; contrary to any federal, state, or local statute, rule or regulations; contrary to any Big Ten Conference, Central Collegiate Hockey Association or NCAA rules and regulations; or which are injurious to the reputation and image of the University.

## Section 7.    <u>SEASON SHIRT PROGRAM</u>

7.1    The University grants to M-Den during the term of this Agreement an exclusive right and license, without right to sublicense, a RETAIL SEASON SHIRT PROGRAM for the sale of season shirts.

8

06/17/10

7.2    The University will select a design and "theme" for each season's official shirt after consultation with M-Den. Student "pre-orders" for shirts will be taken by University during the season ticket process ("Student Season Shirt Sales"). Unless otherwise agreed, the sale price of the shirt to the students in this pre-order will be $10.00 per shirt. The University will retain the associated sales as a payment towards royalties due from M-Den under Section 10.5. The University will insure that season tickets delivered to students who ordered shirts will have a redemption coupon from University (ordinarily as a separate ticket on season ticket stub). The redemption coupon shall have an appropriate expiration date as agreed to by both parties. That redemption coupon will serve as the appropriate documentation for M-Den to distribute the Season Shirts to students who ordered them. The University will collect the proceeds and notify M-Den as to the number of shirts ordered. The University will submit the sales taxes applicable for these student orders.

7.3    M-Den shall provide merchandise procurement, receiving, product merchandising, inventory management, fulfillment, shipping, and customer service for the Season Shirt. M-Den agrees to solicit bids and assist University in evaluating specifications of the season shirt and place orders as necessary with a mutually agreed upon vendor. M-Den will be responsible for verifying that the orders are properly filled and on-time, paying the vendor and resolving any disputes that may arise. M-Den will insure that the prevailing standard licensing royalty will be paid to CLC by the vendor.

7.4    M-Den will establish convenient locations for students to pick up their ordered shirts. M-Den will be responsible for paying the costs associated with the locations, including labor.

7.5    M-Den will also make Season Shirts available for sale to students who did not purchase shirts with their season ticket as well as the general public ("General Public Season Shirt Sales"). Unless otherwise agreed, the price of the Season Shirt to the general public shall be $15.00 per Season Shirt.


## Section 8.    **UNIVERSITY OWNED MERCHANDISE PROGRAM**

8.1    The University grants to M-Den during the term of this Agreement the right and license, without right to sublicense, a UNIVERSITY OWNED MERCHANDISE PROGRAM for the sale of game used apparel, equipment, or other memorabilia owned by the University.

8.2    Upon the mutual agreement of M-Den and the University, the University may from time to time provide M-Den game-used apparel, equipment, or other memorabilia as available, subject to University policies and NCAA and conference guidelines. M-Den shall sell on consignment such University owned inventory as mutually agreed by University and M-Den.

9

06/17/10

## Section 9.   NON-PREMISES RETAIL SALES

9.1     The University grants to M-Den during the term of this Agreement a non-exclusive right and license, without right to sublicense, to conduct under the service mark, trade name and company name "M-Den" NON-PREMISES RETAIL SALES for the sale of ARTICLES and for the sale of other sports related merchandise, subject to the terms and conditions of the 2009 Agreement and the CLC Agreement, both as amended in accordance with the provisions of paragraph 11.3, below.

9.2     M-Den's establishment and operation of future additional sites for NON-PREMISES RETAIL SALES shall be subject to the University's right to reject and/or terminate any such sites that the University reasonably believes are unsuitable or contrary to public policy; contrary to any federal, state or local statute, rule or regulation; contrary to any Big Ten Conference, Central Collegiate Hockey Association or NCAA rules and regulations; or which are injurious to the reputation and image of the University.

## Section 10.  Consideration

10.1    **GAME DAY SALES.** As consideration for operating the exclusive retail sales operations for all home football and men's basketball games, M-Den shall pay the following amounts to the University:

      (a)    20% of the GROSS SALES for GAME DAY SALES
      (b)    15% of the GROSS SALES for LEASED AREAS

10.2    **RETAIL INTERNET AND CATALOG SALES.** As consideration for operating the exclusive RETAIL INTERNET MERCHANDISING PROGRAM and exclusive RETAIL CATALOG MERCHANDISING PROGRAM, M-Den shall pay the following amounts to the University:

      (a)    15% of GROSS SALES for all combined INTERNET SALES and RETAIL CATALOG SALES in each FISCAL YEAR;

10.3    **NON-PREMISES RETAIL SALES.** As consideration for being the Official Merchandise Retailer, M-Den shall pay to the University the following amounts:

      (a)    1% of the first $10,000,000 of GROSS SALES for NON-PREMISES SALES in each FISCAL YEAR (July 1 through June 30); and

      (b)    2% of GROSS SALES for NON-PREMISES SALES exceeding $10,000,000 in each FISCAL YEAR.

06/17/10

10.4 **ON-PREMISES RETAIL SALES.** To the extent that the M-Den operates any permanent retail sales locations on PREMISES on non-game days, M-Den shall pay to the University the following amounts:

      (a)    20% of the GROSS SALES for ALL ON-PREMISES RETAIL SALES.

10.5 **SEASON SHIRT RETAIL SALES PROGRAM.** As consideration for operating the exclusive SEASON SHIRT RETAIL SALES PROGRAM, M-Den shall pay the following amounts to the University:

      (a)    10% of the GROSS SALES of Student Season Shirt Sales

      (b)    30% of the GROSS SALES for General Public Season Shirt Sales

Any GROSS SALES related to the General Public Season Shirts Sales shall be deducted from Game Day GROSS SALES, RETAIL INTERNET SALES, RETAIL CATALOG SALES, NON-PREMISES SALES, and ON-PREMISES SALES in those related royalty calculations. M-Den shall receive credit for amounts collected and retained by the University for Student Season Shirt Sales pursuant to Section 7.2 for each student season shirt ultimately redeemed by submitting validated redemption coupons to the University.

10.6 **UNIVERSITY OWNED MERCHANDISE PROGRAM SALES.** As consideration for operating the University Owned Merchandise Program, M-Den shall pay the following amounts to the University:

      (a)    50% of the GROSS SALES of University Owned Merchandise

10.7 **Accounting and Time for Payments.** All payments due the University under this Section 10 shall be computed semi-annually and paid as follows:

      (a)    17% of the annual guarantee on or before October 31 of each year

      (b)    50% of the annual guarantee, adjusted to reflect actual GROSS SALES for the first and second quarters of the FISCAL YEAR, paid on or before January 31 – any difference in actual royalties over 67% of the annual guarantee shall be paid on or before January 31

      (c)    17% of the annual guarantee for the third quarter paid on or before April 30

      (d)    16% of the annual guarantee, adjusted for actual GROSS SALES for the entire FISCAL YEAR, paid on or before July 31 – any difference in actual

11

06/17/10

royalties over the annual guarantee for the applicable FISCAL YEAR shall be paid on or before July 31

M-Den shall keep records accurately accounting for all sales and other distribution of ARTICLES in sufficient detail to permit a complete and accurate determination of the GROSS SALES of ARTICLES under this Agreement, and will render to the University written reports as follows:

•a monthly report of GROSS SALES by sales channel within five (5) business days after the end of each month; and

•a semi-annual written report of GROSS SALES of ARTICLES and the amount of royalties due under each paragraph of this Section 10 for each semi-annual segment of each year. The written report shall be submitted semi-annually with the payments made in January and July of each year.

M-Den shall retain all such records and reports for at least six (6) years after making them. In the event payments are not made when due, M-Den shall also pay to the University interest on all overdue amounts at the rate of the lessor of 1½% per month or the maximum amount permitted by law. The University shall have the right, at its own expense and at reasonable times, not exceeding four times per year, during regular business hours, to examine through a certified public accountant or other auditor in good standing, the books and records of M-Den to such extent as may be reasonably necessary and proper to determine the accuracy of any or all the reports and payments submitted by M-Den.

10.8  **Annual Guarantee.**  M-Den guarantees to University a minimum annual royalty (consisting of the amounts due under Sections 10.1 through 10.5) of $725,000 for FISCAL YEAR 2011 through 2015. The annual guarantee shall escalate 4% for each FISCAL YEAR the contract is in effect thereafter (e.g., $754,000 for the FISCAL YEAR 2016).

Any Annual Guarantee shortfall (amount by which the consideration collected under Sections 10.1 through 10.5 for any FISCAL YEAR is less than the Annual Guarantee) will be paid to the University within 15 days of the end of the applicable FISCAL YEAR.

