## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                   Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a   In Proceedings Under

M-Den, Inc., d/b/a The M Den              Chapter 11

                                         Hon.  Thomas J. Tucker

                Debtor.

_____/

## DEBTOR'S MOTION TO REJECT LEASE OF
## NONRESIDENTIAL REAL PROPERTY
## WITH GLOBAL RESOURCE CENTER, LLC

Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den ("Debtor"), through its counsel, Schafer and Weiner, PLLC, for its *Motion to Reject Lease of Nonresidential Real Property with Global Resource Center, LLC* (the "Motion"), states:

### JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are 11 U.S.C. § 365 and Federal Rule of Bankruptcy Procedure 6006.

## BACKGROUND

5.      On August 16, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Court").

6.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is operating its business and managing its property as debtor-in-possession. No trustees or examiners have been appointed in this case.

7.      On September 3, 2024, the Office of the United States Trustee formed an official committee of creditors holding unsecured claims under § 1102 (the "Committee").

8.      The *Declaration of Scott Hirth in Support of Debtor's Chapter 11 Petition and First Day Pleadings*, [DN 33] ("Hirth Declaration") describes Debtor's background and the circumstances leading to its bankruptcy filing.

9.      Prior to the Petition Date, the Debtor operated a retail store at 44 W. Columbia, Detroit, Michigan 48201 pursuant to a Lease dated March 29, 2018 (the "Lease") between Debtor and Global Resource Center, LLC ("Landlord"). *See* Lease attached as Exhibit B.

10.     On August 19, 2024 the Debtor stopped operating out of this location and has removed its personal property.

11.     The Debtor does not intend to operate from this location, and none of the parties who have submitted qualified bids to bid at the auction sale of Debtor's assets currently scheduled for September 18, 2024, have expressed an interest in purchasing the Debtor's rights under the Lease.

12.     As a result, the Lease is burdensome and does not provide a benefit to the Debtor or its estate.  The Lease may therefore be rejected under 11 U.S.C. § 365.

13.     The Debtor requests entry of an order pursuant to 11 U.S.C. § 365 and Federal Rule of Bankruptcy Procedure 6006 rejecting the Lease effective on or before September 30, 2024, and permitting the Landlord to assert a claim for rejection damages, if any, until 30 days after the date an order granting the relief requested by this Motion is entered by this Court.

14.     The Court should authorize a rejection of an executory contract or lease if such rejection is an exercise of a debtor's business judgment.  Generally, a chapter 11 debtor has great latitude in assuming or rejecting a contract or lease in its sound business judgment.  In re Monarch Tool & Mfg., Co., 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990); see also In the Matter of McLouth Steel Corp., 20 B.R. 688 (Bankr. E.D. Mich. 1982).

15.     A debtor has the ability to "abandon contracts that impose burdensome liabilities upon the bankruptcy estate" or "retain favorable contracts that benefit the estate."  In the Matter of Midway Airlines, Inc., 6 F.3d 492, 494

(7th Cir. 1993) *citing* Benjamin Weintraub and Alan N. Resnick, *Bankruptcy Law Manual*, P 7.10 (3d. 1992).  *See also* <u>Leasing Service Corp. v. First Tennessee Bank Nat'l Assoc</u>., 826 F.2d 434, 436 (6th Cir. 1987) ("The statutory purposes of section 365 of the Bankruptcy Code is to enable the trustee to assume executory obligations which are beneficial to the estate while rejecting those which are burdensome to perform.").

16.    In fact, a debtor may reject an unfavorable contract or lease on no other grounds other than the rejection would be a reasonable exercise of its business judgment.  <u>In the Matter of Hanes,</u> 19 B.R. 849, 852 (Bankr. E.D. Mich. 1982); <u>In re Matter of McLouth Steel Corp.,</u> 20 B.R. at 692 ("In determining whether a certain contract should be assumed or rejected, the decision should rest on the business judgment of the debtor.").

17.    The Debtor exercised its sound business judgment and determined that a continuation of the Lease does not provide a benefit to the estate or its creditors.  For this reason, the Debtor seeks Court authority to reject the Lease under 11 U.S.C. § 365.

<u>**NOTICE**</u>

18.    Notice of this Motion has been given to (i) the Landlord, (ii) the Office of the United States Trustee, (iii) the Committee, and (iv) all other parties requesting notice through the Court's electronic filing system.  In light of the nature of the relief requested, the Debtor submits that no further notice is required.

{01075555.1}

## NO PRIOR REQUEST

19.    No prior motion for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, rejecting the Lease effective on September 30, 2024, and granting such other further relief as is just and proper.

Respectfully submitted,

SCHAFER AND WEINER, PLLC

/s/ Kim K. Hillary
KIM K. HILLARY (P67534)
HOWARD BORIN (P51959)
Attorneys for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
dweiner@schaferandweiner.com
khillary@schaferandweiner.com

Dated:  September 17, 2024

# Exhibit

# A

**Exhibit A**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                                Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a              In Proceedings Under

M-Den, Inc., d/b/a The M Den                         Chapter 11

                                                     Hon.  Thomas J. Tucker

                          Debtor.

_____/

## ORDER GRANTING DEBTOR'S MOTION TO REJECT LEASE OF
## NONRESIDENTIAL REAL PROPERTY
## WITH GLOBAL RESOURCE CENTER, LLC

This matter having come before the Court on the above-captioned debtor's

(the "Debtor") *Motion to Reject Lease of Nonresidential Real Property With*

*Global Resource Center, LLC* (the "Motion");[1] the relief requested is in the best

interest of the Debtor's estate, its creditors and other parties-in-interest; the Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334;  this

proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2);  venue of this

proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408

and 1409; notice of this Motion and the opportunity for a hearing on this Motion

was appropriate under the particular circumstances and that no other or further

notice need by given; and after due deliberation and sufficient cause appearing

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings
set forth in the Motion.

{01075567.1}

1

therefore;

**IT IS HEREBY ORDERED** that:

    1.      The Motion is granted.

    2.      The Lease is rejected effective as of September 30, 2024.

    3.      On or before 30 days after the date of this Order, Landlord shall assert a claim, if any, or amend any existing claim to assert any rejection damages arising from the rejection of the Laboratory Lease.

    4.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this order.

# Exhibit

# B

# LEASE

THIS LEASE (this "Lease"), made this 29 day of March, 2018, by and between Global Resource Center, LLC, a Michigan limited liability company ("Landlord") and M-Den, Inc., d/b/a The M Den and Victors Collection By The M Den, a Michigan corporation ("Tenant").

## ARTICLE 1
## TERMS, CONDITIONS AND DEFINITIONS

**1.1** **Premises**: Landlord leases to Tenant and Tenant leases from Landlord, for the Term (as defined) and upon the terms and conditions set forth in this Lease, the "Premises" shown as Lease Space B on **Exhibit A**, which for the purposes of this Lease shall be deemed to contain Four Thousand Two Hundred Forty-One (4,241) square feet of gross leasable area, which is a portion of the land and building(s) shown on the site plan attached as **Exhibit A** (collectively, the "Project"). The Project is located within a mixed use office/residential/retail/entertainment development to be known as The District Detroit (the "Development"). Tenant acknowledges that the Project and the Development are in the planning process, and that in the course of planning, constructing, developing, redeveloping and leasing the Project and the Development, the Project and/or the Development may be changed and altered in whole or in part. As a consequence, the Project and the Development may be subject to such changes as Landlord shall determine in its sole and absolute discretion. Prior to the Rent Commencement Date, the Premises shall be subject to such changes as Landlord or Landlord's architect or engineer may determine, so long as no such change substantially alters the general appearance or relative location of the Premises in the Project and the amount of floor space in the Premises does not vary by more than five percent (5%) from that set forth above.

**1.2** **Term**: The Term of this Lease shall be for ten (10) Lease Years commencing on the Rent Commencement Date (as defined), unless sooner terminated pursuant to the provisions of this Lease. The last day of the Term may be extended by an Extended Term(s) in accordance with Section 5.2 of this Lease.

**1.3** **Permitted Use**: Tenant shall use the Premises for the operation of a first class University of Michigan retail and apparel venue, in accordance with the majority of other M-Den stores in Michigan, subject to **Exhibit F**, and for no other purpose.

**1.4** **Minimum Rent**: The Minimum Rent during the initial Term shall be as follows:

| Lease Year | Annual Minimum Rent | Minimum Rent per Square Foot | Monthly Installment of Minimum Rent |
|---|---|---|---|
| Lease Year 0-1 | $161,158.00 | $38.00 | $13,429.83 |
| Lease Year 2-10 | Increasing by the greater of 3.0% or the increase in the Consumer Price Index, cumulatively, each Lease Year thereafter | | Per Noted Increase |

**1.5** **Percentage Rent:** A sum equal to six percent (6%) of Gross Sales (as defined herein) for each Lease Year in excess of $3,000,000 (the "Breakpoint").

**1.6** **Intentionally Deleted**

**1.7** **Intentionally Deleted**

**1.8** **Intentionally Deleted**

**1.9** **Intentionally Deleted**

**1.10** **Intentionally Deleted**

**1.11** **Intentionally Deleted**

1

**1.12    Estimated Delivery Date**: May 3, 2018 (See Section 3.3.).

**1.13    Fixturing Period:** One hundred twenty (120) calendar days after Notice of Possession (as defined in 2.16) (See Section 2.7).  Notwithstanding anything in this Agreement to the contrary, the running of the Fixturing Period shall be stayed during the period from September 1 through December 31.

**1.14    Landlord's Agent**: Landlord will provide Tenant with the name and address in the Notice of Possession.

**1.15    Tenant's Trade Name:**  "The M Den" and "The Victors Collection by The M Den"

**1.16    Tenant's Agent For Service of Process:** Scott Hirth whose address is 5000 Carpenter Rd., Ypsilanti, MI 48197.

**1.17    Minimum Store Hours:**

Sunday – Thursday: 10:00 a.m. to 9:00 p.m.
Friday – Saturday: 10:00 a.m. to 10:00 p.m.

**1.18    Landlord's Address:**

2211 Woodward Avenue
Detroit, Michigan 48201

**1.19    Tenant's Address:**

The M-Den, Inc.
Scott Hirth
5000 Carpenter Rd.
Ypsilanti, MI 48197

**1.20    Intentionally Deleted**

**1.21    Intentionally Deleted**

**1.22    Certificate of Occupancy**:  Within ten (10) days after the date that Tenant opens for business in the Premises, Tenant shall provide Landlord with a copy of a Certificate of Occupancy and/or such other document as may be required by the applicable governmental agency in order for Tenant to operate in the Premises.

<u>**EXHIBITS**</u>

The following exhibits are attached to this Lease and made a part hereof:

| **EXHIBIT A**: | Site Plan and Premises |
|---|---|
| **EXHIBIT B**: | Agreement Specifying Term of Lease |
| **EXHIBIT C**: | Landlord's Work and Tenant's Work |
| **EXHIBIT D**: | Intentionally Deleted |
| **EXHIBIT E**: | Sign Criteria |
| **EXHIBIT F**: | Prohibited Uses |
| **EXHIBIT G**: | Rules and Regulations |
| **EXHIBIT H**: | Intentionally Deleted |
| **EXHIBIT I**: | Exclusive Area |

<u>**ARTICLE 2**</u>
<u>**IMPORTANT DATES AND ADDITIONAL DEFINITIONS**</u>

**2.1    Additional Rent.**  All payments of money from Tenant to Landlord and required to be paid under this Lease other than Minimum Rent and Percentage Rent.  Unless otherwise provided for in this Lease, any Additional Rent shall be due with the next installment of Minimum Rent due.

2

2.2 **Common Areas.** Means those areas, improvements and facilities within the Project which may from time to time be furnished, operated, or managed by Landlord, or by any designee of Landlord, for the nonexclusive general common use of Tenant and other occupants of the Project, their officers, agents, employees and customers. Certain areas within the Common Areas may be designated by the Landlord as solely for the use of Landlord (such as utility closets) or may be restricted in use by Landlord. Landlord may temporarily close portions of the Common Areas and may erect and operate stages and other facilities for special events and charge patrons for access to such events. Tenant hereby consents to such restrictions, temporary closings and related activities.

2.3 **Consumer Price Index.** The Consumer Price Index, which is presently announced monthly (or, if not announced monthly, as last announced or published) by the Bureau of Labor Statistics, U.S. Department of Labor, and which index is computed on a base period index of Nov. 1996 = 100. This index is the overall summary Consumer Price Index for all Urban Consumers (CPI-U) for the Detroit, Michigan area (or closest area thereto which defines a CPI-U). In the event that the Bureau of Labor Statistics changes the base period index for its summary Consumer Price Index (now Nov. 1996 = 100), the parties agree to continue to use the Nov. 1996 = 100 base period index if the Bureau of Labor Statistics continues to announce a consumer price index based on the present base period index as well as a later base period index. In any event, the base used by any new index, or as revised on the existing index, shall be reconciled to the Nov. 1996 base period index. If the Bureau of Labor Statistics shall no longer publish the Consumer Price Index, Landlord shall then substitute another index generally recognized as authoritative. If and to the extent this Lease expressly provides that Rent, or any item constituting part of Rent, is to be adjusted for changes in the Consumer Price Index (any item subject to such adjustment being herein referred to as an "Adjustment Item") such adjustment shall be made as follows. The amount of the Adjustment Item shall be adjusted, as of the beginning of each year for which the adjustment is to be made ("Adjustment Year"), to equal the amount which is the greater of (a) the amount of such Adjustment Item for the year immediately preceding the Adjustment Year, or (b) the product obtained by multiplying (i) the amount of such Adjustment Item for the year immediately preceding the Adjustment Year by (ii) a fraction, the numerator of which is the Current Consumer Price Index and the denominator of which is the Prior Year Consumer Price Index. As used herein, (A) the term "Current Consumer Price Index" means the Consumer Price Index published for the calendar month immediately preceding the calendar month in which the subject Adjustment Year commences, and (B) the term "Prior Year Consumer Price Index" means the Consumer Price Index published for the calendar month immediately preceding the calendar month in which the year immediately preceding the subject Adjustment Year commenced. In each case, if the Consumer Price Index is not published for any calendar month referred to above, then the Consumer Price Index published for the calendar month closest thereto shall apply.

2.4 **Date of Lease.** The date first set forth above. On such date, all rights and obligations of the parties under this Lease shall commence.

2.5 **Day or day.** A calendar day, unless otherwise expressly set forth to the contrary in a particular provision of this Lease.

2.6 **Expiration Date.** The last day of the Term.

2.7 **Fixturing Period.** The number of days specified in Section 1.13 above, commencing with Notice of Possession, within which Tenant is obligated to build, fixture and equip the Premises in accordance with Tenant's Plans (See Section 13.1) as approved in advance by Landlord.

2.8 **Intentionally Deleted.**

2.9 **Landlord Parties.** Landlord Parties mean Landlord, its agents, contractors and employees.

2.10 **Laws.** All present and future federal, state and local common law, statutes, rules, codes, ordinances and regulations, and all directions, requirements, rulings and orders of all federal, state and local courts and other governmental (and quasi-governmental) agencies and authorities including, without limitation, those of any health officer, fire marshal, building inspector or other officials, of the governmental agencies having jurisdiction.

2.11 **Lease Interest Rate.** An annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the State of Michigan or (ii) ten percent (10%). Interest shall be calculated on the basis of a 365-day year, actual days elapsed, from the date any cost or expense is incurred until the amount owing (including all interest owing thereon) is fully paid.

2.12 **Lease Year.** The first Lease Year shall begin on the Rent Commencement Date and shall end twelve (12) full calendar months thereafter. Thereafter, each Lease Year shall commence on the day following the expiration of the

3

preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter or, if earlier, the Expiration Date.

**2.13    Intentionally Deleted**

**2.14    Mortgage.**  Any mortgage, deed of trust, security interest or title retention interest affecting the Project or any portion thereof.

**2.15    Mortgagee.**  The holder of any note or obligation secured by a Mortgage, including, without limitation, lessors under ground leases, sale-leaseback arrangements and lease-leaseback arrangements.

**2.16    Notice of Possession.**  The earlier of the date (a) of Landlord's notice to Tenant that Landlord has substantially completed the work expressly listed on **Exhibit C** as being performed by Landlord (the "Landlord's Work"), or (b) on which Landlord would have tendered possession of the Premises to Tenant with Landlord's Work substantially completed but for delays caused by Tenant, as such date is set forth in a notice from Landlord to Tenant, or (c) the date Tenant begins work in the Premises.  On such date, the utilities shall become Tenant's sole responsibility as described in Section 6.13, Tenant shall maintain the insurance described in Section 8.2.1 and Section 8.3, and the Fixturing Period (as defined in Section 1.13) begins.

**2.17    Operating Year.** Each twelve (12) consecutive month period or portion thereof occurring during the Term, from time to time designated by Landlord with respect to which Landlord estimates bills to tenants and determines annual Common Area Maintenance Costs.

**2.18    Person.**  An individual, firm, partnership, limited partnership, association, corporation, limited liability company or any other entity.

**2.19    Pro Rata Share**. Tenant's Pro Rata Share shall be a fraction, the numerator of which shall be the gross leasable area of the Premises as set forth in Section 1.1 and the denominator of which shall be the gross leasable area of the building at the property located at 2125 Woodward Avenue, Detroit, Michigan and commonly known as The Little Caesars Global Resource Center (the "Property").

**2.20    Rent:**  All amounts that Tenant is obligated to pay under this Lease, including, without limitation, Minimum Rent, Percentage Rent, Additional Rent, Monthly Tax Charges, Monthly Common Area Maintenance Charges.

**2.21    Rent Commencement Date**. The next calendar day after the last day of the Fixturing Period or the date Tenant opens for business, whichever is earlier, shall be the commencement date of Tenant's obligations to pay Rent and submit statements of Gross Sales pursuant to Article 6 below. Notwithstanding any provision to the contrary contained in this Lease, Tenant agrees if requested by Landlord to delay the opening of the Premises for business in order to coincide with the Grand Opening Date ("Grand Opening").  In that event, the Term shall begin and the Rent Commencement Date shall occur on the Grand Opening Date.

**2.22    Tax Year.**  A twelve (12) month period established by Landlord as the year for purposes of computing Tenant's Pro Rata Share of Taxes.  The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Property.

**2.23    Tenant Parties**. Tenant Parties mean Tenant, its agents, contractors and employees.

**2.24    Grand Opening Date.** The date and time designated from time to time by Landlord for the initial opening of business for the Columbia Street project in Detroit between Woodward Avenue and Park Avenue.  Landlord shall endeavor to provide Tenant one hundred twenty (120) days advance written notice prior to the Grand Opening Date.

**ARTICLE 3**
**POSSESSION**

**3.1**    Subject to Landlord obtaining all building and other permits required under all Laws to perform Landlord's Work, Landlord shall complete Landlord's Work in a first class manner as set forth in **Exhibit C**. Tenant expressly acknowledges that Landlord makes no representations or warranties regarding the foot traffic of the Development or the likelihood of success of retail sales from the Premises for the Permitted Use.

4

Within ten (10) days after Tenant's receipt of the Notice of Possession, Landlord and Tenant shall jointly prepare and agree upon a punch list (the "Punch List") of incomplete elements of Landlord's Work, if any, and Landlord shall cause the incomplete work set forth on said Punch List to be performed with due diligence. Any dispute as to whether an element of Landlord's Work is incomplete shall be resolved by Landlord's architect in its reasonable discretion.

3.2     Upon the date of Notice of Possession from Landlord, Tenant shall, with due diligence, proceed to install such fixtures and equipment and to perform all other work as shall be required pursuant to Tenant's Plans (as defined in Section 13.1 hereof) or otherwise necessary or appropriate in order to prepare and complete the Premises for the opening and continued operation of Tenant's business, and in each as approved in writing by Landlord ("Tenant's Work").

