**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                             Case No. 24-47922-tjt

Heritage Collegiate Apparel, Inc. f/k/a            In Proceedings Under
M-Den, Inc., d/b/a The M Den                       Chapter 11

                                                   Hon.  Thomas J. Tucker

                          Debtor.
_____/

**DEBTOR'S FIRST AMENDED COMBINED PLAN OF**
**LIQUIDATION AND DISCLOSURE STATEMENT**

<u>PREPARED BY</u>:

KIM K. HILLARY (P67534)
HOWARD BORIN (P51959)
SCHAFER AND WEINER, PLLC
Counsel for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340

**<u>DISCLAIMER</u>: THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF LIQUIDATION DESCRIBED HEREIN.  ACCORDINGLY, PRIOR TO THE ENTRY OF AN ORDER GRANTING PRELIMINARY APPROVAL TO THE DISCLOSURE STATEMENT, THE FILING AND DISSEMINATION OF THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT ARE NOT INTENDED TO BE AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN**

**NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED ON FOR ANY PURPOSE. THIS DISCLAIMER MAY BE REMOVED AFTER THE COURT GRANTS PRELIMINARY APPROVAL TO THE DISCLOSURE STATEMENT AND PRIOR TO DISSEMINATION TO THE CREDITORS.**

**THE DEBTOR EXPRESSLY RESERVES ITS RIGHT TO AMEND THIS COMBINED PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT.**

## PLAN OF LIQUIDATION

### INTRODUCTION

Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den ("Debtor") a Michigan limited liability company, hereby proposes in good faith the following First Amended Plan of Liquidation (the "Plan") for the resolution of outstanding Creditor[1] Claims and equity Interests. Reference is made to the Disclosure Statement, combined with this Plan, for a discussion of the Debtor's history, business, properties, results of operations, risk factors and a summary and analysis of the Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

### EXECUTIVE SUMMARY OF PLAN

**A.     Role of Debtor, Liquidation Trustee and Committee after Plan Confirmation**

One of the primary purposes of this Executive Summary is to describe the delineation of duties and responsibilities under the Plan as between the Debtor, the Committee and the Liquidation Trust. As set forth in more detail below, the Debtor shall continue to be responsible for objection to, allowance of, and distribution to all Claims and Interests other than those held by non-priority Unsecured Creditors and certain post-confirmation Professional Fees. The Liquidation Trust shall be responsible for objection to, allowance of, and

---

[1] Defined terms have the meanings ascribed in Article I of this Plan. *See* Article I.

{01094803.2}

distribution to non-priority Unsecured Creditors.[2]  The Committee shall be disbanded upon establishment of the Liquidation Trust and shall have no further duties.

The Debtor will retain and distribute the Sale Proceeds and will retain the right to pursue the MCA Creditor Adversary Proceedings.  To the extent proceeds are generated from the MCA Creditor Adversary Proceedings they will be paid to the Liquidation Trust for distribution.  Pursuant to section 3.10.6 below, to the Debtor is in possession of Sale Proceeds or other funds after payment of all Claims with higher priority than non-priority Unsecured Creditors, such amounts will be transferred to the Liquidation Trust for distribution.

The Liquidation Trust will take title to and distribute the proceeds of the Bank of Ann Arbor Related Entity Loan Documents, all Avoidance Actions and all Causes of Action other than the MCA Creditor Adversary Proceedings.

The Committee will not hold or liquidate any assets.

### (i)     Role of the Debtor

Under the Plan, the Debtor is responsible for the allowance and payment of Groups I and II Creditors with Allowed Claims, including Allowed Administrative Expenses, and Holders of Allowed Claims in Classes I – IX as set forth in more detail below.  The Debtor is responsible for:

(a) Making distributions to Creditors who are subject to treatment under Classes I (Bank of Ann Arbor), II (SBA), III (Newtek), VIII (Unifi) and IX (GM Financial) of the Plan on their Allowed Secured Claims.  The Plan provides an Allowed Claim amount for each of these Creditors, as a result the Debtor will not be filing objections to any of these Claims.

(b) Objecting to the claim of Class IV Creditor (TVT) and making a distribution to this Creditor to the extent it is determined to have an Allowed Secured Claim.[3]

---

[2] Except for any unsecured deficiency Claim of the Holder of a Secured Claim which the Debtor is responsible for establishing.

[3] The amount of the Allowed Secured Claim of Classes II (SBA), III (Newtek) and IV (TVT) cannot be determined until the Claims of Ownership of one or more of

(c) Distributing funds to Group I Creditors with Allowed Administrative Claims.

(d) Distributing funds to Group II Creditors Holding Allowed Priority Tax Claims. The Debtor does not anticipate objecting to any of the Priority Tax Claims, as a result it does not expect there to be any claim objection procedure regarding these Creditors.

(e) Filing Adversary Proceedings against the MCA Creditors (Classes V, VI and VII) in order to determine whether any of the MCA Creditors own any portion of the Sale Proceeds. To the extent it is determined by entry of a Final Order that any MCA Creditor owns some or all of the Sale Proceeds, the Debtor will turn those Sale Proceeds over to the relevant MCA Creditor. To the extent it is determined that any of the MCA Creditors have an Allowed Secured Claim, the Debtor is responsible for distributing funds to the MCA Creditors.

The assets that the Debtor will administer are (i) the Sale Proceeds and (ii) the MCA Adversary Proceedings.

### (ii)  Role of the Liquidation Trust

Under the Plan, the Liquidation Trust is responsible for allowance and payment of the following:

(a) Fees and costs incurred to administer the Trust.

---

the MCA Creditors are resolved. As a result, the Debtor will only make distributions to the SBA, Newtek and TVT if and when the MCA Adversary Proceedings are resolved such that Sale Proceeds become available for distribution to these Creditors on their Allowed Secured Claims. To the extent there are not sufficient Sale Proceeds to pay these Allowed Claims in full, these Creditors will be entitled to an Allowed Unsecured Claim for the deficiency which will be entitled to payment on a pro-rata basis from the Liquidation Trust.

(b) As set forth in more detail in section 3.10.7, unpaid Professional Fees incurred by Debtor after the Confirmation Date related to (i) advising the Debtor on the final aspect of winding down its business and implementation of the Plan and Confirmation Order, and (ii) litigating the MCA Adversary Proceedings.

(c) Allowed Unsecured Claims.

The assets that the Liquidation Trust will administer are as follows:

(a) Rights under the Bank of Ann Arbor Related Entity Loan Documents which provide the Trust with the right to collect approximately $3,642,694 from the Insider Entities, and which obligations are secured by Related Entity Mortgages against the Related Entity Real Estate.

(b) All Causes of Action and Avoidance Actions (except the MCA Adversary Proceedings).

### (iii)    Role of the Committee

The Committee does not have any obligations after the Confirmation Date other than the appointment of a Trustee to administer the Liquidation Trust. Upon appointment of the Trustee and establishment of the Liquidation Trust, the Committee will be disbanded.

### B.    Involvement of Both Debtor and Liquidation Trustee

Under the Bankruptcy Code, the Debtor has a fiduciary duty to all Creditors and Interest Holders. Conversely, the Committee is appointed to represent the interests of only the non-Priority Unsecured Creditors. The Debtor's Plan proposes to include both the Debtor and the Trust (which supplants the Committee) in the liquidation process in order to maintain this framework and division of these fiduciary obligations.

### C. Purpose of Debtor's Involvement in Post-confirmation Liquidation

The primary purpose of the Debtor's involvement in the post-confirmation liquidation is for the Debtor to file the MCA Adversary Proceedings and take other steps necessary to determine the amounts owed to Secured Creditors and MCA Creditors, and to distribute the Sale Proceeds to all Groups and Classes except the Class X non-priority Unsecured Creditors. Debtor's involvement in this respect is necessary as the Committee and Trustee's fiduciary obligation runs solely to non-priority Unsecured Creditors whose interest may diverge from those of the Debtor and other Creditors and Interest Holders.

### D. Liquidation of Assets

As set forth in more detail in section A(i) above, the Debtor will administer[4] (i) the Sale Proceeds and (ii) the MCA Adversary Proceedings.

As set forth in more detail in section A(ii) above, the Liquidation Trust will administer and liquidate (i) the Bank of Ann Arbor Related Entity Loan Documents, including the Related Entity Mortgages, (ii) Causes of Action, and (iii) Avoidance Actions (except the MCA Adversary Proceedings).

### E. Debtor's Understanding of Waterfall of Sale Proceeds

The Debtor estimates that the Sale Proceeds (excluding amounts in the Professional Fee Account) will total approximately $9,939,972[5] as of January 29, 2025.[6]

---

[4] The Sale Proceeds are liquid and the primary purpose of the MCA Adversary Proceedings is the avoidance of interests and not the recovery of funds. As a result the Debtor is not "liquidating" any assets within the common understanding of the word.

[5] The original Sale Proceeds totaled $11,613,877 and were combined with the Debtor's cash on hand on the Closing Date. From these amounts the Debtor has paid (i) $2,361,751 to Bank of Ann Arbor pursuant to this Court's Order entered at DN 142, (ii) approximately $52,930 to CMP pursuant to the Court's Order entered at DN 210, and (iii) other expenses authorized pursuant to the Final Cash Collateral Order.

Of this amount, the Debtor estimates that $250,000 will be used to pay United States Trustee Fees, $90,795 will be used to pay Priority Tax Claims, leaving a balance of $9,599,177.

| Estimated Sale Proceeds as of Jan. 29th | $9,939,972 |
|---|---|
| Payment of UST Fees (estimated) | ($250,000) |
| Payment of Allowed Priority Tax Claims | ($90,795) |
| **Estimated Sale Proceeds remaining after payment of (i) UST Fees and (ii) Allowed Priority Tax Claims Claim** | **$9,599,177** |

### (i)    Security Interests and Claims of Ownership

Various parties have claimed that they have a security interest in the Sale Proceeds, or that they own the Debtor's Sale Proceeds. The chart below lists these parties in their order of priority based on the UCC Financing Statements they allege to have filed.[7]

| Priority | Claimant | Amount Claimed | Type of Interest | UCC Filing Date |
|---|---|---|---|---|
| | | | | |
| First | Bank of Ann Arbor | $3,642,694 | Security | 5-6-1999 |
| Second | Elemental | $4,596,132 | Ownership | 3-12-2020 |
| Third | SBA | $514,494.53 | Security | 6-28-2020 |
| Fourth | Newtek | $3,558,992 | Security | 11-13-2020 |
| Fifth | TVT | $3,251,793 | Security | 4-3-2023 |
| Sixth | Vault Capital | $860,700 | Ownership | 11-9-2023 |
| Seventh | Family Fund | $380,000 | Ownership | 5-21-2024 |

---

[6] This date was selected because it was the date and time of the originally scheduled hearing on confirmation of the Plan. The Debtor anticipates that this hearing will be adjourned with the filing of this First Amended Combined Plan and Disclosure Statement.

[7] Nothing in this Plan is an admission by Debtor of the veracity of any Party's allegation that they filed a particular UCC Financing Statement or that the filing of any UCC Financing Statement resulted in the perfection of any interest they may have. Debtor retains all rights and defenses regarding same.

{01094803.2}

7

### (ii)    MCA Creditor Holdback

The typical priority analysis is turned on its head in this Case by the argument of the MCA Creditors that they collectively <u>own</u> $5,836,832 in Sale Proceeds.  The MCA Creditors argue that this Court cannot oversee the distribution of this portion of the Sale Proceeds because such proceeds are not property of the Estate and not subject to this Court's jurisdiction.  The MCA Creditors allege that his argument also applies to Sale Proceeds that they allegedly purchased subject to a security interest.  For instance, and assuming arguendo that Vault Capital owns $860,700 in Sale Proceeds, it purchased these Sale Proceeds subject to the liens of Bank of Ann Arbor, SBA, Newtek, and TVT.  After payment of all these liens, the Sale Proceeds Vault Capital purchased are worthless.  However, this does not prevent Vault Capital from arguing that this Court cannot oversee the distribution of these Sale Proceeds to Secured Creditors because *it argues that the $860,700 in Sale Proceeds that it allegedly owns are not property of the estate and not subject to the jurisdiction of this Court*.  Vault Capital's position is that it owns this portion of the Sale Proceeds and the security interests in these Sale Proceeds must be foreclosed by Bank of Ann Arbor, SBA, Newtek and TVT in state court.

The result is that the Debtor is unable to distribute a total of $5,836,832 in Sale Proceeds without this Court's determination as to whether such proceeds are property of the Estate or property of an MCA Creditor.  The Debtor created the MCA Creditor Holdback (which totals $5,836,832) which the Debtor will not distribute without a resolution of the MCA Creditor ownership claims, and the Debtor will file the MCA Creditor Adversary Proceedings seeking a determination as to ownership.

### (iii)    Payment of Bank of Ann Arbor

Bank of Ann Arbor is owed $3,642,694, and has a security interest in the Sale Proceeds which it perfected with the filing of its UCC Financing Statement on May 6, 1999.  The total Sale Proceeds are sufficient to pay Bank of Ann Arbor in full on its first priority Allowed Secured Claim (totaling approximately $3,642,694) without using any of the funds necessary for creation of the MCA Creditor Holdback.  As a result, as set forth in more detail in Plan section 3.1, the Debtor proposes to pay Bank of Ann Arbor's Allowed Secured Claim in full prior to the resolution of the MCA Adversary Proceedings.

### (iv) Reduction of Creditor Holdback and Payment of Additional Claims

As set forth in the chart below, after payment of (i) UST Fees, (ii) Allowed Priority Tax Claims, (iii) Bank of Ann Arbor, and (iv) the Creditor Holdback, the estimated remaining Sale Proceeds total $119,652.

| Estimated Sale Proceeds as of Jan. 29th | $9,939,972 |
|---|---|
| Payment of UST Fees (estimated) | ($250,000) |
| Payment of Allowed Priority Tax Claims | ($90,795) |
| Payment of Bank of Ann Arbor Allowed Secured Claim | ($3,642,694) |
| Creditor Holdback | ($5,836,832) |
| **Estimated Remaining Proceeds** | **$119,652** |

However, to the extent the Debtor succeeds in eliminating or reducing any MCA Creditor's claim that it owns a portion of the Sale Proceeds, it will be able to reduce the amount it holds in the MCA Creditor Holdback. Once the available Sale Proceeds increase, the Debtor will be able to use the Proceeds to pay additional Allowed Secured Claims, while still retaining funds sufficient to account for the MCA Creditor Claims of Ownership.

For example, and as set forth in the chart below, in the event the MCA Creditor Holdback is reduced to $5,202,685, the available Sale Proceeds will increase to $514,494 which would be sufficient to pay the SBA's Allowed Secured Claim.

| Estimated Sale Proceeds as of Jan. 29th | $9,939,972 |
|---|---|
| Payment of UST Fees (estimated) | ($250,000) |
| Payment of Allowed Priority Tax Claims | ($90,795) |
| Payment of Bank of Ann Arbor Allowed Secured Claim | ($3,642,694) |
| Reduced MCA Creditor Holdback | ($5,202,685)[8] |
| Payment of SBA Allowed Secured Claim | ($514,494) |
| **Estimated Remaining Proceeds** | **$0** |

---

[8] This chart and the Reduced MCA Creditor Holdback represent a hypothetical scenario which is included only to explain how the Sale Proceeds will be disbursed in various scenarios.

As a continuation of this example, if the MCA Creditor Holdback is reduced to $4,202,685, the available Sale Proceeds will increase to $1,514,494 which would be sufficient to pay the SBA's Allowed Secured Claim, and to pay $1,00,000 toward Newtek's Allowed Secured Claim.

| Estimated Sale Proceeds as of Jan. 29th | $9,939,972 |
|---|---|
| Payment of UST Fees (estimated) | ($250,000) |
| Payment of Allowed Priority Tax Claims | ($90,795) |
| Payment of Bank of Ann Arbor Allowed Secured Claim | ($3,642,694) |
| Reduced MCA Creditor Holdback | ($4,202,685)[9] |
| Payment of SBA Allowed Secured Claim | ($514,494) |
| Payment toward Newtek's Allowed Secured Claim | ($1,000,000) |
| **REMAINING PROCEEDS** | **$0** |

The Debtor's Plan implements the above examples by providing that Class II (SBA), III (Newtek) and IV (TVT) Creditors will be paid on their Allowed Secured Claims at such time as the MCA Creditor Holdback is reduced to a level that allows for payment of all or part of their Allowed Secured Claim in their order of priority. *See* below at sections 3.2.2 and 3.2.3 (SBA); 3.3.2 and 3.3.3 (Newtek); and 3.4.2 and 3.4.3 (TVT).

## F. Assets Available for Distribution to Non-priority Unsecured Creditors (Class X)

The primary asset being transferred to the Trust for distribution to Class X non-priority Unsecured Creditors are the rights to collect the approximately $3,642,694 owed under the Bank of Ann Arbor Related Entity Loan Documents, which amount is secured by the Related Entity Mortgages on the Related Entity Real Estate. In addition, the Trust will hold the right to collect $592,634 owed by Stadium Properties to the Debtor and other Causes of Action and Avoidance Actions, the proceeds of which may be sufficient to result in a distribution to Class X non-priority Unsecured Creditors.

---

[9] This chart and the Reduced MCA Creditor Holdback represent a hypothetical scenario which is included only to explain how the Sale Proceeds will be disbursed in various scenarios.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

1.1   **SCOPE OF DEFINITIONS; RULES OF CONSTRUCTION**   For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meaning ascribed to them in this Article I of the Plan. Any term used in the Plan that is not defined in this Article I of the Plan, but is defined in the Bankruptcy Code, the Bankruptcy Rules (as defined below) or the Disclosure Statement shall have the meaning ascribed to such terms in the Bankruptcy Code, the Bankruptcy Rules or the Disclosure Statement as the case shall be. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include masculine.

1.2   **DEFINITIONS**

1.2.1   "**Administrative Claim**" means a Claim for payment of an administrative expense of a kind specified in Section 503(b) or 507(b) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) or 507(b) of the Bankruptcy Code, including, but not limited to, (a) the actual necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor, including wages, salaries or commissions for services rendered after the Petition Date, (b) Professional Fees, (c) all fees and charges assessed against the Estate under 28 U.S.C. § 1930 and (d) all Allowed Claims that are entitled to be treated as administrative claims pursuant to a Final Order under Section 546(c)(2) of the Bankruptcy Code.

1.2.2   "**Administrative Creditor**" means any Creditor entitled to payment of an Allowed Administrative Claim.

1.2.3   "**Allowed**" means when used in reference to a Claim or Interest, within a particular Class, an Allowed Claim or Allowed Interest of the type described in such Class.

1.2.4   "**Allowed Claim**" means:

{01094803.2}

A.    A Proof of Claim or Interest that was:

1.    Timely filed;

2.    Deemed filed pursuant to Section 1111(a) of the Code; <u>or</u>

3.    Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to the Debtor and counsel for the Debtor; <u>and</u>

B.    1.    The Claim is not a Contested Claim or a Contested Interest,

<u>or</u>

2.    The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

1.2.5    "**<u>Available Proceeds</u>**" means the funds in the Debtor-in-Possession bank account ending in 9107, minus the MCA Creditor Holdback and amounts necessary to pay current or future estimated United States Trustee's Fees.

1.2.6    "**<u>Avoidance Actions</u>**" means all Claims granted to the Debtor-in-Possession or to the Estate under Chapter 5 of the Bankruptcy Code.

1.2.7    "**<u>Ballot</u>**" means the official bankruptcy form no. B314 adopted for this Case or a document prepared to substantially conform to same which was distributed to all Creditors and parties-in-interest in connection with the solicitation of votes for or against the Plan.

1.2.8    "**<u>Bankruptcy Code</u>**" **or "<u>Code</u>"** means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code (11 U.S.C. §§101, <u>et</u> <u>seq</u>.), as in effect as of the Petition Date, or thereafter amended to the extent such amendments are applicable to the Chapter 11 Cases.

1.2.9    "**<u>Bankruptcy Court</u>**" or "**<u>Court</u>**" means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, or such

other court as may have jurisdiction over this Case.

1.2.10   "**Bankruptcy Rules**" or "**Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991, and any amendments thereto, and the Federal Rules of Civil Procedure, as amended, and as made applicable to this Case or proceedings therein.   To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District Court for the Eastern District of Michigan, as amended and as applicable to this Case and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

1.2.11   "**Bar Date(s)**" means the date(s), if any, designated by the Bankruptcy Court as the last date(s) for filing Proofs of Claim or Interest against the Debtor, or otherwise asserting any Claim against the Debtor, or, in the absence of such designation, as shall be applicable under the Bankruptcy Rules.

1.2.12   "**Business Day**" means any day, other than a Saturday, Sunday or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

1.2.13   "**Cash**" means legal tender of the United States or equivalence thereof.

1.2.14   "**Cash Collateral Motion**" means the *First Day Motion for Entry of an Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate Protection to Prepetition Lenders; and (III) Scheduling a Final Hearing* filed by the Debtor at DN 18.

1.2.15   "**Causes of Action**" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions.

1.2.16   "**Chapter 11 Case**" or "**Case**" means the above titled case currently pending before the Bankruptcy Court styled *In re Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den.*

1.2.17 "**Claim**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.2.18 "**Class**" means a category of Holders of Claims or Interests as described in Article III of this Plan.

1.2.19 "**Closing Date**" means September 24, 2024, the date on which the Debtor sold substantially all of its operating assets to Rally House Stores, Inc.

1.2.20 "**Collateral**" means any property or interest in property of the Estate subject to an unavoidable Lien securing the payment or performance of a Secured Claim.

1.2.21 "**Committee**" means the official committee of unsecured creditors or any other official committee that has been or may be appointed pursuant to section 1102(a) of the Bankruptcy Code in this case.

1.2.22 "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order.

1.2.23 "**Confirmation Hearing**" means the hearing to consider the confirmation of the Plan under Section 1128 of the Bankruptcy Code.

1.2.24 "**Confirmation Order**" means the order entered by the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Code.

1.2.25 "**Contested**" means when used in reference to a Claim or Interest in this Plan, any Claim or Interest as to which Debtor or any other party-in-interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

1.2.26 "**Cure**" means the payment or other honor of all

obligations required to be paid or honored in connection with assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law: (a) the cure of any non-monetary defaults to the extent required, if at all, pursuant to section 365 of the Bankruptcy Code, and (b) with respect to monetary defaults, the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations or such lesser amount as may be agreed upon by the parties, under such executory contract or unexpired lease.

       1.2.27      **"<u>Creditor</u>"** means any Holder of a Claim against the Debtor.