10.9  **Championship Merchandise Override.**  As additional consideration, M-Den agrees to pay the University an extra 5% of GROSS SALES of any BCS Bowl Game, Final Four, and National Championship apparel sold through any of the M-Den retail channels.

## Section 11.  Ownership and Use of MARKS

11.1  M-Den acknowledges and agrees that the University has all right, title and interest in and to and is the sole and exclusive owners of the MARKS, the goodwill associated with the MARKS, and all United States and foreign registrations thereon. M-

12

Den acknowledges that the MARKS and the registrations are valuable assets of and form a valuable part of the business and operations of the University. M-Den agrees that it has no proprietary interest in the MARKS and that all use of the MARKS shall inure to the benefit of the University, including without limitation the "M" in the name M-Den. M-Den will not register or attempt to register the MARKS in any jurisdiction. M-Den, at the University's request, shall provide the University with any specimens and other documents reasonably necessary for the University to secure or maintain rights to the MARKS. M-Den agrees that it will not contest, oppose or challenge the University's use or ownership of the MARKS.

      11.2   Except as expressly stated in this Agreement and as otherwise agreed to in writing by the University, M-Den shall not make any other use of the MARKS. M-Den shall not use the name of the University of Michigan or the MARKS for any purpose, including advertising for any of the operations permitted under this Agreement, without the prior written permission of the University. The University agrees to handle requests for use of the name and MARKS in a reasonably expeditious manner.

      11.3   The University and M-Den hereby agree that, promptly upon execution of this Agreement, the 2009 Agreement and the CLC Agreement will be amended effective July 1, 2010, to extend the term of each of the agreements in order to provide that the rights granted therein by the University and Collegiate Licensing Company (acting on behalf of the University) to M-Den to license the University's MARKS as set forth in the agreements shall automatically renew for successive terms until there is a CHANGE IN CONTROL of M-Den or the agreements otherwise terminate pursuant to their respective terms. The form of the amendment to the 2009 Agreement shall be as set forth in attached and incorporated Attachment B, and the form of the Amendment to the CLC Agreement shall be as set forth on attached and incorporated Attachment C. In the event of a conflict between the terms of this Agreement and the terms of the 2009 Agreement and/or the CLC Agreement, the terms of this Agreement shall control.

## Section 12.  <u>Ownership and Use of Customer Lists</u>

      12.1   On at least an annual basis, the University's Athletic Department shall provide M-Den with its mailing list and e-mail list of ticket purchasers, and M-Den shall provide its retail catalog and retail INTERNET SALES customer lists to the University Athletic Department's Trademark Licensing Office. M-Den agrees that it shall use the ticket mailing list solely for purposes of the RETAIL CATALOG MERCHANDISING PROGRAM and RETAIL INTERNET SALES PROGRAM under this Agreement. The University and its subcontractors shall use M-Den's mailing lists solely for the University's own purposes. Upon termination or expiration of this Agreement, each party shall be entitled to keep their respective mailing lists for the exclusive purposes of retail sales of ARTICLES. M-Den shall not release or disclose the information to any third party other than as permitted under this Agreement. M-Den shall not release the information in the ticket mailing lists to any employee, contractor or other person affiliated with M-Den unless that person has a need to know and that person agrees in writing to use the information only as permitted under this Agreement and to maintain

the confidentiality of the information pursuant to the terms of this Agreement. M-Den shall consult with the University regarding the collection and inputting of updated information for inclusion in the University's records.

## Section 13. <u>Purchase and Sale of Only Licensed Goods</u>

13.1    M-Den shall purchase ARTICLES only from licensed manufacturers, and the wholesale price charged to M-Den shall include the standard royalty due under the manufacturer's license.

13.2    Nothing in this Agreement shall be construed as granting M-Den a license to utilize the University's MARKS or to sell merchandise bearing the MARKS that have not been separately licensed by the University or its designated licensing agent.

13.3    M-Den agrees to provide sport specific product for each of the University's Varsity Sports.

13.4    M-Den acknowledges and agrees that the University's equipment and shoe partner (currently Adidas) is a key supplier of product and product procurement by M-Den will be planned accordingly.

## Section 14. <u>Marketing Plans</u>

14.1    The parties shall meet at least annually at the request of the University to review and establish marketing plans for all operations permitted under this Agreement. At all times, M-Den shall exert its best efforts in the promotion, sale and distribution of the ARTICLES under this Agreement.

14.2    M-Den agrees and warrants that its sales, advertising, marketing and other activities under this Agreement will be conducted in such a way as to preserve the integrity, character, and dignity of the University and that all ARTICLES shall be of high quality in design, construction, assembly, finish, materials, appearance and workmanship. The University shall have access to the PREMISES of M-Den during normal business hours for the purpose of inspection of the ARTICLES.

## Section 15. <u>Reservation of Rights</u>

15.1    During the term of this Agreement, the University's Athletic Department expressly reserves the right to engage, either directly or through another vendor, in the following retail sale of ARTICLES:

(a)    At the University Golf Course for on-premises sales of golf pro shop type merchandise.

14

06/17/10

(b)     At the Yost Ice Arena skate shop for sales of ARTICLES, hockey related merchandise, and equipment. The parties shall negotiate in good faith for M-Den to be the provider of fulfillment services for ARTICLES under terms and conditions acceptable to both parties.

(c)     At Summer Sport Camps for on premise sales of items specific to the applicable sport.

(d)     At hosted athletic events and championships (other than home football and men's basketball games), honorary or similar events, for on premise sales of ARTICLES provided, however, that M-Den shall have the right of first refusal for other such hosted athletic events and championships.

(e)     Nothing in this Agreement shall limit the University, or its agents (e.g., IMG or CLC) from licensing, sponsorship, promotions, and premium arrangements with national or regional retailers that may offer ARTICLES for sale, so long as those businesses main line of business does not feature the sale of ARTICLES.

(f)     The University's Athletic Department may develop and sell unique items for fundraising purposes provided such sales are not intended to undermine M-Den's status as the exclusive seller of ARTICLES under this Agreement. The parties shall negotiate in good faith for M-Den to be the sole provider of fulfillment services under terms and conditions acceptable to both parties. If the parties cannot reach agreement within 15 days after the University gives notice of its need for fulfillment services for a particular unique item to be sold by its Athletic Department, the University may negotiate and contract with any other party it chooses. If M-Den provides fulfillment services, the University shall not require such unique items to be purchased from manufacturers licensed through the licensing agent under section 4.

15.2    During the term of this Agreement, the University's Athletic Department expressly reserves the right to engage, either directly or through another vendor, in the following retail sales of products:

(a)     M-Den acknowledges and agrees that University will be allowed to conduct online ticket sales and maintain an online photo store.

(b)     M-Den acknowledges and agrees that the University will be allowed to conduct online auctions for special unique memorabilia and experiences.

15.3    The restrictions on retail activities contained in this Agreement apply only to the University Athletic Department and the Athletic Department property. Nothing in this Agreement shall prevent any other University department, unit or affiliated group from directly or indirectly engaging in retail activities, including operating retail outlets in locations other than on Athletic Department property and/or distributing listings, mailings, and brochures, catalogs and the like promoting the sale of merchandise

15

06/17/10

containing the MARKS in connection with the various operations of the University and its alumni, groups and organizations.

15.4    Except as expressly stated in this Agreement, the University reserves all other rights in the retail sale of ARTICLES. Nothing in this Agreement shall be construed as granting M-Den, by implication, estoppel or otherwise, any license or right to any intellectual property or other rights of the University or to grant to M-Den any right or licenses other than those expressly granted in this Agreement.

## Section 16.  Compliance With Laws

M-Den shall comply with all applicable University, local state, and federal laws, ordinances, rules, and regulations in conducting the operations and performing the services under this Agreement.

## Section 17.  Insurance

17.1    M-Den, at M-Den's sole expense, shall secure and shall maintain during the term of this Agreement, for the mutual benefit of University and M-Den, a policy of general public liability and property damage insurance against claims for personal injuries or death, or destruction of, or damage to, property occasioned by an accident occurring upon, in or about the PREMISES at any time, such policy of insurance shall provide coverage in an amount not less than One Million ($1,000,000) Dollars for injury or death of any one (1) person, and One Million ($1,000,000) Dollars for injury to or death of any number of persons arising out of any one (1) occurrence and Three Million ($3,000,000) Dollars annual aggregate, and not less than One Hundred Thousand ($100,000) Dollars for property damage arising out of any one (1) occurrence. Such policy of insurance shall be issued by an insurance company that is licensed to write policies in the State of Michigan, and shall name University and M-Den as the insureds thereunder, and shall be delivered to University prior to the commencement of this Agreement or M-Den's possession of the PREMISES.