3.3     If Tenant is unable to obtain possession of the Premises on or before the Estimated Delivery Date, Landlord shall not be liable for any loss, damage or cost resulting therefrom, and this Lease shall not be affected thereby in any way; provided, however, that if the Premises are not available for Tenant's possession by one year after the Estimated Delivery Date, Landlord may terminate this Lease by giving Tenant written notice thereof at any time thereafter.

3.4     Landlord covenants and agrees that so long as Tenant is in compliance with its obligations under this Lease, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject, however, to the terms of this Lease.

3.5     During the month of September 2018, Columbia Street in Detroit between Woodward Avenue and Park Avenue is projected to be opened to pedestrian and vehicular traffic. Tenant acknowledges that such portion of Columbia Street between Woodward Avenue and Park Avenue has been vacated and that Landlord may close such portion of Columbia Street to vehicular or pedestrian traffic or both and restrict the use thereof from time to time. Tenant hereby consents to such restrictions and closings and any related activities.

**ARTICLE 4**
**USE**

4.1     Tenant shall continually use and occupy the entire Premises at all times during the Term solely for the Permitted Use, only under the Tenant's Trade Name and only in accordance with the uses permitted under applicable zoning and other applicable governmental regulations and requirements and for no other purpose or under any other name, unless otherwise approved in advance in writing by Landlord, which consent may be withheld in Landlord's sole and absolute discretion. It is agreed that the Permitted Use specified in Section 1.3 has been, and is, a material inducement to Landlord in entering into this Lease with Tenant, and that Landlord would not enter into this Lease without this inducement. Furthermore, and without limiting the generality of the preceding sentence, Tenant shall not use the Premises for any of the purposes prohibited in **Exhibit F**.

4.2     As of the ninetieth (90th) day following the Rent Commencement Date or, if earlier, the Grand Opening Date, and at all times thereafter during the Term, Tenant shall continuously and uninterruptedly operate its business from the entire Premises for the Permitted Use, in good faith, fully staffed and merchandised so as to maximize its sales volume during all hours of operation, as may be set from time to time by Landlord, and shall remain open for business at least during the Minimum Store Hours set forth in Section 1.17 except Tenant may be closed for Christmas, Thanksgiving, and Easter. Tenant shall conduct no distress sales, such as "going-out-of-business", "lost-our-lease", fire or bankruptcy sales on the Premises or elsewhere in the Project. Tenant expressly acknowledges that the failure of Tenant to operate the Premises in accordance with this Section 4.2 shall constitute an Event of Default under this Lease giving rise to all remedies provided in this Lease and/or available at law or in equity to Landlord, and Landlord shall be entitled, among its other remedies, to enjoin the removal from, or discontinuance of Tenant's business at the Premises by seeking injunctive relief or other appropriate remedy.

4.3     Without in any way limiting the foregoing, Tenant agrees to operate the Premises in a manner consistent with a first -class urban retail/entertainment project, and to obtain all applicable licenses and permits for the operation of its business. Tenant covenants and agrees that it will: (a) not place or maintain any merchandise, hostess or maitre'de stands in any vestibule or entry of the Premises or outside the Premises; (b) replace promptly any cracked or broken glass with glass of like kind and quality; (c) not permit any sound or sound system audible, or objectionable advertising medium visible, outside the Premises and, without limiting the generality of the foregoing, not permit any loudspeakers, phonographs, public address systems, sound amplifiers, radio or broadcast to operate in a manner that any sounds reproduced, transmitted, or produced shall be directed beyond the Premises in a manner that may disturb others as determined by Landlord in its sole discretion nor permit vibration and/or noise from mechanical apparatus to be transmitted beyond the interior of the Premises in a manner that may disturb others as determined by Landlord in its sole discretion; (d) keep all hoods and equipment in good working order and condition; (e) not commit or permit waste or a nuisance upon the Premises; (f) not permit or cause objectionable odors to emanate or be dispelled from the Premises; (g) not solicit business in the Common Areas nor distribute advertising matter to,

5

in or upon any Common Area; (h) cause its vendors and suppliers making deliveries to the Premises not to load or unload or park delivery vehicles making deliveries to Tenant outside any area designated by Landlord therefor; (i) not permit any use of vehicles which will interfere with the use of any Common Area; (j) comply with all Laws, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, the Master Deed of the Condominium Project (if any) and any rules and regulations promulgated by the condominium association, all as they may be hereafter implemented or revised, as well as comply, at Tenant's expense, with the reasonable recommendations of Landlord's insurance company and insurance agent regarding the Premises; (k) light the show windows of the Premises each day from dusk to dawn; (l) have the storefront sign remain lit from dusk to dawn every day; (m) not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; (n) not place a load on any floor in the Project which exceeds the floor load per square foot which such floor was designed to carry; (o) receive all deliveries only through entrances designated by Landlord therefor; (p) not permit undue accumulations of garbage, trash, rubbish, or any other refuse, fail to remove the same at regular intervals, fail to keep such refuse in proper containers as designated by Landlord, (q) keep the Premises free of rodents, roaches, or other pests; (r) not use or permit any use to be made of the Premises that constitutes a nuisance; (s) not commit waste, or knowingly permit any party to commit waste, upon the Premises; (t) not cover the windows of the Premises with any window coverings or any other materials, and shall keep all windows on the Premises uncovered at all times; (u) not paint or decorate any part of the exterior of the Premises, or any part of the interior of the Premises visible from the exterior thereof, without first obtaining Landlord's written approval; and (v) do or permit any on the Premises act tending to increase the cost of Landlord's insurance or that results in a substantial increase in taxes for the portion (or the entire) of the Project of which the Premises are a part.  Tenant shall not use, suffer or permit the Premises or any part thereof or any portion of the property of which the Premises are a part to be used in violation of any Laws, ordinance or regulation of any governmental authority or in any manner that will constitute a nuisance or an unreasonable annoyance to the Project, any other tenant, or to any of the Project's customers, guests and other users, or to any adjoining property owners. Tenant shall immediately cease or cause to be ceased any behavior causing any of the foregoing upon written notice from the Landlord.

4.4     Tenant shall not play or present any music within the Premises that is likely to have a detrimental effect on the Project, that is likely to create a perception that the Project is not safe for families and the general public, or that it is likely to attract organized "gangs", as determined by Landlord in its sole discretion.  Tenant shall not play or present any music within the Premises that can be heard outside the Premises.  Tenant shall immediately comply with Landlord's written directions concerning any music presented within the Premises.  Thus if Landlord instructs Tenant to reduce the volume of the music played or presented within the Premises or cease playing or presenting a particular type of music within the Premises, Tenant shall immediately comply with such instructions.

4.5     Intentionally Deleted

4.6     Intentionally Deleted

4.7     Intentionally deleted.

4.8     Tenant agrees that it shall conduct its sales and services within the Premises solely under the name as set forth in the definition of Tenant.  Tenant acknowledges Landlord's exclusive right, title, and interest in and to all trademarks, trade names, service marks, logos, program and event names, identifications and other proprietary rights and privileges including the marks, "The District", "District Detroit," "Little Caesars Arena," and "Fox Theatre" (the "Landlord Marks").  This Lease is not a license or assignment of any right, title or interest in the Landlord Marks by Landlord to Tenant.  Tenant shall not in any manner represent that it has any ownership in the Landlord Marks and shall not do or cause to be done anything impairing Landlord's exclusive right, title, and interest in the Landlord Marks.  Tenant shall not use, print or duplicate the Landlord Marks without the prior written approval of Landlord, which approval may be withheld for any reason, and upon termination hereof, Tenant shall immediately cease all previously permitted use of the Landlord Marks, if any.  Tenant shall not assign or attempt to assign any rights with regard to the Landlord Marks which may arise hereunder; any such attempted assignment shall be void.  In no event shall Tenant have authority to act or contract on behalf of Landlord.

4.9     Competing Business.  (1) Non-competition.  The term "Exclusive Use" shall mean a business that devotes more than 20% of its floor space to the sale of licensed University of Michigan retail and apparel.  During the Term of this Agreement, Landlord shall not execute any lease in the area outlined on Exhibit I ("Exclusive Area") which expressly grants the occupant thereunder the right to operate its premises in the Exclusive Area as a Competing Business.

(2) Competing Business Defined. "Competing Business shall mean a business which uses its premises in the Exclusive Area for the Exclusive Use, excluding:

(i)     any department store or junior department store;
(ii)    any variety store;

6

<ol type="i" start="3">
<li>any supermarket;</li>
<li>any convenience store;</li>
<li>any store containing a floor area in excess of 10,000 square feet; and</li>
<li>any store containing a floor area, for operation of the Exclusive Use, of less than 500 square feet.</li>
</ol>

(3)  Incidental Uses of Other Tenants.  A business (other than the business conducted at the Premises) shall be deemed not to use its premises in the Exclusive Area for the Exclusive Use if on an annual basis, less than 20% of the gross sales from such premises are generated by the Exclusive Use.

(4)  Exclusive Becomes Null and Void.  This Section 4.9 shall automatically become null and void if:

<ol type="i">
<li>there exists an Event of Default which has not been cured within any applicable cure period;</li>
<li>Tenant assigns its rights under this Lease (or ownership interests in Tenant) in whole or in part or sublets all or any portion of the Premises and such assignment is not expressly permitted hereunder;</li>
<li>the Premises cease to be used primarily for the Exclusive Use; or</li>
<li>Tenant, or any person or entity affiliated with or controlled by Tenant, conducts business for the Exclusive Use at any location within fifteen (15) miles of the Project.</li>
</ol>

(5)  Enforcement.  Upon request and at Tenant's expense (which expenses of Landlord Tenant shall pay Landlord as Additional Rent within 10 days of billing), Landlord shall use its reasonable efforts to enforce this against any tenant operating a Competing Business; provided, however, that Landlord may, but shall not be obligated to file suit to enforce Tenant's rights hereunder; and provided further, however, that at the request of Tenant, and at the sole cost and expense of Tenant, Landlord shall seek the imposition of a court ordered injunction against any tenant of the Exclusive Area operating a Competing Business.  Notwithstanding anything to the contrary, Landlord is not required to appeal any decision of any court.  Landlord shall have the right to terminate such legal action or lawsuit if its costs are not paid promptly by Tenant.  Tenant shall also have the right, at its sole cost and expense, to seek the imposition of such a court ordered injunction.  Notwithstanding anything herein to the contrary, in the event of a breach of this Section 4.9 by Landlord, Tenant shall be entitled to injunctive relief as Tenant's sole and exclusive remedy against Landlord, but may pursue at law or in equity any action available against any party operating a Competing Business. Tenant shall defend, indemnify and hold harmless Landlord against and from, any and all liability, claim of liability or expense arising out of or related to this Section 4.9. Provided the Exclusive Use has not become null and void in accordance with the terms of this Lease, then in the case of (a) an intentional breach of this provision by Landlord; and (b) as a result of the operation of the Competing Business, Tenant's Gross Sales for the period of the existence of the Competing Business decrease by ten percent (10%) or more from the prior comparable period, the Tenant shall have the right to pay, in lieu of Minimum and Percentage Rent, the lower of such rent or eight percent (8%) of Tenant's monthly Gross Sales until the earlier of the cessation of the Competing Business; a court or administrative determination that such cessation cannot be ordered; or Tenant's Gross Sales no longer are in such decline.

(6)  Tenant acknowledges that, except as otherwise herein specifically provided, it does not have any exclusive rights in the Exclusive Area with respect to the sale of its products or the provisions of its services or otherwise.  Tenant's exclusive use as expressly provided in this Lease is to be strictly construed, and no exclusive uses whatsoever are to be implied beyond the express exclusive(s) provided in this Lease.

**ARTICLE 5**
**TERM**

**5.1**  The Term of this Lease shall commence on the Rent Commencement Date and shall end at midnight on the Expiration Date without the necessity of any notice from either party to the other to terminate the same.  Tenant hereby waives notice to vacate the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting summary recovery of possession from a tenant holding over to the same extent as if any statutory notice had been given. Tenant's obligations with respect to the payment of Rent and all other obligations of Tenant hereunder shall survive the expiration or earlier termination of this Lease.  If requested by Landlord, Tenant shall execute, within thirty (30) days after the Rent Commencement Date, an agreement, substantially in the form attached hereto as **Exhibit B** (the "Agreement Specifying Term of Lease"), confirming the Rent Commencement Date and stating, among other things, that this Lease is in full force and effect.  If Tenant shall fail to execute the Agreement Specifying Term of Lease within ten (10) days after receipt of such agreement from Landlord, the Rent Commencement Date and Expiration Date shall be conclusively deemed to be those dates as set forth by Landlord in such agreement.

**5.2**  Provided (1) Tenant is not then in default beyond any and all applicable cure periods, of any term or provision of this Lease; (2) this Lease is in full force and effect, and (3) Tenant is not subject to any insolvency or bankruptcy proceedings, then Tenant shall have the option to extend the term of this Lease for one (1) additional period of five (5) Lease Years, commencing on the first day following the last day of the initial Term of this Lease, on the same terms and conditions

7

as contained in this Lease. Tenant's option to extend the Term of this Lease, as above provided, shall be subject to the conditions precedent that (i) Tenant shall give Landlord written notice of Tenant's exercise of the above options to extend no earlier than fifteen (15) months prior to the end of the original Term, and no later than three hundred sixty five (365) days prior to the expiration of the original Term, and (ii) all charges, including Minimum Rent, which shall continue to escalate pursuant to the provisions of Section 1.4, shall continue to be paid as if such extension period(s) were a part of the original Term of this Lease.

**ARTICLE 6**
**RENT**

  **6.1**  Tenant shall pay to Landlord the Minimum Rent in the sums set forth in Section 1.4 above and the Monthly Tax Charge, Monthly Common Area Maintenance Charge, and any other monthly charges under this Lease in advance on the first (1st) day of each calendar month during the Term, without offset, notice, deduction, recoupment, setoff or demand therefor. Rent shall commence to accrue on the Rent Commencement Date. The first payment of Rent shall be due on the Rent Commencement Date. For the full calendar year, Lease Year or Tax Year, in which this Lease commences and terminates, Tenant's liability for Taxes, Insurance, Common Area Maintenance Charges, and any other charges shall be subject to a pro rata adjustment based on the number of days of said calendar year, Lease Year or Tax Year, as applicable, during which the Term of this Lease is in effect.

  **6.2**  For each Lease Year or portion thereof during the Term, Tenant shall pay Percentage Rent in the amount calculated in accordance with Section 1.5 above, which shall be in addition to Minimum Rent and Additional Rent. There shall be no abatement, apportionment or suspension of the Percentage Rent payable hereunder except as provided for herein. Commencing with the first (1st) Lease Year of the Term, and continuing throughout the remainder of the Term, the amount of Percentage Rent due under this Lease shall be calculated and shall be payable on or before the thirtieth (30th) day after the end of each Lease Year or portion thereof. The first (1st) payment of Percentage Rent due hereunder shall include all Gross Sales (as defined below) from the Rent Commencement Date to the close of the first Lease Year following the Rent Commencement Date. Notwithstanding anything herein contained to the contrary, payment of Percentage Rent shall be made by Tenant to Landlord on a monthly basis in each Lease Year as soon as Tenant's Gross Sales for said Lease Year (computed from the beginning thereof) have reached the volume of Gross Sales at which Tenant is required to pay Percentage Rent for such Lease Year (the "Breakpoint").

  **6.3**  Percentage Rent shall be determined (as provided in 1.5 above) based on "Gross Sales" which, shall be construed to include the entire amount of the actual receipts, whether for cash or otherwise, of all sales of merchandise, food, drink, admission charges, other charges, service or any other receipt whatsoever of all business conducted at, in, from, about, or upon the Premises, including, but not limited to, catering orders, mail orders, telephone orders, internet orders and/or other orders in whatever manner received, placed or filled, whether in whole or in part, at the Premises, and including all deposits not refunded to purchasers, orders taken (although said orders may be filled elsewhere), sales to employees, sales through vending machines or other devices, and sales by any subtenant, concessionaire or licensee or otherwise at, in, from, about, or upon the Premises, provided that nothing herein shall (a) prevent Landlord from requiring an additional or different Percentage Rent as a condition to approval of any subtenant, concessionaire or licensee hereunder, (b) permit Tenant to sublet the Premises or grant any license or concession except as expressly permitted pursuant to the terms of Section 22 hereof, or (c) permit Tenant to operate any use other than expressly set forth in Section 1.3. No deduction from Gross Sales shall be allowed for (i) uncollected or uncollectible accounts, (ii) any income or similar tax based on income, (iii) any gross receipts tax, or (iv) any cash or credit refund given for any sale made via the internet and not originating with an internet order placed in the Premises. Each sale upon installments or credit shall be treated as a sale for the full price in the month during which such sale is made, irrespective of the time when Tenant shall receive payment therefor. Gross Sales shall not include any (i) sales tax, use tax, or any other tax separately collected by Tenant and paid to any duly constituted governmental authority, (ii) the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which had theretofore been made at, in, from, about or upon the Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from, about or upon the Premises, (iii) the amount of returns to shippers or manufacturers, (iv) the actual net amount of refunds, credits or allowances made or allowed by Tenant in accordance with reasonable business practices upon transactions included within Gross Sales (not exceeding in amount the selling price of the item in question) where the item is returned by the purchaser to and accepted by Tenant (provided that anything given in exchange for returned items and any such credits to customers shall be included in Gross Sales); and (v) sales of Tenant's store fixtures which are not a part of Tenant's stock in trade and which Tenant has a right to remove from the Premises.

  Tenant's right to exclude the items set forth in subsections (i) through (v) of Section 6.3 in Gross Sales shall be conditional upon Landlord's receipt of Tenant's annual statement of Gross Sales with an itemization by category of the total amount not included within Gross Sales. Tenant shall maintain itemized records in accordance with sound accounting

8

principles in connection with each category as permitted hereunder.

6.4     During the Term, neither Tenant nor Tenant's management, nor any person or entity controlled by Tenant or controlling Tenant, or controlled by the same person or entity or persons or entities who control Tenant, shall own, operate or maintain, or have any significant affiliation, investment or interest, directly or indirectly, through or with any other person, partnership, corporation, other entity, agent or employee in any similar or competing business as that being operated at the Premises (this includes both M-Den and Victors Collection concepts), within a radius of fifteen (15) miles from the outside boundary of the Project (which distance shall be measured in a straight line without reference to road mileage). Tenant acknowledges that Landlord's obtaining a fair and equitable rental for the Premises under this Lease is dependent upon Tenant concentrating its business efforts within the geographical area in which the Project is located so as to maximize Gross Sales.

6.5     Within ten (10) days after the end of each calendar month during the Term, Tenant shall submit to Landlord a complete written statement showing the amount of Gross Sales from the Premises (and from such other business as may be required pursuant to Section 6.4 above) during said calendar month.  If Tenant fails to timely deliver the statements required by this Section 6.5, Tenant shall pay to Landlord a late charge in accordance with Section 25.10 below.