       1.2.28      **"<u>Determination Date</u>"** means the date on which the Court has entered Final Orders establishing the Allowed amounts of any Claim of Ownership or other Claim of each of the MCA Creditors.

       1.2.29      **"<u>Disallowed</u>"** and **"<u>Disallow</u>"** means (a) a Claim or Interest or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or Interest or any portion thereof that is listed in the Debtor's Schedules at zero, unknown, or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or Interest or any portion thereof that is not listed in the Debtor's Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

       1.2.30      **"<u>Disclosure Statement</u>"** means the written Disclosure Statement that is incorporated within and into the Plan, as amended, supplemented or modified from time to time, and that was prepared and distributed in accordance with Section 1125 of the Bankruptcy Code and applicable Bankruptcy Rules.

       1.2.31      **"<u>Disputed Claim</u>"** or **"<u>Disputed Interest</u>"** means a Claim

{01094803.2}

or any portion thereof, or an Interest or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, nor an Allowed Interest nor a Disallowed Interest, as the case may be.

1.2.32    "**Effective Date**" shall be the first business day after the Confirmation Order becomes a Final Order.

1.2.33    "**Estate**" means the estate of a Debtor created pursuant to Section 541 of the Bankruptcy Code.

1.2.34    "**Exhibit**" means any exhibit or schedule attached to this Plan, the Disclosure Statement, or incorporated into either by reference, including any amendments and supplemental exhibits or schedules that may be filed subsequent to filing of the Plan and Disclosure Statement.

1.2.35    "**Final Order**" means an order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken, (ii) any timely appeal has been finally determined or dismissed and the time for any successive appeal has expired and no successive appeal has been timely taken or, (iii) an appeal has been timely taken but such order has not been stayed within fourteen (14) days after the filing of such appeal.

1.2.36    "**Final Cash Collateral Order**" means the *Final Order (I) Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate Protection to Prepetition Lenders; and (III) Cancelling Final Hearing Scheduled for September 20, 2024,* entered at DN 138.

1.2.37    "**GAAP**" means generally accepted accounting principles.

1.2.38    "**Governmental Unit**" has the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

1.2.39    "**Group**" means one or more similarly situated Creditors who hold or may allege Claims against the Debtor whose Claims are not subject to classification pursuant to Section 1123(a)(1) of the Bankruptcy Code.

1.2.40    "**Holder**" means a Person holding a Claim, Interest, or Lien, as applicable.

1.2.41    "**Impaired**" when used in reference to a Claim or Interest,

{01094803.2}

has the meaning set forth in Section 1124 of the Bankruptcy Code.

1.2.42    "**Insider**" has the meaning as set forth in Section 101(31) of the Bankruptcy Code.

1.2.43    "**Interest**" means any equity interests in the Debtor, of any kind or nature, including without limitation, any corporate share or membership interests.

1.2.44    "**Interest Rate**" means, for each Claim, except as otherwise expressly set forth in the Plan, (a) the prime rate of interest published in the Wall Street Journal on the Confirmation Date (or, if no prime rate of interest is published on the Confirmation Date, the most recent prime rate of interest published in the Wall Street Journal prior to the Confirmation Date), (b) with respect to a claim for taxes, the interest rate applicable under non-bankruptcy law or (c) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

1.2.45    "**Initial Trust Claims**" means (i) any claim or cause of action of Debtor against the University of Michigan, and (ii) any claim or cause of action of Debtor against an Insider or Related Entity

1.2.46    "**Interim Cash Collateral Order**" means the *Interim Order (I) Authorizing the Debtor to Use Cash Collateral; (II) Providing Adequate Protection to Prepetition Lenders; and (III) Scheduling a Final Hearing* entered at DN 40.

1.2.47    "**Lien**" means a charge against, or an interest in property to secure payment of a debt or performance of an obligation.

1.2.48    "**Liquidation Trust**" means the trust established for the benefit of Holders of Allowed Unsecured Claims and governed by the Trust Agreement.

1.2.49    "**Liquidation Trustee**" means the Trustee appointed pursuant to the Liquidation Trust.

1.2.50    "**MCA Creditors**" means Family Funding Group, LLC, Vault Capital and Elemental Capital, Inc.

{01094803.2}

1.2.51 **"MCA Creditor Holdback"** means the combined amount of the Claims of Ownership filed by the MCA Creditors which equals $5,836,832 on the Confirmation Date (Elemental = $4,596,132; Family Fund = $860,700; Vault Capital = $380,000). The amount of the MCA Creditor Holdback is subject to reduction pursuant to any Final Order establishing the Allowed amount of any Claim of Ownership or other Claim of any MCA.

1.2.52 **"Person"** shall have the meaning given to it under section 101(41) of the Bankruptcy Code.

1.2.53 **"Petition Date"** means August 16, 2024, the date upon which the Debtor voluntarily filed for relief pursuant to chapter 11 of the Bankruptcy Code.

1.2.54 **"Plan Supplement"** refers to the implementing documents necessary to effectuate this Plan, including, but not limited to the Trust Agreement, which has been filed with the Bankruptcy Court at DN 229.

1.2.55 **"Priority Claim"** means a Claim under or entitled to priority under any of the following sections of the Bankruptcy Code; §§ 507(a)(1), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), 507(a)(7) and 507(a)(8) of the Bankruptcy Code.

1.2.56 **"Priority Tax Claim"** means a Claim under or entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

1.2.57 **"Professional"** means any professional employed in the Chapter 11 Case pursuant to Sections 327 or 1103 of the Bankruptcy Code seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Section 503(b)(4) of the Bankruptcy Code.

1.2.58 **"Professional Fees"** means the fees and expenses owed to Professionals.

1.2.59 **"Proof of Claim"** means a Claim properly filed by a Holder of a Claim before the Bar Date.

1.2.60 **"Pro-Rata"** means at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all

Claims (including disputed or Contested Claims) in such Class as of the Confirmation Date unless the Plan expressly provides otherwise.

1.2.61     "**Rally House**" means Rally House Stores, Inc., the entity that purchased substantially all of Debtor's operating assets at the Auction Sale conducted by Debtor on September 24, 2024, pursuant to the Sale Order.

1.2.62     "**Related Entities**" means M-Den Properties, LLC ("Heritage Properties"), M Den Stadium Properties, LLC ("Stadium Properties"), and M Den State Street Properties, LLC ("State Street Properties").

1.2.63     "**Related Entity Real Estate**" means real property located at (i) 5000 Carpenter Rd. in Ypsilanti, Michigan, (i) 1336 South Main St. in Ann Arbor, Michigan, (iii) 210 West Stadium Blvd., in Ann Arbor, Michigan, and (iv) 307-309 State Street in Ann Arbor, Michigan.

1.2.64     "**Sale Order**" means the Order of the Court entered on September 20, 2024 [DN 142] authorizing the Debtor to sell substantially all its assets to Rally House free and clear of liens.

1.2.65     "**Sale Proceeds**" means $11,613,877 which the Debtor received as a result of the sale of its assets to Rally House.

1.2.66     "**Schedules**" means the schedules of assets and liabilities, the list of Holders of Interests and the statement of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1017 as such schedules and statements have been, or may be supplemented or amended through the Confirmation Date.

1.2.67     "**Secured Claim**" means a Claim secured by a Lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in such property as of the Petition Date and only if such Secured Claim is Allowed.

1.2.68     "**Trust Agreement**" means the Heritage Collegiate Apparel, Inc. Liquidation Trust Agreement which is included in the Plan Supplement as Exhibit 1.2.68.

1.2.69     "**Unsecured Claim**" means a Claim that is neither a Secured

Claim, an Administrative Claim, a Priority Claim, nor a Priority Tax Claim.

      1.2.70   **"Unsecured Creditor"** means any Creditor that holds an Unsecured Claim.

    1.3   **RULES OF INTERPRETATION**   For purposes of the Plan;

      1.3.1  Any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially on such terms and conditions.

      1.3.2  The words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan unless expressly stated otherwise.

      1.3.3  Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or effect the interpretation of the Plan.

      1.3.4  The rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

      1.3.5  The Disclosure Statement may be used as an aid for interpretation of this Plan to the extent that any provision of this Plan is determined to be vague or ambiguous. However, to the extent any statement in the Disclosure Statement conflicts with any provision of this Plan, this Plan controls.

      1.3.6  Any reference in the Plan to an existing document or Exhibit filed or to be filed means such document or Exhibit as it may have been or may be amended, modified, or supplemented.

      1.3.7  Any reference in the Plan to a docket number ("DN") is a reference to a docket number in the Case, unless specifically noted to the contrary.

      1.3.8  Except as provided to the contrary or as required by the context, each reference to a section is a reference to a section of the Bankruptcy Code.

    1.4   **COMPUTATION OF TIME**   In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall govern.

{01094803.2}

1.5    **GOVERNING LAW** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Michigan shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

1.6    **EXHIBITS**. All Exhibits and Plan Supplement(s) are fully incorporated into and are a part of this Plan and Disclosure Statement as if fully set forth herein and, to the extent not attached to this Plan, the Exhibits and Plan Supplement(s) all have been filed separately with the Bankruptcy Court on January 9, 2025 [DN___]. Upon its filing, any Exhibit and Plan Supplement(s) may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours or at the Bankruptcy Court's website for a fee at https://www.mieb.uscourts.gov/. The Exhibits and Plan Supplement(s) may also be requested in writing from Debtor's counsel. **All Exhibits and/or the Plan Supplements may be revised before the Confirmation Date by the filing of the revised Exhibits and/or Plan Supplements with the Bankruptcy Court, so long as the revised Exhibits and/or Plan Supplement(s) are substantially in conformance with the terms of this Plan.** The Exhibits and Plan Supplement(s) are an integral part of this Plan, and entry of the Confirmation Order by the Bankruptcy Court will constitute an approval of the Exhibits and Plan Supplement(s).

1.7    **No Admissions; Estimates of Claims**. Unless expressly stated otherwise, nothing herein will be deemed to be an admission by Debtor or to otherwise prejudice Debtor or Liquidation Trustee in any Claim objection or Cause of Action. All estimates of Causes of Action and Claim amounts listed in the Plan, the Disclosure Statement, Plan Supplements and Exhibits are current estimates only. All Claim amounts and classifications remain subject to the Claims objection process as set forth in Article XI.

## ARTICLE II

### TREATMENT OF CLAIMANTS NOT SUBJECT TO CLASSIFICATION

Administrative Creditors and Priority Tax Creditors shall be paid as follows:

2.1    **GROUP I - ADMINISTRATIVE CLAIMS** The Claims of Group I shall consist of, without limitation, Holders of Administrative Claims, if and when

{01094803.2}

Allowed. Holders of Administrative Claims may include, without limitation, the Office of the United States Trustee for unpaid quarterly fees, Schafer and Weiner, PLLC, Wolfson Bolton Kochis, PLLC, Capstone Partners, Conlin McKenney Philbrick, P.C. and taxes that qualify as Administrative Claims. The Debtor anticipates that the following Administrative Creditors will assert claims in approximately the following amounts:

| Claimant | Estimated Amount |
|---|---|
| Schafer and Weiner, PLLC | $300,000 |
| Office of the United States Trustee | $100,000 |
| Wolfson Bolton Kochis, PLLC | $241,000 |
| Capstone Partners | $225,000 |
| Taxing Authorities | None |

2.1.1 Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during this Chapter 11 Case, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim on such date as may be mutually agreed upon between Debtor and the claimant, or, if no such date is agreed upon: (a) no later than ten (10) business days after the date on which an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or as soon thereafter as reasonably practicable; (b) on the date such fee is due under 28 U.S.C. §1930 (a)(6)(A) and payable pursuant to the United States Trustee Guidelines, or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Estate in the ordinary course of business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

2.1.2 Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court or as provided herein, requests for payment of Allowed Administrative Claims, except for any Professional Fee Claims, must be filed and served on the Debtor no later than thirty (30) days after the Confirmation Date (the "Administrative Claims Bar Date"). Holders of Allowed Administrative Claims that are required to file and serve a request for payment of such Allowed Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined

from asserting such Claims against the Debtor or their property, and such Claims shall be deemed discharged as of the Confirmation Date.

2.1.3 Notwithstanding any other provision of the Plan concerning Administrative Claims, any Professional seeking an award by the Bankruptcy Court of an Allowed Administrative Claim on account of Professional Fee Claims shall (consistent with the Scheduling Order entered at DN 60) file a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Confirmation Date no later than thirty (30) days after date the Confirmation Order is entered. The Debtor shall pay each Professional Fee Claim within ten business days after the order allowing such claim becomes a Final Order.

2.1.4 Orders of the Bankruptcy Court authorizing the payment of any Group I Claim shall have the effect of a judgment under Bankruptcy Rule 7054.

2.1.5 Except as otherwise specifically provided in the Plan, after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay the reasonable fees and expenses incurred by Professionals on or after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103, in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may pay any Professional in the ordinary course of business without any further notice, action, order or approval of the Bankruptcy Court.

2.1.6 Except as otherwise specifically provided in the Plan, any Person or Entity that requests compensation or expense reimbursement for making a substantial contribution to this Chapter 11 Case pursuant to Bankruptcy Code sections 503(b)(3), (4) or (5) must file an application and serve such application on counsel for the Debtor, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code or the Bankruptcy Rules on or before the Administrative Claim Bar Date, or be forever barred from seeking such compensation or expense reimbursement. All rights of the Debtor the United States Trustee and all other parties in interest to object to such request are expressly reserved.

2.2 **GROUP II - PRIORITY TAX CLAIMS** The Claims of Group II shall consist of the Allowed Claims that are entitled to priority under Section 507(a)(8) of the Bankruptcy Code (as more fully set forth in the Disclosure Statement, the

Debtor's Schedules and the Court's claims register).  The Debtor believes that the following are Priority Tax Claims in this Case:

| Claimant | Filed Proof of Claim Amount |
|---|---|
| Ohio Department of Taxation | $42,758.13 |
| WA Department of Revenue | $11,518.99 |
| Illinois Department of Revenue | $35,472.23 |
| Massachusetts Department of Revenue | $1,045.15 |
| **TOTAL** | **$90,795** |

2.2.2    The Debtor shall pay Allowed Priority Tax Claims in full within ninety (90) days after the Effective Date.  The Debtor is not currently aware of any objection to the proof of claim amounts filed by the Priority Tax Creditors identified above.

2.3    **DETERMINATION OF PRIORITY CLAIMS**    Notwithstanding the above, the Debtor shall have the right to challenge any Priority Claim through the claims objection process set forth in Article XI of this Plan, which challenge may include, but need not be limited to, a challenge to any penalty portion of such Claim, the amount and the value of the property which forms the basis for any assessment of taxes and the computation of the tax.  The right to challenge these Claims shall include, without limitation, an objection to the assessment of the Debtor's real or personal property that may or may not have been made by the respective taxing authority.

# ARTICLE III

## SPECIFICATION OF TREATMENT OF CLASSES OF CLAIMS OR INTERESTS NOT IMPAIRED UNDER THE PLAN AND THOSE IMPAIRED UNDER THE PLAN

All holders of claims against the Debtor and the Estate, other than the Claims treated in Article II, are divided into the Classes set forth in this Article III for all purposes, including voting on, confirmation of and distribution under the Plan.  A Claim will be entitled to the treatment accorded to a particular Class only to the extent that such Claim is an Allowed Claim.

Except as specifically set forth in the Plan, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that

the Debtor is subject to or liable for any Claim, and the Debtor reserves all rights to challenge any such assertion.

The Plan divides Claims and Interests into eleven (11) Classes and treats them as follows:

3.1 **CLASS I.** Class I consists of the Allowed Secured Claim of Bank of Ann Arbor. The Debtor is indebted to Bank of Ann Arbor pursuant to Guaranty Agreements described in section IV.F of the Disclosure Statement ("Guaranty Agreements") whereby the Debtor guaranteed repayment of four separate loans made by Bank of Ann Arbor to certain of the Related Entities – which loans are described in more detail in section IV.F of the Disclosure Statement ("Related Entity Loans"). The Debtor's obligations under the Guaranty Agreements are secured by a first priority security interest in all of its assets pursuant Commercial Security Agreement dated July 5, 2020, and a UCC Financing Statement with the State of Michigan on May 6, 1999, file number D514533. As set forth in more detail in section IV.F of the Disclosure Statement, these Related Entity Loans are secured by mortgages on the Related Entity Real Estate ("Related Entity Mortgages" and together with the Guarantee Agreements, Commercial Security Agreements and other loan documents evidencing or related to these Related Entity Loans, the "Bank of Ann Arbor Related Entity Loan Documents"). Bank of Ann Arbor declared a default under the Bank of Ann Arbor Related Entity Loan Documents on or about August 20, 2024, and the loans have been accelerated pursuant to their terms. The Debtor believes the total amount it owes to Bank of Ann Arbor pursuant to the Guaranty Agreements is approximately $3,642,694. Bank of Ann Arbor's Class I Claim shall be treated as follows:

3.1.1 Bank of Ann Arbor shall have an Allowed Secured Claim in the amount of $3,642,694.18 as of December 5, 2024, which amount shall be adjusted to account for interest accrued and payments made after such date.

3.1.2 The Debtor shall pay to Bank of Ann Arbor the amount of its Allowed Secured Claim within ninety (90) days after the Effective Date in full satisfaction of the Allowed Secured Claim against the Debtor. The Related Entities' liability under the Bank of Ann Arbor Related Entity Loan Documents will not be extinguished as a result of this payment under the principal of equitable subrogation, and the Related Entities will continue to be liable for repayment of all amounts due and owning under the Bank of Ann Arbor Related Entity Loan Documents. Furthermore, upon payment in full of Bank of Ann Arbor's Allowed Secured Claim,

all of Bank of Ann Arbor's rights, title and interest in, to and under the Bank of Ann Arbor Related Entity Loan Documents will transfer to the Liquidation Trust, and all of the Debtor's claims, rights and interest in equitable subrogation to Bank of Ann Arbor's rights against the Related Entities and the Related Entity Real Estate shall automatically be deemed to have been transferred and assigned to the Liquidation Trust.

   3.1.3 Bank of Ann Arbor shall execute such documentation as is reasonably necessary to evidence the assignment of the Bank of Ann Arbor Related Entity Loan Documents to the Liquidation Trust.

   **This Class is Impaired.**

   3.2 **<u>CLASS II</u>**. Class II consists of the Allowed Claim of the Small Business Administration ("<u>SBA</u>") pursuant to an SBA Note in the face amount of $500,000 and Security Agreement both dated June 17, 2020, which were amended on July 2, 2021 ("<u>SBA Note</u>"). The SBA asserts a perfected all asset lien on the Debtor's assets to secure repayment of the SBA Note pursuant to the Security Agreement and UCC Financing Statement #20200628001058 filed with the State of Michigan on June 28, 2020. The Class II Claim shall be treated as follows:

   3.2.1 Class II shall have an Allowed Claim in the amount of $514,494.53 as of September 5, 2024, which amount shall be reduced to reflect any payments made after such date.

   3.2.2 Within ninety (90) days after both of the following have occurred: (A) payment in full of the Allowed Secured Class I Claim, and (B) the earlier of (i) the Determination Date, or (ii) the date on which the Available Proceeds are sufficient to pay the Class II Allowed Secured Claim in full, the Debtor shall pay to SBA all of the Available Proceeds up to the amount of its Allowed Claim.

   3.2.3 Notwithstanding the forgoing, the Debtor shall be entitled, but not required, to prepay some or all of the amounts it is required to pay pursuant to section 3.2.2 at any time after payment of in full of Class I Allowed Secured Claim so long as it retains the MCA Creditor Holdback and sufficient funds to pay current and future United States Trustee Fees.

   3.2.4 To the extent the Class II's Allowed Claim is not paid in full under

{01094803.2}

sections 3.2.2 or 3.2.3, Class II will be entitled to an Allowed Unsecured Claim for any deficiency, which shall be paid in accordance section 10.1.6 below.

**This Class is impaired.**

3.3     **CLASS III**. Class III consist of the Allowed Claim of Newtek Small Business Finance, LLC ("Newtek") owed pursuant to the U.S. Small Business Administration Note in the face amount of $4,600,000 and Commercial Security Agreement both dated December 10, 2020 ("Newtek Note"). Newtek asserts a perfected all asset lien on the Debtor's assets to secure repayment of the Newtek Note pursuant to the Commercial Security Agreement and UCC Financing Statement #20201113000487-3 filed with the State of Michigan on November 13, 2020.

3.3.1 Class III shall have an Allowed Secured Claim in the amount of $3,558,991.61 as of October 4, 2024, which amount shall be reduced to reflect any payments made after such date.

3.3.2 Within ninety (90) days after all of the following have occurred: (A) payment in full of the Allowed Claims of Classes I and II, and (B) the earlier of the following event (i) the Determination Date, or (ii) the date on which the Available Proceeds are sufficient to pay the Class III Allowed Secured Claim in full, the Debtor shall pay to Newtek all of the Available Proceeds up to the amount of its Allowed Claim.

3.3.3 Notwithstanding the forgoing, the Debtor shall be entitled, but not required, to prepay some or all of the amounts it is required to pay pursuant to section 3.3.2 at anytime after payment of in full of the Allowed Claims of Classes I and II so long as it retains the MCA Creditor Holdback and sufficient funds to pay current and future United States Trustee Fees.

3.3.4 To the extent the Class III's Allowed Claim is not paid in full under sections 3.3.2 or 3.3.3, Class III will be entitled to an Allowed Unsecured Claim for any deficiency, which shall be paid in accordance section 10.1.6 below.

**This Class is impaired.**

3.4     **CLASS IV**. Class IV consist of the Claim of TVT pursuant to the

{01094803.2}

Business Loan and Security Agreement dated March 23, 2023 in the face amount of $2,500,000 ("TVT Agreement") which TVT alleges is secured by UCC Financing Statement #20230403000622-4 filed with the State of Michigan on April 3, 2023. TVT filed a Proof of Claim in this Case alleging it is owed $3,251,793.36. The Class IV Claim shall be treated as follows:

3.4.1 Debtor disputes the amount of TVT's Claim and believes the current balance owed under the TVT Agreement is approximately $1,443,926. The dispute shall be resolved pursuant to the claim objection procedures set forth in Article XI of the Plan.

3.4.2 Within ninety (90) days after all of the following have occurred: (A) TVT is determined to have an Allowed Claim, (B) the Allowed Claims of Classes I, II and III have been paid in full, and (C) the earlier of the following event (i) the Determination Date, or (ii) the date on which the Available Proceeds are sufficient to pay the Class IV Allowed Secured Claim in full, the Debtor shall pay to TVT all of the Available Proceeds up to the amount of its Allowed Claim.