17.2    M-Den shall maintain during the term of this Agreement such worker's compensation and disability insurance to statutory limits as may from time to time be required by city, county or state laws. Evidence of such insurance shall be delivered to University prior to commencement of this Agreement or M-Den's possession of the PREMISES.

17.3    In addition, M-Den shall purchase and maintain during the term of this Agreement, product liability insurance in the amount of at least One Million ($1,000,000) Dollars with a company which is satisfactory to University. Any such policy shall name University as an additional insured and shall be delivered to University prior to the commencement of this Agreement.

17.4    M-Den shall have sole responsibility for any damage to, or loss or destruction of, its personal property located on the PREMISES plus any consequential loss or damage, and in its discretion, shall purchase any insurance which it considers to be necessary.

16

06/17/10

**Section 18.  Indemnification**

M-Den shall be solely responsible to, defend, indemnify and hold harmless the University, its Regents, officers, employees and agents from any and all claims, causes of action, product liability claims, demands, damages, costs, expenses, court fees and attorney fees arising out of actions or failure to act by M-Den in connection with the sales, distribution or other use of the ARTICLES or the performance of any services under this Agreement.

**Section 19.  No Agent, Employee or Representative**

This Agreement does not constitute either party the agent, employee, partner, joint venturer, or legal representative of the other party for any purpose.  By this Agreement, no party is granted any right or authority to assume or create any obligation or responsibility, expressed or implied, on behalf of or in the name of the other party, or to bind the other party in any manner or thing.

**Section 20.  Miscellaneous Provisions**

20.1  **Waiver.**  No waiver by any party of any breach or default of any of the terms of this Agreement shall be deemed a waiver of any subsequent breach or default even if similar to or the same as such prior breach or default.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

20.2  **Modifications.** This Agreement and its Attachments contain the entire understanding between the parties regarding its subject matter, and supercedes any prior or contemporaneous discussion, negotiation, agreement, whether oral or written, or understanding regarding the subject matter.  None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both of the parties.

20.3  **Assignment.**  This Agreement cannot be assigned by M-Den, either directly or indirectly, including, but not limited to, through the transfer of any ownership interest in M-Den, without the prior written consent of the University.  The prior written consent of the University shall not be required for the transfer of stock in M-Den by the current principle stockholders to immediate family members (defined as spouse, children, grandchildren, nieces and nephews) or to a trust for the benefit of family members.  This non-assignment clause will survive any such transfer to immediate family members.  This Agreement or any of the rights or benefits under this Agreement may be assigned by the University.

20.4  **Governing Law.** This Agreement and all collaterally related issues shall be governed by Michigan Law.

06/17/10

20.5 **Severability.** Any provision of this Agreement found by a court to be void or unenforceable shall not affect the validity or enforceability of any other provision.

20.6 **Headings.** Provision headings are solely for convenience and have no legal significance.

20.7 **Equal Opportunity Employer.** M-Den certifies that it is an equal opportunity employer, and that, during the performance of this Agreement, it will comply with all applicable federal, state and local civil rights statues, rules, regulations and executive orders.

20.8 **Force Majeure.** No breach of this Agreement shall occur as a consequence of the failure of the University to play any game or the failure of either party to perform any services under this Agreement if such failure results from: inclement weather; an act of God; strike lockout or other labor dispute; any decision, order, law, rule or regulation of the Big Ten Conference, the Central Collegiate Hockey Association, and the National Collegiate Athletic Association, or any other federal, state or municipal agency or official; or the occurrence of any other event that is beyond the reasonable control of a party.

20.9 **University Discount.** M-Den shall establish procedures whereby the Athletic Department and its employees can purchase ARTICLES directly from M-Den at public prices less 20%.

20.10 **Freedom of Information Act**. Nothing in this Agreement shall in any way limit the ability of the University to comply with any laws or legal process concerning disclosures by public bodies. The parties acknowledge that any responses, materials, correspondence or documents provided to the University are subject to the State of Michigan Freedom of Information Act ("Act") and may be released to third parties in compliance with that Act or any other law will not constitute a breach or threatened breach of this Agreement.

## Section 21. **Notices**

All notices under this Agreement shall be effective and given when mailed, first class mail, postage prepaid, or when personally delivered as follows:

The University:

      Director of Intercollegiate Athletics
      University of Michigan
      1000 South State Street
      Ann Arbor, Michigan 48109-3717

18

06/17/10

To M-Den

Douglas Horning
M-Den
315 South Main Street
Ann Arbor, Michigan 48104

With a separate copy mailed or personally delivered to:

Chris L. McKenney
Conlin, McKenney & Philbrick, P.C.
350 South Main Street, Suite 400
Ann Arbor, Michigan 48104

Or to such other addresses or individuals as are provided in writing by either party.

REGENTS OF THE UNIVERSITY
OF MICHIGAN

Date: 6/21/2010

Timothy Slottow, Executive Vice
President & Chief Financial Officer

UNIVERSITY OF MICHIGAN ATHLETIC
DEPARTMENT

Date: 6/18/10

David Brandon, Athletic Director

M-DEN INC.

Date: 6/17/10

Douglas Horning, President

H:\CLM\M-Den\UofM\2010\MDenAgreement Draft 6 9 10.clm revised.20100616.doc

19

06/17/10

**ATTACHMENT A**

**University of Michigan MARKS**

# UNIVERSITY OF MICHIGAN WOLVERINES

UNIVERSITY OF MICHIGAN is the owner of all rights, title and interest in and to the following Indicia, which includes trademarks, service marks, trade names, designs, logos seals and symbols.



## BLOCK M's

When utilizing the ONE COLOR "M", be sure to use Logo #1 or Logo #2. DO NOT use #3 or #4 and drop the outline.

When raising the middle of the "Block M" in embroidery, a second outline may be added to the logo. The second outline MUST be visually narrower than the inner border.

## COLOR INFORMATION

You must use the approved university colors or the "PANTONE" colors listed on this page and are intended to match the PANTONE color standards. For the PANTONE color standards, refer to the current editions of the PANTONE color publications. "PANTONE" is a registered trademark of PANTONE, Inc.

### SCHOOL COLORS

| | |
|---|---|
| MICHIGAN BLUE | PANTONE 282 |
| MICHIGAN MAIZE | PANTONE 116 Coated |
| MICHIGAN MAIZE | PANTONE 109 Uncoated |
| MICHIGAN GOLD | PANTONE 8640 |
| WHITE | WHITE |

### PANTONE COLORS

| MICHIGAN BLUE | MICHIGAN MAIZE 116 | MICHIGAN MAIZE 109 |
|---|---|---|

### THREAD COLORS

| | | | |
|---|---|---|---|
| MADEIRA 1243 | MADEIRA 1125 | WHITE | |
| RA 2303 | RA 2445 | WHITE | |

## VERBIAGE

The University of Michigan™
Michigan™
UM™
Wolverines™
Michigan Wolverines™
U of M™
Go Blue™

Victors Valiant ®
Champions of the West™
Conquering Heroes™
Maize and Blue™
"Hail to the Victors"™
Michigan Stadium™
Big House®
Ross School of Business™
Yost Arena™
Crisler Arena™

## GENERAL INFORMATION

LOCATION:
ANN ARBOR, MI

MASCOT:
WOLVERINES

MASCOT NICKNAME:
N/A

ESTABLISHED DATE:
1817

CONFERENCE:
BIG TEN

## SPLIT BLOCK M's

When raising the "Split Block M" in embroidery, the "M" AND the "BAR" must both be raised. Raising the "M" and NOT the "BAR" or the "BAR" without the "M" will not be approved.

## ADDITIONAL PERTINENT INFORMATION

| | Yes | No |
|---|---|---|
| University seal permitted on products for resale: | X | |
| Utilization of seal permitted with seal: | | X |
| Overlaying / intersecting graphics permitted with seal: | | X |
| University licenses consumables: | X | |
| University licenses health & beauty products: | X | |
| University permits numbers on products for resale: | X | |
| Mascot caricatures permitted: | | X |
| Cross licensing with other marks permitted: | | X |
| NO USE of current player's name, image, or likeness is permitted on commercial products in violation of NCAA rules and regulations. | | |
| NO REFERENCES to alcohol, drugs, or tobacco related products may be used in conjunction with University marks. | | |

Restrictions
Special Approval Required _____

Last two digits of the current year (i.e. FI03, and BW only. _____

NOTE: The marks of The University of Michigan are controlled under a licensing program administered by The Collegiate Licensing Company. Any use of these marks will require written approval from The Collegiate Licensing Company.