6.6     Within forty-five (45) days after the expiration of each Lease Year, Tenant shall deliver to Landlord a written statement certified without material qualification by Tenant or principal officer of Tenant, setting forth the amount of Tenant's Gross Sales for such Lease Year. All such statements of Gross Sales shall list as separate amounts (a) Gross Sales upon which Percentage Rent shall be computed and (b) other categories of receipts not subject to Percentage Rent.  If Tenant has previously paid any Percentage Rent and the statement submitted pursuant to this Section 6.6 indicates total Gross Sales for the Lease Year differing from the amounts reported on the monthly statements submitted for such Lease Year, the amount of Percentage Rent shall be adjusted, and if (a) the Percentage Rent paid is less than what is owed, than the difference, shall be paid by Tenant to Landlord within fifteen (15) days after delivery of such statement by Tenant to Landlord, or (b) the Percentage Rent paid is greater than what is owed to Landlord, then Landlord shall  credit such overpayment against the next amounts of Percentage Rent due under this Lease or if at the end of the Term, shall be paid by Landlord to Tenant within fifteen (15) days after delivery of such statement by Tenant to Landlord.  Tenant shall require its subtenants, if any, to furnish similar monthly and annual statements to Tenant within the same periods specified in Sections 6.5 and 6.6.  For the last Lease Year of the Term, the statements of Gross Sales shall end with the expiration or termination of this Lease.  If Tenant fails to timely deliver the reports required by this Section 6.6, in addition to any other remedies available to Landlord, Tenant shall pay Landlord a late charge in accordance with Section 25.10 below.

6.7     Tenant shall record at the time of each sale or other transaction, in the presence of the customer, all receipts from all Gross Sales or other transactions whether for cash, debit or credit in a cash register or in cash registers sealed in a manner approved by Landlord and having such other features as shall be reasonably approved in advance in writing by Landlord.  Tenant shall keep at its corporate headquarters for three (3) years following the end of each Lease Year adequate records evidencing inventories and receipts of merchandise at the Premises, the gross income, sales and tax returns with respect to such Lease Years at or from the Premises and all pertinent original sales records, which shall include:  (a) cash register tapes, including tapes from temporary registers; (b) serially numbered sales slips; (c) the originals of all mail orders at and to the Premises; (d) the original records of all telephone orders at and to the Premises; (e) settlement report sheets of transactions with subtenants, concessionaires and licensees; (f) the original records showing that merchandise returned by customers was purchased at the Premises by such customers; (g) memorandum receipts or other records of merchandise taken out on approval; (h) such other sales records, if any, which would normally be examined by an independent accountant performing an audit of Tenant's sales and (i) the records specified in (a) through (h) above of any other persons conducting business upon or from the Premises, including without limitation, subtenants, assignees, concessionaires, or licensees.  Landlord and Landlord's authorized representatives shall have the right to examine the foregoing records at Tenant's corporate headquarters during reasonable business hours upon reasonable notice.

Landlord hereby approves of the system currently used in Tenant's other M-Den locations.  Landlord shall give its approval with respect to "other features" so long as such other features are used in a majority of Tenant's other locations.

6.8     Landlord shall have the right to have an audit made of Tenant's books and records pertaining to all Gross Sales. Landlord shall not have the right to audit Tenant's books and records with respect to a particular calendar year or Lease Year more than one time (however, this does not restrict the length of time allowed for the audit and if the audit should take more than 1 day, it does not need to occur on consecutive days.)  Tenant shall promptly pay Landlord any deficiency found in Tenant's payment of Percentage Rent by such audit. If any statement required by Section 6.4, 6.5, 6.6 or 6.7 above is found to differ from the audited amount by more than three percent (3%), Tenant shall also pay for any and all costs and fees of such audit as Additional Rent within fifteen (15) days after notice from Landlord.

9

**6.9**     Intentionally Deleted

**6.10**     Any payments of Rent or other charges by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a payment for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such payment, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such payment without prejudice to any rights or remedies which Landlord may have under this Lease, at law or in equity.

**6.11**     If Landlord does not receive any payment of Rent due under this Lease within five (5) days after the payment is due, then Tenant shall pay to Landlord, upon demand, a late charge in accordance with Section 25.5 below. The provisions of this Section 6 are cumulative and shall in no way restrict the other remedies available to Landlord in the event of Tenant's default under this Lease.

**6.12**     Intentionally Deleted

**6.13**     Intentionally Deleted

**6.14**     If required by applicable laws, Tenant shall obtain a separate Michigan Tax Identification Number for the Premises to enable Tenant to separately report sales at the Premises to the State of Michigan and/or City of Detroit and shall provide such number to Landlord. Tenant acknowledges that Landlord may be entitled to collect sales tax rebates/credits, which rebates/credits are based on the sales tax paid by Tenant to the State of Michigan and/or City of Detroit, for sales generated from the Premises. All such sales taxes shall be reported and timely paid by Tenant to the relevant governmental authorities. Tenant hereby waives any rights to such sales tax rebates/credits, and if requested by Landlord, Tenant agrees to sign a waiver of any rights it may have to same. Within fifteen (15) days of Landlord's request, Tenant shall: (i) execute and deliver to Landlord an assignment agreement, in a form acceptable to the State of Michigan and/or City of Detroit, between Tenant and Landlord which allows Landlord to receive the sales tax rebate; (ii) a statement as to the dates in the prior fiscal year when Tenant occupied the Premises; and (iii) a waiver which allows Landlord to review the sales tax records at the State of Michigan and/or City of Detroit. Additionally, Tenant, at no cost to Tenant, shall provide any additional information as may be requested by the State of Michigan and/or City of Detroit with respect to sales made at the Premises. Tenant shall cooperate with Landlord as to any other arrangements Landlord makes with government agencies.

Tenant further agrees that Landlord may and is entitled to collect any and all other tax rebates/credits of every kind and nature. Tenant hereby waives any and all rights to collect tax rebates/credits that Landlord is entitled to, and if requested by Landlord, Tenant agrees to sign a waiver of any rights it may have to same. Tenant shall cooperate with Landlord as to any arrangements Landlord makes with governmental entities or agencies and Tenant shall provide any information as may be requested by the State of Michigan and/or City of Detroit and/or applicable agency as is reasonably required.

**ARTICLE 7**
**TAXES**

**7.1**     Tenant shall pay to Landlord, as Additional Rent, Tenant's Pro Rata Share of all impositions of every kind and nature imposed by any federal, state, regional, municipal, local or other governmental authority or agency in connection with the ownership, operation or use of all or any portion of the Property (all of the foregoing collectively referred to herein as "Taxes"). Taxes shall include, but not be limited to, ad valorem taxes, sewer taxes, front-foot benefit charges (public or private), school taxes, special assessments, occupancy taxes, gross receipt taxes, other taxes levied directly upon the Property and/or any land associated with the Property (including any tax or surcharge of any kind or nature levied upon, against or with respect to the parking areas or the number of parking spaces for the Property) and any other taxes, assessments or charges in the manner of taxes, or contained on any tax bill, which Landlord shall be obligated to pay arising out of the use, occupancy, ownership, leasing, management, repair or replacement of the Property, any appurtenances thereto or any property, fixtures or equipment thereon, and shall also include the cost to review, initiate and/or prosecute the appeal or contest of any such Taxes. Taxes shall not include any taxes assessed against any leasehold interest or personal property of any kind owned or placed in, upon or about the Premises by Tenant (which taxes Tenant shall pay as and when the same become due) nor net income taxes assessed against Landlord. Notwithstanding anything to the contrary, Tenant shall not be charged for property tax increases resulting from a transfer of ownership.

**7.2**     Tenant shall pay Tenant's Pro Rata Share of Taxes to Landlord in the form of a Monthly Tax Charge, at the same time as Minimum Rent is payable hereunder. The Monthly Tax Charge shall be the initial charge payable by Tenant for Taxes, and Landlord shall advise Tenant of the amount of the Monthly Tax Charge prior to the Rent Commencement Date,

provided, however, the failure of Landlord to advise Tenant of the amount of the Monthly Tax Charge prior to the Rent Commencement Date shall not relieve Tenant of its obligations hereunder.  Following receipt of all tax bills and assessment bills attributable to any calendar or fiscal year during the Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Pro Rata Share of Taxes for such year.  If the total amount paid by Tenant is different than the actual amount owed, there shall be an appropriate adjustment, with payment being made by the applicable party to the other within fifteen (15) days after the rendering of the statement. Landlord may provide any refund in the form of a credit against the next installment or installments of Rent due from Tenant to Landlord hereunder. If at any time the Taxes increase, Landlord may increase the Monthly Tax Charge accordingly to reflect Tenant's Pro Rata Share of such increase.  Landlord's agreement to provide a statement as provided for in this Section is not a condition to the Tenant's obligation to make payment of the Tenant's Pro Rata Share of Taxes.

**7.3**

(a)        Upon the establishment of tax increment (or similar) financing or other agreements relating to real property taxes by  a constituent governmental agency, this Lease is or shall be subject in all respects to any tax increment financing contract relating to the Property and the Premises.

(b)        Intentionally deleted.

(c)        Tenant acknowledges that the Property and the Premises are or may be subject to assessment for annual PILOTS, economic activity taxes, and other obligations, covenants, conditions, restrictions and approval rights as are or will be more fully set forth in the documents, agreements, or laws relating to the Property.  Tenant hereby agrees to furnish to any applicable agency such documentation as is reasonably required.  Tenant shall also provide all information as may be requested by the agency made in connection with the development of the Premises.

**7.4**        Notwithstanding anything in this Lease to the contrary, in the event that Taxes are not assessed on the property on which the Premises is located, Tenant shall pay to Landlord a fixed fee of five dollars ($5.00) per square foot of gross leasable area of the Premises annually, increasing by three percent (3%) over the rate then in effect at the beginning of each Lease Year.

**ARTICLE 8**
**INSURANCE**

**8.1**        Landlord shall provide fire, casualty, liability, umbrella and/or such other insurance coverages ("Insurance") as Landlord, in its sole discretion, deems appropriate for the Project.  Landlord's cost for such insurance, and any deductible incurred by Landlord, shall be included as part of the Project's Common Area Maintenance Costs for which Tenant is obligated to pay its share or other amounts pursuant to Section 9.

**8.2**        Tenant Insurance Requirements.

**8.2.1**        During the period commencing on Notice of Possession and ending on the Rent Commencement Date, Tenant shall, at its sole cost and expense, maintain commercial property insurance (Builders' Risk coverage) and plate glass insurance for the full replacement cost of repairing and/or restoring all of the plate glass in or at the Premises.

**8.2.2**        Tenant shall be responsible for maintaining during the Term causes of loss-special form property insurance, or substitute policy providing equivalent coverage, insuring Tenant's inventory, furniture, fixtures, equipment, leasehold improvements and all other contents in the Premises in an amount not less than the full replacement cost thereof. Such property insurance shall also include builders' risk coverage during the course of any construction in or affecting the Premises.  Tenant shall maintain liquor liability insurance in amounts required by Landlord if Tenant sells alcoholic beverages.

**8.2.3**        Tenant shall maintain any workers' compensation insurance required by law.

**8.2.4**        Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord: (i) commercial general liability insurance, including contractors liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, providing protection with limits for each occurrence of not less than Two Million Dollars ($2,000,000); and (ii) workers' compensation or similar insurance in form and amounts required by any Laws.

**8.3**        From and after Notice of Possession through the Expiration Date, Tenant shall, at its sole cost and expense keep in full force and effect a policy of commercial general liability (at least as broad as ISO form CG 00 01 07 98 or

11

equivalent) with respect to the Premises, the areas adjacent to the Premises (including, but not limited to, the sidewalk and loading dock) and the business operated by Tenant with a combined single limit for bodily injury, including death, to any person or persons, and for property damage, of not less than Two Million Dollars ($2,000,000.00).

**8.4**     Tenant shall, at its sole cost and expense, keep in full force and effect during the Term business interruption insurance in an amount equal to the annual Rent for a twelve (12) month period plus the Percentage Rent calculated based on Gross Sales of the preceding Lease Year.

**8.5**     Tenant shall, at its sole cost and expense, keep in full force and effect during the Term such other insurance coverages against other insurable hazards may be reasonably requested by Landlord, and the minimum limits of coverage as set forth in this Section 8 may from time to time, at Landlord's option, be increased in a manner consistent with industry standards.

**8.6**     Tenant shall furnish Landlord with certificates of insurance at all times from and after Notice of Possession through and including the Expiration Date.  All certificates of insurance shall evidence that Tenant's insurance policies required pursuant to the provisions of this Lease (i) name Landlord, Landlord's Agent,  Landlord's Mortgagee(s), ground lessor(s) and any other parties designated by Landlord as additional insureds and that an endorsement be attached providing for this coverage, (ii) contain a standard mortgagee endorsement satisfactory to Landlord and Landlord's Mortgagee(s) (iii) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord or any other party is excess and is non-contributing with the subject insurance coverage; (iv) contain a cross-liability endorsement or severability of interest clause in a commercially reasonable form; (v) provide that an act or omission of one of the insureds or additional insureds thereunder which would void or otherwise reduce coverage, shall not void or reduce coverage as to the other insureds or additional insureds; (vi) provide that the insurer thereunder waives any right of recovery by way of subrogation against Landlord and the Landlord Indemnitees (as defined in Section 8.7) in connection with any loss or damage covered by such insurance policy; (vii) not contain any deductible provision in excess of Twenty-Five Thousand Dollars ($25,000); (viii) initially be for a term of one (1) year and shall contain an endorsement prohibiting cancellation, modification or reduction of coverage without first giving the additional insureds at least thirty (30) days prior notice of such proposed action; and (ix) be in commercially reasonable form.  All insurance carriers providing insurance required by this Section 8 must be of recognized financial standing, duly licensed to do business in the State of Michigan and have no less than an A.M. Best's A-/X rating and amounts of such insurance must be approved by Landlord.  If such certificates of insurance are not received by Landlord within five (5) days after Notice of Possession and at least fifteen (15) days prior to the expiration of any insurance policy, Tenant shall pay to Landlord, upon demand and in addition to any other rights and remedies of Landlord hereunder, a late charge pursuant to Section 25.10 below, and Landlord shall have the right, (but not the obligation) without notice to Tenant and at any time and from time to time, to acquire such insurance, and Tenant shall be obligated to pay Landlord, as Additional Rent, the amount of the premium and all sums incurred by Landlord applicable thereto within five (5) days following notice from Landlord.

**8.7**     Except where the claim is caused by Landlord's breach of this Lease, negligence or willful misconduct of Landlord or any Landlord Indemnitees, Tenant shall indemnify, defend and hold Landlord and Landlord's lessors, its partners, officers, shareholders, members, managers, owners, trustees, principals, agents, property managers, employees and any Mortgagee(s) (collectively, the "Landlord Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Landlord Indemnitees  and arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the acts or negligence of the Tenant Parties, (iii) any loading platform area permitted to be used by Tenant, and/or (iv) the use or occupancy of the Premises, the Project or the Development by Tenant's invitees and by the Tenant Parties.  If any action or proceeding is brought against any of the Landlord Indemnitees by reason of any of the foregoing, Tenant shall reimburse the Landlord Indemnitees the cost of defending such action or proceeding or, upon Landlord Indemnitees' written request and at Tenant's sole cost and expense, resist and defend such action and proceeding by counsel approved by the Landlord Indemnitees.   Any such cost, damage, claim, liability or expense incurred by the Landlord Indemnitees for which Tenant is obligated to reimburse Landlord Indemnitees hereunder or under this Lease shall be deemed Additional Rent due and payable within five (5) days after notice to Tenant that payment is due.  This Section 8.7 shall survive the expiration or earlier termination of this Lease.

Except where the claim is caused by Tenant's breach of this Agreement, negligence or willful misconduct of Tenant or any Tenant Indemnitees, Landlord shall indemnify, defend and hold Tenant and Tenant's lessors, its partners, officers, shareholders, members, managers, owners, trustees, principals, agents, property managers, employees and any Mortgagee(s) (collectively, the "Tenant Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Tenant Indemnitees to the extent arising out of the acts or negligence, willful misconduct or gross negligence of Landlord in the operation of the Common Areas. If any action

12

or proceeding is brought against any of the Tenant Indemnitees by reason of any of the foregoing, Landlord shall defend the Tenant Indemnitees at Landlord's sole cost and expense. This Section 8.7 shall survive the expiration or earlier termination of this Lease.

8.8    It is understood and agreed that all property kept, stored or maintained in the Premises shall be so kept, stored or maintained at the sole risk of Tenant. Landlord shall not be liable to Tenant for any loss of business or other consequential loss or damage from any cause whatsoever.

8.9    Each party releases and waives on behalf of itself and on behalf of the insurers of such party's property, any and all claims and any rights of subrogation of any such insurer against the other party, its employees and agents for loss (other than loss or damage resulting from the willful, wrongful act of such other party, its employees and agents but including loss or damage resulting from the negligent acts of such other party, its employees and agents) sustained from any peril to property that is covered under a standard all-risk or Special Form - Causes of Loss policy, or any peril that is required to be insured against herein, whether or not such insurance is actually in force, or from any peril to property actually insured against, though not required to be under this Lease. All insurance policies of Landlord and Tenant required by this Lease shall contain a clause or endorsement pursuant to which the insurance companies waive subrogation and consent to a waiver of right of recovery. Tenant shall provide Landlord with a copy of the endorsement providing for the aforesaid release and waiver of subrogation together with the certificates of insurance required by Section 8.6.

8.10    Tenant shall comply with all requirements and recommendations of Landlord's Insurance carriers. In case of breach of this covenant, in addition to all other remedies of Landlord hereunder, Tenant shall pay to Landlord, as Additional Rent, any and all increases in premiums for Insurance carried by Landlord where such increases were caused in any way by the occupancy or use of Tenant or the condition of the Premises.

**ARTICLE 9**
**COMMON AREA MAINTENANCE**

9.1    Landlord grants to Tenant, in common with Landlord and others, the non-exclusive right to use the Common Areas to the extent provided by Landlord. Tenant agrees that (i) the Project is under the complete control of Landlord and (ii) that any delivery area may be designated by Landlord in its sole and absolute discretion. Landlord will have the right (a) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the Common Areas; (b) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary for repairs or alterations or to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; and (c) to do and perform such other acts in and to said areas and improvements as Landlord shall determine to be advisable. Landlord shall have the right, from time to time, in connection with special events produced, sponsored, presented or authorized by Landlord, to limit access to all or part of the Common Areas, the Project or the Development to persons that have paid an admission charge for access to such areas and or are otherwise authorized by Landlord to enter such areas. Tenant acknowledges that Landlord has the right, in its sole and absolute discretion to erect buildings or other structures and to make any changes and improvements in the Project or the Development, including, without limitation, expanding and/or subdividing the Project or the Development, granting licenses and easements to others, and remodeling or changing the interior and/or other exterior surfaces of the Project. Tenant acknowledges that the Common Areas of the Project do not include parking areas, and that any parking areas in, about or around the Project are provided by third parties and are not the responsibility of Landlord. Landlord and Tenant acknowledge that Landlord shall not be obligated to provide any area for the parking of automobiles for the customers, employees, and invitees of Tenant or for other tenants of the Project.

9.2    Tenant shall pay Landlord, as Additional Rent, as Tenant's share of the cost of operating, maintaining, managing, or repairing the Project (the "Common Area Maintenance Costs"), Twenty-Two Dollars and Fifty Cents ($22.50) per square foot of gross leasable area of the Premises for the first Operating Year, in equal monthly installments, without offset, notice, deduction, recoupment, setoff or demand. Such annual sum shall increase at the beginning of the second and each subsequent Operating Year by four percent (4%). As Tenant's annual payment of Common Area Maintenance Costs is predetermined and not subject to adjustment except as provided herein, Tenant shall have no express or implied right to examine, inspect or audit Landlord's books and records related to such costs.