3.4.3 Notwithstanding the forgoing, the Debtor shall be entitled, but not required, to prepay the amounts it is required to pay pursuant to section 3.4.2 at any time after payment of in full of the Allowed Claims of Classes I, II and III so long as it retains the MCA Creditor Holdback and sufficient funds to pay current and future United States Trustee Fees.

3.4.4 To the extent Class IV's Allowed Secured Claim is not paid in full under sections 3.4.2 or 3.4.3, it will be entitled to an Allowed Unsecured Claim for any deficiency which shall be paid in accordance with section 10.1.6 below.

**This Class is impaired.**

3.5 **CLASS V**. Class V consists of the Claims of Family Funding Group, LLC ("Family Funding"). Family Funding filed a Claim of Ownership alleging that it is owed $380,000 as a result of the purchase of future receivables pursuant to a Standard Merchant Cash Advance Agreement ("Family Fund MCA Agreement") dated December 5, 2023. Family Funding alleges that it filed a UCC Financing Statement on May 21, 2024, #20240521000542-3. The Debtor disputes Family Funding's Claim of Ownership for multiple reasons, including, but not limited to, the following: (i) Family Funding's transaction with the Debtor is not a true purchase of

future receivables but is instead a usurious loan that is legally void, (ii) the entire amount paid by Debtor over and above the funds that it received from Family Fund (the "Family Fund Purchase Price") must be returned to Debtor because it was paid pursuant to a usurious and void agreement, (iii) in the event the Family Fund MCA Agreement is determined to evidence a true purchase of assets and not a usurious loan, then (a) the Debtor nevertheless repaid in full the amounts owed to Family Funding under the Family Fund MCA Agreement, and (b) Family Fund did not purchase any portion of the Sale Proceeds and has no ownership rights in them, and (iv) the UCC Financing Statement filed by Family Funding is an avoidable preference which the Debtor is entitled to set aside under 11 U.S.C. §547.

3.5.1    On or before the Effective Date, the Debtor will commence an Adversary Proceeding (the "Family Fund Adversary Proceeding") against Family Fund (i) seeking a determination that the transaction represented by the Family Fund MCA Agreement is a usurious loan which is void under applicable law, (ii) demanding a return of all amounts the Debtor paid to Family Fund over and above the Family Fund Purchase Price, (iii) avoiding Family Fund's filed UCC Financing Statement as an avoidable preference, and, in the alternative (iv) seeking a determination that (a) the entire amount owed to Family Fund under the Family Fund MCA Agreement has been paid in full, and (b) Family Fund did not purchase any portion of the Sale Proceeds.

3.5.2    In the event the Court enters an Order determining that Family Fund owns some portion of the Sale Proceeds, the Debtor shall turn such amounts over to Family Fund within fourteen days after such Order becomes a Final Order.

3.5.3    In the event the Court enters an Order determining that Family Fund is entitled to an Allowed Secured Claim, Family Fund's Allowed Secured Claim shall be paid in its order of priority.  To the extent Debtor's assets are not sufficient to pay Family Fund's Allowed Secured Claim in full, it will be entitled to an Allowed Unsecured Claim for any deficiency which shall be paid in accordance with section 10.1.6 below.

3.5.4    In the event the Court enters an Order determining that Family Fund is entitled to an Allowed Unsecured Claim, Family Fund's Allowed Unsecured Claim shall be paid in accordance with section 10.1.6 below.

**This Class is impaired.**

3.6   **CLASS VI**.  Class VI consists of the claims of Vault Capital. Vault Capital filed a Claim of Ownership alleging that it is owed $860,700 as a result of the purchase of future receivables pursuant three Merchant Agreements dated November 9, 2023, November 14, 2023, and December 1, 2023 (collectively the "Merchant Agreements"). Vault Capital alleges that it filed a UCC Financing Statement on November 9, 2023, #20231109000701-4. The Debtor disputes Vault Capital's Claim of Ownership for multiple reasons, including, but not limited to, the following: (i) Vault Capital's transactions with the Debtor are not true purchases of future receivables but instead are usurious loans that are legally void, (ii) the entire amount paid by Debtor over and above the amount it received from Vault Capital (the "Vault Capital Purchase Price") must be returned to Debtor because it was paid pursuant to the usurious and void Merchant Agreements, (iii) in the event the Merchant Agreement are determined to evidence true purchases and not a usurious loans, then (a) the Debtor nevertheless repaid at least approximately $615,000 to Vault Capital and its actual claim under the Merchant Agreements is a small fraction of what is set forth in its Claim of Ownership, and (b) Vault Capital did not purchase any portion of the Sale Proceeds and has no ownership rights in them.

3.6.1   On or before the Effective Date, the Debtor will commence an Adversary Proceeding against Vault Capital (the "Vault Capital Adversary Proceeding") (i) seeking a determination that the transaction represented by the Merchant Agreements are usurious loans which are void under applicable law, (ii) demanding a return of all amounts the Debtor paid to Vault Capital over and above the Vault Capital Purchase Price, and, in the alternative (iv) seeking a determination that (a) the amount owed to Vault Capital is substantially less that what is set forth in Vault Capital's Claim of Ownership, and (b) Vault Capital did not purchase any portion of the Sale Proceeds.

3.6.2   In the event the Court determines that Vault Capital is the owner of any of the Sale Proceeds, the Debtor shall turn such amounts over to Vault Capital within fourteen days after such Order becomes a Final Order.

3.6.3   In the event the Court enters an Order determining that Vault Capital is entitled to an Allowed Secured Claim, Vault Capital's Allowed Secured Claim shall be paid in its order of priority. To the extent Debtor's assets are not sufficient to pay Vault Capital's Allowed Secured Claim in full, it will be entitled to an Allowed Unsecured Claim for any for any deficiency which shall be paid in accordance with section 10.1.6 below.

{01094803.2}

3.6.4  In the event the Court enters an Order determining that Vault Capital is entitled to an Allowed Unsecured Claim, Vault Capital's Allowed Unsecured Claim shall be paid in accordance with section 10.1.6 below.

**This Class is impaired.**

3.7  **CLASS VII.**  Class VII consists of the claims of Elemental Capital, Inc. ("Elemental").  Elemental filed a Claim of Ownership alleging that it is owed $4,956,132 as a result of the purchase of future receivables pursuant to a Sale of Future Receipts Agreement dated December 6, 2023.  Elemental alleges that it filed a UCC Financing Statement on March 12, 2020, #20200312000523-6.  The Debtor disputes Elemental's Claim of Ownership for multiple reasons, including, but not limited to, the following: (i) Elemental's transaction with the Debtor is not a true purchase of future receivables but is instead a usurious loan that is legally void, (ii) the entire amount paid by Debtor over and above the amount it received from Elemental (the "Elemental Purchase Price") must be returned to Debtor because it was paid pursuant to a usurious and void agreement, (iii) in the event the Sale of Future Receipts Agreement is determined to evidence a true purchase and not a usurious loan, the Debtor nevertheless repaid in full the amounts owed to Elemental under the Sale of Future Receipts Agreement, (iv) in the event Elemental's transaction with Debtor is a loan, Elemental is not entitled to rely on a UCC Financing Statement filed by a different entity before Elemental was incorporated, and (v) Elemental did not take a security interest in the Debtor's inventory or contract rights and as a result it does not have a lien on the Sale Proceeds.

3.7.1  On or before the Effective Date, the Debtor will commence an Adversary Proceeding against Elemental (the "Elemental Adversary Proceeding") (i) seeking a determination that the transaction represented by the Sale of Future Receipts Agreement is a usurious loans that is void under applicable law, (ii) demanding a return of all amounts the Debtor paid to Elemental over and above the Elemental Purchase Price, and, in the alternative (iii) seek a determination that (a) Elemental was paid in full under the Sale of Future Receipts Agreement, and (b) Elemental did not purchase or take a security interest in any portion of the Sale Proceeds.

3.7.2  In the event the Court determines that Elemental is the owner of any of the Sale Proceeds, the Debtor shall turn such amounts over to Elemental within fourteen days after such Order becomes a Final Order.

3.7.3  In the event the Court enters an Order determining that Elemental is entitled to an Allowed Secured Claim, Elemental's Allowed Secured Claim shall be paid in its order of priority.  To the Debtor's assets are not sufficient to pay Elemental's Allowed Secured Claim in full, it will be entitled to an Allowed Unsecured Claim for any deficiency which shall be paid in accordance with section 10.1.6 below.

3.7.4 In the event the Court enters an Order determining that Elemental is entitled to an Allowed Unsecured Claim, Elemental's Allowed Unsecured Claim shall be paid in accordance with section 10.1.6 below.

**This Class is Impaired.**

3.8  **CLASS VIII.**  Class VIII consists of the Allowed Secured Claim of Unifi Equipment Finance, Inc. ("Unifi"), pursuant to the Equipment Finance Agreement ("Unifi Loan") dated March 8, 2023 pursuant to which Unifi loaned $60,153.44 to the Debtor for the purchase of a 2023 Ram Promaster Van, VIN# 3C6LRVBG6PE529472 ("Promaster Van").  Unifi took a security interest in the Promaster Van to secure repayment of the Unifi Loan and the lien was perfected by acknowledgment of the lien on the certificate of title.  Unifi alleges that the current balance owed under the Unifi Loan as of the date of this filing is $51,588.03.

3.8.1  The Promaster Van was sold to Rally House on the Closing Date free and clear of the Unifi Lien which transferred to the Sale Proceeds in the amount of its Allowed Secured Claim.

3.8.2  Unifi shall have an Allowed Secured Claim in the amount of $22,103, which represents the current Blue Book Value of the Promaster Van.

3.8.3  On or before the date that fourteen (14) days after the Confirmation Order becomes a Final Order, the Debtor shall pay Unifi the amount of its Allowed Secured Claim.  Within thirty (30) days after receipt of this payment, Unifi shall deliver to Debtor a release of lien allowing the Debtor to remove the Unifi lien from the certificate of title.

3.8.4  Any amount owed to Unifi over and above the amount of its Allowed Secured Claim shall be treated as a Class VIII Claim entitled to treatment in

accordance with section 10.1.6 below.

**This Class is impaired.**

3.9 **CLASS IX.** Class IX consists of the Allowed Claim of AmeriCredit Financial Services, Inc., dba GM Financial ("<u>GM Financial</u>"), pursuant to the Retail Installment Sale Contract dated on or about June 17, 2020 ("<u>GM Financial Loan</u>") pursuant to which GM Financial loaned $48,267 for the purchase of a 2019 Chevrolet Express Box Truck, VIN# 1HA3GTCG7KN015406 ("<u>Box Truck</u>"). GM Financial took a security interest in the Box Trust to secure repayment of the GM Financial Loan and the lien was perfected by acknowledgment of the lien on the certificate of title ("<u>GM Lien</u>"). GM Financial filed Proof of Claim 5-1 claiming that it was owed $8,701.84 under the GM Financial Loan as of the Petition Date.

3.9.1 GM Financial shall have an Allowed Secured Claim in the amount of $8,701.84 as of Petition Date, which amount shall be reduced by any payments received after the Petition Date.

3.9.2 The Box Truck was sold to Rally House on the Closing Date free and clear of the GM Lien which transferred to the Sale Proceeds in the amount of its Allowed Secured Claim.

3.9.3 On or before the date that fourteen (14) days after the Confirmation Order becomes a Final Order, the Debtor shall pay the Allowed Secured Claim, or such lesser amount that is then owed, to GM Financial. In the event the Debtor and GM Financial cannot agree on the amount owed, either party shall be authorized to file a motion with the Court seeking entry of an order establishing the amount of the remaining balance.

3.9.4 Within thirty (30) days after receipt of payment of its Allowed Secured Claim, GM Financial shall deliver to Debtor a release of lien allowing the Debtor to remove GM Financial as a lien holder on the certificate of title to the Box Truck.

**This Class is impaired.**

3.10. **CLASS X.** Class X shall consist of the Allowed Claims of Unsecured

Creditors. The Debtor estimates that the total of all Allowed Unsecured Claims will equal approximately $31,609,981.44 (the "Estimated Claim Pool").

3.10.1 All Allowed Claims of Unsecured Creditors shall transfer to the Liquidation Trust and shall be paid from the Liquidation Trust in their order of priority and according to the terms of the Liquidation Trust.

3.10.2 Upon payment in full of Bank of Ann Arbor's Allowed Secured Claim, all of Bank of Ann Arbor's rights, title and interest in, to and under the Bank of Ann Arbor Related Entity Loan Documents will transfer to the Liquidation Trust, and all of the Debtor's claims, rights and interest in equitable subrogation to Bank of Ann Arbor's rights against the Related Entities and the Related Entity Real Estate shall automatically be deemed to have been transferred and assigned to the Liquidation Trust.

3.10.3. As a result of the transfer of the Related Entity Loan Documents to the Liquidation Trust the Debtor estimates that the Liquidation Trust will receive approximately $3,642,694 as a result of its rights under the Related Entity Loan Documents.

3.10.4 In the event the Claims of Ownership filed by Family Fund, Vault Capital and Elemental ("MCA Creditors") are Allowed there will not be any Sale Proceeds available for payment of Allowed Unsecured Claims. However, the Debtor disputes these Claims of Ownership and believes that nothing (or dramatically less) is owed to these MCA Creditors. On or before the Effective Date, the Debtor will file the (i) Family Fund Adversary Proceeding, (ii) Vault Capital Adversary Proceeding, and (iii) Elemental Adversary Proceeding (collectively, the "MCA Adversary Proceedings"). In the event the Debtor succeeds in reducing or eliminating the claims of the MCA Creditors, it may result in funds being available from the Sale Proceeds for distribution to Unsecured Creditors.

3.10.5 If any Adversary Proceeding results in a judgment or Court Order ("MCA Judgment") determining that any MCA Creditor owes a monetary obligation to the Debtor, the Debtor's right, title and interest in the MCA Judgment shall be deemed automatically transferred to the Liquidation Trust, except that the Debtor shall retain standing to defend the appeal of an MCA Judgment.

3.10.6 After payment of all (i) Allowed Secured Claims, (ii) Allowed Claims of Ownership, (iii) Allowed Administrative Claims, including United

States Trustee Fees, (iv) Allowed Priority Claims, and (v) any other Allowed Claims of higher priority, all remaining funds in the Debtor's debtor-in-possession bank accounts will be paid to the Liquidation Trust for distribution to creditors pursuant to the terms of the Liquidation Trust.

3.10.7 Upon transfer of any remaining funds to the Liquidation Trust in accordance with section 3.10.6, the Litigation Trust shall be responsible for payment of any unpaid Professional Fees incurred by Debtor after the Confirmation Date related to (i) advising the Debtor on the final aspect of winding down its business and implementation of the Plan and Confirmation Order, and (ii) litigating the MCA Adversary Proceedings.

**This Class is Impaired.**

11. **CLASS XI.** Class XI shall consist of Allowed Interests. The Interests of the Debtor are wholly owned by Scott Hirth, Julie Corrin and Steve Horning.

3.11.1 The Interests in the Debtor shall be cancelled as of the Effective Date.

3.11.2 Notwithstanding the forgoing cancellation of the Interests, the Debtor shall continue to exist after the cancellation set forth above, for the purposes of winding down the Debtors' affairs and cooperating with the Liquidation Trust to (a) implement and effectuate the distribution of assets in accordance with the priorities set forth in this Plan and (b) assist with the prosecution of any Causes of Action.

**This Class is Impaired.**

# ARTICLE IV
## ACCEPTANCE

4.1 **PRESUMED ACCEPTANCE AND REJECTION OF THE PLAN:** There are no classes that are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. There are no Classes that are

{01094803.2}

conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

4.2 **VOTING CLASSES:** All Classes of Claims are Impaired under the Plan, and Holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

4.3 **ELIMINATION OF VACANT CLASSES:** Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

4.4 **CRAMDOWN:** If necessary, the Debtor shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification of the Plan.

# ARTICLE V
# EXECUTION AND IMPLEMENTATION OF THE PLAN

5.1 **Execution of Liquidation Trust Agreement** The Liquidation Trustee and the Debtor will execute the Trust Agreement on or before the Effective Date.

5.2 **Appointment of Liquidation Trustee** The Committee shall select the Liquidation Trustee and he/she shall be appointed pursuant to the terms of the Liquidation Trust, and shall have the powers, duties, and obligations set forth therein.

5.3 **Disbandment of the Committee** The Committee shall be disbanded on the date when each of the following have occurred: (i) the Effective Date has occurred, (ii) the Liquidation Trust has been executed by the Debtor and Trustee, and (iii) a Trustee has been appointed over the Liquidation Trust.

5.4 **Funding the Liquidation Trust** Upon payment in full of Bank of Ann Arbor's Allowed Secured Claim, all of Bank of Ann Arbor's rights, title and interest in, to and under the Bank of Ann Arbor Related Entity Loan Documents

will transfer to the Liquidation Trust, and all of the Debtor's claims, rights and interest in equitable subrogation to Bank of Ann Arbor's rights against the Related Entities and the Related Entity Real Estate shall automatically be deemed to have been transferred and assigned to the Liquidation Trust. The Debtor and Bank of Ann Arbor shall be required to execute such documentation as is reasonably necessary to evidence the assignment of the Bank of Ann Arbor Related Entity Loan Documents and all equitable subrogation rights to the Liquidation Trust.

5.5 **Authorization for Distribution prior to Effective Date** The Debtor is authorized to make payments to Creditors pursuant to the terms of this Plan prior to the Effective Date.

5.6 **Payment of Claims and Claimholder's Rights after Payment** The Debtor may pre-pay any Claim, other than Claims held by Insiders or Related Entities, at any time without penalty or liability for unmatured interest. The Debtor may negotiate discounts in exchange for pre-payments. Upon satisfaction of all obligations by Debtor to Holder of an Allowed Claim, the Debtor shall have no further obligation to the Holder of such Claim under this Plan, and such Claim Holder shall have no further or continued rights or standing under this Plan.

5.7 **Transfer of Causes of Action and Avoidance Actions** All Avoidance Actions, Causes of Action and rights to object to the Claims of any non-priority Unsecured Creditor, Insider or Related Entity shall transfer to the Liquidation Trust on the Effective Date. The Debtor shall retain the right to object to all other Claims, including Claims of Ownership. Notwithstanding anything herein to the contrary, the Debtor retains the rights to rely on any Cause of Action or Avoidance Action for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to section 502(d) of the Bankruptcy Code.

5.8 **Causes of Action and Avoidance Actions** The Debtor has not yet completed its investigation into Avoidance Actions. Potential Avoidance Actions may include avoidance of pre-petition payments to Insiders within one year of the Petition Date, avoidance of other pre-petition payments within 90 days of the Petition Date, avoidance or challenge to any Liens asserted against property of the Debtor, avoidance of any unauthorized payment made after the Petition Date, and avoidance of any fraudulent conveyance that may have been made within six years of the Petition Date. Other Causes of Action preserved by this Plan include all accounts receivable, collection actions, contract claims, and commercial tort claims

{01094803.2}

37

held by the Debtor. Potential defendants include all Persons that transact business with the Debtor and any Person listed in the Debtor's statements of financial affairs (available at the Bankruptcy Court or upon request to Debtor's counsel) as having received a payment within ninety (90) days of the Petition Date. A list of transfers made by the Debtor within 90 days of the Petition Date is attached as **Exhibit B**

In addition, the Debtor specifically preserves any and all Claims and Causes of Action against the University of Michigan arising out of the Forbearance Agreement between the Debtor and the University of Michigan dated effective as of May 13,2024 and/or the transfer of certain rights related to the "M-Den" name to the University, and, to the extent such claims are not released as a result of a Final Order entered in this Case, the Debtor specifically preserves any other causes of action against which may exist against the University of Michigan related to any benefit received by the University of Michigan prior to the Petition Date and the interactions between the Debtor and the University of Michigan prior to or after the Petition Date.

**All Causes of Action, including Avoidance Actions, are specifically reserved, whether or not specifically listed in the Plan or Disclosure Statement.** The Liquidation Trust shall have full discretion to pursue, litigate, settle and/or abandon any Cause of Action or Avoidance Action. Unless any cause of action against a Person is expressly waived, released, compromised or settled in the Plan or a Final Order, the Liquidation Trust specifically reserves all causes of action for later adjudication, and, therefore, no preclusion doctrine, res judicata, estoppel (judicial, equitable or otherwise) or laches shall apply to any of the causes of action upon, after or as a consequence of the confirmation of the Plan, entry of the Confirmation Order, the Effective Date or consummation of the Plan. Notwithstanding anything herein to the contrary, and whether or not any Cause of Action is pursued or abandoned, the Debtor and the Liquidation Trust reserve their rights to use any Cause of Action defensively, including for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to section 502(d) of the Bankruptcy Code or otherwise.

5.9 **Post-Effective Date Professional Fees.** Any services performed or expenses incurred by any Professional on behalf of the Debtor or the Committee with respect to this Case after the Confirmation Date shall not be subject to the prior review and approval of the Bankruptcy Court. The Debtor does not anticipate that the Committee's Professionals will incur any significant fees or expenses after the Confirmation Date because the Committee's duties terminate when the Liquidation

Trust is established. All Professional Fees arising after the Confirmation Date, shall be billed directly to the Debtor or Liquidation Trustee, as the case may be, and in accordance with section 3.10.7 and paid in the ordinance with the terms of the invoice.

5.10 **Change of Address** In order to ensure that it receives its distribution, each Creditor holding a Claim must advise the Debtor and Liquidation Trustee, as applicable, of any change in address. Absent any such notification, Debtor and/or Liquidation Trustee, as applicable, shall send payments to the address listed on the Matrix on file with the Bankruptcy Court. If the payment is not negotiated within four (4) months after being mailed, it shall be void.

5.11 **Corporate Action and Effectuating Documents** Each of the matters provided for in this Plan involving the Debtor, including corporate action to be taken or required of Debtor, shall, as of the Confirmation Date, be deemed to have occurred, approved, authorized, and shall be effective as provided under this Plan without the requirement of any further action of any kind by the shareholders, members, managers, directors, officers, or board of the Debtor. Any officer of Debtor shall be and hereby is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate on behalf of the Debtor to effectuate and further evidence the terms and conditions of this Plan without further notice to or order, action or approval of the Debtor's members, managers, officers or the Bankruptcy Court.