In addition to the Indicia shown above, any Indicia adopted hereafter and use or approved for use by UNIVERSITY OF MICHIGAN shall be deemed to be additions to the Indicia as though shown above and shall be subject to the terms and conditions of the Agreement.

# UNIVERSITY OF MICHIGAN WOLVERINES

UNIVERSITY OF MICHIGAN is the owner of all rights, title and interest in and to the following Indicia, which includes trademarks, service marks, trade names, designs, logos seals and symbols.

## FOOTBALL HELMETS



8    9    10    11

### MICHIGAN WORD MARKS

**MICHIGAN** 12

*Wolverines.* 18

**M GO BLUE** 21

**MICHIGAN** 13
Also may be used in gold 15

*Michigan* 16
Also may be used in gold 19

**M GO BLUE.** 22

**MICHIGAN WOLVERINES.** 14

### MICHIGAN WORD MARKS

*Michigan* 17
Also may be used in gold

*Michigan Wolverines* 20

U*M 23
Also may be used in gold

## COLOR INFORMATION

You must use the approved university colors or the "PANTONE" colors listed on this page. The colors on this page are not intended to match the PANTONE color standards. For the PANTONE color standards, refer to the current editions of the PANTONE color publications. "PANTONE" is a registered trademark of PANTONE, Inc.

### SCHOOL COLORS

| | |
|---|---|
| MICHIGAN BLUE | |
| MICHIGAN MAIZE | |
| MICHIGAN MAIZE | |
| MICHIGAN GOLD | |
| WHITE | |

### PANTONE COLORS

| | |
|---|---|
| MICHIGAN BLUE | PANTONE 282 |
| MICHIGAN MAIZE | PANTONE 116 Coated |
| MICHIGAN MAIZE | PANTONE 109 Uncoated |
| MICHIGAN GOLD | PANTONE 8640 |
| WHITE | WHITE |

### THREAD COLORS

| | |
|---|---|
| MADEIRA 1243 | RA 2303 |
| MADEIRA 1125 | RA 2466 |
| | |
| | |
| WHITE | WHITE |

MICHIGAN BLUE    MICHIGAN MAIZE 116    MICHIGAN MAIZE 109

**NOTE:** The marks of The University of Michigan are controlled under a licensing program administered by The Collegiate Licensing Company.

In addition to the Indicia shown above, any Indicia adopted hereafter and use or approved for use by UNIVERSITY OF MICHIGAN shall be deemed to be additions to the Indicia as though shown above and shall be subject to the terms and conditions of the Agreement.

## VERBIAGE

The University of Michigan™
Michigan®
UM™
Wolverines™
"Hail to the Victors"™
Michigan Wolverines™
U of M™
Go Blue™

Victors Valiant ®
Champions of the West™
Conquering Heroes™
Maize Page ®
Big House®
Ross School of Business™

Let's Go Blue™
M Go Blue®
The Victors™
Yost Arena™

## GENERAL INFORMATION

| | |
|---|---|
| LOCATION: | ANN ARBOR, MI |
| | |
| MASCOT: | WOLVERINES |
| MASCOT NICKNAME: | NA |

ESTABLISHED DATE:
1817
CONFERENCE:
BIG TEN

## INSTITUTIONAL MARKS



M UNIVERSITY OF MICHIGAN™

UNIVERSITY OF MICHIGAN™

## ADDITIONAL PERTINENT INFORMATION

| | Yes | No | Restrictions |
|---|---|---|---|
| | | | Special Approval Required. |
| University seal permitted on products for resale: | X | | |
| Alterations to seal permitted: | | X | |
| Overlaying / intersecting graphics permitted with seal: | | X | |
| University licenses consumables: | X | | |
| University licenses health & beauty products: | X | | |
| University permits numbers on products for resale: | X | | |
| Mascot caricatures permitted: | X | | |
| Cross licensing with other marks permitted: | | | Last two digits of the current year (i.e. #06), and #87 only. |
| NO USE of current player's name, image, or likeness is permitted on commercial products in violation of NCAA rules and regulations. | | | |
| NO REFERENCES to alcohol, drugs, or tobacco related products may be used in conjunction with University marks. | | | |

24    25    26

## ATTACHMENT B

## FIRST AMENDMENT TO 2009 AGREEMENT BETWEEN THE REGENTS OF THE UNIVERSITY OF MICHIGAN AND M-DEN, INC.

**THIS FIRST AMENDMENT** is made between the Regents of the University of Michigan for its Department of Athletics ("University") and M-Den, Inc., a Michigan corporation ("M-Den") effective July 1, 2010.

## RECITALS

A.    The University and M-Den are the parties to an Agreement effective July 1, 2009 entitled "2009 Agreement Between the Regents of the University of Michigan and M-Den, Inc." ("2009 Agreement").

B.    University and M-Den are simultaneously entering into a new 2010 Agreement effective July 1, 2010 (the "2010 Agreement").

C.    University and M-Den wish to amend the 2009 Agreement to better coordinate its terms with those of the 2010 Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants of the parties as herein contained,

**IT IS AGREED AS FOLLOWS:**

1.    <u>Incorporation of 2009 Agreement</u>.  The 2009 Agreement is hereby specifically referred to and incorporated as a part of this First Amendment.  In all respects other than as herein amended, the terms and conditions of the 2009 Agreement shall continue in full force and effect.

2.    Paragraph 2.c) is hereby retitled and amended to read as follows:

c)  <u>Official Designation of M-Den</u>.  M-Den shall be designated as "The Official Merchandise Retailer of the University of Michigan Athletic Department" in accordance with the provisions of Section 3 of the 2010 Agreement.

3. :    Paragraph 2.i) is hereby amended to read as follows:

i)  This Agreement shall be effective July 1, 2009 and thereafter shall automatically renew for successive annual terms until there is a CHANGE IN

CONTROL (as that term is defined in the 2010 Agreement) of M-Den or until this 2009 Agreement otherwise terminates pursuant to its terms. In establishing this provision for automatic renewal, it is the intention of the parties that the term of this 2009 Agreement shall match the term of the 2010 Agreement, as that term may be extended. The University may terminate this Agreement at any time immediately upon written notice to M-Den under any of the following circumstances:

[the provisions of subparagraphs 1) through 5), inclusive, are continued in full force and effect]

4.     Paragraph 3.a) entitled "License Grant" is hereby amended to read as follows:

a) License Grant: University grants to M-Den the right, subject to the terms and conditions of this Agreement, to use the description "M-Den" (part of the Marks) as contemplated by the 2010 Agreement. Through the 2010 Agreement and the CLC Agreement, University has granted M-Den permission to use Marks in connection with its advertising and promotion of its retail outlets. No other right to use the Marks is granted to M-Den.

5.     Paragraph 3.c) entitled "Limitation on Locations" is hereby amended to read as follows:

c) Limitation on Locations: M-Den shall use the Marks for the operation of it retail locations, internet websites and catalogs, as approved in writing by University, or as established in accordance with the provisions of paragraph 9.2 of the 2010 Agreement. All such use of the Marks must be in accordance with the requirements of the CLC Agreement.

6.     Paragraph 3.d) entitled "Identification as independent business" is hereby retitled and amended to read as follows:

d) Official Designation: M-Den shall be designated as "The Official Merchandise Retailer of the University of Michigan Athletic Department" that is an independently owned and operated licensee of the University of Michigan.

7.     Paragraph 3.e) entitled "No use of corporate name" is hereby retitled and amended to read as follows:

- 2 -

e) M-Den Corporate Name: M-Den shall be entitled to use the name "M-Den" as its corporate name in accordance with the provisions of the 2010 Agreement.

8. The following additional paragraph 5 is added to the 2009 Agreement:

   5. In the event of a conflict between the terms of this Agreement and the terms of the 2010 Agreement, the terms of the 2010 Agreement shall control.

**IN WITNESS WHEREOF,** the parties have executed this First Amendment to be effective as of the day and year first above written.

**The University of Michigan Department of Athletics**

By: _David H Brandon_
David Brandon, Director

Date: 6/18/10

**The Regents of the University of Michigan**

By: _Timothy Slottow_
Timothy Slottow, Executive Vice President and Chief Financial Officer

Date: 6/21/2010

**M-Den, Inc.**

By: _Douglas Horton_

Title: _Pres. / Treas._

Date: 6/17/10

H:\CLM\M-DEN\UOFM\2010\FIRST AMEND.2009 AGT.DOC

- 3 -

## ATTACHMENT C

## FIRST AMENDMENT TO LICENSE AGREEMENT

**THIS FIRST AMENDMENT TO LICENSE AGREEMENT** ("First Amendment") is made by and between **M-DEN, INC.**, a Michigan corporation ("Business") and the **COLLEGIATE LICENSING COMPANY**, a Georgia corporation ("CLC"), as agent on behalf of the University of Michigan ("University"), effective July 1, 2010.