**ARTICLE 10**

**INTENTIONALLY DELETED**

13

## ARTICLE 11

## INTENTIONALLY DELETED

## ARTICLE 12
## COVENANTS OF TENANT

**12.1**    The Tenant Parties shall at all times abide by and observe the rules and regulations set forth in **Exhibit G**, as the same may be reasonably modified by Landlord from time to time, and such other rules and regulations as may be promulgated by Landlord from time to time (the "Rules and Regulations").  Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, contractors, invitees, licensees, customers, clients, family members or guests. The failure of Landlord to enforce any of the Rules and Regulations against Tenant and/or any other tenant in the Project shall not be deemed a waiver of any such Rules and Regulations.  Landlord's enforcement of the Rules and Regulations shall not be discriminatory against Tenant versus other tenants (except that some rules may apply to some occupants and not others). If there is any inconsistency between this Lease and any current or future Rules and Regulations, this Lease shall govern.

## ARTICLE 13
## TENANT WORK

**13.1**    Tenant shall, at its sole cost and expense, provide Landlord, for Landlord's approval, in its sole and absolute discretion, four (4) copies of plans and specifications showing in reasonable detail any and all interior and/or exterior alterations or improvements to complete the Premises in a first-class manner for the Permitted Use and that Tenant proposes to make to the Premises (collectively, the "Tenant's Plans"), within fourteen (14) calendar days after notice from Landlord to Tenant requesting that Tenant begin plans (the "Tenant Plans Due Date").  Any revisions to Tenant's Plans requested by Landlord shall be completed and delivered to Landlord within five (5) calendar days after Landlord's request. Tenant's Plans shall be prepared such that Tenant's Work (as shown in Tenant's Plans), if completed in accordance with Tenant's Plans, shall be in accordance with all Laws, and shall be all work necessary to result in a space fully-completed and outfitted in a first-class manner for the operation of Tenant's business in accordance with the Permitted Use. Tenant's Plans shall also be in accordance with all requirements of all applicable governmental authorities and Laws for submissions to obtain a building permit. Tenant shall not commence any work in the Premises prior to obtaining Landlord's written approval of Tenant's Plans. There shall be no changes to Tenant's Plans once Landlord approves the same, unless Landlord approves the changes in writing.  If Tenant shall fail to deliver Tenant's Plans to Landlord on or before the Tenant Plans Due Date, or fails to respond to Landlord's comments as set forth above, or fails to respond to a submission of any plans by Landlord within one (1) week after Landlord delivers same, such failure shall constitute an Event of Default under this Lease and, in addition to any remedies available at law or in equity or under this Lease, Tenant shall be obligated to pay a late charge pursuant to Section 25.10 below.

**13.2**    Tenant shall not alter the exterior of the Premises and shall not make any structural or non-structural alterations to the interior of the Premises without first obtaining Landlord's written approval of such alterations, which approval may be withheld in Landlord's sole and absolute discretion.  Tenant agrees that all improvements and fixtures, other than trade fixtures made or installed by it, shall immediately become the property of Landlord and shall remain upon the Premises, unless Landlord requires that Tenant, at its sole cost and expense, remove such alterations or improvements prior to the Expiration Date.  Tenant shall, at its sole expense, promptly repair all damage caused by removal of any alteration, improvement, fixture or trade fixture.  Tenant shall not be compensated for any alteration or improvements left in the Premises at the end of the Term.  Except for installation of fixtures and other work to be performed by it in strict accordance with Tenant's Plans as approved by Landlord, Tenant shall not cut or drill into the Premises or secure any fixture, apparatus or equipment of any kind to any part of the Premises without first obtaining Landlord's written consent, which may be withheld in its sole discretion.

**13.3**    Tenant shall not suffer, permit or give cause for the filing of a lien against the Premises or the Project.  If any mechanic's or materialman's lien or notice of lien shall at any time be threatened or filed against the Premises or Project by reason of work, labor, services or materials performed or furnished to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall immediately cause the same to be bonded or discharged of record.  If Tenant shall fail to cause such lien or notice of lien to be discharged or bonded within five (5) days after the filing thereof, then, in addition to any other rights and remedies available to Landlord at law, in equity or under this Lease, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amounts so paid by

14

Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in paying, bonding off or procuring the discharge of such lien, shall be due and payable by Tenant to Landlord as Additional Rent within five (5) days of Landlord's demand therefor. Tenant shall, upon notice and request in writing by Landlord, defend for Landlord, with counsel acceptable to Landlord at Tenant's sole cost and expense, any action or proceeding which may be brought on or for the enforcement of any such lien or order for payment of money, and will pay any damages and satisfy and discharge any judgment entered in such action or proceeding and save harmless Landlord from any liability, claim or damage resulting therefrom.

13.4    Before the commencement of construction of Tenant's Work, Tenant shall obtain a detailed breakdown, by trade, of the costs incurred or that will be incurred, in connection with the design and construction of Tenant's Work (the "Budget"), and deliver a copy of the Budget to Landlord for Landlord's approval, which shall not be unreasonably withheld or delayed. The Budget shall be based upon the Tenant's Plan approved by Landlord.

13.5    Landlord shall provide to Tenant a tenant improvement allowance ("TI Allowance") of thirty and 00/100 dollars ($30.00) per leasable square foot of the Premises, or One Hundred Twenty-Seven Thousand Two Hundred Thirty and 00/100 dollars ($127,230.00) in the aggregate. The TI Allowance shall be disbursed in accordance with this Lease. Tenant shall have no right to the use or benefit (including any reduction to Minimum Rent) of any portion of the TI Allowance not required for the construction of Tenant's Work described in the Tenant's Plans approved or any changes pursuant to Section 13.1.

Tennant shall have the right to use all or a portion of the TI Allowance to reimburse itself for the costs incurred by Tenant in performing Tenant's Work. The costs shall mean the hard and soft costs incurred by Tenant in installing furniture, fixtures, and equipment in the Premises during the Fixturing Period as well as architectural and data installation costs.

In no event whatsoever shall Landlord have any obligation to pay to Tenant any amount in excess of the TI Allowance for the aggregate cost of the Tenant's Work.

Tenant shall have no right to any portion of the TI Allowance that is not disbursed before the last day of the month that is twelve (12) months after completion of Tenant's Work.

13.5.1    Costs Includable in TI Allowance. The TI Allowance shall be used solely for the payment of design, permits, and construction costs in connection with Tenant's Work, including, without limitation, the cost of electrical power and other utilities used in connection with the construction of Tenant's Work, the cost of preparing the Tenant's Plan, the cost of furniture, all costs set forth in the Budget, and the cost of changes (collectively, "TI Costs"). Notwithstanding anything to the contrary contained herein, the TI Allowance shall not be used to purchase any office furniture, personal property or other non-building system materials or equipment.

13.5.2    Payment for TI Costs. Upon completion of the Tenant's Work, within thirty (30) days after the Rent Commencement Date, Tenant shall deliver to Landlord a written request for TI Costs Payment. The written request shall include: (i) sworn statements setting forth the names of all contractors and first tier subcontractors who did the work and final, unconditional lien waivers from all such contractors and first tier subcontractors; (ii) as-built plans (one copy in print format and two copies in electronic CAD format) for such Tenant's Work; (iii) a certification of completion of Tenant's Work; (iv) a certificate of occupancy for the Premises; (v) a certification of business opening; (vi) a certification of Rent Commencement and (vii) documentation of Rent payment.

13.6    Notwithstanding anything in this Lease to the contrary, Tenant shall not use any contractor without Landlord's prior written consent, which may be withheld in Landlord's reasonable discretion. If Tenant's contractor has not been approved by Landlord prior to signing this Lease, Landlord may require that Tenant use only certain approved contractors located in, or utilizing a workforce comprised primarily of residents of, the City of Detroit.

13.7    Tenant hereby agrees to certify to Landlord the actual costs incurred by Tenant in constructing and improving the Premises, which costs shall include so called soft costs (i.e. architectural fees, design costs, costs incurred in preparation of plans, permitting fees, attorneys' fees, consultants fees. etc.), as well as hard costs for labor, materials, contractor fees, etc. Upon Landlord's request, Tenant shall also provide in sufficient detail documentation necessary to verify and substantiate such costs. Landlord shall keep such information confidential, provided, however, it shall be permitted to provide such information to the State of Michigan, the City of Detroit, and/or any applicable municipal or governmental agencies.

## ARTICLE 14
### MAINTENANCE AND REPAIRS

**14.1**     Tenant, at its sole cost, shall repair promptly at its sole expense any damage to the Premises or any other improvement within the Project or the Development caused by or arising out of the use of the Premises or the Project or the Development by Tenant or its employees, agents, customers, invitees, contractors and assigns, regardless of fault or by whom such damage shall be caused, unless caused solely by the gross negligence or willful misconduct of Landlord. Notwithstanding the foregoing, if insurance proceeds are available for the repair, they shall be used and made available for the repair.

**14.2**     Tenant, at its sole cost, shall be solely responsible for keeping the Premises in first-class appearance and in good condition and repair (including replacements) from the date of the Notice of Possession until the Expiration Date (or such later date as Tenant actually vacates the Premises), including, without limitation, all required and necessary repairs and replacements to the doors, windows, glass, floor, ceiling, mechanical, electrical, plumbing and sewage (facilities and lines within the Premises including free flow to the main sewer line), heating, ventilating and air-conditioning systems, and equipment exclusively serving the Premises (whether or not located in the Premises).  Tenant shall not cause the roof of the Premises to be penetrated without first obtaining Landlord's written consent, which may be withheld in Landlord's sole discretion, and, upon obtaining such consent, Tenant agrees that any such work shall be performed by Landlord's roofing contractor at Tenant's sole expense.  Tenant agrees that Landlord may, perform any and all repairs and replacements to the sprinkler system at the sole cost of Tenant, payable within five (5) days of Landlord's demand therefor.  Tenant shall replace any damaged glass with glass of like kind and quality at Tenant's expense within twenty-four (24) hours after damage occurs from any cause whatsoever.

**14.3**     Tenant, at Tenant's sole expense, shall initiate and carry out a program of regular maintenance and repair of the Premises and shall keep and maintain the Premises in a clean, safe, and sanitary condition in accordance with all Laws and of the requirements of any insurance underwriters, inspection bureaus or a similar agency designated by Landlord, including, without limitation, (i) the painting or refinishing of all areas of the interior and maintaining or replacing of all trade fixtures and equipment, ceiling tile, flooring and other items of display used in the conduct of Tenant's business, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive and first-class condition throughout the Term and (ii) obtaining and maintaining, at Tenant's sole cost, service contracts with reputable, licensed mechanical contractors to carry out a program of regular maintenance and repair of the heating, ventilating and air-conditioning systems exclusively serving the Premises, and, if Tenant is required to have a grease trap, the grease trap. From time to time, within five (5) days of Landlord's request, Tenant shall provide copies of such contracts to Landlord.  All Tenant contractors performing alterations or repairs that are required or permitted by this Lease shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld.

**14.4**     If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice thereof by Landlord to Tenant, such failure shall constitute an Event of Default under this Lease, and Landlord may, at its option, make such repairs without prior notice to Tenant or liability to Tenant for any loss or damage which may result to Tenant's business by reason of such repairs (including, without limitation, damage to Tenant's business). Tenant shall pay Landlord, within five (5) days of demand therefor, the cost of such repairs plus an amount equal to twenty percent (20%) of the cost of such repairs as Additional Rent.

**14.5**     Tenant shall provide janitorial service for the Premises at its sole cost and expense.

## ARTICLE 15
### SURRENDER OF PREMISES

**15.1**     Tenant, on the Expiration Date, shall peaceably surrender to Landlord the Premises in broom-clean condition and in good condition and repair, and shall return to Landlord any and all keys (including, without limitation, access cards) furnished to, or otherwise procured by, Tenant relating in any way to the Premises or the Project; provided, however, in no event shall the Premises be deemed surrendered until Tenant has provided Landlord with a certification from a HVAC contractor acceptable to Landlord that the HVAC system is in good repair and condition. Tenant hereby waives any and all notices to vacate. If Tenant fails to remove any of its property at the end of the Term, Landlord shall have the right, at Landlord's election, to deem the same abandoned by Tenant and may dispose of the same at Tenant's expense, payable to Landlord within five (5) days after demand therefor.

**15.2**     All trade fixtures owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removed by Tenant at the expiration of the Term, or any renewal or extension hereof, or other termination thereof, provided Tenant shall not at such time be in default under any covenant, agreement or obligation contained herein; and, if in default, Landlord shall have a lien on such trade fixtures as security against loss or damage resulting from any such default by Tenant, and said fixtures shall not be removed by Tenant until such default is cured or Landlord notifies Tenant to remove such trade fixtures (or any items thereof) from the Premises.  Tenant shall repair all damage resulting from its removal of trade fixtures and restore such areas of the Premises to the condition existing before installation of the trade fixtures.

**15.3**     It shall be an Event of Default under this Lease if Tenant remains in possession of the Premises after the Expiration Date without the written permission of Landlord, and without the execution and delivery of a new lease.  In the event of such default by Tenant, Landlord, at its option, may, in addition to any other remedies available to Landlord at law, in equity or under this Lease, (i) immediately re-enter and take possession of the Premises without process, or by any legal process in force in the jurisdiction in which the Project is located, and hold Tenant liable for any and all damages incurred as a result of such holdover, and for the reasonable value of the use of the Premises which is hereby agreed to be a monthly amount equal to one and one-half (1.5) times the Minimum Rent plus all other Rent required under this Lease at the amounts in effect during the last month of the Term or (ii) treat Tenant as occupying the Premises as a tenant at will, subject to all the conditions, provisions and obligations of this Lease (but without any right of Tenant hereunder to extend the Term) insofar as the same are applicable to an at-will tenancy.  During any such holdover period, monthly Rent shall be one and one-half (1.5) times the Minimum Rent plus all other Rent required under this Lease at the amounts in effect during the last month of the Term.

**15.4**     If Tenant fails to remove all of its trade fixtures and other effects, if any, on the Expiration Date, then Landlord may (a) remove the same in any manner that Landlord shall choose and store such trade fixtures and effects without compensation to Tenant or liability to Tenant for loss thereof or damage thereto, and Tenant agrees to pay Landlord upon demand any and all costs and expenses incident to such removal and storage, or (b) without notice, sell such trade fixtures and other effects at private sale and without legal process, for such price as Landlord may obtain, and apply the proceeds of such sale against any amounts due under this Lease from Tenant to Landlord and against any and all expenses incident to the removal, repair of any damage to the Premises resulting or caused by such removal, storage and sale of such trade fixtures and other effects.

**ARTICLE 16**
**UTILITIES AND TRASH**

**16.1**     Tenant shall, at its sole cost and expense, pay promptly when due all fees, deposits and charges for use of water, gas, electricity, heat, air conditioning, sewer rentals or service charges, including use and/or connection fees, impact fees, tap fees, hook-up fees and/or standby fees and any other utility charges incurred by Tenant in its use and occupancy of the Premises or furnished to the Premises commencing upon Notice of Possession.  If Landlord is required or elects to supply water, gas, electricity, heat, air conditioning, or sewer rentals, or any other utility service for the Project and/or the Premises, then Tenant shall purchase the same from Landlord at the then-prevailing local rates and charges, and to pay promptly the charges therefor when bills are rendered to Tenant. Tenant shall use reasonable diligence in conservation of utilities.  If one or more utilities are provided and are not separately metered to Tenant, Tenant shall pay as Additional Rent at the times determined by Landlord for such utilities an amount determined by Landlord based on allocations by Landlord based on estimated usage or size as determined by Landlord from time to time.  Any utilities paid by Landlord for which Tenant is responsible shall be reimbursed to Landlord within five (5) days after Tenant's receipt of an invoice of such costs. Notwithstanding anything to the contrary, Tenant shall pay no more than $5,000 total for the cost of use and/or connection fees, impact fees, tap fees, hook-up fees and/or standby fees and any additional amount shall be paid by Landlord.

**16.2**     Alternate Service Providers.

**16.2.1**     If permitted by Law, Landlord shall have the right, in its sole discretion, at any time and from time to time during the Term to either contract for service from different utility companies ("Alternate Service Providers") than those providing utility  service on the date hereof ("Utility Service Providers") or continue to contract for service from the Utility Service Providers.

**16.2.2**     Tenant shall cooperate with Landlord, the Utility Service Providers, and any Alternate Service Providers at all times and, as reasonably necessary, shall allow Landlord, Utility Service Providers, and any Alternate Service Providers reasonable access to all utility lines, feeders, risers, wiring, and any other machinery within and/or serving the Premises.

**16.2.3**     Landlord shall in no way be liable or responsible for any loss, damage, or expense that Tenant may sustain or incur by reason of any change, failure, interference, disruption, or defect in the supply or character of the utilities

17

furnished to the Premises, or if the quantity or character of the utility supplied by any Utility Service Providers or any Alternate Service Providers is no longer available or suitable for Tenant's requirements, and no such change, failure, defect, interference, unavailability, or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease.

**16.3** Landlord shall not be liable in damages or otherwise for any utility interruption; provided, however, if the interruption of utilities services is not the sole responsibility of the utility service company or the Tenant, upon request and as Landlord's sole obligation, Landlord, at Tenant's cost and expense, shall use commercially reasonable efforts to assist Tenant in obtaining the restoration of such service.

**16.4** Tenant, at Tenant's own and sole expense, shall arrange for all trash generated at or associated with the Premises to be placed in proper trash receptacle(s). Landlord may elect to provide to Tenant and other tenants of the Project a shared dumpster ("Shared Dumpster"). If a Shared Dumpster is provided, Tenant will bear its proportionate share of the cost to operate the Shared Dumpster (which may be based on any commercially reasonable method(s) selected by Landlord from time to time of calculating proportionate share). Tenant shall pay Tenant's share of the Shared Dumpster trash removal service to the third party provider of such services or to Landlord (at Landlord's discretion, if Landlord pays such third party provider). If Landlord reasonably deems Tenant's generation and/or generation of trash at the Premises to be excessive, Tenant shall also pay Landlord, as Additional Rent, the costs for the same that exceed normal trash generation for a tenant of comparable size as determined by Landlord. In the alternative to Landlord providing receptacle(s) for trash, Landlord shall have the option to require Tenant to obtain and pay for its own receptacle or dumpster (or to share a receptacle or dumpster with one or more other tenants of the Project, sharing such costs on an equitable manner), and in such event, Tenant, shall arrange for regular, prompt and reliable trash removal. In the alternative, Landlord shall have the right to charge as Additional Rent the sum of One Dollar ($1.00) per square foot of the Premises for trash removal, increasing by three percent (3%) over the rate then in effect at the beginning of each Lease Year. Landlord shall have the right from time to time to provide for different methods of trash removal and shall have the right to charge Tenant a reasonable amount for trash removal which Tenant shall pay as Additional Rent.

**16.5** Intentionally deleted.

**16.6** Intentionally deleted.

**ARTICLE 17**
**SIGNS**

**17.1** Tenant shall, at its own expense and by the end of the Fixturing Period, install and at all times thereafter maintain in good condition and repair an exterior sign(s) of such size, color, design, illumination and location, all as designated and approved by Landlord in writing, which approval may be given or withheld in Landlord's sole and absolute discretion. The sign must conform to all governmental requirements and be in compliance with all Laws and Landlord's Sign Criteria as set forth in **Exhibit E** hereto. Landlord, in its sole discretion, may modify the sign criteria from time to time, in which event Tenant shall promptly, at Landlord's expense, bring its sign into conformity with Landlord's new sign criteria. On the Tenant Plans Due Date, Tenant shall submit to Landlord four (4) copies of Tenant's sign plans and specifications, showing in complete detail the proposed construction and installation of Tenant's sign (the "Sign Plans"). If Tenant fails to deliver the Sign Plans to Landlord within the time period set forth above, such failure shall constitute an Event of Default under this Lease and, in addition to any other remedies available to Landlord at law, in equity or under this Lease, a late charge shall be assessed against and paid by Tenant pursuant to Section 25.10 below. Tenant's exterior sign(s) shall be kept illuminated from dusk until dawn every day or at such other times as prescribed by Landlord.