## ARTICLE VI

### EFFECT OF CONFIRMATION

6.1 **SUBORDINATED CLAIMS** Pursuant to section 510 of the Bankruptcy Code, the Debtor reserves the right to re-classify (or request that the Bankruptcy Court re-classify) any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

6.2 **PLAN INJUNCTION** Except as otherwise provided in the Plan or the Confirmation Order, all persons or entities who have held, hold or may hold Claims, Interests, Causes of Action, or liabilities that: (i) are subject to

{01094803.2}

compromise and settlement pursuant to the terms of the Plan (as modified and/or confirmed); or (ii) are otherwise stayed or terminated pursuant to the terms of the Plan (as modified and/or confirmed), are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other proceeding, including on account of any Claims, Interests, Causes of Action, or liabilities that have been compromised or settled against the Debtor on account of or in connection with or with respect to any released, settled, compromised, or waived Claims, Interests, Cause(s) of Action or liabilities.

6.3 **PROTECTIONS AGAINST DISCRIMINATORY TREATMENT** Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Persons, including Governmental Units, shall not discriminate against the Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtor or other Person with whom Debtor has been associated, solely because the Debtor has been a Debtor under Chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Case (or during the Chapter 11 Case but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Case.

6.4 **SETOFFS** Except as otherwise expressly provided for in the Plan, the Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable to non-bankruptcy law, or as may be agreed by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtor may hold against the Holder of such Allowed Claim (or against the predecessor-in-interest to Holder to the extent that the Holder takes such Allowed Claim subject to setoffs and defenses that may be asserted against the predecessor-in-interest), to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor of any Claims, rights, setoff rights and Causes of Action that Debtor may possess against such Holder. The Debtor shall not be required to make any distributions to the Holder of any Allowed Claim to the extent that the Debtor asserts setoff rights against such Holder until after entry of a Final Order resolving such setoff rights. In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of

the Debtor unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

6.5  **RECOUPMENT**  In no event shall any Holder of a Claim or Interest be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtor unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

## ARTICLE VII

### MODIFICATION OF THE PLAN

7.1  **AMENDMENTS TO PLAN**  Debtor may, from time to time, propose amendments or modifications of this Plan prior to its confirmation, without leave of the Court.  After confirmation, the Debtor may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan, subject to the limitations of 11 U.S.C. §1127(b).

7.2  **REVOCATION OR WITHDRAWAL OF THE PLAN**  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent Chapter 11 plan(s).  If the Debtor revokes or withdraws the Plan, or if confirmation or consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption, assignment, or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the right of Debtor or any other Person; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by Debtor or any other Person.

# ARTICLE VIII

## TITLE TO PROPERTY

8.1 **VESTING OF PROPERTY** The Debtor shall retains the following assets which shall be managed and disposed of pursuant to the terms of the Plan (i) the Sale Proceeds, (ii) the claims and defenses underlying the MCA Adversary Proceedings, and (iii) all other rights and defenses related to any other Claim, including Claims of Ownership, except for Avoidance Actions, Causes of Action and rights to object to the Claims of any non-priority Unsecured Creditors, Insider or Related Entity which shall transfer to the Liquidation Trust on the Effective Date. Notwithstanding anything herein to the contrary, the Debtor retains the rights to rely on any Cause of Action or Avoidance Action for the purposes of asserting a setoff or recoupment, or to object to all or part of any Claim pursuant to section 502(d) of the Bankruptcy Code.

# ARTICLE IX

## UNITED STATES TRUSTEE FEES

9.1 **U.S. TRUSTEE FEES AND CASE CLOSURE** The Debtor shall pay to the United States Trustee the appropriate sums required pursuant to 28 U.S.C. § 1930(a)(6) and shall provide the relevant information as required by the Office of the United States Trustee until the Chapter 11 Case is administratively closed. Upon payment of the Allowed Class I Secured Claim, the Plan shall be deemed to be substantially consummated and the Court shall enter an order administratively closing the case.

# ARTICLE X

## EXECUTORY CONTRACTS

10.1 **REJECTION OF EXECUTORY CONTRACTS** Upon the occurrence of the Confirmation Date all other Executory Contracts shall be deemed rejected. Notwithstanding anything to the contrary in this Plan, the Debtor shall not reject any collective bargaining agreement subject to section 1113 of the Bankruptcy Code

without further order of the Bankruptcy Court under the requirements of section 1113.

10.2 **REJECTION OF UNEXPIRED LEASES** Upon the occurrence of the Confirmation Date, all unexpired leases shall be rejected, except for unexpired leases that are the subject of a motion to assume filed prior to the Confirmation Date.

10.3 **ASSUMPTION AND CURE PAYMENTS** Unless otherwise provided for in Article III of this Plan, all assumed contracts and leases shall be cured by the Debtor pursuant to Section 10.4, unless other provisions have been agreed to by the counter-party. As long as the Debtor complies with this provision, all contract and lease counterparties must fulfill all contract and lease obligations and are enjoined from declaring a default for non-performance due to the bankruptcy or pre-assumption default.

10.4 **RESOLUTION OF CURE CLAIM DISPUTES** Unless otherwise provided for in Article III, each executory contract or unexpired lease to be assumed under this Article X, within thirty (30) days after the Confirmation Date, the Debtor shall deliver a written proposal to the contract counter-party describing the method, timing and amount of any proposed Cure. The Debtor's proposal shall be binding unless the contract counter-party delivers to the Debtor's counsel, within fifteen (15) days after receipt of the proposal, a written objection detailing all reasons for the counter-party's objection and setting forth a counter-proposal. In the event that the dispute cannot be resolved, either party may petition the Bankruptcy Court to resolve the dispute through filing of a properly noticed motion. In the event that the Bankruptcy Court sets a Cure amount greater than the Cure amount proposed by the Debtor, the Debtor shall have ten (10) Business Days to Cure or reject the contract or lease.

10.5 **REJECTION CLAIMS** Any Creditor who has a Claim as a result of the rejection of a an executory contract or unexpired lease shall have thirty (30) days after the Confirmation Date to file a Proof of Claim (with notice to the Debtor's counsel), failing which such Claim shall be disallowed in its entirety.

10.6 **OBJECTIONS TO REJECTION CLAIMS** The Liquidation Trust may file an objection to any Proof of Claim filed in accordance with this Section 10.5 on or before the later of (i) sixty (60) days after the filing of the Proof of Claim or (ii) the time set for the filing of objections in Section XI (including any extensions). The objection will be resolved in accordance with Article XI.

# ARTICLE XI

## OBJECTIONS TO CLAIMS

11.1 **TIMING OF OBJECTIONS** The Debtor or the Liquidation Trustee, as the case may be, may object to the allowance and priority of any Claim, or the extent, validity and enforcement of any security interest, whether listed on the schedules filed by Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of filing of any Proof of Claim or (b) twelve (12) months after the Confirmation Date. The Debtor may petition the Bankruptcy Court for an extension of this time by filing an appropriate motion. The service of the motion through the Court's electronic court filing system shall be sufficient notice of any such request. Any Claim not subject to a timely objection shall be an Allowed Claim.

11.2 **EXTENT OF OBJECTIONS** As part of the objection process set forth in Section 11.1 above, and without limiting same, the Debtor and/or Liquidation Trustee, as the case may be, shall have the right to object to any Lien asserted against property of the Debtor or the Liquidation Trust.

11.3 **CLAIM DISPUTE RESOLUTION PROCEDURES**: The Debtor and/or Liquidation Trustee, as the case may be, shall be authorized to resolve all Disputed Claims by withdrawing or settling objections thereto, or by litigating to judgment in the Bankruptcy Court the validity, nature, and/or amount thereof. Any objection to a Disputed Claim may be compromised, settled, and/or resolved without Bankruptcy Court approval upon the written consent of the Debtor and the Holder of the Claim or the Trustee and the Holder of the Claim, as the case may be.

11.4 **CLAIMS BAR DATE** Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims.

# ARTICLE XII

# PROVISIONS GOVERNING DISTRIBUTION

{01094803.2}

12.1 **DISPUTED PAYMENTS** Notwithstanding anything in this Plan to the contrary, the Debtor and the Liquidation Trustee shall not be obligated to make any payments towards the Disputed portion of any Disputed Claim. The Debtor or Liquidation Trustee shall withhold any such payments, and, if the dispute is resolved in favor of the Claim Holder, the Debtor shall make any missed distributions within fourteen (14) days after entry of a Final Order determining the Claim.

12.2 **EFFECT OF ASSUMPTION AND CURE** These distribution procedures shall not apply to any Claim resulting from an executory contract or unexpired lease assumed by the Debtor. The Cure provisions of Article X and any agreement with the counter-party shall exclusively apply to distributions on such Claims.

12.3 **DELIVERY OF DISTRIBUTIONS IN GENERAL**: Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Allowed Interests shall be made by the Debtor, in order of preference, (a) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim, (b) at the addresses set forth on the Proofs of Claim Filed by such Holders of Claims, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor has not received a written notice of a change of address, or (d) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Except as set forth herein, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtor shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

12.4 **ALLOCATION OF PAYMENTS** All distributions shall be allocated first to principle until the principle amount of the Claim is paid in full, next to interest if interest is Allowed in relation to the Claim and finally, to fees, costs and expenses if such are Allowed.

12.5 **COMPLIANCE WITH TAX REQUIREMENTS AND ALLOCATIONS** In connection with the Plan, to the extent applicable, the Debtor shall be authorized to take all actions necessary or appropriate actions to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions

pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtor reserves the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, other spousal awards, Liens, and encumbrances.

12.6 **UNDELIVERABLE DISTRIBUTIONS AND NON-NEGOTIATED CHECKS** If any distribution to a Holder of a Claim is returned as undeliverable, no further distributions to such Holder of such Claim shall be made unless and until the Debtor is notified of the then-current address of such Holder of the Claim, after which time future distributions shall be made to such Holder of the Claim without interest at such address. If checks issued by the Debtor on account of Claims are not negotiated within one hundred and twenty (120) days after the issuance of such check, the check shall be null and void. Amounts in respect to undeliverable distributions and non-negotiated checks shall be held by the Debtor until (i) such distributions are claimed or (ii) ninety (90) days after the check is returned or voided for due to non-negotiation, after which date all such undistributed and non-negotiated amounts shall revert to the Debtor free of any restrictions thereon and the Claim of any Holder or successor to such Holder with respect to such distribution shall be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained herein shall require the Debtor to attempt to locate any Holder of an Allowed Claim.

12.7 **FRACTIONAL PAYMENTS** Notwithstanding any other provision of the Plan to the contrary, payments of fractions of dollars shall not be required. Payment of fractions of dollars that would otherwise be distributed under the Plan shall be rounded to the lower whole number of dollars.

# ARTICLE XIII

## MISCELLANEOUS PROVISIONS

13.1 **RELEASE OF LIENS** The Debtor and all parties-in-interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to memorialize and effectuate the terms and conditions of this Plan. This shall include without limitation any execution by the Debtor of UCC financing statements and the execution by Creditors of any UCC or

{01094803.2}

46

mortgage discharges, releases or terminations.

13.2 **SETOFFS AND COUNTERCLAIMS** No Creditor (including without limitation a Person or entity that becomes a Creditor as a result of a rejection of a contract) shall be allowed to setoff a Claim against an obligation to the Debtor arising in connection with a different contract. Unless expressly asserted in the Chapter 11 Case through the filing of a Proof of Claim, all setoffs and counterclaims are waived pursuant to Article V of this Plan. The terms of this paragraph shall not apply to any taxing authority.

13.3 **CONTINUATION LITIGATION** The Debtor shall have the right to pursue the MCA Adversary Proceedings whether or not those Causes of Action were the subject of a suit as of the Confirmation Date.

13.4 **NOTICES** Any notice to the Debtor required under this Plan shall be addressed to the respective Debtor and delivered by (i) U.S. certified mail, return receipt requested, (ii) reputable overnight courier service with tracking, or (iii) hand-delivery:

> c/o Scott Hirth
> 500 Carpenter Road
> Ypsilanti, MI 48197

with a copy to:

> Kim K. Hillary
> Schafer and Weiner, PLLC
> 40950 Woodward Ave., Ste. 100
> Bloomfield Hills, MI 48304

Failure to comply with this Section 13.4 shall render any notice to the Debtor to be invalid for purposes of this Plan.

13.5 **SUCCESSORS AND ASSIGNS** This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties-in-interest and their respective successors and assigns.

# ARTICLE XIV

## JURISDICTION OF THE COURT

14.1    Following the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising from or relating to the Chapter 11 Case to the fullest extent of applicable law, including, without limitation, all of the following:

14.1.1    To hear and determine any timely objections to Claims, including Proofs of Claim, or to Administrative Claims, both before and after the Effective Date, including any objections to the classification of any Claim, and to Allow, Disallow, determine, liquidate, classify, estimate, or establish the amount, priority, secured or unsecured status of any Claim in whole or part.

14.1.2    The classification of the Claim of any Creditor and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed to Claims of Creditors.  The failure by the Debtor to object to, or to examine any Claim for the purposes of voting, shall not be deemed to be a waiver of any right to object to, or reexamine the Claim in whole or in part.

14.1.3    The resolution of any Disputed Claims or Disputed Interests.

14.1.4    To hear and determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Debtor or Liquidation Trust after the Effective Date.

14.1.5    The determination of all questions and disputes regarding title to the assets of the Estate, and all Causes of Action, controversies, disputes, or conflicts, whether or not subject to action pending as of the Confirmation Date, between the Debtor or Liquidation Trustee and any other party.

14.1.6    The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan.

14.1.7    The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code and as provided as in Article VI of the Plan.

14.1.8    The enforcement and interpretation of the terms and conditions of this Plan and the entry of orders in aid of confirmation of this Plan.

14.1.9    To hear and determine applications for allowance of compensation and reimbursement of expenses of Professionals under sections 330, 331 and/or 503(b) of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under this Plan.

14.1.10    To determine matters concerning local, state, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code and to determine any tax Claims that may arises as a result of the transactions contemplated by this Plan.

14.1.11    The assumption or rejection of executory contracts and/or unexpired leases, including issues related to cure rights, under Article X of this Plan.

14.1.12    The right to pursue any Avoidance Actions or Causes of Action.

14.1.13    The entry of an order determining the extent or validity of any Lien.

14.1.14    The entry of an order concluding and terminating this Case.

14.1.15    To hear any other matter not inconsistent with the Bankruptcy Code.

# DISCLOSURE STATEMENT

## I. INTRODUCTION AND OVERVIEW

### A. PURPOSE OF DISCLOSURE STATEMENT

Unless defined in this Disclosure Statement, all capitalized terms shall have the meaning ascribed to them in the Debtor's Plan of Liquidation (the "Plan"), unless the context indicates a different meaning.

Debtor submits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, to all known Holders of a Claim against it. The Debtor provides this Disclosure Statement to its Creditors to disclose information deemed by it to be material and necessary for Creditors to make a reasonably informed decision in exercising their right to vote for the acceptance of the Plan.

Nothing in this Plan and Disclosure Statement may be construed as an admission with respect to liability for any indebtedness, nor should anything within this Plan and Disclosure Statement be construed as an admission with respect to the amount, extent, status, validity, and/or enforceability of any Lien against any of the Debtor's assets or the Property.

### B. SOURCE OF INFORMATION

The Disclosure Statement and the Plan have been prepared from information furnished primarily by the Debtor. The Debtor's Professionals have not conducted an independent investigation to verify such information.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified. Neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change of the facts set forth herein since the date of this Disclosure Statement.

**NO PERSON OR ENTITY HAS BEEN AUTHORIZED BY THE DEBTOR OR THE COURT TO GIVE ANY INSTRUCTIONS OR MAKE ANY REPRESENTATIONS CONCERNING THE DEBTOR OR ITS FINANCIAL AFFAIRS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE**

{01094803.2}

50

**STATEMENT. ANY REPRESENTATIONS, PROMISES OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. SUCH REPRESENTATION, INDUCEMENTS AND/OR PROMISES, IF ANY, SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER SUCH INFORMATION FOR SUCH ACTION AS THE COURT MAY DEEM APPROPRIATE.**

### C. OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization or liquidation chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting a rehabilitation and/or liquidation of a debtor, another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization or liquidation is the principal objective in a Chapter 11 case. A plan of reorganization or liquidation sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization or liquidation by the Bankruptcy Court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

After a plan of reorganization or liquidation has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of

the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtor is submitting this Disclosure Statement to Holders of Claims against, and equity Interests in, the Debtor to satisfy requirements of section 1125 of the Bankruptcy Code.

## II. DESCRIPTION OF DEBTOR

### A. THE DEBTOR-IN-POSSESSION

On August 16, 2024 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code, §§101 *et. seq.* in the United States Bankruptcy Court for the Eastern District of Michigan commencing its Chapter 11 Case. The Chapter 11 Case was assigned to the Honorable Thomas J. Tucker. Upon filing the Chapter 11 Case, the Debtor became the "Debtor-in-Possession," as that term is understood in the Bankruptcy Code.

The Debtor is a Michigan limited liability company. The Debtor sold its assets during this Chapter 11 proceeding and now seeks confirmation of its liquidating Plan which provides for the distribution of the Sale Proceeds. The Debtor is liquidating and is not continuing in business.

The Debtor is owned 25.03% by Scott Hirth ("Hirth"), 25.03% by Julie Corrin ("Corrin"), 25.03% by Steve Horning ("Horning") and 24.91% by SSJ Return Holdings, Inc. SSJ Return Holdings, Inc., is owned by 33.33% by Hirth, 33.33% by Corrin and 33.33% by Horning.

### B. DEBTOR'S PRINCIPAL AND MANAGEMENT

Prior to the Petition Date, Hirth, Corrin and Horning managed the Debtor. Hirth was in charge of purchasing, marketing and business development for the Debtor. Corrin ran the Debtor's retail operations, oversaw all store managers, and ran the operations at Michigan Stadium on game days and managed game day inventory. Horning was responsible for the Debtor's warehouse operations,

restocking inventory at retail locations and managed facility operations such as internet, phone service, UPS, copiers, etc. The Debtor paid each of Hirth, Corrin and Horning an annual salary of $160,000.

After the Petition Date, Hirth, Corrin and Horning continued in their positions through the Closing Date except that, after the Petition Date, the Debtor was no longer operating inside Michigan Stadium on game days. Game day operations inside Michigan Stadium were run by Coleman House. As set forth in more detail in Section III, A below, Coleman House utilized the Debtor's employees, including Corrin, to run the stadium operations and reimbursed the Debtor for the wages and salary of those employees.

### i.  Background:

Hirth received his Master of Business Administration from the University of Michigan. He has been employed full time by the Debtor since 2009, but spent much of his youth and college years working for the Debtor and also worked full time for the Debtor from 1992 -1994.

Corrin has a Bachelor degree from Michigan State University and has worked full time for the Debtor since 1994.

**Horning has a Bachelor degree from Central Michigan University and has worked full time for the Debtor since 1993.**

### ii. Compensation:

Each of Hirth, Corrin and Horning received an annual salary of $160,000 for the work they performed for the Debtor. In addition, Hirth Corrin and Horning each received annual distributions sufficient to cover their pass-through tax liability to the federal and state government. They did not receive distributions over and above the amount necessary to pay their pass-through tax liabilities.

### iii. Legal Relationship Between Principals and Debtor

On the Petition Date, each of Hirth, Corrin and Horning held a 25.03% ownership interest in the Debtor which they acquired in 2013. In addition, each of

Hirth, Corrin and Horning owned 33.33% of SSJ Return Holdings, Inc which in turn owed 24.91% of the Debtor.

The Debtor's books and records and Amended Schedules show that Hirth, Corrin and Horning hold unsecured claims against the Debtor in the following amounts: (i) $1,617,470 (Hirth); (ii) $972,727 (Corrin); and (iii) $1,006,432.00 (Horning).

Hirth, Corrin and Horning also owned the Affiliated Entities which leased the Affiliated Entity Real Estate to the Debtor. The Debtor operated retail locations from the Affiliated Entity Real Estate located at (i) 210 West Stadium Blvd., Ann Arbor, Michigan; (ii) 1336 South Main, Ann Arbor, Michigan, and (iii) 307-309 State Street, Ann Arbor, Michigan, and operated a warehouse out of the Affiliated Entity Real Estate located at 5000 Carpenter Rd., Ypsilanti, Michigan. The Debtor paid the following rent for each of the locations owned by one of the Affiliated Entities:

| Affiliated Entity (landlord) | Leased Premises | Monthly Rent Paid by Debtor |
|---|---|---|
| M-Den Properties, LLC ("Heritage Properties") | 5000 Carpenter Rd., Ypsilanti, Michigan | $15,000 |
| M Den Stadium Properties, LLC ("Stadium Properties") | 210 West Stadium Blvd., Ann Arbor, Michigan; And | $19,000 |
| | 1336 South Main, Ann Arbor, Michigan | $33,660 |
| M Den State Street Properties, LLC ("State Street Properties") | 307-309 State Street, Ann Arbor, Michigan | $16,000 |

In addition, the Debtor holds a claim against Stadium Properties in the amount of $592,634 as a result of various intercompany loans occurring between 2013 and 2024. Stadium Properties is an Affiliated Entity owned by Hirth, Corrin and Horning.

## C.  DESCRIPTION OF DEBTOR'S BUSINESS AND CAUSES FOR CHAPTER 11 FILING

Debtor operated the largest retail operation of the University of Michigan ("University") branded clothing and other merchandise for almost fifty (50) years. For the prior thirty (30) years[10], the Debtor was the official merchandise retailer of the University of Michigan Athletics, including a link to Debtor's website on the University of Michigan Athletics' website, pursuant to a July 1, 2009 licensing agreement and amendments (collectively the "Licensing Agreement").

The University purported to terminate the Debtor's right under the Licensing Agreement (including its right to be the University's official merchandise retailer, as well as the Debtor's right to use the "M Den" name and URL) effective May 13, 2024. The Debtor and the University subsequently entered into a Forbearance Agreement (retroactively effective to May 13) pursuant to which the Debtor was authorized to continue to use the "M Den" name and URL and continued as the official merchandise retailer.

The Forbearance Agreement was terminated by the University effective June 11, 2024, but the University allowed the Debtor to continue operating as if the Forbearance Agreement remained in effect in order to minimize disruption while the University looked for a new official merchandise retailer and the Debtor pursued a going concern sale. This continued until August 15, 2024, when the University demanded in writing that the Debtor cease and desist from further use of the "M Den" name and URL.

Until just prior to the Petition Date, Debtor operated from five separate retail locations and sold merchandise through the MDEN.com website. Debtor's largest store by far was located on State Street in Ann Arbor (the "Flagship Store"). The Debtor also operated from stores located (i) on Main Street in Ann Arbor, (i) in the Briarwood Mall in Ann Arbor (iii) in the Twelve Oaks Mall in Novi, and (iv) on Columbia Street in Detroit.