**WHEREAS,** Business and CLC are the parties to a License Agreement effective on July 1, 2009 ("License Agreement").

**WHEREAS,** Business and CLC, with the approval of University, wish to amend the License Agreement to better coordinate its terms with those of a new Agreement being entered into effective July 1, 2010, between University and Business (the "2010 Agreement").

**NOW, THEREFORE**, in consideration of the mutual covenants of the parties as herein contained,

**IT IS AGREED AS FOLLOWS:**

1.     <u>Incorporation of License Agreement</u>.  The License Agreement is hereby specifically referred to and incorporated as a part of this First Amendment.  In all respects other than as herein amended, the terms and conditions of the License Agreement shall continue in full force and effect.

2.     Paragraph 2(b) of the License Agreement shall be amended in its entirety to read as follows:

(b)     Business shall be allowed to work with manufacturers licensed by CLC (acting on behalf of the University) to create neck labels, jock tags or other forms of product labeling featuring the name "M-Den." Any merchandise manufactured, distributed and sold as described herein shall be done in accordance with the terms and conditions of the license agreement between CLC and the licensed manufacturer. However, M-Den shall be responsible for securing the University's approval as to the specific manufacturers and product categories that it intends to use for any specific "M-Den" product labeling.

3.     Paragraph 2 of the License Agreement is hereby amended by the addition of the following new subparagraph (c):

(c)     CLC, on behalf of University, hereby also grants Business permission to use the Marks in connection with its activities contemplated by the 2010 Agreement, including, but not limited to, use of the Marks at the

temporary location of business at the corner of Stadium and Main Streets in Ann Arbor, Michigan, and at other LEASED AREAS as that term is defined in the 2010 Agreement. Business shall have the right to establish additional NON-PREMISES RETAIL SALES sites in accordance the provisions of paragraph 9.2 of the 2010 Agreement.

4.  Paragraph 3 of the License Agreement is hereby amended to read as follows:

This Agreement shall take effect on July 1, 2009, and thereafter shall automatically renew for successive annual terms until there is a CHANGE IN CONTROL (as that term is defined in the 2010 Agreement) of Business or until this License Agreement otherwise terminates pursuant to its terms. In establishing this provision for automatic renewal, it is the intention of the parties that the term of this License Agreement shall match the term of the 2010 Agreement, as that term may be extended.

5.  The provisions of paragraph 4 of the License Agreement, including subparagraphs (a), (b) and (c) are hereby deleted in their entirety. Effective July 1, 2010, Business shall no longer pay these rights fees to CLC on behalf of the University.

6.  The following additional paragraph 16 is added to the License Agreement:

16.  In the event of a conflict between the terms of this Agreement and the terms of the 2010 Agreement, the terms of the 2010 Agreement shall control.

By their execution below, the parties hereto have agreed to all of the terms and conditions of this Agreement.

**M-Den, Inc.**                                **The Collegiate Licensing Company**

By: _Douglas Horning_                          By: _____

Title: _Pres / Treas_                          Title: _____SVP_____

Date: _6/17/10_                                Date: _6/25/10_

## APPENDIX B

## APPROVED USES OF MARKS

Appendix B of the License Agreement is hereby amended to read as follows:

Storefront signs at:
1. M-Den on Main Street.
2. M-Den on Campus.
3. M-Den Briarwood.
4. M-Den 12 Oaks.
5. M-Den Laurel Park.

Use of approved "M-Den" logo on:
6. Catalog Covers.
7. Website – Screen Shot home page and on signs, banner ads, etc. as www.mden.com.
8. Bags, boxes and gift cards in support of retail sales.
9. Social media – such as Twitter, Facebook, and the like.
10. Neck labels, jock tags and other forms of product labeling.
11. Advertising and advertising items in support of approved retail operations.
12. Uses contemplated by the provisions of the 2010 Agreement.

**M-Den, Inc.**                          **The Collegiate Licensing Company**

By: _Douglas Horning_                    By: _____

Title: _Pres / Sec_                      Title: _____ Sup

Date: _6/17/10_                          Date: _6/25/10_

3

<u>FIRST AMENDMENT TO THE 2010 AGREEMENT BETWEEN</u>
<u>THE REGENTS OF THE UNIVERSITY OF MICHIGAN AND M-DEN, INC.</u>

This First Amendment made between the Regents of the University of Michigan for its Department of Athletics ("University") and M-Den, Inc., a Michigan corporation ("M-Den") amends the June 21, 2010 Agreement ("June 2010 Agreement") between the University and M-Den.

**RECITALS**

1.  The University and M-Den are the parties to an Agreement, which was effective July 1, 2010, and is identified herein as the June 2010 Agreement.

2.  The University and M-Den wish to amend the June 2010 Agreement as stated in this First Amendment.

NOW THEREFORE, in consideration of the mutual convenants of the parties as herein stated,

IT IS AGREED AS FOLLOWS:

1.  <u>Incorporation of the June 2010 Agreement</u>.  The June 2010 Agreement is hereby specifically referred to and incorporated into this First Amendment.  This First Amendment supersedes and replaces only those sections of the June 2010 Agreement specifically referenced herein.  All sections of the June 2010 Agreement not specifically amended herein remain in full force and effect.

2.  Paragraph 2.1 is hereby amended to read as follows:

    2.1    This Agreement shall be effective July 1, 2010 and shall expire on June 30, 2028.   M-Den shall have the right to renew this Agreement for an additional five year term if (i) M-Den has not been in MATERIAL BREACH of any of the terms of this Agreement, (ii) there has been no change in the owner(s) or ownership structure of M-Den, (iii) M-Den has not been insolvent during the Term of this Agreement, (iv) M-Den has not been in violation of paragraph 20.11 of this Agreement, and (v) M-Den give written notice of its intent to renew on or before March 31, 2026.

3.  Paragraph 4.7 is hereby amended to read as follows:

    4.7    The University reserves the right to approve the retail GAME DAY SALES contents and promotional mentions.  The University expressly reserves the right to reject and/or terminate any such placements in the GAME DAY SALES sites that the University believes are unsuitable or contrary to public policy; contrary to any federal, state, or local statute, rule or regulations; contrary to any Big Ten Conference or NCAA rules or regulations, or the rules or regulations of any additional, alternative or

successor athletic conference(s) or association(s) the University may join or become affiliated with during the term of this Agreement; or injurious to the reputation and image of the University.

4. Paragraph 5.3 is hereby deleted in its entirety.

5. Section 6 RETAIL CATALOG SALES is hereby amended to read as follows:

6.1 The University grants to M-Den during the term of this Agreement an exclusive right and license, without right to sublicense, to conduct under the service mark, trade name and company name "M-Den" a RETAIL CATALOG MERCHANDISING PROGRAM for the sale of ARTICLES. The medium(ia) in which the catalog shall be created (e.g., print, digital) shall be determined by M-Den after reasonable consultation with the University. The catalog shall be used solely for the sale, distribution, promotion and/or advertising of ARTICLES on a retail basis, and not to sell, distribute or promote any other merchandise.

6.2 The University reserves the right to approve the retail catalog contents and promotional mentions. The University expressly reserves the right to reject and/or terminate any such placements in the retail catalog that the University believes are unsuitable or contrary to public policy; contrary to any federal, state, or local statute, rule or regulations; contrary to any Big Ten Conference or NCAA rules or regulations, or the rules or regulations of any additional, alternative or successor athletic conference(s) or association(s) the University may join or become affiliated with during the term of this Agreement; or injurious to the reputation and image of the University.

6. Paragraph 7.2 is hereby amended to read as follows:

7.2 The University will select a design and "theme" for each season's official shirt after consultation with M-Den ("SEASON SHIRT"). The University will provide students ordering season tickets with a redemption coupon from University (ordinarily as a separate ticket on season ticket stub). The redemption coupon shall have an appropriate expiration date as agreed to by both parties. That redemption coupon will serve as the appropriate documentation for M-Den to distribute the Season Shirts to students who ordered them. ("SEASON SHIRT PROGRAM"). The University will submit the sales taxes applicable for these student orders. M-Den will charge the University and the University will pay M-Den for the actual costs of producing the shirts to be distributed to students with redemption coupons. Such costs will be settled through the accounting and payment process set forth at paragraph 10.7. In the event that the University decides to revise the SEASON SHIRT PROGRAM (e.g., the

process by which students will order, receive, and/or pay for SEASON SHIRTS) during the term of this Agreement, the parties agree to negotiate in good faith a mutually agreeable revision of the production, delivery and/or revenue sharing obligations. The price of any SEASON SHIRTS distributed through the redemption coupon process shall not be included in the calculation of any RETAIL SALES payments the University shall receive pursuant to Section 10.