**17.2** Tenant will have exterior signage and storefront designed to promote Tenant's visibility and identity. Landlord shall work cooperatively with Tenant in the design of signage and storefront. All signage and storefront modifications shall be subject to Landlord's approval, which approval may be given or withheld in Landlord's sole and absolute discretion. Except for normal size credit card emblems and store hours, all as approved by Landlord in writing, Tenant shall not attach any sign to the inside of any window of the Premises. Tenant shall at no time utilize any scotch plaid decal strips or flashing or neon signs or lights in the Premises, and the bulbs of all Tenant's permitted signs and lights shall be replaced as soon as they become defective or lose their intensity, as determined by Landlord in its sole discretion. No rights are granted to Tenant to use the outer walls or the roof of the Premises for any purpose. Tenant shall use a sign designer and fabricator designated by Landlord if Landlord so requests, and Tenant shall spend on Signage an amount designated by Landlord. In addition, Tenant shall be responsible, at its sole cost and expense, for the fabrication, installation, maintenance, repair (including replacement) and operation of all its signs. At the expiration or earlier termination of this Lease, Tenant shall pay for the cost of (i) removing all signage, (ii) repairing any damage to the Premises caused by the installation, placement or removal of the signage, and (iii) restoring the affected portion of the Premises to its condition prior to the installation of such signage, normal

wear and tear excepted. Tenant shall acknowledge that these provisions are reasonable and that unique and distinctive signage is an important part of the Development.

**17.3**    If Tenant fails to install an exterior sign as depicted on the Tenant's Sign Plans approved by Landlord within the Fixturing Period, such failure shall constitute an Event of Default under this Lease and, in addition to any other remedies available to Landlord at law, in equity or under this Lease, a late charge shall be assessed against and paid by Tenant pursuant to Section 25.10 below.  In addition, Landlord may, at its option, have a sign installed on behalf of Tenant and Tenant shall pay Landlord, the cost of the sign and installation within fifteen (15) days after Tenant's receipt of an invoice from Landlord.

**17.4**    Prior to the Expiration Date, Tenant shall remove all signs in or on the Premises and shall repair any damage, including the filling of holes caused by the installation or removal of the signs.

**17.5**    If Landlord provides other Tenant identification signs, such as pylon, under canopy or directory signs, Tenant shall pay Landlord, for the cost of such additional signage within fifteen (15) days after Tenant's receipt of an invoice from Landlord.

**ARTICLE 18**
**RIGHTS OF LANDLORD**

**18.1**    Landlord reserves the following rights with respect to the Premises:

**18.1.1**    For Landlord and any Mortgagee, and their representatives, to have free and unrestricted access to, and to enter upon, the Premises at all reasonable hours upon oral notification to Tenant's store manager on duty (or in the event of an emergency at any time)  for the purposes of inspecting the Premises, or of making repairs, replacements or improvements in or to the Premises, the building, equipment, or all or any portion of the Project (including, without limitation, sanitary, electrical, heating, air-conditioning or other systems), or of complying with all Laws, or of exercising any right reserved to Landlord under this Lease (including the right during the progress of any repairs, replacements, improvements or other work permitted or required by this Lease to keep and store within the Premises all necessary materials, tools and equipment);

**18.1.2**    To show, at reasonable times, the Premises during ordinary business hours to any existing or prospective Mortgagee, purchaser, assignee of any loan secured by the Project, or any portion thereof, or assignee of any interest in Landlord, and/or to any person contemplating the leasing of the Premises or any part thereof during the last six (6) months of the Term.  If during the last month of the Term or any renewal or extension thereof, Tenant shall have removed all or substantially all of Tenant's trade fixtures from the Premises, Landlord may immediately enter and alter, renovate, and redecorate the Premises, without elimination or abatement of Rent, and without incurring any liability to Tenant for any compensation or otherwise, and such acts shall have no effect upon this Lease and shall not be deemed to release Tenant from any of Tenant's obligations under this Lease, including the obligations to return certain property, to repair and restore the Premises and to pay the full Rent and other sums due hereunder;

**18.1.3**    To display a "For Sale" sign at any time, and also, after notice from either party of intention to terminate (as permitted pursuant to the provisions of this Lease) this Lease, or at any time within six (6) months prior to the Expiration Date, a "For Rent" sign, or both "For Rent" and "For Sale" signs, and all of said signs shall be placed upon such part of the Premises as Landlord shall require, except on display windows or doors leading into the Premises;

**18.1.4**    To install or place upon, or affix to, the roof and exterior walls of the Premises equipment, signs, displays, antenna, and any other object or structure of any kind;

**18.1.5**    At any time, and from time to time, to make alterations or additions to, and to build additional stories on, the building(s) in which the Premises are contained, and to build in or on the areas adjoining the Premises, including, without limitation, the Common Areas.  Landlord also reserves the right to construct other buildings or improvements or add to existing buildings or facilities in the Project and the Development, to expand and/or subdivide the Project and the Development, and to permit others to do so, from time to time;

**18.1.6**    To discontinue any and all facilities furnished and services rendered by Landlord not expressly covenanted for herein, it being understood that they constitute no part of the consideration for this Lease;

19

18.1.7　At any time, and from time to time, to use all or any part of the roof and exterior walls of the Premises for any purpose; to erect scaffolds, protective barriers and other aids to construction on, around and about the exterior of the Premises, provided that access to the Premises shall not be completely denied or materially restricted; to enter the Premises to shore the foundations and/or walls thereof and/or to install, maintain, use, repair, inspect and replace pipes, ducts, conduits and wires leading through the Premises and serving other parts of the Project and/or the Development. Tenant further agrees that Landlord may make any use it desires of the side or rear walls of the Premises, provided that there shall be no encroachment upon the interior of the Premises;

18.1.8　If an excavation shall be made or authorized to be made upon land adjacent to the Premises, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent;

18.1.9　Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other losses or annoyance arising from the exercise of any or all of the rights of Landlord under this Section 18.1;

18.1.10　It is understood that **Exhibit A** is for informational purposes only and shall not be deemed to be a warranty, representation or agreement of any kind on the part of the Landlord. Store references, if any, are not and shall not be deemed to be representations by Landlord to Tenant. The purpose of the plan annexed hereto as **Exhibit A** is solely to show the approximate location of the Premises. Landlord hereby reserves the right at any time, and from time to time, to make changes or revisions in such plan, including, but not limited to, additions to, subtractions from, and/or relocations or rearrangements of, the buildings, parking areas, and other Common Areas shown on such plan;

18.1.11　Landlord reserves the right at any time, and from time to time, to add to and incorporate additional land into the Project and/or the Development and the right to build additional buildings and Common Areas on such additional land. Landlord reserves the right to sever the ownership of or title to the various sections of the Project and/or the Development and/or to place separate Mortgages on such sections, in which case the right of Tenant and other tenants in the Project will be preserved by a written declaration or agreement, to be executed by Landlord and duly recorded, creating mutual, reciprocal and interdependent rights to use the Common Areas and the utilities and facilities needed for the full use and enjoyment of the Premises by Tenant and other tenants or occupants in the Project without impairing any of the duties and obligations of Landlord to Tenant under this Lease. Tenant shall execute from time to time such instruments reasonably required by Landlord and its Mortgagee(s) to effectuate the provisions of this Section 18.1.11 within ten (10) days; and if Tenant fails to so execute, acknowledge and deliver such instruments within ten (10) days after such request, without being relieved of the duty to so, the party making such request and/or Landlord is hereby empowered to do so in Tenant's name and on Tenant's behalf for which purpose Tenant hereby appoints such party and/or Landlord, as Tenant's agent and attorney-in-fact and Tenant will be bound thereby.

18.1.12　If Tenant shall not be personally present to open and permit an entry into the Premises at any time when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefor, and without any abatement of Rent or in any manner affecting the obligations and covenants of this Lease. Tenant shall not place any additional locks on any doors, change any locks, or place any other device on any entrance that prevents Landlord or any authorized personnel from entering any portion of the Premises. Should the Tenant violate this provision, Tenant agrees to accept full responsibility and bear the full cost and expense for any damage resulting from the forcible entry or for all damage resulting from the inability of Landlord or other authorized persons to gain access to the Premises. Landlord shall exercise its rights of access to the Premises permitted under any of the provisions of this Lease in such manner, to the extent practicable, to not unreasonably interfere with Tenant's use and occupancy of the Premises, provided that Landlord shall incur no additional expense thereby (e.g. overtime pay); and

18.1.13　Landlord has the right, at Landlord's sole and absolute discretion, at any time during the Term, to remodel or change the roof and/or other exterior surfaces of the Project. Tenant understands that, during such remodeling, it might be necessary to remove Tenant's existing sign(s) and that such sign(s) may not be suitable for reinstallation after the remodeling is completed. Such sign(s), or part thereof, which Tenant has installed, shall remain the property of Tenant, but Landlord is released from any and all liability for damages to such sign(s) during its removal, provided said removal was conducted with reasonable care. During any such remodeling, Tenant shall cooperate with Landlord and execute any documentation required or desirable to facilitate the remodeling process. Tenant understands that it may be necessary to erect scaffolds or other construction equipment during the remodeling, but access to the Premises shall not be denied and Landlord shall use reasonable efforts to minimize the impact to the Premises and Tenant's business. Temporary signage

approved by Landlord in its reasonable discretion shall be permitted while existing signage is down pursuant to this Section and until replaced, and the commercially reasonable cost of such signage shall be at Landlord's expense.

## ARTICLE 19
## DAMAGE TO PREMISES

**19.1** If the Premises shall be damaged by fire or other cause, this Lease shall not be terminated and Landlord shall proceed with diligence, subject to the then applicable Laws, building codes, zoning ordinances, and regulations of any governmental authority, and as soon as practicable after such damage occurs, to repair such damage (excluding Tenant's leasehold improvements, trade fixtures, furniture, equipment and personal property or other items Tenant is required to insure or for which it has insurance coverage) at the expense of Landlord, if Landlord is insured with respect thereto to the extent of insurance proceeds made available to Landlord by any Mortgagees, or at the expense of Tenant, if Tenant is required to be insured hereunder with respect to such damage (in either case taking into account the time necessary to effectuate a satis-factory settlement with any insurance company involved and for such other delays as may result from government restrictions, controls on construction, if any, and strikes, emergencies, and other conditions beyond the control of the parties); provided, however, that if the Premises are damaged by fire or other cause to such extent that the damage, in Landlord's reasonable determination, cannot be fully repaired within ninety (90) days from the date of settlement of the insurance claims and Landlord's obtaining building permits, Landlord, upon notice to Tenant, may terminate this Lease, in which event the Rent shall be apportioned and paid to the date of such damage. Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate this Lease if (1) insurance proceeds are insufficient to pay the full cost of such repair and restoration, (2) the holder of any Mortgage fails or refuses to make such insurance proceeds available for such repair and restoration, (3) zoning or other applicable Laws or regulations do not permit such repair and restoration, or (4) damage occurs to twenty-five percent (25%) or more of the floor area of the Premises, the Project or the Development.

**19.2** Subject to the provisions of the next succeeding sentence, during the period that Tenant is deprived of the use of the damaged portion of the Premises due to damage by fire or other cause, Tenant shall be required to pay Rent adjusted in the manner described below to cover only that part of the Premises that Tenant is able to occupy, and the Rent for such space shall be that portion of the total Rent which the amount of the gross leasable area of the Premises remaining that can be occupied by Tenant bears to the total gross leasable area of the Premises. If Landlord, or any Mortgagee, shall be unable to collect the insurance proceeds applicable to such damage because of some action or inaction on the part of Tenant, or the employees, contractors, licensees or invitees of Tenant, such damage shall be repaired promptly, at Tenant's sole cost and expense, either by Landlord or, at Landlord's option, by Tenant, subject to Landlord's direction and supervision, and there shall be no abatement of Rent. Landlord shall not be liable for delays in making of any such repairs that are due to Laws, casualties, strikes, unavailability of labor and materials, and/or other causes beyond the reasonable control of Landlord.

**19.3** Tenant shall give Landlord prompt written notice of any accident, fire or damage occurring on or to the Premises or the Project.

## ARTICLE 20
## CONDEMNATION

**20.1** If all of the Premises (or all rights of use or occupancy of the Premises) shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose, or purchased by such authority under threat of such taking (collectively, a "Taking"), this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the Rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority. If less than all of the Premises is the subject of a Taking, the Rent shall be equitably adjusted on the date when title to the portion of the Premises taken vests in such governmental or quasi-governmental authority and the Lease shall otherwise continue in full force and effect. Tenant shall have no claim against Landlord (or otherwise) for any portion of the amount that may be awarded as damages as a result of any Taking, or for the value of any unexpired portion of the Term, or for loss of profits or moving expenses, or for any other claim or cause of action resulting from such Taking. Tenant shall have the right to make a separate claim against the condemning authority for moving expenses and any other awards to which it may be entitled separately from any award due to Landlord as long as such award to Tenant does not diminish Landlord's award.

## ARTICLE 21
## BANKRUPTCY

**21.1** The following shall be "Events of Bankruptcy" under this Lease:

21.1.1    Tenant's or Tenant's guarantor, if any, becoming insolvent, as that term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code"), or under the insolvency laws of any state, district, commonwealth, or territory of the United States (the "Insolvency Laws");

21.1.2    the appointment of a receiver or custodian for all or a substantial portion of Tenant's or Tenant's guarantor's, if any, property or assets, or the institution of a foreclosure action upon all or a substantial portion of Tenant's or Tenant's guarantor's, if any, real or personal property;

21.1.3    the filing by Tenant or Tenant's guarantor, if any, of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

21.1.4    the filing of an involuntary petition against Tenant or Tenant's guarantor, if any, as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within thirty (30) days of filing, or results in the issuance of an order for relief against the debtor; or

21.1.5    Tenant's or Tenant's guarantor, if any, making or consenting to an assignment for the benefit of creditors or a common law composition of creditors.

21.2    Landlord's remedies upon the occurrence of an Event of Bankruptcy shall be as follows:

21.2.1    Landlord shall have the right to terminate this Lease and/or any services being provided to Tenant under this Lease by giving notice to Tenant, whereupon Tenant shall be immediately obligated to quit the Premises.  Any other notice to quit or notice of Landlord's intention to re-enter is hereby expressly waived.  If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however, to the right of Landlord to recover from Tenant all Rent and any other sums accrued up to the time of termination or recovery of possession of the Premises by Landlord, whichever is later, and any other monetary damages or loss of Rent sustained by Landlord; provided, however, and notwithstanding the foregoing or any remedies set forth in this Section 21.2, Landlord shall not have the right to terminate this Lease while a case in which Tenant is the subject debtor under the Bankruptcy Code is pending, unless Tenant or Tenant's trustee in bankruptcy (the "Trustee") is unable to comply with the provisions of Sections 21.2.5, 21.2.6 and 21.2.7 below.

21.2.2    Upon termination of this Lease pursuant to Section 21.2.1, Landlord may proceed to recover possession under and by virtue of the provisions of the Laws of the jurisdiction in which the Project is located, or by such other proceedings, including re-entry and possession, as may be applicable.

21.2.3    Upon termination of this Lease pursuant to Section 21.2.1, Landlord shall have the option to relet the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition.  Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease.  Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or if  the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord hereunder.

21.2.4    Any damage or loss of Rent sustained by Landlord as a result of an Event of Bankruptcy may be recovered by Landlord, at Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive reletting, or in a single proceeding deferred until the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant shall pay Landlord the difference, if any, between the present value of the Rent reserved under this Lease on the date of breach, discounted at the per annum rate equal to the discount rate of the Federal Reserve Bank, and the fair market value of the Lease on the date of breach.  If Tenant becomes the subject debtor in a case under the Bankruptcy Code, the provisions of this Section 21.2.4 may be limited by the limitations of damage provisions of the Bankruptcy Code.  In addition, Tenant shall reimburse Landlord for its reasonable attorneys' fees incurred in enforcing or interpreting the provisions of this Article 21, including, but not limited to, any and all costs incurred in consulting with its attorneys with respect to any suit or dispute under this Lease, whether or not suit is brought, and any and all costs of litigation with respect to such enforcement or interpretation

22

(which, with regard to any suit or dispute whereby Landlord is seeking a monetary recovery, are hereby stipulated to be fifteen percent (15%) of the monies awarded to Landlord).

        **21.2.5**    If Tenant becomes the subject debtor in a case pending under the Bankruptcy Code, Landlord's right to terminate this Lease pursuant to this Article 21 shall be subject to the rights of Tenant or the Trustee to assume or assign this Lease. Tenant or the Trustee shall not have the right to assume or assign this Lease unless Tenant or the Trustee, within thirty (30) days of the Event of Bankruptcy (a) cures all defaults under this Lease, (b) compensates Landlord for monetary damages incurred as a result of such default, (c) provides "adequate assurance of future performance" (as defined in Section 21.2.6 below) and (d) complies with all provisions of Section 21.2 of this Lease.

        **21.2.6**    Landlord and Tenant hereby agree in advance that the phrase "adequate assurance of future performance", as used in this Section 21.2, includes adequate assurance (a) of the source of Rent and other consideration due under this Lease, and, in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the time Tenant became Tenant under this Lease; (b) that any assumption or assignment of this Lease is subject to all the provisions hereof, including, but not limited to, location, use and exclusivity, and will not breach any such provisions contained in any other lease or financing agreement; (c) that any assumption or assignment of this Lease will not disrupt or adversely affect the tenant mix or balance in the Project; and (d) that any Percentage Rent due under this Lease will not decline substantially.

        **21.2.7**    If Tenant or the Trustee, as applicable, is unable (a) to cure Tenant's defaults, (b) to reimburse Landlord for its monetary damages, (c) to pay when due the Rent due under this Lease, or any other payments required of Tenant under this Lease or (d) to meet the criteria and obligations imposed by Section 21.2.6 above, then Tenant agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Section 21.2.1 above.

        **21.3**    It is understood and agreed that this Lease is a "Lease of Real Property in the Shopping Center" as such term is used in Section 365(b)(3) of the Bankruptcy Code, 11 U.S.C., Section 101 et seq., and that neither Tenant's interest in this Lease or in any estate created hereby shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise except as may be specifically provided therein. Nothing contained in this Section 21.3 shall be deemed in any manner to limit Landlord's rights and remedies under the Bankruptcy Code, as presently existing or as may be hereafter amended.

## ARTICLE 22
## ASSIGNMENT AND SUBLET

        **22.1**    Without the prior written consent of Landlord in each instance, which consent may be given or withheld in Landlord's sole and absolute discretion, Tenant shall not assign, Mortgage, pledge, encumber, sublet, underlet, license or permit the Premises or any part thereof to be used by others, or otherwise transfer, voluntarily, by operation of law, or otherwise, this Lease or the Premises or any interest herein or therein. Neither the Premises, nor any part thereof, will be used, occupied or managed, or permitted to be used, occupied or managed, by anyone other than Tenant, or used for any purpose other than as permitted under this Lease, or be advertised for subletting. A sale, transfer, assignment, conveyance, endorsement or other disposition of (a) a general partnership interest, if Tenant is a partnership, (b) a managing member's interest, if Tenant is a limited liability company or (c) fifty percent (50%) or more (in the aggregate on accumulative basis) of the capital stock of Tenant (if Tenant is a corporation) or of the interest in capital, profits, or losses of Tenant (if Tenant is a partnership, limited liability company or partnership) shall be deemed to be an assignment of this Lease within the meaning of this Section 22.1, unless such sale or transfer is made by (i) a publicly owned corporation, or (ii) involves the sale or issuance of securities registered under the Securities Act of 1933, as amended, or (iii) involves the sale of stock to immediate family members of the selling shareholders (i.e., parents, children, and siblings). Any other transaction that results in a change of operational control of Tenant or the parties to whom the economic impact of Tenant's business accrues shall also be deemed to be an assignment of this Lease within the meaning of this Section 22.1. The transactions described in this Section are sometimes referred to in Section 22 as a "Transfer", and the person to whom Tenant's interest is transferred shall sometimes be referred to as a "Transferee."