---

[10] This thirty-year stretch was interrupted in 2009 when the Debtor's status as the University's official merchandise retailer was terminated for one year and then reinstated.

{01094803.2}

The Debtor ceased operating its Twelve Oaks Mall location on August 16, 2024 and ceased operating at Briarwood Mall and Columbia Street in Detroit on August 19, 2024.

As a result, from the Petition Date through the Closing Date, the Debtor operated from two brick and mortar locations: (i) the Flagship Store, and (ii) the Main Street store. In addition, Debtor sold merchandise from a tent located at the corner of Stadium and Main Streets in Ann Arbor (directly across the street from Michigan Stadium) (the "Tent") on game days.

Prior to the Petition Date, the Debtor sold merchandise on game days inside of Michigan Stadium and the University's retail locations at various other sports venues, but did not do so after the Petition Date.

A long chain of events contributed to Debtor's financial distress and ultimately its bankruptcy filing. Following decades of success, and expansion of Debtor's operations completed in 2019, Debtor was faced with the severe challenges which the COVID-19 pandemic brought to the retail sector, particularly on a suddenly empty college campus, and particularly to a company sitting on depleted cash reserves.

In 2019, the Debtor funded three large capital improvements from its operating capital and cash reserves. The Debtor spent nearly a million dollars updating and implementing a new ERP software system. At the same time, the Debtor funded roughly $600,000 to build out its Detroit and Main Street[11] locations, with both locations opening/reopening for business in November of 2019. The Debtor self-funded these improvements, leaving it with lower-than-normal cash reserves going into 2020, hitting head-on into the unanticipated and unprecedented COVID-19 global pandemic that immediately followed.

Starting in March of 2020, virtually all of Debtor's customers were removed from Ann Arbor for an entire year. The University of Michigan's football and basketball games and other athletic events were played without fans present.

---

[11] The Main Street location was closed in June of 2018 as the landlord demolished the building and re-built it as a six story multi-use complex. Upon completion of the building construction, the Debtor completed the build out of its unit, all funded by cash reserves.

Students moved home, and students and faculty attended classes, graduation and other ceremonies remotely.

With its customer base stuck at home, the Debtor's retail sales took a nosedive and the Debtor shifted to selling the majority of its product online. In 2020 over sixty percent (60%) of Debtor's sales were online which was more than double the percentage of online sales in 2019. Unfortunately for the Debtor, its online sales generated a much lower profit margin than its retail sales.[12]

In addition, the pandemic created significant uncertainty in necessary inventory levels and unpredictability in the supply chain. Leading up to the fall of 2020, it was not clear when students would be returning to campus or whether fans would be able to attend games during the 2020 football and basketball seasons. The Debtor was forced to decide whether to purchase its fall inventory and prepare for a possible return of the students and fans, or risk being left flat footed without proper inventory if the flood gates opened.

As the University's official retail merchandise partner, the Debtor determined it was necessary to purchase its fall inventory in order to be prepared for the return of students and fans. The Debtor purchased roughly $6,000,000 in inventory, but the COVID regulations did not lift. Classes remained remote, and college football and basketball games were played without fans, leaving Debtor with millions of dollars in inventory and vendor obligations to repay without its more profitable retail operations.

With traditional financing being generally unavailable, the Debtor began seeking alternative financing to cover its cash shortages and began taking out high interest loans) which further deteriorated its financial condition.

In addition to the shift to online sales, the Debtor's profit model underwent another significant shift in July of 2021 when the NCAA approved a policy allowing student athletes to monetize their name, image and likeness ("NIL Policy"). The Debtor was quick to respond to the NIL Policy and worked with the University to launch a first of its kind name and number program for the 2021 football season. The Debtor's agility in implementing the program was celebrated,

---

[12] In addition to shipping costs, the royalty Debtor owed to the University's for online sales was significantly higher than the royalty owed to the University for brick-and-mortar sales.

{01094803.2}

but its implementation was not without cost. The increased cost associated with payment of the student athletes further depleted Debtor's profit margin.

Despite all of the adversity, the Debtor's profit showed slight improvement in 2021. Students were returning to campus and sporting events and graduations were once again celebrated at in-person events. The Debtor was making strides at paying back its high interest secondary market loans.

Unfortunately, in fall and winter of 2022 when the supply chain issues caused by the pandemic came home to roost, the Debtor was not strong enough to withstand this final blow. Throughout 2020 and 2021, the Debtor's vendors struggled to complete orders on timelines available prior to Covid and required Debtor to order inventory a year or more in advance of shipment. Debtor met the demands, and submitted inventory orders a year or more in advance. It backfired. During a two-weeks period in December 2022, Debtor received over five million dollars ($5,000,000) in pre-ordered inventory. Much of the inventory was delivered later than expected, after the 2022 football season, in a glut difficult to even process, let alone sell. The vendors went largely unpaid and some initiated lawsuits and obtained judgments which the Debtor could not pay.

The Debtor started 2023 in the red and was ultimately not able to recover. Debtor's sales sky-rocketed at the end of 2023 when University of Michigan's football team won the National Championship, but the royalties due to the University on championship merchandise was even higher and Debtor's profit margin was slim. At the end of the day, the National Championship victory and the increase in sales was not sufficient to provide the Debtor with a financial recovery.

The pandemic, the high interest unconventional financing, the deluge of inventory, lower profit margins attributable to online sales, the NIL Policy, and Championship royalites ultimately contributed to the Debtor's bankruptcy filing and the end of its nearly fifty years of success as the official merchandise retailer to the University of Michigan.

# III.   POST-PETITION EVENTS OF SIGNIFICANCE

## A.   POST-PETITION TRANSFERS OR USE OF PROPERTY OUTSIDE THE ORDINARY COURSE OF BUSINESS

Except as otherwise set forth herein, the Debtor has operated in the ordinary course of business and has not made any post-petition transfers outside the ordinary course of business.

After the Petition Date, the Debtor was no longer operating inside Michigan Stadium on game days. Instead, UM chose Legends to run the operations inside Michigan Stadium. Legends in turn contracted Coleman House to run the stadium operations. Coleman House did not use its own employees to run the stadium operations. Coleman House utilized the Debtor's employees, including Corrin, and reimbursed the Debtor for the wages and salary of those employees. In short, the Debtor's employees continued to run the stadium operations but Coleman House reimbursed the Debtor for their wages. The total amount reimbursed by Coleman house was $29,839 ("Payroll Reimbursement"). The Debtor agreed to the arraignment because it was in the Debtor's best interest to maintain streamlined operations through the sale of its assets in order to protect its asset values and goodwill. In addition, the arraignment provided a financial benefit to the Debtor because Coleman House paid the wages of certain salaried employees, including Corrin, who the Debtor would have been responsible to pay regardless of whether the wages were being reimbursed by Coleman House. Furthermore, Coleman House paid the Debtor a fee of $4,475 which represented 15% of Payroll Reimbursement. The Debtor did not file a motion seeking authority to enter into this arrangement with Coleman House which the Committee argues the Debtor was required to do under 11 USC §363(b).

In addition, Coleman House utilized the Debtor's display units, hanging racks and other display hardware which were located inside of Michigan Stadium and also utilized bags owned by Debtor that were branded with the MDen logo.

B.   **Summary of the Important Details of Cash Collateral, Post Petition Financing and Adequate Protection Orders**

### (i) Cash Collateral Order

Pursuant to the *Interim Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection* [DN 32] (the "Interim Order") granting the *First Day Motion for Entry of an Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate Protection* [DN 40] (the "Cash Collateral Motion")[13], authorizing the Debtor to use cash collateral pursuant to an interim budget and to grant adequate protection to its secured lenders[14].

The Committee filed a limited objection to the Debtor's Cash Collateral Motion [DN 128] which was ultimately resolved pursuant to the terms of the Final Cash Collateral Stipulation (defined below).

Elemental Capital, Inc. filed an Objection to Cash Collateral on September 19, 2024 [DN 130] ("Elemental Objection"). The Court overruled the Elemental Objection as untimely [DN 132].

The Debtor, Newtek, UST, Committee and SBA filed their *Stipulation for Entry of a Final Order (I) Authorizing Debtor to Use Cash Collateral; (II) Providing Adequate Protection to the Prepeittion Lenders* [DN 136] ("Final Cash Collateral Stipulation"), seeking entry of an agreed upon final order of use of cash collateral. The Court entered its *Final Order (I) Authorizing Debtor to Use Cash Collateral; (II) Providing Adequate Protection to the Prepeittion Lenders; and Cancelling Final Hearing Scheduled for September 20, 2024* [DN 138] ("Final Cash Collateral Order"). The Final Cash Collateral Order provides Debtor with authority to use cash collateral pursuant to the terms of a Budget attached to the Final Cash Collateral Stipulation (the "Final Cash Collateral Budget") and to grant replacement liens and make adequate protection payments as set forth in more detail below.

---

[13]   Capitalized terms used in this section but not defined herein shall have the meanings as set forth in the Cash Collateral Motion.

[14]   The Cash Collateral Order authorizes the Debtor to use cash collateral within a twenty (20%) percent variance with regard to each line item.

{01094803.2}

### (ii) Post-Petition Financing

The Debtor did not seek authority for or use any post-petition financing in this Case.

### (iii)    Adequate Protection

To the extent of any diminution in value of the pre-petition Cash Collateral, the Interim Order and Final Cash Collateral Order granted the Bank of Ann Arbor, Newtek, TVT, the SBA and other secured creditors claiming an interest in Cash Collateral, replacement liens in all types and descriptions of collateral that were secured by the applicable pre-petition loan documents, in and the same priority as the liens held pre-petition, which are created, acquired or arise after the Petition Date (the "Replacement Liens"). The Replacement Liens have the same priority and validity as each secured creditor's pre-petition security interests and liens on such Collateral.

The Replacement Liens did not attach to the Debtor's Avoidance Actions or funds in the Professional Fee Account.  Furthermore, the Final Cash Collateral Order provided the Committee with thirty (30) days to object to or challenge the status of any lender or other party claiming an interest in any of Debtor's assets. On Stipulation, the Committee and Bank of Ann Arbor agreed to extend this deadline as it relates to Bank of Ann Arbor through January 31, 2025 [DN 221].

### (iv)    Required Adequate Protection Payments

As additional adequate protection, pursuant to the Interim Order and Final Cash Collateral Order the Debtor is required to make the following monthly payments its creditors (i) $8,828 and $31,172 to Bank of Ann Arbor, (ii) 66,000 to Newtek, (iii) $40,000 to TVT, and (iv) $2,518 to the SBA.  In addition, under the Final Cash Collateral Order, the Debtor is required to make adequate protection payments of $1,012 per month to Unify Equipment Finance, Inc.

The Debtor stopped making adequate protection payments to Unifi when it sold the collateral to Rally House.

The Debtor stopped paying the $8,828 monthly adequate protection payment

to Bank of Ann Arbor after it paid its direct liability pursuant to Court order entered at DN 142.

All other post-petition adequate protection payments required by the Interim Order and Final Cash Collateral Order have been paid and are current.

### (v) Professional Fees

Pursuant to the Interim Order and Final Order, the Debtor has paid $19,275 per week into its Professional Fee Account which funds are may be used to pay Allowed Professional Fees and costs.

### C. Litigation During the Case

The following lawsuits were pending against the Debtor on the Petition Date and were stayed as to the Debtor on the filing of the Petition:

- Alantes Corporate Finance, LLC v. M-Den Properties, LLC, M-Den State Street Properties, LLC, M-Den Stadium Properties, LLC, M-Den, Inc., Scott Hirth, Steve Hornig, Julie Corrin – 2024-155133 – Supreme Court of the State of New York;
- Branded Custom Sportswear, Inc. v. The M Den, Inc., and Scott Hirth – 2:23-cv-0522-TC-ADM – USDC for the District of Kansas;
- Bullion International, Inc. d/b/a The Highland Mint v. Heritage Collegiate Apparel, Inc. f/k/a M-Den, Inc. – 24-00676-CB – Washtenaw County Circuit Court; and
- KCI Sports Publishing, LLC v M-Den Inc, and Scott Hirth– 24-000810-CB – Washtenaw County Circuit Court.

There has been no other litigation pending during this Case, and the Debtor took no action with regard to any of the above litigation due to the automatic stay.

## IV.    ASSETS AND LIABILITIES

### A.    LIQUIDATION ANALYSIS

The Debtor's Liquidation Analysis is attached as **Exhibit A**.

{01094803.2}

In the event that the Plan is not accepted by the Creditors or is not otherwise confirmed by the Bankruptcy Court, the Debtor believes that its assets would be liquidated under Chapter 7 of the Bankruptcy Code. As set forth on Exhibit A, the Debtor expects that a Chapter 7 liquidation would eliminate any distribution to Unsecured Creditors because (i) there would be no mechanism for the transfer of the Bank of Ann Arbor Related Entity Loan Documents to the Liquidation Trust, (ii) there would be no mechanism for payment of administrative fees and costs associated with the MCA Adversary Proceedings which would likely result in the MCA Creditor Claims of Ownership being paid in full prior to any distribution to Unsecured Creditors. As a result, the Debtor anticipates that conversion to a Chapter 7 will result in no distribution to Unsecured Creditors which is substantially less than the more than $3,000,000 in value provided to Unsecured Creditors under the Debtor's Plan.

## B.     RISKS, CONDITIONS AND ASSUMPTIONS IN LIQUIDATION ANALYSIS

The Debtor has used the actual value of its cash on hand and the full value of its receivable from Stadium Properties to determine the value of its assets. The risks, conditions, and assumptions are estimations by the Debtor's management, in consultation with its Professionals, based upon their collective experience in the market; however, current market conditions make such estimations inherently speculative. The most significant risk relates to the outcome of the MCA Adversary. While the Debtor and its professionals believe in good faith that they will be successful in substantially reducing if not eliminating these claims it is difficult to predict the outcome of litigation with certainty.

## C.     CAUSES OF ACTION

The Debtor has not evaluated the value of its Causes of Action or Avoidance Actions, the expected recovery or the expected cost of the litigation. Instead, the Debtor's Plan provides that all such Causes of Action and Avoidance Actions, and whatever value is attributed to them, will transfer to the Liquidation Trust for valuation and liquidation (with the exception of the MCA Adversary Proceedings which are being retained by the Debtor).

The Debtor specifically preserves any and all Claims and Causes of Action against the University of Michigan arising out of the Forbearance Agreement between the Debtor and the University of Michigan dated effective as of May

{01094803.2}

13,2024 and/or the transfer of certain rights related to the "M-Den" name to the University, and, to the extent such claims are not released as a result of a Final Order entered in this Case, the Debtor specifically preserves any other causes of action against which may exist against the University of Michigan related to any benefit received by the University of Michigan prior to the Petition Date and the interactions between the Debtor and the University of Michigan prior to or after the Petition Date. The Debtor is transferring these Claims and Causes of Action to the Litigation Trust on the Effective Date.

In addition, the Debtor reserves its right to collect all accounts receivable and all other amounts due the Debtor for any reason whatsoever (whether owed to the Debtor pursuant to contract rights, quasi contract, tort law, refund rights, deposits, or for any other reason), which rights are transferred to the Liquidation Trust pursuant to the Plan. The Debtor reserves all setoff and recoupment rights of all kinds related to all Claims, including Claims of Ownership, except that setoff and recoupment rights of all kinds related to Claims of any non-priority Unsecured Creditor, Insider or Related Entities are being transferred to the Liquidation Trust. The Debtor reserves the right to commence Avoidance Actions unless expressly waived or released in the Plan, which rights are being transferred to the Liquidation Trust (with the exception of the MCA Adversary Proceedings which are being retained by the Debtor). Accordingly, the Debtor may have potential Causes of Action which are being transferred to the Liquidation Trust and reserves the Liquidation Trust's right to bring a lawsuit against any entity listed on the Debtor's Schedules (as filed with the Bankruptcy Court and as may be amended) as owing a debt to the Debtor, and any entity listed on its Statement of Financial Affairs (as filed with the Bankruptcy Court and as may be amended) as having received a transfer from the Debtor. *See* DN 1. More specifically, and without waiving any other Claim, the Liquidation Trust may seek to avoid from any direct or indirect transferee, (i) under section 547 of the Code, any transfer of an interest of the Debtor in property, including all payments to vendors and suppliers, which occurred within 90 days of the Petition Date, or, for Insiders of the Debtor, within one year of the Petition Date; (ii) under sections 544(a) and 545, any liens asserted against the Debtor, (iii) under sections 544(b) and 548, any actual or constructive fraudulent transfers or obligations, and (iv) under section 549, any unauthorized post-petition transactions. A list of transfers made by the Debtor within 90 days of the Petition Date is attached as **Exhibit B**.

The Debtor has not investigated any potential Causes of Action or Avoidance Actions, and cannot make any representation concerning their value.

{01094803.2}

Except as otherwise provided in this Disclosure Statement, the Debtor is unable to estimate what, if anything at all, will be recovered on account of the Avoidance Actions.

### D.    PRIORITY TAX CLAIMS AND ANTICIPATED ADMINISTRATIVE CLAIMS

The Debtor believes that the following are Priority Tax Claims in this Case:

| Claimant | Filed Proof of Claim Amount |
|---|---|
| Ohio Department of Taxation | $42,758.13 |
| WA Department of Revenue | $11,518.99 |
| Illinois Department of Revenue | $35,472.23 |
| Massachusetts Department of Revenue | $1,045.15 |
| **TOTAL** | **$90,795** |

The Debtor does not anticipate any other Priority Claims in this Case.

The Debtor estimates that the Administrative Claims of Professionals, the United States Trustee and taxing authorities will be as follows:

| Claimant | Estimated Amount |
|---|---|
| Schafer and Weiner, PLLC | $300,000 |
| Office of the United States Trustee | $100,000 |
| Wolfson Bolton Kochis, PLLC | $241,000 |
| Capstone Partners | $130,000 |
| Taxing Authorities | None |

The Debtor does not anticipate any other Administrative Claims. These amounts are estimates only and actual amount may be higher or lower. Professional fees cannot be paid until they are approved by the Bankruptcy Court in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Court's orders.

The Debtor reserves all of its rights and objections to any Priority or Administrative Claim.

### E.   TOTAL NON-PRIORITY UNSECURED CLAIMS

The Debtor estimates that Unsecured Creditors are owed approximately $31,609,981.44 in the aggregate pursuant to the Debtor's Schedules (exclusive of any deficiency claims by any Creditor holding a Secured Claim). *See* DN 151, Schedule F. However, this amount may increase or decrease in the event that additional claims for the rejection of executory contracts or unexpired leases are filed, the Court overrules or sustains objections to Claims that have been or will be made, and/or a Secured Creditor asserts a deficiency Claim. The Debtor reserves all of its rights and objections to any non-priority Unsecured Claim. A listing of the Debtor's Unsecured Creditors is on file with the Bankruptcy Court. *See* DN 151.

### F.   GUARANTEED DEBT

The Debtor and its Affiliated Entities have maintained loan relationships with Bank of Ann Arbor for many years. The loan relationships which existed as of the Petition Date are described below.

The Debtor was indebted to Bank of Ann Arbor pursuant to a Promissory Note and Business Loan Agreement dated October 5, 2023, in the face amount of $2,150,000 ("Loan 100184")[15] and pursuant to a Promissory Note and Business Loan Agreement dated July 29, 2022, in the face amount of $292,061.99 ("Loan 201529"). Loan 100184 matured prior to the Petition Date and was due in full on the Petition Date.

As authorized by the Sale Order, the Debtor used the Sale Proceeds to pay Bank of Ann Arbor a total of $2,361,751 in full satisfaction of Loan 100184 and Loan 201529.

---

[15] Prior to its repayment, the following individuals and entities had guaranteed repayment of Loan 100184: (i) Barbara Hirth, (ii) Barbara A. Hirth Trust u/a/d/ August 15, 1996, (iii) David Hirth, (iv) David F. Hirth Trust u/a/d August 15, 1996, as amended, (v) Scott Hirth, (vi) Julie Corrin, (vii) Steve Horning, (viii) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (ix) Scott David Hirth Trust Dated October 14, 2002, and (x) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

In addition to the Debtor's direct liability to Bank of Ann Arbor, it also guaranteed the obligations of the Related Entities listed below. Debtor secured repayment of these liabilities under a Commercial Security Agreement dated July 5, 2020, granting Bank of Ann Arbor a security interest and all asset lien on Debtor's assets, including its Cash Collateral, to secure all amounts owed by Debtor to Bank of Ann Arbor. Bank of Ann Arbor perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on May 6, 1999, file number D514533, which has been continued from time to time.

### a. Debtor Guaranteed Amounts owed by M-Den Properties, LLC to Bank of Ann Arbor

The Debtor executed a Commercial Guaranty dated July 27, 2017 (the "Heritage Properties Guaranty"), guarantying repayment of all amounts owed by M-Den Properties, LLC ("Heritage Properties") to Bank of Ann Arbor.

Heritage Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 29, 2022, in the face amount of $658,554.57 ("Loan 401828"). The Debtor believes the current balance on Loan 401828 is approximately $606,290.36.

The Scott David Hirth Trust Dated October 14, 2002, and Scott Hirth guaranteed repayment of Loan 401828.

Heritage Properties is also indebted to Bank of Ann Arbor pursuant to a Promissory Note dated June 25, 2022, in the face amount of $283,599.54 ("Loan 400994"). The Debtor believes the current balance on Loan 400994 is approximately $179,530.36.

The obligations of Heritage Properties to Bank of Ann Arbor are also secured by a mortgage and assignment of rents on real property located at 5000 Carpenter Rd. in Ypsilanti, Michigan (the "Warehouse").

The Warehouse is owned by Heritage Properties and is leased to Debtor.

The following individuals and entities have guaranteed repayment of Loan 400994: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (v) Scott David

Hirth Trust Dated October 14, 2002, and (vi) The David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### b. Debtor Guaranteed Amounts owed by Stadium Properties to Bank of Ann Arbor

The Debtor executed a Commercial Guaranty dated June 27, 2017 ("Stadium Properties Guaranty"), guarantying repayment of all amounts owed by M Den Stadium Properties, LLC ("Stadium Properties") to Bank of Ann Arbor.

Stadium Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated March 23, 2024, in the face amount of $870,335 ("Loan 401827"). The Debtor believes the current balance on Loan 401827 is approximately $861,082.35.

Loan 401827 is also secured by a mortgage and assignment of rents on real property located at 1336 South Main and 210 West Stadium Blvd. in Ann Arbor.