7.   Paragraph 7.3 is hereby amended to read as follows:

7.3   M-Den shall provide merchandise procurement, receiving, product merchandising, inventory management, fulfillment, shipping, and customer service for the SEASON SHIRT. M-Den agrees that the SEASON SHIRT will be the brand of the University's then-current shoe and apparel sponsor (i.e., NIKE/Jordan as of the date of this First Amendment). M-Den will be responsible for verifying that the orders are properly filled and on-time, paying the sponsor/licensee/vendor and resolving any disputes that may arise. M-Den will ensure that the prevailing standard licensing royalty will be paid to IMGCL by the sponsor/licensee.

8.   Paragraph 7.5 is hereby amended to read as follows:

7.5   M-Den will also make Season Shirts available for sale to students who did not purchase shirts with their season ticket as well as the general public ("General Public Season Shirt Sales").

9.   Paragraph 10.1 is hereby amended to read as follows:

10.1   **GAME DAY SALES.** As consideration for operating the exclusive retail sales operations for all home football and men's basketball games, M-Den shall pay the University 20% of the GROSS SALES for GAME DAY and LEASED AREAS SALES.

10.   Paragraph 10.2 is hereby amended to read as follows:

10.2   **RETAIL INTERNET AND CATALOG SALES**. As consideration for operating the exclusive RETAIL INTERNET MERCHANDISING PROGRAM and exclusive RETAIL CATALOG MERCHANDISING PROGRAM, M-Den shall pay the following amounts to the University:

(a)   15% of the first $8 million of GROSS SALES for all combined INTERNET SALES and RETAIL CATALOG SALES in each CONTRACT YEAR;

(b)   20% of all GROSS SALES above $8 million for all combined INTERNET SALES and RETAIL CATALOG SALES in each CONTRACT YEAR.

11.     Paragraph 10.5 is hereby amended to read as follows:

10.5    **SEASON SHIRT RETAIL SALES PROGRAM.**  Any GROSS SALES related to the General Public SEASON SHIRT sales shall be treated as other sales (e.g., GAME DAY, NON-PREMISES) as applicable for purposes of calculating related royalties.

12.     Paragraph 10.8 is hereby amended to read as follows:

10.8    **ANNUAL GUARANTEE**.   M-Den guarantees to University a minimum annual royalty (consisting of the amounts due under Section 10.1 through 10.5) of $1.5 million for each CONTRACT YEAR during the term of this Amendment.

Any Annual Guarantee shortfall (amount by which the consideration collected under sections 10.1 through 10.5 for any CONTRACT YEAR is less than the Annual Guarantee) will be paid to the University within 15 days of the end of the applicable CONTRACT YEAR.

13.     Paragraph 10.9 is hereby amended to read as follows:

10.9    **CHAMPIONSHIP MERCHANDISE OVERRIDE**.  As additional consideration, M-Den agrees to pay University an extra 5% of GROSS SALES of any College Football Playoff ("CFP") or Football National Championship or Men's Basketball Final Four or National Championship apparel sold through any of the M-Den retail channels.

14      Paragraph 12.1 is hereby amended to read as follows:

12.1    On at least an annual basis, the University's Athletic Department shall provide M-Den with its mailing list and e-mail list of ticket purchasers, and M-Den shall provide its retail catalog and retail INTERNET SALES customer lists to the University Athletic Department's Trademark Licensing Office.  M-Den agrees that it shall use the ticket mailing list solely for purposes of the RETAIL CATALOG MERCHANDISING PROGRAM and RETAIL INTERNET SALES PROGRAM under this Agreement.  The University and its subcontractors shall use M-Den's mailing lists solely for the University's own purposes.  Upon termination or expiration of this Agreement, each party shall be entitled to keep their respective mailing lists for its own business purposes.  M-Den shall not release or disclose the information to any third party other than as permitted under this Agreement.  M-Den shall not release the information in the ticket mailing lists to any employee, contractor or other person affiliated with M-Den unless that person has a need to know and that person agrees in writing to use the information only as permitted under this Agreement and to

maintain the confidentiality of the information pursuant to the terms of this Agreement. M-Den shall consult with the University regarding the collection and inputting of updated information for inclusion in the University's records.

In the event of actual or suspected unauthorized disclosure, access to, or other breach of the University customer list, M-Den will immediately notify the University and provide resources or reimburse the University for any costs associated with remediation and will otherwise cooperate with University's efforts or University's reasonably requested efforts to mitigate such unauthorized disclosure, access or other breach.

15. Paragraph 14.1 is hereby amended to read as follows:

14.1    The parties will continue to collaborate as a matter of routine and shall meet at least annually at the request of the University to review and establish marketing plans for all operations permitted under this Agreement. At all times, M-Den shall exert its best efforts in the promotion, sale and distribution of the ARTICLES under this Agreement.

16. Paragraph 17.1 is hereby amended to read as follows:

17.1 M-Den, at M-Den's sole expense, shall secure and shall maintain during the term of this Agreement, for the mutual benefit of University and M-Den, a policy of general public liability and property damage insurance against claims for personal injuries or death, or destruction of, or damage to, property occasioned by an accident occurring upon, in or about the PREMISES at any time, such policy of insurance shall provide coverage in an amount not less than TWO MILLION ($2,000,000) Dollars for injury or death of any one (1) person, and TWO MILLION ($2,000,000) for injury to or death of any number of persons arising out of any one (1) occurrence and THREE MILLION ($3,000,000) Dollars annual aggregate, and not less than Five Hundred Thousand ($500,000) Dollars for property damage arising out of any one (1) occurrence. Such policy of insurance shall be issued by an insurance company that is licensed to write policies in the State of Michigan, and shall name the University and M-Den as the insureds thereunder, and shall be delivered to the University prior to the commencement of this Agreement or M-Den's possession of the PREMISES.

17. Section 20 is hereby amended by the addition of the following:

20.11 **Conduct.** M-Den shall ensure that neither it nor its affiliates engages in any act or omission that (i) violates any applicable law, NCAA, Big Ten or University rule or regulation; (ii) is misleading or offensive or injurious to the reputation, traditions and/or image of the University; or (iii)

causes embarrassment to the University or otherwise brings the University into disrepute, regardless of whether or not such act or omission is related to M-Den's obligations under this Agreement.

**20.12  Right to Audit**. During the term of this Agreement and not more than once per year (unless circumstances warrant additional audits as described below), University may audit M-Den's records that relate to its performance under this Agreement upon at least 10 business days notice. Notwithstanding the foregoing, the parties agree that University may conduct an audit at any time, in the event of (i) audits required by University's auditors or any governmental or regulatory authorities, or (ii) University reasonably believes that an audit is necessary to comply with applicable law, or to address a material operational problem or issue that poses a risk to University's business.

REGENTS OF THE UNIVERSITY
OF MICHIGAN

Date: _8 · 21 · 2018_

Kevin P. Hegarty, Executive Vice
President & Chief Financial Officer

UNIVERSITY OF MICHIGAN ATHLETIC
DEPARTMENT

Date: _7 · 31 · 18_

Warde Manuel, Donald R. Shepherd
Director of Athletics

M-DEN, INC.

Date: _7 – 23 – 18_

Scott Hirth
President

# Exhibit 3

This Forbearance Agreement is between the Regents of the University of Michigan (UM) and M-Den, Inc. (M-Den). Regardless of the final date of signature below, this Agreement is retroactively effective to 4:59 p.m. on May 13, 2024 (Effective Date). UM and M-Den are collectively referred to as the Parties.

RECITALS

- UM and M-Den are parties to a 2009 Agreement, as amended (2009 Agreement), and 2010 Agreement, as amended (2010 Agreement), that in part state terms on which M-Den may sell merchandise bearing UM "Marks," as that term is defined in the 2009 Agreement, Recital §1.

- UM notified M-Den that it is terminating the 2009 Agreement and 2010 Agreement effective 5:00 p.m. on Monday, May 13, 2024.

- Before the termination became effective, M-Den advised UM that The Legends Brand (Legends) has expressed interest in acquiring M-Den's stock or assets on terms that will include satisfying M-Den's debts, including paying M-Den's debt to UM, including but not limited to approximately $8.5M through the first quarter of calendar 2024, and curing M-Den's defaults under the 2009 Agreement and 2010 Agreement.