        **22.2**    If Tenant is a partnership, (i) each present and future general partner or venturer shall be personally bound by all of the covenants, agreements, terms, provisions and conditions set forth in this Lease and (ii) in confirmation of the foregoing, at the time that Tenant admits any new general partner or venturer to its joint venture, Landlord may require, and Tenant shall deliver, an agreement executed by each new partner in form and substance satisfactory to Landlord whereby such new general partner or venturer shall agree to be personally bound by all of the covenants,

agreements, terms, provisions and conditions of this Lease, without regard to the time when such new partner is admitted to the partnership or when any obligations under any such covenants, agreements, terms, provisions and conditions accrue.

**22.3**     Tenant shall have no right to ever subdivide a portion of the Premises (except as to a division of space devoted to The M Den and the space devoted to The Victors Collection by The MDen).   If Tenant desires to sublet the Premises, or assign this Lease, Tenant shall request Landlord's consent by providing written notice to Landlord at least ninety (90) days but not more than one hundred eighty (180) days prior to the proposed commencement date of the subletting or assignment.  The notice shall set forth the following: (i) the name of the proposed Transferee, (ii) the tax returns, balance sheets and profit and loss statements for the proposed Transferee or any other person to be liable for Tenant's obligations under this Lease covering the prior three years (or for such shorter period as the proposed Transferee or other person may have been in existence), all certified as true and correct by the proposed Transferee, or an authorized officer thereof or such other person as may be liable for Tenant's obligation under this Lease, (iii) a full description of the terms and conditions of the proposed Transfer, including copies of any and all documents and instruments, any purchase and sale agreements, sublease agreements, assignment agreements and all other writings concerning the proposed Transfer, (iv) a description of the proposed use of the Premises by the proposed Transferee, including any required or desired alterations or improvements to the Premises that may be undertaken by such Transferee in order to facilitate its proposed use, (v) a business plan for the proposed Transferee's operations at the Premises, including a statement of projected income, expense, and cash flow for such operation for the two years following the proposed effective date of the Transfer, (vi) a list of personal, business and credit references of the proposed Transferee,  and (vii) the same information set forth in (i) through (iv) and (vi) of this Section 22.3 but pertaining to  any guarantor or other person who will be liable in any manner for the payment of any amounts under the Lease. Tenant shall also provide within ten (10) days of request any other information, documentation, evidence or certifications that may be requested by Landlord.

**22.4**     Landlord shall have the option, in its sole discretion, to terminate this Lease, if Tenant requests Landlord's consent for a subletting or assignment.  The option shall be exercised by Landlord giving Tenant written notice at any time after Tenant proposes or agrees to a subletting or assignment or other Transfer under Section 22.1 but no later than sixty (60) days following Landlord's receipt of Tenant's written notice as required by Section 22.3 together with all information and documents pursuant to Section 22.3.  The Term shall end on the date stated in Tenant's notice as the effective date for the Transfer (or as specified by Landlord if there is no effective date so specified)  as if that date had been originally fixed in this Lease for the expiration of the Term.  Tenant shall, at Tenant's own cost and expense, discharge in full any outstanding commission obligation with respect to this Lease and any commissions which may be owing as a result of any proposed Transfer, whether or not the Premises are rented by Landlord to the proposed Transferee or any other tenant.

**22.5**     Consent by Landlord to any assignment, subletting or other Transfer shall not include or be construed as consent to any subsequent Transfer by Tenant or its Transferee.  Any Transfer by Tenant that does not comply with the provisions of this Article 22 shall be void.

**22.6**     Notwithstanding Landlord's consent, if Tenant sells, sublets, assigns, or otherwise Transfers this Lease and at any time receives periodic rent or other consideration which exceeds that which Tenant would at that time be obligated to pay Landlord under this Lease, Tenant shall immediately pay to Landlord one hundred percent (100%) of the gross increase in rent as the rent is received by Tenant and one hundred percent (100%) of any other consideration received by Tenant from the Transferee.

**22.7**     Should Landlord consent to a Transfer, Tenant, its proposed Transferee and Landlord shall execute an agreement, prepared by or acceptable to Landlord in its sole reasonable discretion, under which the proposed Transferee shall be bound by the terms and conditions of this Lease. Any consent by Landlord to a Transfer shall not in any manner be construed to relieve Tenant, any guarantor or any of their Transferees from obtaining the consent in writing of Landlord to any further Transfer, nor shall the same release or discharge Tenant or any guarantor from any liability, past, present or future, under this Lease, and Tenant and any guarantor shall continue fully liable in all respects hereunder.  Further, all of the provisions of this Article 22 shall apply to any proposed Transfer by any Transferee and their respective Transferees. Notwithstanding anything contained herein to the contrary, if Tenant is in default hereunder, Tenant shall not be permitted to make a Transfer.

**22.8**     Except for a termination by Landlord pursuant to Section 22.4, notwithstanding any permitted Transfer, Tenant shall at all times remain directly and primarily liable for the payment of Rent and for compliance with all of its other obligations under this Lease.  Upon the occurrence of an Event of Default as defined in Article 25 of this Lease, if the Premises or any part of the Premises are then assigned or sublet, Landlord, in addition to any other remedies provided in this Lease or by law, may collect directly from the assignee or subtenant all rents due and becoming due to Tenant under the sublease and apply the rent against sums due Landlord from Tenant under this Lease.  The collection directly from an assignee or subtenant shall not be construed to constitute a novation or release of Tenant from the further performance of Tenant's obligations.  Any

guaranty of Tenant's performance executed as consideration for this Lease shall remain in full force and effect before and after any Transfer. Landlord may require Tenant, and Tenant agrees, to execute a guaranty of this Lease before Landlord consents to any Transfer. Landlord may proceed directly against Tenant without first exhausting any remedies for default which Landlord may have against any Transferee. In the event of a termination, re-entry or dispossession by Landlord following a sublease by Tenant, Landlord may, at Landlord's option, take over all of the right, title and interest of Tenant (as sublessor) under such sublease, and the subtenant shall, at Landlord's option, attorn to Landlord pursuant to the provisions of such sublease.

**22.9** Tenant shall pay to Landlord $2,500.00 (such amount increasing on each anniversary of the Rent Commencement Date by four (4%) percent) for attorney's fees and administrative expense involved with the review, processing or preparation of any documentation in connection with a Transfer, whether or not Landlord's consent to such Transfer is required or obtained.

**22.10** Anything contained in this Lease to the contrary notwithstanding, and without prejudice to Landlord's right to require a written assumption from each Transferee, any person or entity to whom this Lease is transferred including, without limitation, assignees pursuant to the provisions of the Bankruptcy Code, shall automatically be deemed to have assumed all obligations of Tenant arising under this Lease. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord and shall remain the exclusive property of Landlord and not constitute the property of Tenant or Tenant's estate within the meaning of the Bankruptcy Code. All such money or other consideration not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

**ARTICLE 23**
**SUBORDINATION**

**23.1** This Lease, automatically and without further act or deed by Tenant, shall be subordinate to any and all Mortgages or any ground lease currently existing or that may hereafter be placed upon the Project, or any portion thereof, and to any and all renewals, amendments, modifications, participations, consolidations, replacements and extensions thereof. Upon the request of Landlord or any Mortgagee or prospective Mortgagee, Tenant shall confirm such subordination by executing and delivering within five (5) days of such request whatever instruments may be required by Landlord or any present or prospective Mortgagee or ground lessor. Said subordination and the provisions of this Section shall be self-operative and no further instrument of subordination shall be required by the holder of any Mortgage or any ground lessor. The holder of any Mortgage to which this Lease is subordinate and any ground lessor shall have the right (subject to any required approval of the holders of any superior Mortgage or ground lessor) at any time to declare this Lease to be superior to the lien, provisions, operation and effect of such Mortgage or ground lease and Tenant shall execute, acknowledge and deliver all documents required by such holder or ground lessor in confirmation thereof. This Lease shall also, without further act or deed by Tenant, be subordinate to any reciprocal easement or similar agreement(s) now or in the future entered into between Landlord and other owners of real estate or tenants within or near the Project or the Development and to any condominium regime(s) now or hereafter affecting the Project or any portion thereof.

**23.2** Tenant shall, at any time and from time to time within five (5) days following written notice from Landlord, execute, acknowledge and deliver to Landlord and any person designated by Landlord in such notice, a statement in writing: (i) certifying, as true and complete, a copy of and identifying all the documents constituting this Lease and the dates thereof, (ii) certifying that this Lease is unmodified and in full force and effect (or if modified, that the same is in full force and effect as modified and stating the date and identifying such modifications), (iii) stating the last dates to which the Minimum Rent, Percentage Rent and Additional Rent have been paid, the amount(s) thereof and the extent such Rent has been paid in advance, (iv) stating whether Landlord has completed all work or installations required under the Lease, (v) stating whether or not Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default, and (vi) stating or certifying as to such other matters with respect to this Lease, the Premises or the respective parties' obligations hereunder as may be requested by Landlord or by any present or prospective Mortgagee, ground lessor or purchaser of the Premises or Project. Any such statement delivered pursuant hereto may be relied upon by any owner of the Project, or any portion thereof, any prospective purchaser of the Project, or any portion thereof, any Mortgagee, any ground lessor or any prospective assignee of any of the foregoing. The failure of Tenant to deliver any estoppel certificate in the time and in the manner required by this Section 23.2 shall be deemed to be Tenant's express acknowledgment that the information set forth in any estoppel certificate delivered to Tenant for execution is true, correct and complete and agreed to by Tenant or, if no such certificate was delivered in advance for Tenant's approval, that the Lease is unmodified, in full force and effect, that no default in payment or performance exists and that any default which may exist is waived by Tenant. Tenant waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and Tenant's obligations hereunder in the

event any foreclosure proceeding is prosecuted or completed or in the event the building in which the Premises are contained, or the Project or Landlord's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

23.3    If the Lease is not extinguished upon any such transfer or by transferee following such transfer, then at the request of such transferee, Tenant will attorn to and recognize any purchaser of the Project, or any portion thereof, at a foreclosure sale under any Mortgage, any transferee who acquires the Project, or any portion thereof, by deed in lieu of foreclosure, and the successor and assigns of such purchasers, as successor Landlord under this Lease for the unexpired balance of the Term of this Lease upon the same terms and conditions set forth in this Lease.

23.4    Tenant agrees that if any Mortgagee shall succeed to the interest of Landlord under this Lease, such Mortgagee shall not be:

23.4.1    liable for any act or omission of Landlord;

23.4.2    liable for the return of all or any part of the Security Deposit unless such Security Deposit has been turned over to the Mortgagee;

23.4.3    subject to any offsets or defenses which Tenant might have against Landlord;

23.4.4    bound by any Rent which Tenant might have paid  more than one month in advance; or

23.4.5    bound by any amendment or modification of this Lease made without such Mortgagee's prior written consent.

23.5    Although the provision of Sections 23.1, 23.3 and 23.4 are effective automatically and without further act or deed by Tenant, Tenant shall execute, acknowledge and deliver any and all documents deemed necessary to further evidence Tenant's agreement with these provisions.

23.6    If Landlord can obtain approval of this Lease by its existing or future Mortgagees only upon the basis of modifications of the terms and provisions of this Lease, Tenant shall agree to such modifications and shall execute any instruments amending this Lease containing such modifications provided that such modifications do not (i) materially increase Tenant's monetary obligations hereunder or (ii) reduce the term hereof or (iii) otherwise materially and adversely affect any material and substantive right of Tenant expressly granted hereunder, and if Tenant refuses to approve in writing any such modifications within thirty (30) days after Landlord's request therefor, Landlord shall have the right to terminate this Lease.

23.7    Within ten (10) days of receipt of a request therefor from Landlord, Tenant shall forward to Landlord a financial statement of Tenant for its most completed fiscal year in form satisfactory to Landlord.  Landlord shall use reasonable efforts to keep such information confidential, provided, however, it shall be permitted to provide such information in connection with any administrative or judicial proceedings in which Landlord is involved where Landlord may be required to divulge such information.  If the financial credit rating of Tenant and/or, if applicable, Tenant's guarantor or surety is not acceptable for the purposes of any existing or contemplated financing, Landlord shall have the right to terminate this Lease if Tenant refuses to execute or supply such additional assurances and/or guarantors and/or sureties as Landlord shall state as necessary for such acceptance within thirty (30) days after Landlord's request therefor. If any such right to terminate is exercised pursuant to Section 23.6 or 23.7, each of the parties shall be released from any other further liability accruing after such date, any of the Deposits made hereunder shall (subject to the other provisions of this Lease) be refunded to Tenant without interest, and neither party shall have any liability to the other by reason of such termination.

23.8    Tenant shall give any Mortgage a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such Mortgagees.  Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the Mortgagee(s) shall have an additional thirty (30) days within which to cure such default or, if such default cannot reasonably be cured within that time, such additional time as may be necessary if, within such thirty (30) days, any such Mortgagee(s) has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated so long as such remedies are being diligently pursued.

## ARTICLE 24
## RECORDATION

**24.1** It is agreed that Tenant shall not record this Lease and/or its Exhibits. Any violation of this clause shall be deemed an Event of Default on the part of Tenant, and Landlord, in addition to other remedies available for an Event of Default, shall be entitled to take all steps necessary to remove the Lease and/or its Exhibits from any records.

## ARTICLE 25
## DEFAULT

**25.1** The occurrence of any of the following shall constitute an event of default (each, an "Event of Default") under this Lease:

**25.1.1** Failure of Tenant to pay any Rent within ten (10) days of when due;

**25.1.2** Failure of Tenant to commence business as of the earlier of (a) the ninetieth (90th) day following the Rent Commencement Date and (b) the Grand Opening Date;

**25.1.3** Discontinuance of the operation of Tenant's business at the Premises;

**25.1.4** Apparent abandonment and/or abandonment of the Premises;

**25.1.5** An Event of Bankruptcy pursuant to Article 21;

**25.1.6** Tenant's removal or attempt to remove, or manifestation of an intention to remove, Tenant's goods or property from or out of the Premises (other than in the ordinary and usual course of business) without having first paid and satisfied all obligations to Landlord for all Rent which may become due during the entire Term of this Lease;

**25.1.7** Breach or failure of Tenant to strictly comply with any of the terms and provisions of Articles 8, 22, 23, 24, or 30 of this Lease; or,

**25.1.8** Tenant's failure to perform any covenant, condition or obligation under this Lease (other than those set forth in Sections 25.1.1 through 25.1.7 above) within five (5) days after written notice and demand by Landlord, unless the failure is of such a character as to require more than five (5) days to cure, in which event it shall be an Event of Default upon (a) Tenant's failure to commence and proceed diligently to cure such default with such five (5) day period, and/or (b) Tenant's failure to cure such default within twenty (20) days after Landlord's notice to Tenant of such default; provided, however, no such notice shall be required hereunder if Tenant has received a similar notice within three hundred sixty-five (365) days prior to such default.

**25.2** Upon the occurrence of an Event of Default:

**25.2.1** Landlord may terminate this Lease and/or any services provided to Tenant under this Lease, by giving notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate, and Tenant shall be obligated to immediately quit the Premises. Any other notice to quit or notice of Landlord's intention to re-enter the Premises is hereby expressly waived. If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease, without prejudice, however, to the right of Landlord to recover from Tenant all Rent accrued up to the time of termination or recovery of possession by Landlord, whichever is later, any amounts set forth below (including but not limited to Rent through the Expiration Date had there been no such termination) and any other monetary damages or loss of Rent sustained by Landlord.

**25.2.2** Whether or not this Lease is terminated pursuant to Section 25.2.1, Landlord may proceed to recover possession of the Premises under and by virtue of the provisions of the laws of the state where the Premises are located or by such other proceedings, including re-entry and possession, as may be applicable.

**25.2.3** Should this Lease be terminated pursuant to Section 25.2.1 or if Tenant shall abandon or vacate the Premises (whether or not the keys shall have been surrendered or the Rent shall have been paid) before the Expiration Date without having paid the full Rent for the remainder of the Term, Landlord shall have the option to relet the Premises (or any part thereof, alone or together with other premises) for such rent and upon such terms as Landlord (in Landlord's sole, subjective discretion) may deem advisable and, if the full Rent reserved under this Lease (and any of the costs, expenses, or

27

damages indicated below) shall not be received by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition. Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, if the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord.

Notwithstanding anything to the contrary contained herein, upon default by Tenant and a subsequent eviction by Landlord, Landlord agrees to use reasonable efforts to relet the Premises for a term or terms which may, at Landlord's option (the exercise of which option shall be made reasonably and in good faith), be less than or exceed the balance of the Term of the Lease and the rent may be less than its then fair market value (but the rent shall be commercially reasonable but recognizing that market rent can be difficult to establish with certainty). The foregoing, however, shall in no way obligate Landlord to lease the Premises in any manner which is not in keeping with the type and caliber of occupants at the Project, nor shall the same obligate Landlord to relet the Premises in preference to other vacant space, nor perform any acts in addition to those it performs as to other vacant space, nor hire a broker to market the space, nor perform any work to the Premises nor offer any improvement allowances, nor lease for less term, less occupancy fee or on other terms that are not consistent with its existing policies. Landlord may or may not subdivide the Premises in its sole discretion. If Landlord shall substantially perform the foregoing then, anything in this Lease, or any statute, or common law rule to the contrary notwithstanding, Landlord shall be deemed to have met its duty to mitigate its damages hereunder. Notwithstanding anything to the contrary, if Landlord treats the Premises in the same manner as other vacancies in the Project then Landlord shall be deemed to have met its duty to mitigate its damages hereunder.

     **25.2.4**   Intentionally Deleted

     **25.2.5**   Any damage or loss of Rent sustained by Landlord may be recovered by Landlord, at Landlord's option: (i) in one (1) or more separate actions, at any time and from time to time, as and to the extent that said damages and/or loss of Rent shall have accrued; or (ii) in a single action deferred until on or after the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or (iii) in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the present value of the Rent reserved through the Expiration Date (without regard to the earlier termination) under this Lease on the date of breach, discounted at the per annum rate equal to the Federal Reserve Bank discount rate, the latter remedy hereby acknowledged to be a fair estimation of Landlord's damages and not an unenforceable penalty. Notwithstanding the foregoing, Landlord will not accelerate Rent more than one Lease Year at a time.

     **25.2.6**   Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term. In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction, the right to specific performance, and the right to invoke any remedy allowed at law or in equity or under this Lease.

     **25.2.7**   Intentionally Deleted

     **25.3**   If, under the provisions hereof, Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition, agreement or obligation contained in this Lease, nor of any of Landlord's rights under this Lease. No waiver by Landlord of any breach of any covenant, condition or agreement contained in this Lease and the Rules and Regulations promulgated hereunder shall operate as a waiver of such covenant, condition, agreement or rule or regulation itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord. No endorsement or statement on any check or letter accompanying a check for payment of Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy provided in this Lease.