The following individuals and entities have guaranteed repayment of Loan 401827: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### c. Debtor Guaranteed Amounts owed by State Street Properties to Bank of Ann Arbor

The Debtor executed a Commercial Guaranty dated June 27, 2017 ("State Street Guaranty"), guarantying repayment of all amounts owed by M Den State Street Properties, LLC ("State Street Properties") to Bank of Ann Arbor.

State Street Properties is indebted to Bank of Ann Arbor pursuant to a Promissory Note dated July 27, 2022, in the face amount of $2,256,976.20 ("Loan 401636"). The Debtor believes the current balance on Loan 401636 is approximately $2,057,684.10.

Loan 401636 is also secured by a mortgage and assignment of rents on real property located at 307-309 State Street in Ann Arbor, Michigan.

{01094803.2}

The following individuals and entities have guaranteed repayment of Loan 401636: (i) Scott Hirth, (ii) Julie Corrin, (iii) Steve Horning, (iv) The Steven D. Horning and Elizabeth A. Horning Trust Dated May 10, 2013, (vi) Scott David Hirth Trust Dated October 14, 2002, and (vii) David A. Corrin and Julie C. Corrin Trust Dated May 19, 2008.

### d. Newtek Debt is Guaranteed by Related Parties

Debtor is indebted to Newtek Bank pursuant to U.S. Small Business Administration Note dated December 10, 2020 in the face amount of $4,600,000 ("Newtek Note"). The Debtor believes the current balance on the Newtek Note is approximately $4,835,106.04.

The Newtek Note is secured by a lien on the Debtor's all asset lien on Debtor's assets, including its Cash Collateral, pursuant to a Commercial Security Agreement dated December 10, 2020. Newtek perfected its lien by the filing of a UCC Financing Statement with the State of Michigan on November 13, 2020, file number 20201113000487-3.

The following individuals and entities have guaranteed repayment of the Newtek Note (i) Rennae Whitt; (ii) Elizabeth Horning, (iii) Steven Horning, (iv) M Den State Street Properties, LLC, (v) Scott David Hirth, (vi) July Carol Corrin, (vii) M Den Stadium Properties, LLC, (viii) M-Den Properties, LLC, and (ix) David Corrin.

### V. IMPLEMENTATION OF PLAN

A. **Pre-Petition Financial Summaries:** The Debtor has attached as **Exhibit C**, financial summaries relating to the three fiscal years prior and the year-to-date including the Petition Date. These documents summarize the Debtor's financial history prior to the commencement of the Debtor's bankruptcy proceeding. The Debtor anticipates that these financial statements will be restated to include additional amounts owed to the University of Michigan related to prior year's royalty obligations. These documents were prepared by the Debtor.

**B.** **Post-Petition Financial Summaries:** The Debtor has attached as **Exhibit D** financial summaries related to its post-Petition Date financial activities. Furthermore, the Debtor has attached as **Exhibit E**, its summary of post-confirmation financial projections for the life of the Plan.

## C. TAX RAMIFICATIONS

**To Debtor:** The Debtor is taxed as a partnership and because it is pass-through entity. As a result, the Debtor does not anticipate paying income taxes now or in the future and is, therefore, not impacted as a result of confirmation of the Plan.

**To Creditors:** The tax consequences to each Creditor resulting from confirmation of the Plan may vary depending upon each Creditor's particular circumstances. The Debtor recommends that Creditors or Holders of Claims obtain independent tax counsel to advise them as to the tax consequences of the Plan.

## VI. INFORMATION REQUESTED BY COMMITTEE

### A. Information Regarding Debtor's Post-petition Lease of Estate Property and Employees to Legends

See Section III, A above.

### B. Information Regarding the Lien Priority and Amounts Owing to Secured Creditors of Debtor

The following is a list of parties claiming a security interest or ownership interest in the Sale Proceeds.

|        | Creditor/Owner    | Claim Amount   | Dated of Claimed UCC Filing |
|--------|-------------------|----------------|------------------------------|
| First  | Bank of Ann Arbor | $3,642,694     | May 6, 1999                  |
| Second | Element           | $4,596,132     | March 12, 2020               |
| Third  | SBA               | $500,000       | June 28, 2020                |
| Fourth | Newtek            | $3,558,991.61  | November 13, 2020            |

| Fifth | TVT | $3,251,793.36 | April 3, 2023 |
| Sixth | Vault Capital | $860,000 | November 9, 2023 |
| Seventh | Family Fund | $380,000 | May 21, 2024 |

In addition, Unifi took a security interest in the Debtor's 2023 Ram Promaster Van to secure repayment of amounts owed under the Unifi Loan. Unifi took a security interest in the Promaster Van to secure repayment of the Unifi Loan and the lien was perfected by acknowledgment of the lien on the certificate of title. When the Debtor sold the Promaster Van, Unifi's lien transferred to the Sale Proceeds. As a result, the Debtor believes that Unifi has a first priority lien on $22,103 of the Sale Proceeds (the blue book value of the Promaster Van) which represent the proceeds of the sale of the Promaster Van.

Finally, GM Financial took a security interest in the Debtor's Box Truck to secure repayment of amounts owed under the <u>GM Financial Loan.</u> GM Financial took a security interest in the Box Truck to secure repayment of the GM Financial Loan and the lien was perfected by acknowledgment of the lien on the certificate of title. When the Debtor sold the Box Truck, GM Financial's lien transferred to the Sale Proceeds. As a result, the Debtor believes that GM Financial has a first priority lien on $8,701.84 of the Sale Proceeds which represent the proceeds of the sale of the Box Truck.

### C.    Information Regarding the Facts Used to Drive Debtor's Decision Making Before Entering into Loan or MCA Transactions

See section II C above for a description of Debtor's financial distress, its decision to borrow from MCA Creditors and ultimately its bankruptcy filing.

### D.    Information Regarding the Value of and Potential for Recovery on Avoidance Actions

The Debtor has not analyzed the value of its Avoidance Actions, but all Avoidance Actions will transfer to the Liquidation Trust on the Effective Date. See additional information at section IV C.

### E. Information Regarding Insider/Affiliate Transfers and Other Transactions, Including Related Party Loans.

The Debtor paid the following amounts to Insider individuals in year prior to Petition Date:

| Recipient | S Corp. Tax Distribution | Gross Wages | 401K Match | Total |
|---|---|---|---|---|
| Scott Hirth | $218,000 | $196,101.83 | $6,646.05 | $420,747.88 |
| Julie Corrin | $218,000 | $166,153.95 | $6,646.05 | $390,800.00 |
| Steve Horning | $218,000 | $196,271.27 | $6,646.05 | $420,917.32 |
| Hunter Hirth | | $69,807.90 | $2,492.37 | $72,300.27 |
| Brett Horning | | $27,991.21 | | $27,991.21 |
| Don Horning | | $10,884.60 | | $10,884.60 |
| Drew Horning | | $83 | | $83 |
| Robyn Horning | | $80,319.39 | $2,972.84 | $83,291.78 |

The Debtor paid the following amounts to the Related Entities in year prior to Petition Date:

| Recipient | Amount | Purpose |
|---|---|---|
| M Den Properties | $180,000 | Rent |
| M Den State Street Properties | $420,000 | Rent |
| M Den Stadium Properties | $159,534.43 | Rent |

For information related to related party loans, please see section IV F above.

### F. Information Regarding Board and/or other Involved Parties' Decision-making Process for the Business Before the Filing, and the Process by Which the Debtor Determined That It Would File for Bankruptcy

The Debtor did not have a board of directors. Instead, decisions were made on the vote of the owners of the Debtor, Scott Hirth, Julie Corrin and Steve Horning. The owners of the Debtor, in consultation with counsel, sought to sell the Debtor's assets in the months leading up to the bankruptcy filing but the Debtor

was unable to secure an offer sufficient to pay secured creditors in full, let alone an offer that would allow for a distribution to unsecured creditors.

During this time, there were several creditors who had filed lawsuits against the Debtor and several who had entered judgments against the Debtor. As a result, the Debtor began consulting with insolvency counsel about the possibility of filing a Chapter 11 bankruptcy petition to preserve its going concern value through a sale.

Shortly before the Petition Date, the Debtor received notice that a group of creditors was going to file an involuntary bankruptcy against it. At that time the Debtor, through its owners, Scott Hirth, Julie Corrin and Steve Horning, and in consultation with counsel, voted in favor of causing the Debtor to file a Chapter 11 bankruptcy petition.

**G. Information Regarding the Wind-down Budget and Plans for Funding a Post-confirmation Trust (if any), the Parties That Were Consulted Regarding it, and any Agreements Made With Any Insiders or Affiliates of the Debtors Related to a Post-Confirmation Trust**

For information relating to winddown budget see Exhibit E.

The Debtor's Plan provides for the formation of a Liquidation Trust which will hold certain assets and distribute proceeds on a pro-rata basis on Allowed Administrative and Unsecured Claims. The Plan provides that, upon payment in full of Bank of Ann Arbor's Allowed Secured Claim, all of Bank of Ann Arbor's rights, title and interest in, to and under the Bank of Ann Arbor Related Entity Loan Documents will transfer to the Liquidation Trust, and all of the Debtor's claims, rights and interest in equitable subrogation to Bank of Ann Arbor's rights against the Related Entities and the Related Entity Real Estate shall automatically be deemed to have been transferred and assigned to the Liquidation Trust.

In addition, all Avoidance Actions, Causes of Action and rights to object to the Claims of any Insider or Related Entity shall transfer to the Liquidation Trust on the Effective Date.

No agreements were made with any insiders or affiliates of the Debtor related to the Litigation Trust. The Debtor consulted with counsel for the Unsecured Creditors Committee regarding establishing the Liquidation Trust.

## H. Information Related to Potential Claims from Federal, State, and/or Local Governmental Units (As Well As Foreign Governmental Claims), Including but Not Limited to Environmental and/or Tax Claims

See section IV D above for a description of estimated Priority Tax Claims of government agencies. The Debtor does not anticipate any post-petition Tax Claims against the Debtor. The Debtor is not aware of any environmental Claims by any governmental unit against the Debtor.

## VII. LEGAL REQUIREMENTS

### A. VOTING PROCEDURES

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of Claims, or equity Interests, that are impaired under the Plan. Accordingly, classes of Claims or Interests that are not impaired are not entitled to vote on the Plan.

Creditors that hold Claims in more than one impaired class are entitled to vote separately in each class. Such a Creditor will receive a separate ballot for all of its Claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A Creditor who asserts a Claim in more than one class and who has not been provided with sufficient ballots may photocopy the ballot received and file multiple ballots.

Votes on the Plan will be counted only with respect to Claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a Proof of Claim was filed on or before the Bar Date set by the Court for the filing of Proofs of Claim (except for certain Claims expressly excluded from that Bar Date or which are allowed by Court order). However, any vote by a Holder of a Claim will not be counted if

such Claim has been Disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such Claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the Plan by each Holder of a Claim or Interest in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each Holder of such a Claim or Interest should vote on the enclosed ballot either to accept or to reject the Plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

### B. <u>ACCEPTANCE</u>

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots. If no Creditor or Interest Holder in an impaired class votes, then that class has not accepted the Plan.

### C. <u>CONFIRMATION</u>

11 U.S.C. § 1129(a) establishes conditions for the confirmation of a plan. These conditions are too numerous and detailed to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the Chapter 11 process.

Among the several conditions for confirmation of a plan under 11 U.S.C. § 1129(a) are these: 1) Each class of impaired creditors and interest must accept the plan, as described in VII.B above or, 2) <u>Either</u> each holder of a claim or interest in

a class must accept the plan, <u>or</u> the plan must provide at least as much value as would be received upon liquidation under Chapter 7 of the Bankruptcy Code.

## D.    MODIFICATION

The Debtor reserves the right to modify or withdraw the Plan at any time before confirmation.

## E.    EFFECT OF CONFIRMATION

If the Plan is confirmed by the Court:

    *1.*    Its terms are binding on the debtor, all creditors, shareholders and other parties in interest, regardless of whether they have accepted the plan.

    *2.*    Except as provided in the Plan and in 11 U.S.C. § 1141(d):

        *(a)*    In the case of a corporation that is liquidating and not continuing its business, **as in this case**:

            *(1)*    Claims and interests will not be discharged.

            *(2)*    Creditors and shareholders will not be prohibited from asserting their claims against or interests in the Debtor or its assets.

{01094803.2}

Respectfully submitted,

Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc., d/b/a The M Den

By: /s/ Scott Hirth (with consent)
       Scott Hirth
Its:   Authorized Representative


Prepared by:

SCHAFER AND WEINER, PLLC


/s/ Kim K. Hillary
KIM K. HILLARY (P67534)
HOWARD BORIN (P51959)
SCHAFER AND WEINER, PLLC
Counsel for Debtor
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 540-3340
khillary@schaferandweiner.com

Dated:  January 9, 2024

# EXHIBIT A

**HERITAGE COLLEGIATE APPAREL, INC., F/K/A M-DEN, INC., D/B/A THE M DEN**
**LIQUIDATION ANALYSIS**

A.   ASSETS:

| COLLATERAL | CREDITOR HOLDING LIEN | VALUE[1] | AMOUNT OF SECURED CLAIM | EQUITY |
|---|---|---|---|---|
| Cash[2] | | $9,939,972 | | |
| Chapter 5 Causes of Action[3] | | $0 | | |
| Receivable from Stadium Properties | | $592,634 | | |
| **TOTAL ASSETS** | | **$10,532,606** | | |
| | | | | |
| | Bank of Ann Arbor | | $3,642,694 | $6,889,912 |

---

[1] The Debtor is not including market vs. forced sale value in this Liquidation Analysis because those valuations are not applicable to the Debtor's assets, i.e., cash and causes of action.

[2] The is the estimated amount of cash that will be in the Debtor's bank accounts on January 29, 2025, excluding amounts in the Professional Fee Account.

[3] The Debtor believes that it may have a Cause of Action against the University of Michigan related to the transfer of its right in the "M-Den" name under the Forbearance Agreement.  Under the Debtor's Plan, this and all other Avoidance Actions are being transferred to the Liquidation Trust with a mechanism to fund the associated administrative fees and costs.  Any recovery will be distributed to Unsecured Creditors.  In the event this matter converts to Chapter 7, there will not be a mechanism to fund the administrative fees and costs associated with prosecuting this or any other Avoidance Action and the Debtor believes there is a substantial risk that such Avoidance Actions will be abandoned and not result in any benefit to Unsecured Creditors.

{01087727.1}

| | | | | |
|---|---|---|---|---|
| | Elemental[4] | | $4,596,132 | $2,293,780 |
| | Family Fund | | $860,700 | $1,433,780 |
| | Vault | | $380,000 | $1,053,780 |
| | SBA | | $514,494 | $539,286 |
| | Newtek | | $3,558,991.61 | $0.00 |
| | TVT[5] | | $3,251,793.36 | $0.00 |
| **TOTAL SECURED CLAIMS** | | | **$16,804,805** | |

B.    **LIABILITIES:**

1. **Administrative Creditors**[6]:

Debtor's Counsel's Fees:                $ 300,000
Creditor Committee Counsel Fees:    $ 235,000
Capstone Partners Fees:                  $ 130,000
Chapter 7 Fees Trustee Fees            $  338,000
**TOTAL:**                                       **$ 1,003,000**

---

[4] Debtor believes that the claims of Elemental, Family Fund and Vault will be substantially reduced or eliminated by the MCA Adversary Proceedings the Debtor intends to file.  The Plan provides a mechanism to fund the MCA Adversary Proceedings.  In the event this matter converts to Chapter 7, there will not be a mechanism to fund the prosecution of the MCA Adversary Proceedings and the Debtor believes that these claims will be allowed as filed, which will eliminate any distribution to unsecured creditors.

[5]  Debtor believes that this amount will be substantially reduced through the claims objection process.  However, because of the lack of funding mechanism for the claims objection process, in Chapter 7 this claim may be allowed as filed.

[6] Includes both Chapter 11 and Chapter 7 administrative fees, all of which are estimates.

{01087727.1}

3. **Priority Claims**:

| | |
|---|---|
| Ohio Department of Taxation | $42,758.13 |
| WA Department of Revenue | $11,518.99 |
| Illinois Department of Revenue | $35,472.23 |
| Massachusetts Department of Revenue | $1,045.15 |
| **TOTAL** | **$90,795** |

**EXPECTED DISTRIBUTION TO UNSECURED CREDITORS IN A CHAPTER 7 LIQUIDATION. $ ZERO**

# EXHIBIT B

**PAYMENTS TO CREDITORS MAY 18 - AUG 16**

| PAYEE | PAYMENT |
|---|---:|
| 315-317 SMS, LLC | $ 95,160.43 |
| Absopure Water Company | $ 1,324.81 |
| ACD.net | $ 48.58 |
| American Express | $ 4,909.00 |
| American Funds | $ 18,627.22 |
| Ameritas Life Ins Corp | $ 4,566.36 |
| Avalara | $ 24,195.48 |
| Bank of Ann Arbor | $ 171,479.42 |
| Bank of Ann Arbor-HSA | $ 9,704.16 |
| Bill Shurtliff Studios | $ 5,445.00 |
| Butzel | $ 15,000.00 |
| BVKK Inc. | $ 48,050.39 |
| CertaSite | $ 1,490.34 |
| Certegy Payment Solutions, LLC | $ 359.70 |
| Charles Carlson | $ 88.30 |
| Chase Bank | $ 5,958.54 |
| Chase Card Services | $ 85,000.00 |
| Citizens Insurance | $ 13,018.82 |
| City of Ann Arbor | $ 161.27 |
| Coman Publishing Company | $ 25,869.53 |
| Comcast Business | $ 4,848.67 |
| Conlin, McKenney & Philbrick, P.C. | $ 36,686.20 |
| CyberSource | $ 1,473.50 |
| Dale Fisher | $ 7,481.03 |
| David Nissly | $ 88.30 |
| DTE Energy | $ 23,185.09 |
| Dynamic Drains | $ 200.00 |
| E & J Associates | $ 169,866.50 |
| Feed the Need Autism and Special Needs Acitivity Center | $ 215.00 |
| FreedomPay, Inc. | $ 4,834.55 |
| General Linen & Unifrom | $ 937.72 |
| GM Financial | $ 812.49 |
| Gulf Coast Sales & Marketing | $ 21,083.65 |
| Indiana DOR ID: 8489401 | $ 14,080.67 |
| Jerome's Property Enhancements | $ 460.73 |
| Kapnick / Traveler's Insurance | $ 25,137.00 |
| KDP Retirement Plan Services | $ 325.00 |
| Kone Inc (fka Detroit Elevator) | $ 225.72 |
| Main Street Area Assoc | $ 675.00 |
| Mall at Briarwood, LLC | $ 270,000.00 |
| Marney Brown | $ 88.30 |
| MI Retailer's - Merchant Processing | $ 526.80 |
| Michigan Office Solutions | $ 1,923.40 |
| Michigan Retailer's Services, Inc. | $ 114,894.38 |
| New Roof, Inc | $ 450.00 |
| Newtek Small Business Finance, LLC | $ 66,760.00 |
| Niki's Shine Bright Cleaning Services | $ 19,020.19 |
| Nova IP Law, PLLC | $ 1,000.00 |
| Oracle Credit Corp | $ 100,000.00 |
| Otis Elevator | $ 2,954.04 |
| Packline Co. | $ 17,490.27 |
| Paychex | $ 793,396.96 |
| PCI Municipal Services | $ 6,075.00 |
| Pest Masters, Inc. | $ 676.00 |
| Peter Millar, LLC. | $ 20,000.00 |
| Pittsfield Township-Utilities | $ 85.90 |
| Principal Life Insurance | $ 983.06 |
| Quality Window Cleaning | $ 1,650.00 |
| Queue-it | $ 3,359.40 |
| Retailer's Insurance Company | $ 5,712.25 |
| RFSmart, ICS | $ 50,027.05 |

| | | |
|---|---|---:|
| Richard & Beverly Fabian | $ | 30,000.00 |
| Riddell | $ | 10,000.00 |
| RightBrain Networks | $ | 4,578.75 |
| Robertson Morrison | $ | 5,332.50 |
| Ryder Transportation | $ | 60.55 |
| S & B Party Rentals | $ | 3,030.00 |
| Saia Motor Freight Line, LLC | $ | 1,471.20 |
| Sam's Club MC/Syncb | $ | 6,500.00 |
| SBA EIDL | $ | 2,518.00 |
| SBA Loan payment | $ | 2,518.00 |
| Schafer & Weiner, PLLC | $ | 75,861.04 |
| Second Story Interiors, LLC | $ | 7,000.00 |
| Shamrock Services | $ | 38,000.00 |
| SS Properties FET Tax Deposit | $ | 3,500.00 |
| Stadium View Properties, LLC | $ | 8,000.00 |
| State of Michigan | $ | 1,100.00 |
| State of Michigan, SUT | $ | 625.00 |
| State Street Area Assoc | $ | 3,206.00 |
| Susan Vigo | $ | 88.30 |
| Timothy Psychas | $ | 323.23 |
| Tommy Bahama | $ | 15,000.00 |
| TVO Mall Owner, LLC | $ | 50,000.00 |
| TVT 2.0, LLC | $ | 311,300.00 |
| Twin Oaks Landscape | $ | 915.00 |
| Underground Printing | $ | 27,000.00 |
| UniFi Equipment (Bank of Ann Arbor) | $ | 3,084.59 |
| Unum | $ | 3,682.77 |
| UPS | $ | 146,918.73 |
| USA Paper, LLC | $ | 270.32 |
| Usable Development LLC | $ | 1,587.50 |
| Vintage Detroit Collection, Inc | $ | 3,409.25 |
| Waste Management | $ | 996.10 |
| Xerox Financial Services | $ | 408.18 |
| YP | $ | 110.65 |
| M Den Properties LLC | $ | 45,000.00 |
| M Den State Street Properties LLC | $ | 105,000.00 |
| M Den Stadium Properties LLC | $ | 65,000.00 |

# EXHIBIT C

# M-Den Inc.



# Years Ended December 31, 2022 and 2021

# Financial Statements

**Rehmann**

# M-DEN INC.

## Table of Contents

| | Page |
|---|---|
| **Independent Accountants' Compilation Report** | 1 |
| | |
| **Financial Statements for the Years Ended** | |
| **December 31, 2022 and 2021** | |
| | |
| Statements of Assets, Liabilities, and Shareholders' Equity | |
| (Accrual Basis Method of Accounting Used for Federal Income Tax Purposes) | 2 |
| | |
| Statements of Revenue and Expenses | |
| (Accrual Basis Method of Accounting Used for Federal Income Tax Purposes) | 3 |
| | |
| Statements of Shareholders' Equity | |
| (Accrual Basis Method of Accounting Used for Federal Income Tax Purposes) | 4 |
| | |
| Statements of Cash Flows | |
| (Accrual Basis Method of Accounting Used for Federal Income Tax Purposes) | 5 |



**INDEPENDENT ACCOUNTANTS' COMPILATION REPORT**

June 22, 2023

Shareholders
M-Den Inc.
Ann Arbor, Michigan

Management is responsible for the accompanying financial statements of **M-Den Inc.** (an S Corporation) (the "Company"), which comprise the statements of assets, liabilities, and shareholders' equity as of December 31, 2022 and 2021, and the related statements of revenue and expenses, shareholders' equity, and cash flows for the years then ended, all of which were prepared under the accrual basis method of accounting used for federal income tax purposes and for determining that the income tax basis of accounting is an acceptable financial reporting framework. We have performed compilation engagements on these financial statements in accordance with *Statements on Standards for Accounting and Review Services* issued by the Accounting and Review Services Committee of the AICPA. We did not audit or review the accompanying financial statements nor were we required to perform any procedures to verify the accuracy or the completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

The financial statements are prepared in accordance with the income tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America.

Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared in accordance with the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, shareholders' equity, revenue, and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.





555 Briarwood Circle, Suite 300, Ann Arbor, MI 48108    734.761.2005

# M-DEN INC.

**Statements of Assets, Liabilities, and Shareholders' Equity**
(Accrual Basis Method of Accounting Used for Federal Income Tax Purposes)

| | December 31 | |
|---|---|---|
| ASSETS | 2022 | 2021 |
| **Current assets** | | |
| Cash | $ 263,290 | $ 3,892,372 |
| Accounts receivable | 96,980 | 43,182 |
| Inventory | 14,372,055 | 7,975,471 |
| Employee retention credit receivable | 460,873 | 460,873 |
| Prepaid expenses | 243,618 | 243,456 |
| **Total current assets** | **15,436,816** | **12,615,354** |
| **Property and equipment** | | |
| Leasehold improvements | 4,475,817 | 4,344,287 |
| Furniture and fixtures | 351,331 | 351,331 |
| Office equipment and software | 329,653 | 329,653 |
| Vehicles | 63,026 | 63,026 |
| Total | 5,219,827 | 5,088,297 |
| Less accumulated depreciation | 4,023,992 | 3,813,562 |
| **Net property and equipment** | **1,195,835** | **1,274,735** |
| Goodwill and other intangible assets, net of accumulated amortization of $1,101,067 and $955,441, respectively | 1,088,635 | 1,234,261 |
| Due from related party | 462,356 | 301,297 |
| Security deposits | 10,500 | 10,500 |
| **Total assets** | **$ 18,194,142** | **$ 15,436,147** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable | $ 7,054,432 | $ 9,366,846 |
| Short-term bank borrowings | 2,150,000 | - |
| Current portion of long-term debt | 210,855 | 556,825 |
| Accrued expenses | 5,441,602 | 4,241,177 |
| Due to related parties | 1,292,823 | - |
| **Total current liabilities** | **16,149,712** | **14,164,848** |
| Long-term debt, less current portion | 724,359 | 619,461 |
| **Total liabilities** | **16,874,071** | **14,784,309** |
| **Shareholders' equity** | | |
| Common stock | 8,948 | 8,948 |
| Additional paid-in capital | 9,038 | 9,038 |
| Retained earnings | 1,302,085 | 633,852 |
| **Total shareholders' equity** | **1,320,071** | **651,838** |
| **Total liabilities and shareholders' equity** | **$ 18,194,142** | **$ 15,436,147** |

See independent accountants' compilation report.

# M-DEN INC.

**Statements of Revenue and Expenses**
(Accrual Basis Method of Accounting Used for Federal Income Tax Purposes)

| | Year Ended December 31 | |
| --- | ---: | ---: |
| | **2022** | **2021** |
| Revenue | $ 47,386,305 | $ 38,652,224 |
| Cost of goods sold | 23,965,524 | 20,743,853 |
| **Gross profit** | **23,420,781** | **17,908,371** |
| **Operating expenses** | | |
| Salaries and wages | 4,155,832 | 3,201,962 |
| Rents | 3,521,904 | 3,141,973 |
| Royalties | 3,427,529 | 2,033,589 |
| Taxes and licenses | 3,299,680 | 2,677,553 |
| Shipping | 2,426,735 | 1,968,742 |
| Credit card processing expenses | 1,523,416 | 1,087,568 |
| Professional fees | 502,186 | 781,903 |
| Employee benefits | 444,587 | 314,734 |
| Miscellaneous | 439,705 | 176,356 |
| Supplies | 380,806 | 243,724 |
| Depreciation and amortization | 356,056 | 271,388 |
| Advertising | 209,777 | 558,037 |
| Catalog production and mailing | 155,822 | 31,876 |
| Interest expense, net | 144,345 | 292,993 |
| Utilities | 131,700 | 131,208 |
| Insurance | 104,912 | 85,915 |
| Service contracts | 91,719 | 71,467 |
| Repair and maintenance | 89,650 | 46,408 |
| Telephone | 87,768 | 73,449 |
| Automobile expense | 71,229 | 60,275 |
| Furniture rental | 43,534 | 29,984 |
| **Total operating expenses** | **21,608,892** | **17,281,104** |
| **Tax basis income** | **1,811,889** | **627,267** |
| **Nondeductible expense (income)** | | |
| 263A adjustment | 68,160 | (388,178) |
| Permanent differences | 34,200 | (1,702,874) |
| **Nondeductible expense (income)** | **102,360** | **(2,091,052)** |
| **Revenue over expenses** | **$ 1,709,529** | **$ 2,718,319** |

See independent accountants' compilation report.

**M-DEN INC.**

(Accrual Basis Method of Accounting Used for Federal Income Tax Purposes)

| | Common Stock | | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Total Shareholders' Equity (Deficit) |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balances, January 1, 2021** | **8,948** | $ **8,948** | $ **9,038** | $ **(1,947,093)** | $ **(1,929,107)** |
| Revenue over expenses | - | - | - | 2,718,319 | 2,718,319 |
| Distributions | - | - | - | (137,374) | (137,374) |
| **Balances, December 31, 2021** | **8,948** | **8,948** | **9,038** | **633,852** | **651,838** |
| Revenue over expenses | - | - | - | 1,709,529 | 1,709,529 |
| Distributions | - | - | - | (1,041,296) | (1,041,296) |
| **Balances, December 31, 2022** | **8,948** | $ **8,948** | $ **9,038** | $ **1,302,085** | $ **1,320,071** |

See independent accountants' compilation report.

# M-DEN INC.

## Statements of Cash Flows

(Accrual Basis Method of Accounting Used for Federal Income Tax Purposes)

| | Year Ended December 31 | |
|---|---|---|
| | 2022 | 2021 |
| **Cash flows from operating activities** | | |
| Revenue over expenses | $ 1,709,529 | $ 2,718,319 |
| Adjustments to reconcile revenue over expenses | | |
| to net cash (used in) provided by operating activities | | |
| Depreciation | 210,430 | 125,410 |
| Amortization | 145,626 | 145,978 |
| Bad debts | 35,950 | 24,413 |
| Paycheck Protection Program loan forgiveness | - | (1,736,062) |
| Changes in operating assets and liabilities | | |
| which (used) provided cash | | |
| Accounts receivable | (89,748) | (61,471) |
| Inventory | (6,396,584) | 1,470,170 |
| Employee retention credit receivable | - | (99,613) |
| Prepaid expense | (162) | (36,182) |
| Accounts payable | (2,312,414) | 1,983,518 |
| Accrued expenses | 1,200,425 | 1,606,534 |
| **Net cash (used in) provided by operating activities** | **(5,496,948)** | **6,141,014** |
| **Cash flows from investing activities** | | |
| Purchases of property and equipment | (131,530) | (37,076) |
| Advances to related party | (161,059) | (74,086) |
| **Net cash used in investing activities** | **(292,589)** | **(111,162)** |
| **Cash flows from financing activities** | | |
| Net decrease in cash overdraft | - | (42,276) |
| Net borrowings (repayments) of short-term bank borrowings | 2,150,000 | (2,150,000) |
| Proceeds from Paycheck Protection Program loan | - | 868,031 |
| Proceeds from issuance of long-term debt | - | 350,000 |
| Repayments of long-term debt | (241,072) | (238,711) |
| Advance from (repayments to) related parties | 1,292,823 | (787,150) |
| Distributions | (1,041,296) | (137,374) |
| **Net cash provided by (used in) financing activities** | **2,160,455** | **(2,137,480)** |
| **Net (decrease) increase in cash** | **(3,629,082)** | **3,892,372** |
| Cash, beginning of year | 3,892,372 | - |
| **Cash, end of year** | **$ 263,290** | **$ 3,892,372** |

See independent accountants' compilation report.

# MDen, Inc. Income Statement - 12312023
## January 1, 2023 - December 31, 2023

| Financial Row | CURRENT MONTH (12/1/2023 - 12/31/2023) | THIS MONTH LAST YEAR (12/1/2022 - 12/31/2022) | CURRENT YTD (01/1/2023 - 12/31/2023) | LAST YEAR YTD (01/1/2022 - 12/31/2022) |
|---|---|---|---|---|
| Ordinary Income/Expense | | | | |
| Income | $8,483,004.62 | $8,880,978.55 | $48,099,536.39 | $44,846,915.17 |
| Cost Of Sales | $5,343,303.82 | $6,845,358.74 | $24,867,869.92 | $24,033,683.44 |
| Gross Profit | $3,139,700.80 | $2,035,619.81 | $23,231,666.47 | $20,813,231.73 |
| Expense | | | | |
| 605140 - Advertising and Promotion | $5,167.23 | $4,694.43 | $81,826.68 | $131,707.36 |
| 605142 - Catalog Production Costs | $0.00 | $0.00 | $0.00 | $155,821.65 |
| 605144 - Internet Connection | $4,245.11 | $3,583.32 | $34,848.87 | $36,355.23 |
| 605160 - Automobile Expense | $9,698.34 | $6,509.58 | $90,803.94 | $71,229.47 |
| 605170 - Bad Debts | $5,618.10 | $3,339.24 | $29,764.93 | $35,950.42 |
| 605190 - Bank Fees | $1,563.00 | $19,140.56 | $23,766.76 | $35,677.47 |
| 605195 - Business Licenses and Permits | $91.00 | $75.00 | $954.00 | $2,722.00 |
| 605200 - Cash Over and Short | $5,379.57 | ($4.63) | $10,036.62 | $1,931.07 |
| 605220 - Contract Labor | $80,106.14 | $87,745.29 | $102,059.51 | $97,521.20 |
| 605240 - CC Merchant Processing Fees | $289,073.32 | $306,400.98 | $1,674,710.81 | $1,523,415.72 |
| 605290 - Depreciation Expense | $6,371.08 | $117,444.37 | $76,452.96 | $210,431.44 |
| 605291 - Amortization | $12,114.92 | $11,810.93 | $145,379.04 | $145,625.16 |
| 605310 - Donations & Contributions | $15,740.50 | $1,712.48 | $395,439.03 | $111,790.85 |
| 605330 - Dues and Subscriptions | $0.00 | $250.00 | $8,830.00 | $7,886.92 |
| 605400 - Furniture & Fixtures Expense | $76.09 | $0.00 | $17,965.51 | $43,534.44 |
| 605450 - Employee Benefits | $36,135.82 | $34,633.39 | $433,083.16 | $364,408.90 |
| 605455 - 401k Match Company Contribution | $6,253.82 | $7,973.01 | $80,179.02 | $80,178.08 |
| 605460 - Insurance Expense | $8,745.84 | $6,990.38 | $148,660.04 | $139,083.08 |
| 605520 - Legal & Accounting | $0.00 | $0.00 | $68,935.00 | $104,475.00 |
| 605545 - Equipment Rental | $438.38 | $375.58 | $10,364.90 | $5,536.00 |
| 605546 - Equipment Lease | $1,358.35 | $1,242.88 | $14,461.00 | $12,441.44 |
| 605550 - Meals and Entertainment | $7,556.14 | $11,335.57 | $64,012.64 | $24,283.80 |
| 605570 - Miscellaneous Expense | ($3,395.43) | $5,039.25 | ($12,586.60) | $71,535.24 |
| 605600 - Payroll Service | $11,583.28 | $6,577.78 | $63,462.42 | $52,376.49 |
| 605650 - 401K Plan Administration | $325.00 | $0.00 | $1,905.00 | $1,300.00 |
| 605665 - Professional Fees | $87,005.33 | $32,162.65 | $355,978.76 | $397,710.82 |
| 605740 - Rent Expense | $402,990.82 | $478,237.43 | $3,669,641.51 | $3,503,926.20 |
| 605745 - Royalties (Mich Contract) | $757,952.15 | $804,828.31 | $3,388,707.32 | $3,053,028.30 |
| 605746 - Player NIL Merchandise | $483,219.00 | $27,950.00 | $848,690.62 | $283,050.50 |
| 605747 - Player NIL Appearances | $0.00 | $0.00 | $19,500.00 | $91,450.27 |
| 605750 - Promotion Expense | $1,110.00 | $48,300.00 | $75,899.95 | $78,070.00 |
| 605755 - Repairs and Maintenance | $4,691.80 | $3,311.27 | $59,885.42 | $89,649.96 |
| 605780 - Salaries & Wages | $801,685.90 | $834,847.68 | $4,717,626.88 | $4,235,368.09 |
| 605795 - Service Contracts | $9,664.14 | $8,533.53 | $133,187.48 | $91,718.89 |
| 605800 - Shipping - UPS | $927,866.49 | $909,379.34 | $2,241,107.58 | $2,419,133.27 |
| 605805 - USPS Catalog | $21,337.55 | $7,001.96 | $58,872.82 | $7,601.96 |
| 605810 - Supplies | $37,732.83 | $53,673.15 | $335,502.18 | $380,805.81 |
| 605815 - Taxes | $90,000.00 | $90,000.00 | $93,000.00 | $92,500.00 |
| 605850 - Unemployment Taxes | $6,918.59 | $2,458.18 | $37,455.33 | $25,375.35 |
| 605860 - FICA | $60,333.05 | $59,419.74 | $353,141.22 | $314,298.89 |
| 605890 - Sales Tax | $0.00 | $185.59 | $1,813.26 | $224.92 |
| 605900 - SBT Taxes | $0.00 | $22.61 | $0.00 | $22.61 |
| 605910 - Property Taxes | $61,327.67 | $61,811.88 | $249,641.93 | $245,609.61 |
| 605920 - Telephone Expense | $3,789.76 | $3,506.47 | $39,932.68 | $51,412.78 |
| 605930 - Travel & Entertainment Expense | $0.00 | $0.00 | $11,549.32 | $50.00 |
| 605980 - Utilities | $7,314.16 | $15,255.03 | $133,722.32 | $131,699.88 |
| Total - Expense | $4,269,184.84 | $4,077,754.21 | $20,390,171.82 | $18,959,926.54 |
| Net Ordinary Income | ($1,129,484.04) | ($2,042,134.40) | $2,841,494.65 | $1,853,305.19 |
| Other Income and Expenses | | | | |
| Other Income | $0.00 | $192.25 | $11,229.45 | $597.31 |

| Financial Row | CURRENT MONTH (12/1/2023 - 12/31/2023) | THIS MONTH LAST YEAR (12/1/2022 - 12/31/2022) | CURRENT YTD (01/1/2023 - 12/31/2023) | LAST YEAR YTD (01/1/2022 - 12/31/2022) |
|---|---|---|---|---|
| Other Expense | $14,660.89 | $44,246.17 | $257,977.59 | $144,372.56 |
| Net Other Income | ($14,660.89) | ($44,053.92) | ($246,748.14) | ($143,775.25) |
| Net Taxable Income | ($1,144,144.93) | ($2,086,188.32) | $2,594,746.51 | $1,709,529.94 |
| Net Income | ($1,144,144.93) | ($2,086,188.32) | $2,594,746.51 | $1,709,529.94 |

**The M Den**

## MDen, Inc. Balance Sheet - 12312023
### As of December 31, 2023

| Financial Row | Current (As of 12/31/2023) | Prior Year (As of 12/31/2022) |
|---|---:|---:|
| ASSETS | | |
| Current Assets | | |
| Bank | | |
| 101000 - Bank | $427,301.32 | $188,511.28 |
| 107010 - Cash On Hand | $29,108.00 | $25,379.04 |
| Total Bank | $456,409.32 | $213,890.32 |
| Accounts Receivable | $194,615.72 | $146,380.20 |
| Other Current Asset | | |
| 107200 - Inventory | $13,922,609.90 | $14,372,054.68 |
| 107380 - Prepaid Expense | $294,937.96 | $243,455.99 |
| 107390 - Security Deposits | | |
| 107390.32 - Campus/LaMarsa | $10,500.00 | $10,500.00 |
| Total - 107390 - Security Deposits | $10,500.00 | $10,500.00 |
| 107395 - ERTC Credit - Receivable | $0.00 | $460,872.96 |
| Total Other Current Asset | $14,228,047.86 | $15,086,883.63 |
| Total Current Assets | $14,879,072.90 | $15,447,154.15 |
| Fixed Assets | | |
| 107500 - Fixed Assets | | |
| 107700 - Furniture & Fixtures | $362,085.36 | $351,331.36 |
| 107715 - Leasehold Improvements | $4,555,368.80 | $4,475,818.88 |
| Total - 107500 - Fixed Assets | $4,917,454.16 | $4,827,150.24 |
| 107710 - Office Equipment | $114,936.23 | $114,936.23 |
| 107711 - Software | $85,266.58 | $85,266.58 |
| 107713 - Automobiles | | |
| 107713.25 - 2009 Ford Econoline Van | $0.00 | $19,450.00 |
| 107713.50 - 2019 Chevrolet Box Truck | $43,575.50 | $43,575.50 |
| 107713.75 - 2023 Ram Promaster | $60,153.44 | $0.00 |
| Total - 107713 - Automobiles | $103,728.94 | $63,025.50 |
| 107714 - Equipment | $5,329.42 | $0.00 |
| 107715.99 - Oracle NetSuite | $129,450.00 | $129,450.00 |
| 107720 - Accumulated Depreciation | ($4,100,446.50) | ($4,023,993.54) |
| Total Fixed Assets | $1,255,718.83 | $1,195,835.01 |
| Other Assets | | |
| 107750 - Other Assets | | |
| 107760 - Loan Costs | | |
| 107760.30 - State Street Loan | $3,500.00 | $3,500.00 |
| 107760.32 - Campus Expansion | $3,000.00 | $3,000.00 |
| 107760.35 - Victor's Loan | $2,531.00 | $2,531.00 |
| Total - 107760 - Loan Costs | $9,031.00 | $9,031.00 |
| 107770 - Intangible | | |
| 107770.01 - Goodwill - AAB | $1,008,171.19 | $1,008,171.19 |
| 107770.02 - Covenant (AAB Non-compete) | $400,000.00 | $400,000.00 |
| 107770.03 - Lease Surrender - State St-MLC | $502,500.00 | $502,500.00 |
| 107770.04 - Trademark - Moe's | $10,000.00 | $10,000.00 |
| 107770.05 - Goodwill - Moe's | $260,000.00 | $260,000.00 |
| Total - 107770 - Intangible | $2,180,671.19 | $2,180,671.19 |
| 7755 - InterCompany | $448,159.58 | $462,356.08 |
| Total - 107750 - Other Assets | $2,637,861.77 | $2,652,058.27 |
| 107775 - Accum Amort - Intangible Assets | ($923,335.14) | ($829,456.14) |
| 107780 - Accumulated Amortization | ($323,110.43) | ($271,610.39) |
| Total Other Assets | $1,391,416.20 | $1,550,991.74 |
| Total ASSETS | $17,526,207.93 | $18,193,980.90 |
| Liabilities & Equity | | |
| Current Liabilities | | |
| Accounts Payable | $6,095,849.43 | $7,054,431.63 |
| Credit Card | | |

| Financial Row | Current (As of 12/31/2023) | Prior Year (As of 12/31/2022) |
|---|---|---|
| 208010 - Credit Card | | |
| 208010.01 - Amex Corporate Gold Card | $0.00 | $39,825.65 |
| 208010.02 - MDen Inc - Chase Visa | $40,795.67 | $58,371.56 |
| 208010.03 - Sam's MasterCard | $0.00 | ($6.00) |
| 208010.04 - Amex - Other (Platinum) | $228,361.94 | $0.00 |
| Total - 208010 - Credit Card | $269,157.61 | $98,191.21 |
| Total Credit Card | $269,157.61 | $98,191.21 |
| Other Current Liability | | |
| 208050 - Current Liabilities | | |
| 208400 - Payroll Liabilities | ($1,494.20) | ($1,584.90) |
| 208500 - Notes Payable | | |
| 208557 - Loan#201529 (Camp-2nd) | $160,178.40 | $254,313.59 |
| Total - 208500 - Notes Payable | $160,178.40 | $254,313.59 |
| 208560 - MDen LOC Payable | | |
| 208570.01 - BoAA LOC #100184 | $2,150,000.00 | $2,150,000.00 |
| Total - 208560 - MDen LOC Payable | $2,150,000.00 | $2,150,000.00 |
| 208580 - MDen InterCompany | $1,543,947.89 | $1,292,822.89 |
| Total - 208050 - Current Liabilities | $3,852,632.09 | $3,695,551.58 |
| 208105 - GM Financial | $15,442.17 | $23,679.91 |
| 208106 - UniFi Equipment Finance (Van) | $53,914.17 | $0.00 |
| 208190 - Sales Tax Payable | $223,244.81 | $857,620.91 |
| 208191 - MI FTE Business Tax Payable | $90,000.00 | $90,000.00 |
| 208195 - BestApps - GFX Partnership | $1,183.76 | $15,878.65 |
| 208200 - Gift Card Liability | $825,692.59 | $794,777.53 |
| 208491 - Accrued Royalties - UM Contract | $2,134,263.86 | $3,399,063.27 |
| 299999 - Deferred Revenue | | |
| 299999.10 - Banked vs. Shipped | $178,943.97 | $153,054.32 |
| Total - 299999 - Deferred Revenue | $178,943.97 | $153,054.32 |
| Customer Deposits | $1,809.88 | $1,588.81 |
| Total Other Current Liability | $7,377,127.30 | $9,031,214.98 |
| Total Current Liabilities | $13,742,134.34 | $16,183,837.82 |
| Long Term Liabilities | | |
| 208600 - Long Term Liabilities | | |
| 208601 - Federal Disaster Loan - SBA | $500,000.00 | $500,000.00 |
| 208656 - Note Payable - MLC | $157,220.93 | $157,220.93 |
| Total - 208600 - Long Term Liabilities | $657,220.93 | $657,220.93 |
| 208602 - Accrued Interest (on EIDL Loans) | $2,634.15 | $32,850.15 |
| Total Long Term Liabilities | $659,855.08 | $690,071.08 |
| Equity | | |
| 338720 - Common Stock | $8,948.00 | $8,948.00 |
| 338760 - Paid in Capital | $9,037.84 | $9,037.84 |
| 339000 - Shareholder Distributions | ($790,600.00) | $0.00 |
| Retained Earnings | $1,302,086.16 | ($407,443.78) |
| Net Income | $2,594,746.51 | $1,709,529.94 |
| Total Equity | $3,124,218.51 | $1,320,072.00 |
| Total Liabilities & Equity | $17,526,207.93 | $18,193,980.90 |