- UM will give M-Den a limited period for due diligence with Legends and to determine if M-Den and Legends may agree on transaction terms acceptable to cause UM to withdraw its notice terminating the 2009 Agreement and 2010 Agreement.

- UM's forbearance is contingent on M-Den assigning any interest it has or may have in the "M-Den" name, M-Den URL registration, and transferring a copy of its complete and current customer list to UM.

- This Agreement documents terms for UM's forbearance.

For valuable consideration, including UM forbearing on its legal right to terminate the 2009 Agreement and 2010 Agreement, the Parties agree as follows:

1. **M-Den Name.**

    a. On the Effective Date M-Den irrevocably assigns to UM, and agrees that UM shall have all right, title, and interest in and to and is the sole and exclusive owner of the name "M-Den" and any United States or foreign registrations or right to register the M-Den name as a trademark, sales mark, assumed name, or otherwise. UM may immediately file documents to register the M-Den name as its own Mark (as Mark is defined in the 2009

- 1 -

Agreement) and property. This irrevocable assignment survives termination of this Agreement and UM may use the M-Den name for any purpose following termination.

b. M-Den may continue to operate under the M-Den name and shall have the right to assign use of the M-Den name to Legends on terms acceptable to UM until termination of this Agreement, at which time M-Den must immediately cease all use of the M-Den name.

c. Immediately after the Effective Date of this Agreement M-Den must file documents necessary to formally change its corporate name so it does not include M-Den or any derivation thereof.

d. If Legends acquires M-Den's assets or stock on terms acceptable to UM, then UM will license the M-Den name to Legends for use consistent with that specified in the 2009 Agreement and for the duration of Legends' agreement with UM to sell merchandise bearing UM Marks, as defined in the 2009 Agreement.

**e. If this Agreement terminates without M-Den closing an asset or stock sale to Legends on terms acceptable to UM, then M-Den must immediately after closing file documents to terminate its certificate to use M-Den as an assumed name.**

2. M-Den URL.

a. On the Effective Date, M-Den will complete documents necessary to irrevocably assign its M-Den URL to UM and agrees that UM shall have all right, title, and interest in and to and is the sole and exclusive owner of the M-Den URL.

b. M-Den may continue to operate the M-Den URL until termination of this Agreement.

c. If Legends acquires M-Den's assets or stock on terms acceptable to UM, in UM's sole discretion, then UM will license the M-Den URL to Legends for the duration of Legends' agreement with UM to sell merchandise bearing UM Marks, as defined in the 2009 Agreement.

3. Customer List. On the Effective Date M-Den will transfer its current and complete customer list to UM and consents to UM using said information for its own purposes thereafter.

4. Legends. Nothing in this Agreement obligates UM to approve a transaction for Legends to acquire M-Den's stock or assets or for UM to enter into any related agreement with Legends to sell merchandise bearing UM Marks, as defined in the 2009 Agreement. UM reserves all rights and discretion to evaluate and decide whether to approve any transaction between M-Den and Legends and whether to enter into any subsequent agreement with Legends. During and after the term of this Agreement, UM reserves the right to pursue other

2 -

potential vendors, excluding Legends, to sell merchandise bearing UM Marks, as defined in the 2009 Agreement.

5. **Term of Agreement**. This Agreement is effective from the Effective Date until the earliest of the following: (i) June 25, 2024; (ii) UM provides 15 days' written notice of termination to M-Den; (iii) Legends withdraws its interest in acquiring M-Den assets or stock or fails to agree on terms with M-Den that UM approves in its sole discretion; (iv) M-Den and Legends execute closing documents on terms acceptable to UM.

6. **Reservation of Rights**. Other than as stated in this Agreement, the Parties reserve all rights, claims, and defenses each may have against the other arising under or related to the 2009 Agreement and 2010 Agreement.

7. **Denial of Right or Claim.** Nothing in this Agreement should be construed as UM admitting M-Den otherwise had or has any legal, equitable, intellectual property, or other right to the M-Den name after termination of the 2009 Agreement or 2010 Agreement. Likewise, nothing in this Agreement should be construed as M-Den's admission that any claim UM may assert against M-Den has any merit.

8. **Integration**. This is a fully integrated agreement on the terms specified above and it voids and supersedes any prior or contemporaneous promises, inducements, assurances, representations, or agreements on the same terms. In the event of a conflict between this Agreement and the 2009 Agreement or 2010 Agreement, this Agreement controls. This Agreement may only be amended in writing signed by all Parties.

By signing below, I confirm that I have read, understand, and accept these terms on behalf of the entity for which I am signing, and that I sign with the entity's informed consent:

The Regents of the University of Michigan

By: _A. Manuel_

Its: Donald R. Shepherd Director of Athletics

Date: 5/16/24

M-Den, Inc.

By: _Scott Hirth_

Its: President

Date: 5 - 16 - 24

- 3

# Exhibit 4



February 7, 2024

**Via Overnight Mail**
Mr. Scott Hirth
M-Den, Inc.
315 South Main Street
Ann Arbor, MI 48104

      **Re: Notice of Termination Effective March 11, 2024**
          **2009 Agreement, as Amended**
          **2010 Agreement, as Amended**

Dear Scott:

On behalf of the University of Michigan, this is to notify you that the University hereby exercises its right to terminate the 2009 Agreement, as amended, and 2010 Agreement, as amended (collectively, the Agreements), between the Regents of the University of Michigan and M-Den.

Even though the University of Michigan's audit is not complete, largely because of M-Den failing to provide financial and accounting records promptly, the University has sufficient information to confirm that M-Den materially breached the Agreements.

The University may terminate each agreement if M-Den is insolvent for two months (2009 Agreement, §2(i)(1); 2010 Agreement, §2.2(a)). According to information you provided, M-Den has been insolvent from at least December 31, 2020 through the present. As of the calendar year ended December 31, 2020, M-Den's total liabilities of ($14,930,425) exceeded its total assets of $13,001,318 and the M-Den reported negative equity of ($1,929,107). At December 31, 2020, M-Den had no available cash or securities and its balance sheet reported that M-Den was in a cash overdraft position at that time. M-Den had insufficient capital and was unable to pay its obligations as they became due, including amounts owed to the University of Michigan pursuant to the Agreements. M-Den continues through present to fail to pay its obligations as they became due, including millions of dollars owed to the University of Michigan under the Agreements. The current liabilities of M-Den are significantly greater than its available cash, securities, or other liquid assets. The balance sheet provided by you as of month end November 30, 2023, reported M-Den had a bank balance of $389,758, while its current liabilities were ($14,701,020), including approximately $6.2 million owed to the University of Michigan under the Agreements.[1] To state the obvious, M-Den has been insolvent for far greater than two months. As a result, the University may immediately terminate the Agreements.

---

[1] A second version of the M-Den balance sheet at November 30, 2023 was provided by you one day earlier reflected a negative cash balance of ($3,209,964) and current liabilities of ($11,261,854).

**Warde Manuel**
*Donald R. Shepherd Director of Athletics*

Stephen M. Ross Athletic Campus · 1000 South State Street · Ann Arbor, Michigan 48109-2201 · (734) 763-7568 · Fax (734) 763-7553 · warde@umich.edu

24-47922-jtg Doc 81 Filed 09/03/24 Entered 09/03/24 16:58:36 Page 83 of 90



On January 31, 2024, M-Den dropped a check for $3,850,939.79 at the reception desk at Michigan Athletics but alerted no one that the envelope contained a check of such a significant amount. Michigan opened the envelope and negotiated the check on February 1. The check has now been rejected twice for insufficient funds. This is an independent basis to terminate the Agreements.

The University may also terminate each agreement if M-Den fails to pay amounts due within 30 days of receiving notice of default. (2009 Agreement, §2(i)(2); 2010 Agreement, §2.2(b)). I sent M-Den written notice of its default on October 2, 2023 for failing to pay over $3,000,000 due the University for M-Den's sale of licensed products. M-Den failed to pay the amount due within 30 days. Indeed, M-Den currently owes the University in excess of $3.8 million for royalties earned through the contract year ended June 30, 2023, prior to consideration of required interest due on this overdue balance (2010 Agreement, §10.7(d)), and prior to consideration of amounts currently or past due for contract year 2024. As noted above, M-Den's November 30, 2023 balance sheet recognizes an undisputed balance of approximately $6.2 million currently owed by the M-Den to the University of Michigan pursuant to the Agreements. The University may terminate each agreement due to M-Den's longstanding breach.