     **25.4**   If Tenant defaults in the making of any payment or in the doing of any act under this Lease required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act, and charge the amount of the expense thereof, if made or done by Landlord, with interest thereon at the Lease Interest Rate. Such payment and interest shall constitute Additional Rent hereunder due and payable within five (5) days of Landlord's demand therefor, but the making of such payment or the taking of such action by Landlord shall not operate to cure such default or to estop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled at law, in equity or under this Lease.

28

25.5　　If Tenant fails to pay any Rent in accordance with the provisions of this Lease when such Rent becomes due and payable as specified in Section 6.11, Tenant shall pay to Landlord a late charge equal to the greater of five percent (5%) of the amount due or Two Hundred Fifty Dollars ($250.00) for each month that such Rent remains unpaid, and, in addition, such unpaid Rent shall bear interest at the Lease Interest Rate. Such late charge and interest shall constitute Additional Rent hereunder immediately due and payable. If payments have been accelerated pursuant to Section 25.2.4 or Section 25.2.5 above, all Additional Rent due under any provision of this Lease, including, but not limited to, all charges and interest, shall be due and payable immediately.

25.6　　Intentionally Deleted

25.7　　Tenant hereby waives and surrenders all rights and privileges which it might have under or by reason of any present or future law to redeem the Premises, or to have a continuance of this Lease for the remainder of the Term after being dispossessed or ejected therefrom by process of law, or under the terms of this Lease, or after the termination of this Lease as herein provided.

25.8　　The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any remedies or means of redress to which Landlord may at any time be lawfully entitled at law, in equity or under this Lease, and Landlord may invoke any remedy (including the remedy of specific performance) allowed at law, in equity or under this Lease as if specific remedies were not provided for herein.

25.9　　Landlord shall have the right to apply any payments made by Tenant to the satisfaction of any debt or obligation of Tenant to Landlord according to Landlord's sole and absolute discretion and regardless of the instructions of Tenant as to application of any such sum, whether such instructions be endorsed upon Tenant's check or otherwise.

25.10　　In addition to any other rights and remedies which Landlord may have at law, in equity or under this Lease, if (a) Tenant fails to deliver all insurance certificates required under Article 8 hereof within the number of days required in Article 8; (b) Tenant fails to deliver Tenant's Plans to Landlord pursuant to Article 13 hereof; (c) Tenant fails to deliver the Sign Plans to Landlord pursuant to Article 17 hereof; (d) Tenant fails to deliver the statements of Gross Sales to Landlord pursuant to Sections 6.5 and/or 6.6 hereof; or (e) Tenant fails to install an exterior sign as approved by Landlord by the end of the Fixturing Period, then Tenant shall pay to Landlord, upon demand, a late charge of Two Hundred Fifty Dollars ($250.00) for each thirty (30) day period during which any such failure shall continue.

**ARTICLE 26**
**LEGAL PROCEEDINGS AND NOTICES**

26.1　　If either Landlord or Tenant institutes any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, the non-prevailing party in such action or proceeding shall reimburse the prevailing party for the reasonable expenses of attorneys' fees and all costs and disbursements incurred therein by the prevailing party, including, without limitation, any such fees, costs, or disbursements incurred on any appeal from such action or proceeding. The prevailing party shall recover all such fees, costs or disbursements as costs taxable by the court in the action or proceeding itself without the necessity for a cross-action by the prevailing party.

26.2　　This Lease is made pursuant to, and shall be governed by, and construed in accordance with the Laws of the State of Michigan and any applicable local, municipal or county rules, regulations, and ordinances. Any action or proceeding arising hereunder shall be brought in the courts of such state; provided, that it such action or proceeding arises under the Constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties thereto, so that it is to be brought in a United States District Court, it shall be brought in the United States District Court for the Eastern District of Michigan. Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against the party who itself or through its agent prepared the same.

26.3　　If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law. In the event that any provision of this Lease would be deemed unenforceable due to the excessiveness or unreasonableness of any fee, charge, cost or expense for which payment is required thereby, then such provision automatically shall be deemed to be modified to provide that the amount of such fee, charge, cost or expense shall be the maximum amount permitted by law and such provision, as so modified, shall be enforced.

**26.4**    Tenant hereby waives all rights of redemption granted by any present or future Laws.

**26.5**    All notices, demands and requests (collectively the "notice" or "Notice") which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party or (b) delivery by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt or providing other evidence of delivery upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the party or (c) personal delivery. The Notice Address of each party is set forth in Sections 1.18 and 1.19. Any Notice to Landlord shall include an additional copy to Landlord at the address set forth in Section 1.14 but marked "Attn: General Counsel". Landlord may send Notice(s) by its attorney from time to time and such notice(s) shall constitute valid Notice(s) hereunder. Notices forwarded pursuant to this Section shall be deemed conclusively to have been received by the addressee, (a) if delivered in person as of the date of the delivery receipt, (b) if forwarded by a private courier service guaranteeing next business day delivery as of the business day next following the date shown on the sender's receipt from such private courier service, and (c) if by United States registered or certified mail as of the third (3rd) business day next following the date deposited in the United States mail. Either Landlord or Tenant may, at any time and from time-to-time, change its Notice Address by sending a notice in accordance herewith to the other party stating the change and setting forth the new address for notices.

**26.6**    Tenant hereby (i) irrevocably appoints Tenant's Agent for Service of Process as Tenant's agent to accept service of process in any action or proceeding for the enforcement against Tenant of any obligation or liability under this Lease, (ii) agrees that any such action or proceeding against Tenant may be commenced in any court of competent jurisdiction by service of process upon Tenant's Agent for Service of Process with the same effect as if Tenant were physically present in the location where service was made upon Tenant's Agent for Service of Process and had lawfully been served with process in such location and (iii) directs Tenant's Agent for Service of Process to forward a copy of any notice, process or pleading served on Tenant's Agent for Service of Process to Tenant in the same manner in which notices are to be delivered to Tenant pursuant to Section 26.5.

**ARTICLE 27**
**SUCCESSORS AND ASSIGNS**

**27.1**    Landlord is entitled to sell, transfer or assign, in whole or in part, its rights and obligations under this Lease and in the Premises provided such transferee assumes all obligations of Landlord under this Lease. If in connection with or as a consequence of the sale, transfer, assignment or other disposition of the Project, or any portion thereof, or this Lease, Landlord ceases to be the owner of the Project, Landlord shall be entirely freed and relieved from the performance and observance thereafter of all covenants and obligations under this Lease on the part of Landlord to be performed and observed, it being understood and agreed in such event (and it shall be deemed and construed as a covenant running with the land) that the person succeeding to Landlord's ownership of said Project, shall, subject to the provisions contained in Section 23.1, thereupon and thereafter assume, and perform and observe, any and all of such covenants and obligations of Landlord thereafter accruing while such party is the owner of the Project. Any Deposits or other security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to its successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

**27.2**    If there shall be more than one party constituting Tenant, they shall all be bound jointly and severally by the terms, covenants, agreements and obligations under this Lease and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one party constituting Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. No rights, however, shall inure to the benefit of any assignee, sublessee or other transferee, of Tenant unless the Transfer to such transferee has been approved by Landlord in writing in accordance with this Lease but no approval of a sublease shall be deemed to create a privity or landlord and tenant relationship between Landlord and any subtenant.

**27.3**    This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, Tenant and their respective successors and assigns; provided, however, no rights shall inure to the benefit of any assignee or successor of Tenant to the extent such assignee or successor acquired any purported interest herein in violation of Section 22. Upon any sale or other transfer by Landlord of its interest in the Premises, and assumption of possession of the Premises by the transferee, such transferee shall be solely responsible for all obligations of Landlord under this Lease accruing thereafter and Landlord shall be fully and forever released of its obligations hereunder.

## ARTICLE 28
## BROKERS AND AGENTS

**28.1**     Each of the parties hereto represents and warrants that, other than the brokerage commission payable by Landlord to CBRE pursuant to a separate agreement, there are no other brokerage commissions or finders' fees of any kind due in connection with this Lease, and each of the parties hereto shall indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any such claim (including, without limitation, the cost of attorneys' fees in connection therewith) by any party claiming through them.  This Section 28.1 shall survive the expiration or earlier termination of this Lease.

**28.2**     The Landlord's Agent(s) listed in Section 1.14 are acting as Landlord's Agent only and shall not in any event be held liable to Tenant for the fulfillment or non-fulfillment of any of the terms, covenants, conditions or obligations of this Lease or for any action or proceedings that may be taken by Landlord against Tenant, or by Tenant against Landlord, including, but not limited to, any such action arising out of, in connection with or in any manner relating to, the performance or nonperformance by Landlord's Agent of any act pursuant to this Lease or Landlord's direction.  Any waiver by Tenant of Landlord's liability under this Lease, including, but not limited to, any waiver of subrogation rights, shall apply with equal force and effect to Landlord's Agent. Landlord shall have the right to designate a new Landlord's Agent, from time-to-time, upon notice to Tenant.

## ARTICLE 29
## PERSONAL PROPERTY

**29.1**     Tenant shall have the right to finance equipment and grant purchase money equipment liens to third-party lenders on such equipment, and Landlord agrees to subordinate its lien to such third-party purchase money lenders.

## ARTICLE 30
## ENVIRONMENTAL COVENANTS AND PROHIBITED MATERIALS

**30.1**     Tenant shall maintain the Premises, and its operations thereon, in compliance with all federal, state and local laws, ordinances, rules, regulations and legally enforceable policies and guidelines regarding the environment, human health or safety ("Environmental Laws") which apply to the Premises or its use.  Tenant shall cure in compliance with Environmental Laws any hazardous substances, hazardous wastes, toxic substances, pollutants or contaminants (as those terms are defined in any of the Environmental Laws or at common law, hereinafter "Hazardous Substances") discharged by the Tenant Parties, on, at or under the Premises, but Tenant shall not be responsible for curing any Hazardous Substances existing on the Commencement Date of the Lease or caused solely by the Landlord Parties during the term of the Lease. Tenant shall not install any underground or aboveground storage tanks on the Premises without Landlord's prior written permission, which may be withheld in Landlord's sole discretion.  In no event shall Tenant store, locate, generate, produce, process, treat, transport, incorporate, discharge, emit, release, deposit or dispose of any Hazardous Substances in, upon, under, over or from the Premises except in the normal course of operation of the Premises and provided that Tenant complies with all applicable Environmental Laws with respect to any Hazardous Substances in, upon, under, over or from the Premises in the normal course of operation of the Premises.

**30.2**     Notwithstanding the expiration or earlier termination of this Lease, if upon the expiration or earlier termination of this Lease there exists a violation of Environmental Laws at the Premises for which Tenant is liable or if Tenant has failed to fulfill its obligations under this Article 30, and if such violation or failure precludes another tenant from commencing its work or operations at the Premises, Tenant shall reimburse Landlord for Landlord's lost rental plus the amount required for Landlord to cure the violation of Environmental Laws and to cure Tenant's default by fulfilling Tenant's obligations under this Lease, if possible.

**30.3**     Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnitees harmless from any and all fines, suits, procedures, claims, liabilities, costs and actions of any kind, including counsel fees (including those incurred to enforce this indemnity or for any other purpose) arising out of or in any way related to (1) the Tenant's use, handling, generation, treatment, storage, disposal, other management or Release of any Hazardous Substances, in or about the Project, the Development or the Premises, whether or not the Tenant Parties may have acted negligently with respect to such Hazardous Substances, or (2) Tenant's failure to comply with the provisions of Article 30 of this Lease.  Tenant's obligations and liabilities under Article 30 survive the expiration or earlier termination of this Lease, and shall continue for so long as Landlord remains responsible or liable under Environmental Laws or otherwise for either any spills or discharges of Hazardous Substances or for any violations of Environmental Laws which occurred during Tenant's possession of the Premises, unless caused by the Landlord Parties.  Notwithstanding anything in this Lease to the contrary, Landlord may enforce Tenant's failure to abide by the terms of this Article 30 by injunction.

## ARTICLE 31
## APPROVALS

**31.1** Except as otherwise expressly set forth in this Lease, any discretionary action or decision or permission, approval or consent requested or required of Landlord under this Lease may be made, granted or denied by Landlord in its sole, absolute and unfettered discretion. Tenant hereby expressly acknowledges and agrees that Landlord shall not be held liable to Tenant, any person claiming under Tenant or any third party as a result of Landlord's approval or failure to approve or consent to any discretionary action or decision requested or required by Landlord under this Lease. If Landlord is found to be in breach of this Lease as a result of Landlord's failure to grant such approval or consent despite the foregoing provisions of this Section 31, Tenant's sole and exclusive remedy shall be to obtain injunctive relief directing Landlord to grant or deny such approval or consent. Landlord's consent or approval of any request by Tenant shall not be deemed a consent to or approval of such action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.

**31.2** Neither Landlord's approval of the Tenant's Plans and Sign Plans, nor any other inspections or approvals of the improvements on the Project or plans for construction thereof by the Landlord Parties or inspecting engineers, shall constitute a warranty or representation as to the technical sufficiency, adequacy or safety of the plans, structures, any of their component parts, or any other physical condition or feature pertaining to the improvements, it being acknowledged by Tenant that Landlord has made such approvals solely as a landlord in determining and protecting the value of its property for internal purposes, and not as an expert in construction-related matters.

## ARTICLE 32
## LIABILITY OF LANDLORD

**32.1** Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges and agrees that Landlord is not and shall not be liable to Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members, guests, or any other person claiming under or through Tenant, for any damage, compensation or claim arising from the necessity of repairing or replacing any portion of the Premises or the Project, interruption in the use of the Premises, accident or damage resulting from the use or operation (by Landlord, Tenant or any other person or persons whatsoever) of the Premises or the Project or any part thereof or anything contained therein or the termination of this Lease by reason of the destruction of the Premises or the Project, or from any fire, and/or any other casualty, robbery, theft or mysterious disappearance, or for any personal injury arising from the use, occupancy and condition of the Premises or the Project, unless, subject to Section 8.9, any of the foregoing is solely attributable to the willful misconduct of Landlord. Notwithstanding the foregoing, in no event shall Landlord or its agents or employees have any liability to Tenant for any damage caused by any other tenants or occupants of the Premises or the Project or the Development or any other person claiming under or through Tenant, or their agents or employees, or for any damage caused by governmental or quasi-governmental authorities or public or private utilities or their agents or employees. Tenant shall not be entitled to any abatement or diminution of Rent as a result of any of the foregoing occurrences, nor shall the same release Tenant from its obligations under this Lease or constitute an eviction. Any goods, property or personal effects of Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members or guests, stored or placed in or about the Premises (including but not limited to any automobiles parked in any Parking Spaces, as defined below) shall be at their sole risk, and Landlord shall not in any manner be held responsible therefor. Tenant acknowledges that Landlord is not under any obligation to carry insurance on the Premises or Tenant's furniture, furnishings, fixtures, equipment and/or improvements in or to the Premises. It is expressly understood and agreed that Tenant shall look to its business interruption and property damage insurance policies, and not to the Landlord Indemnitees for reimbursement for any damages or losses incurred as a result of any of the foregoing occurrences, and that said policies must contain waiver of subrogation clauses.

**32.2** Tenant shall neither assert nor seek to enforce any claim, and hereby waives any and all rights to assert or claim, for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Project, or any portion thereof, and Tenant shall look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that in no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be personally liable for any such liability. In no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be liable for consequential damages.

32

# ARTICLE 33
## ENTIRE AGREEMENT AND MISCELLANEOUS

**33.1** The submission of this Lease by Landlord for examination by Tenant does not constitute a reservation of, or option for, the Premises, and this Lease shall become effective only upon execution and delivery by all parties hereto; provided, however, Tenant's execution and delivery of this Lease to Landlord shall be deemed an irrevocable offer to Lease upon the terms and conditions contained in this Lease for a period of thirty (30) business days from the date of delivery of the signed Lease to Landlord. There are no oral agreements between the parties hereto affecting this Lease, the Premises, the Project and/or the Development and this Lease supersedes and cancels any and all previous written or oral negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. All prior communications from Landlord with respect to estimated charges payable by Tenant hereunder are for information only and are not to be construed as representations of the actual charges that Tenant is required to pay hereunder, or as binding upon Landlord in any manner whatsoever. Without limiting the foregoing, Tenant hereby expressly acknowledges that the Landlord Parties have made no representations, warranties, inducements or promises with respect to the Project, the Development or the Premises or this Lease or estimated Gross Sales or the number or kind of tenants in the Project or the Development except as herein expressly set forth. Tenant acknowledges that prior to entering into this Lease, Tenant has satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents (including, without limitation, Landlord's Agent).

**33.2** Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between the parties hereto other than that of Landlord and Tenant.

**33.3** Time shall be of the essence in the performance of all obligations of Tenant under this Lease.

**33.4** The Exhibits attached hereto (or contemplated to be completed and attached to this Lease within the time periods specified in this Lease) are hereby made a part of this Lease as fully as if set forth in the text of this Lease.

Unless expressly set forth to the contrary in this Lease, any site plans or tenant lists set forth in this Lease or in Exhibits to this Lease are not intended, in any way, to constitute a representation or warranty by, or on behalf of, Landlord (a) as to the past, current or future layout of the Project or the Development or (b) as to the past, existing or future tenants or occupants in the Project or the Development. Any site plans or listing of tenants or occupants in the Project or the Development set forth in this Lease are for the sole purpose of showing the approximate location of the Premises in the Project and are to be used for no other purposes whatsoever. The labeling of any past, current or future tenants or occupants in the Project or the Development on any Exhibit to this Lease are not intended to represent or warrant that such listed tenants or occupants have been, are or will be tenants or occupants in the Project or the Development.

**33.5** Tenant, at its sole expense, shall comply, and shall cause the Premises to comply, with all Laws, rules, orders and regulations, including without limitation, all energy-related requirements, of Federal, state, county, and municipal authorities and with any direction of any public officer or officers, pursuant to law, which shall impose any duty upon Landlord or Tenant with respect to or arising out of Tenant's use or occupancy of the Premises, including, without limitation, the Americans With Disabilities Act, as amended from time to time. Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to nonperformance or noncompliance with or breach or failure to observe an item, covenant, or condition of this Lease upon Tenant's part to be kept, observed, performed or complied with. If Tenant receives notice of any violation of law, ordinance, order or regulation applicable to the Premises, it shall give prompt notice thereof to Landlord.

**33.6** Intentionally Deleted

**33.7** Masculine, feminine or neuter pronouns shall be substituted for one another, and the plural shall be substituted for the singular number, in any place or places herein in which the context may require such substitution.

**33.8** Any headings preceding the text of the several Sections and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

**33.9** If Tenant is a corporation, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that: Tenant is a duly formed corporation qualified to do business and in good standing in the State of Michigan; Tenant will remain qualified to do business and in good standing in said state throughout the Term; and such person(s) are

33

duly authorized by such corporation to execute and deliver this Lease on behalf of the corporation. If such corporation is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of the corporation hereby acknowledge and agree that they individually, jointly, and severally, shall be responsible for all terms, covenants, and obligations of this Lease; in addition to said corporation. Further, if Tenant is a corporation and a second officer fails to attest to this Lease, then Tenant shall be deemed to represent that such attestation is not required for the corporate signature to be valid and binding upon the corporation.

33.10    If Tenant is a partnership or limited liability partnership or company, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that: Tenant is a duly formed partnership or limited liability partnership or company, as applicable, qualified to do business and in good standing in the State of Michigan: Tenant will remain qualified to do business and in good standing in said state throughout the Term; and such person(s) are duly authorized by the applicable entity to execute and deliver this Lease on behalf of the partnership or limited liability partnership or company. If the applicable entity is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of such entity hereby acknowledge and agree that they individually, jointly, and severally, shall be responsible for all terms, covenants, and obligations of this Lease; in addition to said entity.