The M Den

# Custom Income Statement
# From Jan 2024 to Aug 2024

| Financial Row | Amount |
|---|---:|
| Ordinary Income/Expense | |
|   Income | $27,979,405.71 |
|   Cost Of Sales | $15,875,990.68 |
|   Gross Profit | $12,103,415.03 |
|   Expense | |
|     605140 - Advertising and Promotion | $362,256.39 |
|     605144 - Internet Connection | $28,406.76 |
|     605160 - Automobile Expense | $54,789.86 |
|     605170 - Bad Debts | $25,333.19 |
|     605190 - Bank Fees | $29,109.21 |
|     605195 - Business Licenses and Permits | $1,571.60 |
|     605200 - Cash Over and Short | ($5,154.33) |
|     605220 - Contract Labor | $151,450.82 |
|     605240 - CC Merchant Processing Fees | $1,129,472.88 |
|     605290 - Depreciation Expense | $50,968.64 |
|     605291 - Amortization | $96,919.36 |
|     605310 - Donations & Contributions | $6,615.00 |
|     605330 - Dues and Subscriptions | $3,931.00 |
|     605450 - Employee Benefits | $299,442.98 |
|     605455 - 401k Match Company Contribution | $57,968.81 |
|     605460 - Insurance Expense | $111,632.25 |
|     605520 - Legal & Accounting | $298,309.87 |
|     605545 - Equipment Rental | $3,019.11 |
|     605546 - Equipment Lease | $8,654.87 |
|     605550 - Meals and Entertainment | $7,822.45 |
|     605560 - Merchandise | $54,933.60 |
|     605570 - Miscellaneous Expense | ($4,531.48) |
|     605600 - Payroll Service | $26,565.30 |
|     605650 - 401K Plan Administration | $940.00 |
|     605665 - Professional Fees | $312,164.52 |
|     605740 - Rent Expense | $2,514,818.81 |
|     605745 - Royalties (Mich Contract) | $2,082,866.87 |
|     605746 - Player NIL Merchandise | $107,027.00 |
|     605750 - Promotion Expense | $15,985.00 |
|     605755 - Repairs and Maintenance | $48,385.48 |
|     605780 - Salaries & Wages | $2,994,587.09 |
|     605795 - Service Contracts | $110,708.94 |
|     605800 - Shipping - UPS | $1,652,912.16 |
|     605805 - USPS Catalog | $34,014.35 |
|     605810 - Supplies | $163,929.46 |
|     605815 - Taxes | $4,500.00 |
|     605820 - Use Tax | $2,681.83 |
|     605850 - Unemployment Taxes | $32,277.77 |
|     605860 - FICA | $222,834.74 |
|     605890 - Sales Tax | $169.91 |
|     605910 - Property Taxes | $196,482.08 |
|     605920 - Telephone Expense | $31,881.68 |
|     605930 - Travel & Entertainment Expense | $3.60 |
|     605980 - Utilities | $90,468.80 |
|   Total - Expense | $13,419,128.23 |
|   Net Ordinary Income | ($1,315,713.20) |
| Other Income and Expenses | |
|   Other Income | |
|     999900 - Other Income | |
|       999901 - Interest Income | $33.21 |
|     Total - 999900 - Other Income | $33.21 |

| Financial Row | Amount |
|---|---|
| Total - Other Income | $33.21 |
| Other Expense | |
| 999950 - Other Expenses | |
| 999951 - Interest Expense | $240,436.03 |
| Total - 999950 - Other Expenses | $240,436.03 |
| Total - Other Expense | $240,436.03 |
| Net Other Income | ($240,402.82) |
| Net Income | ($1,556,116.02) |

# Custom Balance Sheet 8
## End of Aug 2024

| Financial Row | Amount |
|---|---:|
| ASSETS | |
| Current Assets | |
| Bank | $1,208,170.50 |
| Accounts Receivable | $171,703.68 |
| Other Current Asset | |
| 107200 - Inventory | $7,172,221.84 |
| 107379 - Prepayments (vendor clearing acct) | $21,760.00 |
| 107380 - Prepaid Expense | $295,535.07 |
| 107390 - Security Deposits | |
| 107390.32 - Campus/LaMarsa | $10,500.00 |
| Total - 107390 - Security Deposits | $10,500.00 |
| Total Other Current Asset | $7,500,016.91 |
| Total Current Assets | $8,879,891.09 |
| Fixed Assets | |
| 107500 - Fixed Assets | |
| 107700 - Furniture & Fixtures | $362,085.36 |
| 107715 - Leasehold Improvements | $4,596,948.80 |
| Total - 107500 - Fixed Assets | $4,959,034.16 |
| 107710 - Office Equipment | $114,936.23 |
| 107711 - Software | $85,266.58 |
| 107713 - Automobiles | |
| 107713.50 - 2019 Chevrolet Box Truck | $43,575.50 |
| 107713.75 - 2023 Ram Promaster | $60,153.44 |
| Total - 107713 - Automobiles | $103,728.94 |
| 107714 - Equipment | $5,294.70 |
| 107715.99 - Oracle NetSuite | $177,390.00 |
| 107720 - Accumulated Depreciation | ($4,151,415.14) |
| Total Fixed Assets | $1,294,235.47 |
| Other Assets | |
| 107750 - Other Assets | |
| 107760 - Loan Costs | |
| 107760.30 - State Street Loan | $3,500.00 |
| 107760.32 - Campus Expansion | $3,000.00 |
| 107760.35 - Victor's Loan | $2,531.00 |
| Total - 107760 - Loan Costs | $9,031.00 |
| 107770 - Intangible | |
| 107770.01 - Goodwill - AAB | $1,008,171.19 |
| 107770.02 - Covenant (AAB Non-compete) | $400,000.00 |
| 107770.03 - Lease Surrender - State St-MLC | $502,500.00 |
| 107770.04 - Trademark - Moe's | $10,000.00 |
| 107770.05 - Goodwill - Moe's | $260,000.00 |
| Total - 107770 - Intangible | $2,180,671.19 |
| 7755 - InterCompany | |
| 107755.03 - Due from Stadium Properties | $584,139.54 |
| Total - 7755 - InterCompany | $584,139.54 |
| Total - 107750 - Other Assets | $2,773,841.73 |
| 107775 - Accum Amort - Intangible Assets | ($985,921.14) |
| 107780 - Accumulated Amortization | ($357,443.79) |
| Total Other Assets | $1,430,476.80 |
| Total ASSETS | $11,604,603.36 |
| Liabilities & Equity | |
| Current Liabilities | |
| Accounts Payable | $23,148,587.66 |
| Credit Card | $306,231.05 |
| Other Current Liability | |
| 208050 - Current Liabilities | |

| Financial Row | Amount |
|---|---|
| 208400 - Payroll Liabilities | |
| 208430 - 401k Contributions | $14,470.00 |
| 208440 - Employee HSA Contributions | $49.90 |
| 208450 - Employee Dental Premiums | ($259.56) |
| Total - 208400 - Payroll Liabilities | $14,260.34 |
| 208500 - Notes Payable | |
| 208557 - Loan#201529 (Camp-2nd) | $94,469.87 |
| Total - 208500 - Notes Payable | $94,469.87 |
| 208560 - MDen LOC Payable | |
| 208570.01 - BoAA LOC #100184 | $2,246,538.00 |
| Total - 208560 - MDen LOC Payable | $2,246,538.00 |
| 208580 - MDen InterCompany | |
| 208580.01 - To-MDen Properties | $397,000.04 |
| 208580.02 - To-State Street Properties | $1,322,535.30 |
| Total - 208580 - MDen InterCompany | $1,719,535.34 |
| Total - 208050 - Current Liabilities | $4,074,803.55 |
| 208105 - GM Financial | $8,728.86 |
| 208106 - UniFi Equipment Finance (Van) | $48,096.05 |
| 208150 - Accrued Purchases | $99,445.61 |
| 208190 - Sales Tax Payable | |
| 208190.10 - SUT Payable MI | $532,382.65 |
| Total - 208190 - Sales Tax Payable | $532,382.65 |
| 208200 - Gift Card Liability | $1,101,183.58 |
| 208491 - Accrued Royalties - UM Contract | $8,918,009.88 |
| 299999 - Deferred Revenue | |
| 299999.10 - Banked vs. Shipped | $87,780.55 |
| Total - 299999 - Deferred Revenue | $87,780.55 |
| Customer Deposits | $3,324.47 |
| Total Other Current Liability | $14,873,755.20 |
| Total Current Liabilities | $38,328,573.91 |
| Long Term Liabilities | |
| 208600 - Long Term Liabilities | |
| 208601 - Federal Disaster Loan - SBA | $500,000.00 |
| 208656 - Note Payable - MLC | $157,220.93 |
| Total - 208600 - Long Term Liabilities | $657,220.93 |
| Total Long Term Liabilities | $657,220.93 |
| Equity | |
| 338720 - Common Stock | $8,948.00 |
| 338760 - Paid in Capital | $9,037.84 |
| 339000 - Shareholder Distributions | ($748,000.00) |
| Retained Earnings | ($25,095,061.30) |
| Net Income | ($1,556,116.02) |
| Total Equity | ($27,381,191.48) |
| Total Liabilities & Equity | $11,604,603.36 |

# EXHIBIT D

**OPERATING STATEMENT (P&L)**

Period Ending: August 31, 2024

Case No: 24-47922-tjt

| | Current Month | Total Since Filing |
|---|---|---|
| Total Revenue / Sales | $ 1,789,152 | $ 1,789,152 |
| Cost of Sales | $ 965,413 | $ 965,413 |
| **GROSS PROFIT** | $ 823,738 | $ 823,738 |
| **EXPENSES:** | | |
| Officer Compensation | $ 24,181 | $ 24,181 |
| Salary Expenses other Employees | $ 124,459 | $ 124,459 |
| Employee Benefits & Pensions | $ 3,186 | $ 3,186 |
| Payroll Taxes | $ 11,906 | $ 11,906 |
| Other Taxes | $ - | $ - |
| Rent and Lease Expense | $ 21,996 | $ 21,996 |
| Insurance | $ 983 | $ 983 |
| Automobile and Truck Expense | $ 5,645 | $ 5,645 |
| Utilities (gas, electric, phone) | $ 2,223 | $ 2,223 |
| Depreciation | $ - | $ - |
| Travel and Entertainment | $ - | $ - |
| Repairs and Maintenance | $ 8,854 | $ 8,854 |
| Advertising | $ 8,359 | $ 8,359 |
| Supplies, Office Expense, etc. | $ 29,160 | $ 29,160 |
| Other Specify : Credit Card Processing Fees | $ 65,069 | $ 65,069 |
| Other Specify: Professional Fees & Service Contracts | $ 15,625 | $ 15,625 |
| **TOTAL EXPENSES:** | $ 321,646 | $ 321,646 |
| **NET OPERATING PROFIT/(LOSS)** | $ 502,093 | $ 502,093 |
| Add:  Non-Operating Income: | | |
| Interest Income | | |
| Other Income | | |
| Less: Non-Operating Expenses: | | |
| Professional Fees : Legal Fees | $ 9,000 | $ 9,000 |
| Other : Interest Expense | $ 489 | $ 489 |
| **NET INCOME/(LOSS)** | $ 501,603 | $ 501,603 |

Form 2

| | Current Month | Prior Month | At Filing |
|---|---|---|---|

Period Ending: August 31, 2024
Case No: 24-47922-tjt

**ASSETS**

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| Cash: | $ 1,143,549 | | $ 1,159 |
| Inventory: | $ 7,172,240 | | $ 8,006,973 |
| Accounts Receivables: | $ 171,776 | | $ 161,687 |
| Insider Receivbles: | $ - | | $ - |
| Land and Buildings: | $ - | | $ - |
| Furniture, Fixtures & Equip: | $ 5,445,651 | | $ 5,445,651 |
| Accumulated Depreciation: | $ (4,151,415) | | $ (4,145,044) |
| Other: Prepaids/Deposits/Misc | $ 392,417 | | $ 354,415 |
| Other: Other Assets/Intangibles/Amortization | $ 1,430,477 | | $ 1,451,086 |
| **TOTAL ASSETS** | $ 11,604,694 | | $ 11,275,928 |

**LIABILITIES**

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| Post-petition Liabilities: | $ - | | $ - |
| Accounts Payable: | $ 14,039,416 | | $ 14,280,800 |
| Rent and Lease Payable: | $ - | | $ - |
| Wages and Salaries: | $ 14,260 | | $ (25,033) |
| Taxes Payable: | $ 532,383 | | $ 425,565 |
| Other: | $ 5,764,782 | | $ 5,774,782 |
| **TOTAL Post-petition Liabilities** | $ 20,350,841 | | $ 20,456,114 |

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| Secured Liabilities: | | | |
| Subject to Post-petition: | | | |
| Collateral or Financing Order: | | | |
| All Other Secured Liabilities: LOC/Loans | $ 6,548,454 | | $ 6,556,793 |
| **TOTAL Secured Liabilities** | $ 6,548,454 | | $ 6,556,793 |

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| Pre-petition Liabilities: | | | |
| Taxes & Other Priority Liabilities: | | | |
| Unsecured Liabilities: | $ 157,221 | | $ 157,221 |
| Other: Accr Purchases, GC's, Royalties, InterCompany, MISC | $ 11,929,279 | | $ 11,988,506 |
| **TOTAL Pre-petition Liabilities** | $ 12,086,500 | | $ 12,145,727 |

**EQUITY**

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| Owners Capital: | $ (730,014) | | $ (730,014) |
| Retained Earnings-Pre Petition: | $ (25,094,971) | | $ (25,094,971) |
| Retained Earnings-Post Petition: | $ (1,556,116) | | $ (2,057,720) |
| **TOTAL Equity** | $ (27,381,101) | | $ (27,882,705) |
| **TOTAL LIABILITIES** | $ 38,985,795 | | $ 39,158,633 |
| **/AND EQUITY** | $ 11,604,694 | | $ 11,275,928 |

*Form 3*

**OPERATING STATEMENT (P&L)**

Period Ending: _____ September 30, 2024 _____

Case No: 24-47922-tjt

| | Current Month | Total Since Filing |
|---|---|---|
| Total Revenue / Sales | $ 2,129,176 | $ 3,918,328 |
| Cost of Sales | $ 1,164,067 | $ 2,129,481 |
| **GROSS PROFIT** | $ 965,109 | $ 1,788,847 |
| **EXPENSES:** | | |
| Officer Compensation | $ 41,582 | $ 65,763 |
| Salary Expenses other Employees | $ 295,440 | $ 419,899 |
| Employee Benefits & Pensions | $ 47,532 | $ 50,717 |
| Payroll Taxes | $ 27,230 | $ 39,136 |
| Other Taxes | $ 10 | $ 10 |
| Rent and Lease Expense | $ 209,867 | $ 231,863 |
| Insurance | $ 14,832 | $ 15,815 |
| Automobile and Truck Expense | $ 7,710 | $ 13,355 |
| Utilities (gas, electric, phone) | $ 20,150 | $ 22,373 |
| Depreciation | $ 18,486 | $ 18,486 |
| Travel and Entertainment | $ - | $ - |
| Repairs and Maintenance | $ 1,834 | $ 10,688 |
| Advertising | $ - | $ 8,359 |
| Supplies, Office Expense, etc. | $ 15,146 | $ 44,306 |
| Other Specify : Credit Card Processing Fees | $ 74,521 | $ 139,590 |
| Other Specify: Professional Fees  & Service Contracts | $ 57,348 | $ 72,973 |
| **TOTAL EXPENSES:** | $ 831,688 | $ 1,153,334 |
| **NET OPERATING PROFIT/(LOSS)** | $ 133,421 | $ 635,514 |
| Add:  Non-Operating Income: | | |
|   Interest Income | | |
|   Other Income | | |
| Less: Non-Operating Expenses: | | |
| Professional Fees : Legal Fees | $ - | $ 9,000 |
| Other : Interest Expense | $ 54,627 | $ 55,117 |
| **NET INCOME/(LOSS)** | $ 78,794 | $ 580,397 |

**BALANCE SHEET**

Period Ending: September 30,2024

Case No: 24-47922-tjt

| | Current Month | Prior Month | At Filing |
|---|---|---|---|
| **ASSETS** | | | |
| Cash: | $ 11,048,607 | $ 1,143,549 | $ 1,159 |
| Inventory: | $ 6,232,213 | $ 7,172,240 | $ 8,006,973 |
| Accounts Receivables: | $ 189,502 | $ 171,776 | $ 161,687 |
| Insider Receivbles: | $ - | $ - | $ - |
| Land and Buildings: | $ - | $ - | $ - |
| Furniture, Fixtures & Equip: | $ 5,457,636 | $ 5,445,651 | $ 5,445,651 |
| Accumulated Depreciation: | $ (4,157,786) | $ (4,151,415) | $ (4,145,044) |
| Other: Prepaids/Deposits/Misc | $ 449,309 | $ 392,417 | $ 354,415 |
| Other: Other Assets/Intangibles/Amortization | $ 1,472,568 | $ 1,430,477 | $ 1,451,086 |
| **TOTAL ASSETS** | $ 20,692,048 | $ 11,604,694 | $ 11,275,928 |
| | | | |
| **LIABILITIES** | | | |
| Post-petition Liabilities: | $ - | $ - | $ - |
| Accounts Payable: | $ 14,044,139 | $ 14,039,416 | $ 14,280,800 |
| Rent and Lease Payable: | $ - | $ - | $ - |
| Wages and Salaries: | $ - | $ 14,260 | $ (25,033) |
| Taxes Payable: | $ 638,326 | $ 532,383 | $ 425,565 |
| Other: Factors/CC's | $ 5,682,022 | $ 5,764,782 | $ 5,774,782 |
| **TOTAL Post-petition Liabilities** | $ 20,364,487 | $ 20,350,841 | $ 20,456,114 |
| | | | |
| Secured Liabilities: | | | |
| Subject to Post-petition: | | | |
| Collateral or Financing Order: | | | |
| All Other Secured Liabilities: Loans | $ 4,206,702 | $ 6,548,454 | $ 6,556,793 |
| **TOTAL Secured Liabilities** | $ 4,206,702 | $ 6,548,454 | $ 6,556,793 |
| | | | |
| Pre-petition Liabilities: | | | |
| Taxes & Other Priority Liabilities: | | | |
| Unsecured Liabilities: | $ 157,221 | $ 157,221 | $ 157,221 |
| Other: Accr Purchases, GC's, Royalties, InterCompany, MISC | $ 11,902,159 | $ 11,929,279 | $ 11,988,506 |
| **TOTAL Pre-petition Liabilities** | $ 12,059,380 | $ 12,086,500 | $ 12,145,727 |
| | | | |
| **EQUITY** | | | |
| Owners Capital: | $ (730,014) | $ (730,014) | $ (730,014) |
| Retained Earnings-Pre Petition: | $ (25,095,061) | $ (25,094,971) | $ (25,094,971) |
| Retained Earnings-Post Petition: | $ (1,477,323) | $ (1,556,116) | $ (2,057,720) |
| **TOTAL Equity** | $ (27,302,398) | $ (27,381,101) | $ (27,882,705) |
| | | | |
| **TOTAL LIABILITIES** | $ 36,630,569 | $ 38,985,795 | $ 39,158,633 |
| | | | |
| **/AND EQUITY** | $ 9,328,171 | $ 11,604,694 | $ 11,275,928 |

*Form 3*

# EXHIBIT E

**Heritage Collegiate Apparel, Inc., f/k/a M-Den, Inc.,**
**d/b/a The M Den**
**Liquidating Plan Projections**[1]

| | | 1-Feb-25 | | 1-May-25 |
|---|---|---|---|---|
| **Ending Balance Operating Account** | $ | 9,939,972.00 | $ | 9,859,972.00 |
| | | | | |
| **Plan Payments** | | | | |
| Class I Allowed Claim | | | $ | 3,642,694.00 |
| Class II Allowed Claim | | | $ | 500,000.00 |
| Class III Allowed Claim | | | $ | 3,558,991.61 |
| Class IV Allowed Claim[2] | | | $ | 1,443,926.00 |
| Class V Allowed Claim[3] | | | $ | - |
| Class VI Allowed Claim[4] | | | $ | 165,000.00 |
| Class VII Allowed Claim[5] | | | $ | - |
| Class VIII Allowed Claim | | | $ | 22,103.00 |
| Class IX Allowed Claim | | | $ | 8,701.84 |
| Priority Tax Claims | | | $ | 90,795.00 |
| Payments to Professional Fee Account | $ | 80,000.00 | $ | 80,000.00 |
| United States Trustee Fees | | | $ | 100,000.00 |
| **TOTAL PLAN PAYMENTS** | | | $ | 9,612,211.45 |
| | | | | |
| **Ending Balance**[6] | $ | 9,859,972.00 | $ | 247,760.55 |
| | | | | |
| **Beginning Balance Professional Fee Account** | $ | 620,520.00 | $ | 700,520.00 |
| Payment of Allowed Professional Fees Through Effective Date | | | $ | 671,000.00 |
| **Ending Balance Professional Fee Account** | | | $ | 29,520.00 |

[1]Because this is a liquidating plan, Debtor's does not have operating expenses and its only anticipated disbursements are the payments due under the Plan.

[2]Debtor disuptes TVT's filed Claim amount of $3,251,793.36 and instead believes the amount owed is closer to $1,443,926.

[3]Debtor believes the claim of Family Funding will be disallowed in its entirety as a result of the MCA Adversary.

[4]Debtor believes the claim of Vault Capital will be substantially reduced as a result of the MCA Adversary.

[5]Debtor believes the claim of Elemental will be disallowed in its entirety as a result of the MCA Adversary.

[6]The balance in the Operating Account and Professional Fee Account after payment of all Plan obligations will be transferred to the Liquidation Trust.