M-Den also breached its obligation to make financial records available for an audit. (2009 Agreement, §2(h); 2010 Agreement, §10.7). The University acknowledges that you have provided certain financial records, but M-Den has impeded the University's effort to determine the accuracy of M-Den's reports or ascertain the full extent of M-Den's financial position by failing to produce many of the basic records the University requested. As a result, M-Den has breached its obligations under each agreement. (2009 Agreement, §2(i)(2); 2010 Agreement, §2.2(d)).

M-Den has also breached the Agreements by failing to pay certain licensees promptly, thereby causing licensees to refuse to ship licensed products or refuse to ship products without at least 50% cash on delivery. That type of gross mismanagement has a material adverse effect on the University's image and goodwill. The University, therefore, may terminate M-Den for failing to pay licensees promptly. (2009 Agreement, §2(i)(3); 2010 Agreement, §2.2(c)).

The partial list of transgressions outlined above represents three or more examples of M-Den's uncured breaches. As a result, the University may terminate the agreements immediately and M-Den has no right to cure. (2009 Agreement, §2(i)(4); 2010 Agreement, §2.2(f)).

Your correspondence with Ms. Krievs and others states an interest in preserving your relationship with the University of Michigan, but M-Den's conduct proves otherwise. By example, even though licensees refuse to ship product at all or without at least partial payment on delivery, and M-Den has longstanding, uncured breaches and open receivables with the University, M-Den's financial records confirm that the M-Den made cash distributions to its owners of over $1.0 million in 2022 and $790,600 year to date through November 2023. Despite M-Den's assurances, its conduct suggests that M-Den is wasting assets, bleeding cash out of the business rather than paying its vendors or paying down its obligation with the University.

Effective March 11, 2024, the University terminates the Agreements. Starting March 11, 2024, M-Den must not operate under the name M-Den, the Victors Collection, any variations thereof or other d/b/a name(s) likely to cause confusion with those impermissible business names, and M-Den must immediately take down its website and stop representing itself as an authorized or official merchandise retailer for the University of Michigan. Failure to do so will result in the University of Michigan seeking a preliminary and permanent injunction against M-Den, in addition to recovering its damages and securing other relief.

**Warde Manuel**
*Donald R. Shepherd Director of Athletics*

Stephen M. Ross Athletic Campus | 1000 South State Street | Ann Arbor, Michigan 48109-2201 | 734.764.4158 | F 734.763.2569 | wmanuel@umich.edu

24-47922-qt Doc 81 Filed 09/03/24 Entered 09/03/24 16:58:36 Page 84 of 90



You responded to my prior correspondence by suggesting disbelief and questioning why the University would not informally cooperate with you on these issues. Although all informal and formal efforts to work with M-Den have failed, understand that we are open to an in-person meeting with all principals of M-Den to review or discuss each of the items listed below within the next two weeks.

1. Why don't the sales in the royalty calculations submitted to the University tie into the tax returns and compiled financial statements?

2. If there are adjustments to sales from the compiled financials to the royalty reports submitted to the University, why have the reconciliations not been provided? What is the source record for sales reported on the royalty calculations?

3. How can M-Den pay the University the over $6.1 million that it undisputedly owes per its own balance sheet as of November 30, 2023 (unadjusted before any royalty audit adjustments)? What is the plan to pay? Are there cash flow projections to support this plan? How does M-Den also intend to pay past-due creditors or vendors?

4. Why did M-Den distribute cash to its owners in 2022 and 2023 in preference to paying the royalty amounts owed to the University?

5. Evidence (cancelled check, wire advances or other remittance) that the following alleged royalty payments were disbursed from the M-Den bank account: $125,250 in October 2019, $500,000 in April 2023, $285,065 in July 2023, and $123,000 in August 2023.

6. What is the relationship between SSJ Holdings and M-Den as the bank statements show multiple payments each month being paid to SSJ Holdings?

7. Does M-Den conduct a physical inventory at year-end or any other time throughout the year? When was the most recent physical inventory? Explain inventory balances and increases relative to sales and typical working capital cycles.

8. Why have the general ledgers not been provided to date?

9. Explain the changes, variances, and new account captions contained in the November 2023 balance sheet versus the balance sheets provided in prior months and the new balance sheet submitted to Ms. Krievs on January 18, 2024?

10. What are the nature and terms of the merchant financing arrangements recorded in the November 2023 balance sheet?

**Warde Manuel**
*Donald R. Shepherd Director of Athletics*

Stephen M. Ross Athletic Campus 1000 South State Street Ann Arbor, Michigan 48109-2201 Office (734) 764-4455 Fax (734) 763-2560 bigma.net@umich.edu

24-47922-jtj   Doc 81   Filed 09/03/24   Entered 09/03/24 16:58:36   Page 85 of 90



Scott, the University will consider rescinding termination based on M-Den's response to the items above and immediate payment with a bank check of the over $6.4 million due the University, including $3.8 million past due through contract year end 2023 and $2.6 million past due on the current contract year 2024 according to your own calculations, plus applicable interest, but we cannot overstate the importance of your immediate attention to this matter.

Sincerely,

Warde Manuel
Donald R. Shepherd, Director of Athletics
University of Michigan

c. Julie Corrin (via email)
Steve Horning (via email)
Michael R. Turco, Esq. (via email)

Warde Manuel
Donald R. Shepherd Director of Athletics
Stephen M. Ross Athletic Campus | 1000 South State Street | Ann Arbor, Michigan 48109-2201 | Office (734) 761-0445 | Fax (734) 363-2560 | wmanuel@umich.edu

24-47922-jjt    Doc 81    Filed 09/03/24    Entered 09/03/24 16:58:36    Page 86 of 90

# Exhibit 5



Brooks Wilkins Sharkey & Turco PLLC

Michael R. Turco
248.971.1713
turco@bwst-law.com

LITIGATION &
SUPPLY-CHAIN
SPECIALISTS

August 15, 2024

**Via Email**
Marjorie M. Dixon
W. Daniel Troyka
Albert Balewski
Conlin, McKenney & Philbrick, P.C.
350 S. Main Street, Suite 400
Ann Arbor, MI 48104-2131

RE: Heritage Collegiate Apparel, Inc.'s Unauthorized Use of
University of Michigan Intellectual Property

Dear Marjorie, Daniel, and Albert:

Given the negative attention Heritage Collegiate Apparel, Inc. (f/k/a M-Den, Inc.) has received in the local press, and risk of ensuing damage to the University of Michigan brand and goodwill, the University must take immediate action to enforce its rights and protect its intellectual property.

There is no dispute and the parties agree that the 2009 Agreement, as amended ("2009 Agreement"), the 2010 Agreement, as amended (the "2010 Agreement"), and Heritage's rights under the Forbearance Agreement dated May 13, 2024 ("Forbearance Agreement") have been terminated. As a result, Heritage has no rights to use any University of Michigan intellectual property, use any University "Marks" (as defined in the agreements), or exercise any other rights under the agreements. By example, Heritage has consistently admitted that it has no right to ownership or use of the M-Den name or Mden.com URL, and Heritage agreed to cooperate with the University to protect the University's rights in these assets.

Accordingly, to protect against misappropriation or unauthorized use of the University's intellectual property rights, including its Marks, and to avoid further consumer confusion, we insist that Heritage and its owners immediately:

---

1. Cease and desist using, displaying, or conducting business under the M-Den name or any variation thereof;

2. Cover the M-Den signage at Heritage's facilities and leave the signs covered under further instructions for the University;

3. Cease and desist hosting, registering, controlling, or operating the Mden.com URL; complete control of that University property must be immediately transferred to the University of Michigan or third party of the University's designation;

4. Cease and desist using and displaying the Marks, including any variations of the Marks, standing alone or together with other words, including as may be displayed on your products, in your advertising, on your website and social media pages, in social media account and domain names, in keyword advertising, meta-tags, including any of the "Approved Uses of the Marks" as set forth in Appendix B to the 2010 Agreement, and in any other manner likely to cause confusion;

5. Immediately stop selling all University of Michigan-branded gift cards;

6. File documents to terminate Heritage's registration and use of the assumed name "M-Den" or any variation thereof; and

7. Refrain from taking any other action that is likely to suggest a sponsorship, endorsement, or affiliation of Heritage or Heritage's products with the University of Michigan.

Please immediately confirm in writing that Heritage will comply with each of these requests by no later than 3:00 P.M. Friday, August 16. If we do not receive your written confirmation then the University of Michigan will take action to enjoin Heritage from continuing to violate the University's intellectual property rights and to hold Heritage accountable for the University's damages and legal fees.

This letter is without prejudice to any action or demand which may be made on behalf of the University of Michigan; all such rights and claims reserved.

Thank you for your prompt attention to this matter.

Very truly yours,

Michael R. Turco

c.   The University of Michigan