33.11    The term "including", as used in this Lease, shall mean in each instance "including, without limitation" and the listed items following such term shall be construed to be exemplary and not exhaustive.

33.12    This Lease may not be modified or amended except by a written instrument signed by both Landlord and Tenant.

**33.13**    **Right to Terminate**.

33.13.1    If Landlord determines in its reasonable discretion that Tenant's presence in the Project has resulted in: (i) public demonstrations in or near the Project or the Development; (ii) increased security risks for the Project, the Development and/or its occupants; (iii) material and continuing inconvenience to other occupants of the Project or the Development; or (iv)  material and continuing interference with the operation or management of the Project or the Development, Landlord shall have the right to terminate this Lease upon thirty (30) days' prior written notice to Tenant.

33.13.2    If Landlord shall exercise the foregoing termination right, then Tenant shall pay Minimum Rent and Additional Rent through and apportioned as of the effective date of such termination; and neither Landlord nor Tenant shall have any rights, estates, liabilities, or obligations under this Lease accruing after the effective date of such termination, except such rights, liabilities, and obligations that, by the terms of this Lease, survive the expiration or sooner termination of this Lease.

33.14    Tenant will not discriminate in the conduct and operation of its business in the Premises against any person or group of persons because of the race, creed, color, sex, age, national origin or ancestry of such person or group of persons.

33.15    Tenant shall not impose any counterclaim or counterclaims in any proceeding for possession of the Premises or summary proceeding, or other action based on termination or holdover, except to the extent that Tenant's failure to make such claim in such proceeding would, as a matter of law, preclude Tenant from raising such claim in any other proceeding or forum.

33.16    Upon execution of this Lease by Tenant and thereafter within ten (10) days after written request from Landlord, Tenant shall deliver to Landlord a copy of a financial statement or annual report of Tenant for the most recently completed fiscal period and tax returns for the most recent three (3) years. Landlord shall use reasonable efforts to keep such information confidential, provided, however, it shall be permitted to provide such information in connection with any administrative or judicial proceedings in which Landlord is involved where Landlord may be required to divulge such information.

33.17    Intentionally Deleted

33.18    Intentionally Deleted

33.19     Landlord's agents and employees may purchase merchandise from Tenant without identifying themselves so as to verify that all customers are being treated in a courteous and businesslike manner, that the use of the Premises corresponds with the use provided for in this Lease and that each customer receives a receipt for all purchases. If any inspection made pursuant to this section discloses that Tenant is not properly receipting for all purchases in accordance with

this Lease or is otherwise in default, Tenant shall pay Landlord's cost of such inspection as Additional Rent within five (5) days of Tenant's receipt of Landlord's demand therefor.  At the conclusion of any inspection, Landlord shall have the right to return such unused merchandise to Tenant for a full refund.

**33.20**    Except for the payment of monetary obligations, if a party is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles, governmental action or inaction, or complying with governmental order, or any similar cause whatsoever beyond its control, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by the party.  In no event shall this Section be construed to delay or excuse the timely payment of Rent under this Lease.

**33.21**    Tenant hereby acknowledges and agrees that this Lease is intended to be a complete net lease to Landlord, except as expressly herein set out, that Landlord is not responsible for any costs, charges, expenses and outlays of any nature whatsoever arising from or relating to the Premises, or the use and occupancy thereof, or the contents thereof or the business carried on therein, and Tenant shall pay all charges, impositions, costs and expenses of every nature and kind relating to the Premises, except as expressly otherwise agreed herein.

**33.22**    Tenant further acknowledges that the Project is to be developed and constructed, and that Landlord's development and construction of the Project and the Development, as well as completion or renovation of the Common Areas and other premises, may cause interference or interruption with the Common Areas and Tenant's business.  Notwithstanding any interruption or interference, under no circumstances will Landlord be liable in damages or otherwise to Tenant or Tenant's permittees, licensee, invitees, clients, customers, employees, or contractors due to Landlord's development and construction of the Project and the Development, nor shall any interruption or interference be construed as an eviction (actual or constructive) of Tenant, nor be deemed a cause for abatement of Rent by Tenant, nor relieve Tenant from the fulfillment of any covenant, condition, or term of this Lease.

**33.23**    Tenant covenants that this Lease is made and accepted upon and subject to the condition that there shall be no discrimination by Tenant against or segregation of any person or group of persons on account of sex, marital status, race, color, creed, religion, national origin or ancestry, familial status or handicap in the operation of the Premises, nor shall Tenant or any person claiming under or through Tenant, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of the Premises.

**33.24**    Landlord and Tenant acknowledge that the Premises shall be located in a Project planned for development. The proposed development is subject to Landlord obtaining satisfactory financing, subject to the cost of said development being satisfactory to Landlord, and subject to Landlord obtaining all necessary permits and approvals from local, State and Federal governmental agencies.  Accordingly, in the event Landlord shall not obtain satisfactory financing or permits necessary for the project development, or in the event that the projected costs of construction shall not be satisfactory to Landlord, or in the event Landlord shall determine that the economic viability of the proposed development has changed, all in the Landlord's sole discretion, Landlord shall have the right to terminate this Lease upon sixty (60) days' notice to Tenant at any time prior to tender of possession of the Premises, and each party shall be released from all liability hereunder and from any liability whatsoever to the other for any expense incurred arising out of this Lease or in any other way related to Landlord's decision to discontinue development of the Project.

**33.25**    Landlord shall have the unilateral right to assign this Lease after the date hereof without Tenant's consent. Tenant agrees to accept any assignee as the Landlord hereof and to attorn in every respect to such assignee as if the original Landlord hereunder.

**33.26**    Tenant acknowledges that at the execution of this Lease, Landlord may not own or have a ground lease on the Premises.  However, Landlord shall acquire all necessary rights, title and interest in and to the Premises (by fee ownership, ground lease, or otherwise) on or prior to the delivery of the Notice of Possession.  Landlord shall have the right to enable the Project or any portion thereof, together with any and all buildings and all other structures, improvements and other permanent fixtures which are or may be constructed hereafter thereon, to be owned by certain type of common ownership known as condominium ownership.  At Landlord's election from time to time, the Premises and the Project or portions thereof shall be subject to, and entitled to the benefit of, (i) the provisions, rights, privileges, terms and conditions of the Michigan Condominium Act, MCL 559.101 et seq. as amended (the "Act") and (ii) any Master Deed or the like recorded or to be recorded with the Wayne County Recorder of Deeds, a copy of which has been or will be provided to Tenant (the "Master Deed").  Tenant shall be subject to the rules, regulations, covenants, conditions, reservations, easements, charges and assessments set forth in the Master Deed.

**33.27**    Intentionally Deleted

**ARTICLE 34**
**INTENTIONALLY DELETED**

**ARTICLE 35**
**INTENTIONALLY DELETED**


**ARTICLE 36**
**WAIVER OF JURY TRIAL**

      **36.1** **TO INDUCE LANDLORD AND TENANT TO ENTER INTO THIS LEASE, LANDLORD AND TENANT EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE OR ANY OF ITS PROVISIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND LANDLORD AND TENANT EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR TENANT NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR TENANT HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LANDLORD AND TENANT EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE WITH LEGAL COUNSEL.**

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Lease under their respective seals as of the day and year first above written.

**WITNESS:**

**LANDLORD:**

Global Resource Center, LLC, a Michigan limited liability company

DocuSigned by:

By: *Ashley Ketko*
Name: Ashley Ketko
ASEB0815E997475...
Title:_____

DocuSigned by:

By: *Travis Arbogast*
Name: Travis Z. Arbogast
9B3C6B4F6FD4476...
Title:    Vice President of Development

**ATTEST/WITNESS:**

**TENANT:**

M-Den, Inc., d/b/a The M Den and The Victors Collection by The M Den, a Michigan corporation

DocuSigned by:

By: *Scott Young*
Name: Scott Young
6963373634C4C4...
Title:_____

DocuSigned by:

By: *Scott Hirth*
Name: Scott Hirth
...a584A1D4B7...
Title:    President
Federal Tax ID #: 38-1944588

[Corporate Seal]

37

Site Plan





Premises - Lease Space B

**EXHIBIT B**
**TO**
**LEASE**


Agreement Specifying Term of Lease

This Agreement Specifying Term of Lease ("Agreement") is attached to and made part of the Lease dated the ____ day of _____, 20__, by and between Global Resource Center, LLC, a Michigan limited liability company ("Landlord"), and M-Den, Inc., d/b/a The M Den and The Victors Collection by The M Den, a Michigan corporation ("Tenant").

Landlord and Tenant are parties to a lease dated _____ (the "Lease") covering certain premises in the building located at and known as _____. The capitalized terms used in this Agreement shall have the meanings set forth in the Lease, unless otherwise defined in this Agreement.

Landlord and Tenant do hereby confirm and acknowledge the following:  (i) the Rent Commencement Date is hereby established to be _____, 20__; and (ii) the Expiration Date is hereby established to be _____, ____.

This Agreement shall be binding on the parties hereto, their successor and assigns and all subtenants of Tenant and any other party claiming under or through Tenant.  Tenant hereby certifies that the Lease is in full force and effect as of the date hereof in accordance with its terms, and that Tenant is in possession of the Premises.  Tenant further certifies that Landlord has fulfilled all of its obligations under the Lease that were required to be fulfilled by Landlord on or prior to the Rent Commencement Date and that Tenant has no claim or right of set-off against any Rent (as defined in the Lease) under the Lease.

This Agreement was entered into as of the ____ day of _____, 20__.

**WITNESS:**                                                  **LANDLORD:**

                                                             Global Resource Center, LLC,
                                                             a Michigan limited liability company


By:_____                    By:_____
Name:_____                       Name:_____
Title:_____                      Title:_____


**ATTEST/WITNESS:**                               **TENANT:**

                                                             M-Den, Inc., d/b/a The M Den and The Victors Collection by The M Den,
                                                             a Michigan corporation


By:_____                    By:_____
Name:_____                       Name:_____
Title:_____                      Title:_____
                                                             Federal Tax ID #: _____


[Corporate Seal]

**EXHIBIT C**
**TO**
**LEASE**


<u>Landlord's Work and Tenant's Work</u>

Except for the items specifically listed below, Tenant expressly acknowledges and agrees that it is obligated to accept the Premises in their current "as is" condition:

A. **GENERAL.** These specifications are prepared to aid Tenant in preparing and executing Tenant's improvement plan. Tenant should refer to the building plans and specifications indicated on the Lease Outline Drawing or As-Built Drawing (herein referred to as L.O.D.) provided by LANDLORD, and confirm all measurements and as-built conditions with LANDLORD's Tenant coordinator, and by visual inspection of the Premises before starting construction. In cases where these requirements are in conflict with LANDLORD's completed building plans or completed buildings, information in the completed building plans or completed building shall take precedence over these requirements. Prior to starting construction, Tenant shall provide completed working drawings and specifications for the construction of the Premises, in a preliminary and then final submission in order to receive LANDLORD's written approval. Tenant's contractor must be approved by LANDLORD prior to the start of construction.


1. **EXTERIOR FINISH -**    Exterior walls framed, insulated and enclosed.

   Exterior façade, glazing & entry doors installed by LANDLORD (signage by Tenant).


2. **INTERIOR FINISH -**

   A. Floor:    Concrete

   B. Demising Walls:    Demising Studs.

   C. Ceiling:    Exposed to underside of floor/roof above.

   D. Structure    Structural frames columns and beams will be constructed to carry live & dead loads per for assembly use.

3. **ELECTRICAL -**    LANDLORD will provide a 277/480 volt, 400 amp service stub out with disconnects to an area in the back of house as designated by LANDLORD. Tenant shall be responsible for all transformers and distribution within the Premises.

4. **PLUMBING -**    2" gas line to Premises.
   4" sanitary waste-line to Premises. Tenant to make additional tie ins.
   3" water line, meter and shut off valve to the Premises.

5. **FIRE PROTECTION -**    Main to Premises with heads turned up. Tenant is responsible for all distribution and branching.

6. **HVAC -**    LANDLORD will provide HVAC service with a maximum of 1 ton per 300 sf for retail use. Tenant will be responsible for installing and distributing the ductwork, VAV's

thermostats etc.

7. **TELEPHONE -**             Telephone conduit to Premises.

8. **FIRE RATED SHAFT -**    LANDLORD shall provide a fire-rated shaft from the Premises to the roof for the Tenant's rooftop HVAC equipment, restroom exhaust, and make-up air system. LANDLORD shall provide access doors for cleaning if required.

9. **COMMUNICATION -**     LANDLORD shall provide one minimum 3" conduit with pull string for telephone service brought to the location shown on Tenant's Construction Documents from the service main. LANDLORD shall provide two minimum 3" conduits for the internet and cable TV services with pull strings brought to the locations shown on LANDLORD's plans.

Any work beyond the scope of the foregoing specifications shall be subject to LANDLORD's approval and shall be provided and installed at Tenant's sole expense in accordance with all applicable codes. LANDLORD reserves the right to substitute materials of equal or greater quality without Tenant's consent.

**EXHIBIT D**
**TO**
**LEASE**

Intentionally Deleted

**EXHIBIT E**
**TO**
**LEASE**


Sign Criteria


The following criteria shall govern the design, color, size, illumination, location and manner of installation of all of Tenant's signs to be placed on or near the Premises and/or the Project:

Tenant shall use a sign designer and fabricator designated by Landlord if Landlord so requests, and Tenant shall spend on signage an amount designated by Landlord – it is acknowledged by Tenant that these provisions are reasonable and that unique and distinctive signage is an important part of the Development.

[To be supplied by Landlord.  If criteria not supplied, signage shall be subject to Landlord's approval and shall be designed and installed consistent with the requirements of Landlord.]

**EXHIBIT F**
**TO**
**LEASE**

Prohibited Uses, Exclusives, and Restrictions

Tenant shall not use or permit the use of the Premises for any other business or purpose, except as set forth in Section 1.3 of this Lease and in strict accordance with the Rules and Regulations. No part of the Premises shall be used for any purpose other than retail sales and/or services, offices, restaurants or other commercial purposes which are permitted by applicable zoning and other Laws and which are typically found in first-class retail or entertainment centers in the City or County in which the Project is located. No part of the Premises shall be used for any use that would increase the demand or requirement for parking in the Project in excess of that required by the Permitted Use. The restrictions set forth in this Exhibit shall not be deemed to bind Landlord. No part of the Premises shall be used in a way that endangers the health or safety of any user of the Project. Landlord shall have the right, in Landlord's sole and absolute discretion, to waive all or any of the prohibitions set forth above upon such matters, terms and conditions as Landlord, in its sole discretion, may determine.

The term "Tenant" as utilized in this Exhibit "F", shall mean the Tenant and any and all assignees, sublessees and/or licenses of the Tenant and its successors and assigns.

**PROHIBITED USES:**

Tenant shall not use the Premises for any of the following uses:

1.      Tenant shall not use the Premises for any use which is likely to injure the reputation of the Project, including but not limited to, any use which is disreputable or immoral or would require a license pursuant to laws or regulations governing adult entertainment activities including massage parlors.
2.      flea market
3.      swap shop or "outlet store" selling merchandise that is used, damaged or discontinued
4.      massage parlor
5.      adult book store
6.      barber college
7.      place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers
8.      funeral parlors
9.      facility for the sale of paraphernalia for use with illicit drugs
10.     carnival, amusement park or circus
11.     new or used car dealership
12.     gas station
13.     auto repair shop
14.     quick service pizza restaurant

**EXHIBIT G**
**TO**
**LEASE**

Rules and Regulations

A.  Tenant shall be obligated to do the following:

    i.    Keep the Premises, including all exterior surfaces and the interior and exterior sides of all glass, clean, orderly and sanitary;

    ii.    Keep the outside areas adjacent to the Premises clean, orderly and free of ice and snow, rubbish, obstructions and merchandise;

    iii.    Display the certificate of occupancy for the Premises in the Premises (if required by applicable Laws) and provide Landlord with a copy of the certificate of occupancy for the Premises;

    iv.    Keep the Premises free of garbage and trash and remove the same from the Premises to containers approved by Landlord;

    v.    Maintain the Premises free of insects, rodents, vermin and other pests;

    vi.    Keep all mechanical apparatus free of vibration and noise;

    vii.    Procure and maintain at its sole cost and expense any permits and licenses required in the transaction of Tenant's business;

    viii.    Conduct its business in all respects in a dignified manner in accordance with the high standards of first-class store operations;

    ix.    Load and unload goods at such times in the areas and through such entrances as may be designated by Landlord;

    x.    Maintain the temperature in the Premises to prevent freezing of plumbing lines and fixtures;

    xi.    If the Premises connects to a climate controlled interior mall or other area, operate heating and cooling equipment to maintain store temperature between $68^{o}$ F and $74^{o}$ F in the winter and between $72^{o}$ F and $78^{o}$ F in the summer, or in accordance with the then prevailing Laws respecting minimum and maximum winter and summer store temperatures;

    xii.    Keep its show windows dressed, using only professionally prepared signage which must be submitted to Landlord for approval prior to installation;

    xiii.    Keep its show windows and exterior signs illuminated from dusk to dawn every day or such other times as required by Landlord from time to time;

    xiv.    Keep the Premises open during the hours prescribed in Section 1.17;

    xv.    Abide by all Rules and Regulations set forth in this Exhibit G as may be changed by Landlord from time to time;

    xvi.    Tenant and its employees shall park their cars only in such areas as may be designated for that purpose by Landlord.  Tenant shall furnish Landlord with State automobile license numbers used by Tenant or its employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord by the first day of each January, April, July and October of any changes in such information.  If Tenant or its employees shall fail to park their cars in the designated parking areas, Landlord shall have the right to charge Tenant, as Additional Rental, the sum of Twenty-Five Dollars ($25.00) per day per car parked in violation of this Section.  Tenant shall notify its employees in writing of the provisions of this Section.

B.  Tenant shall not do the following:

i.      Display any sign visible outside the Premises without first having obtained Landlord's written permission;

ii.     Use the Premises or any other part of the Project for any Prohibited Use;

iii.    Cause the accumulation of garbage, trash, rubbish or refuse in the Premises, the Project, or the Development;

iv.     Display or store merchandise outside the Premises;

v.      Distribute hand bills or other advertising matter or solicit business in the Common Areas, or elsewhere in the Development;

vi.     Permit parking of any vehicle for more than 24 hours;

vii.    Attach any awning, antenna, or other projection to the roof or the outside walls of the Premises or the building of which the Premises are a part;

viii.   If the Premises are in an enclosed mall, be open for business on any day unless the mall is opened and operated by Landlord;

ix.     Use or permit the use of objectionable advertising mediums such as loud speakers or other mediums that irritate or have the tendency to irritate other tenants within the Project or the Development or their customers or invitees.

## Specific Rules and Regulations Regarding Liquor Service and
## Live Entertainment

1. Tenant shall not play or present any music within the demised premises that is likely to (A) have a detrimental effect on the Project or the Development, (B) create a perception that the Project or the Development is not safe for families and the general public, or (C) attract organized "gangs", as determined by Landlord in its sole discretion. Tenant shall not play or present any music within the Premises that can be heard outside the Premises. Tenant shall immediately comply with Landlord's written directions concerning any music presented within the Premises. Thus if Landlord instructs Tenant to reduce the volume of the music played or presented within the Premises or cease playing or presenting a particular type of music within the Premises, Tenant shall immediately comply with such instructions.

**EXHIBIT H**
**TO**
**LEASE**

**Intentionally Deleted**

**EXHIBIT I**
**TO**
**LEASE**

**Exclusive Area**

The Exclusive Area covers The Fox Theatre Building and the Little Caesars Global Resource Center, on Columbia Street, from Woodward Ave. to Park.



30776298.4\130774-00125